FILED by _____ D.C.

FEB 1 2 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DR. KURT MARIN, MAURICE SYMONETTE, ALFRED DAVIS
CLYDE MCPHATTER,  JAMES BUCKMAN AND JERIMIAH PARHAM

Plaintiffs

CASE:

Vs.

DADE COUNTY, DADE COUNTY EVICTION
SHERIFFS DEPT, DADE COUNTY CLERK OF
COURT, CITY OF NORTH MIAMI BEACH,
NORTH MIAMI BEACH POLICE DEPT, THE
CITY OF NORTH MIAMI BEACH BUILDING
AND ZONING DEPT, WASHINGTON MUTUAL
BANK F.A., WASHINGTON MUTUAL BANK,
JPMORGAN CHASE BANK, MIAMI, JUDGE
BARBARA ARECES, SHAPIRO FISHMAN and
GAC'E LAW FIRM.

Defendant(s)

_____/

**COMPLAINT**

1). VIOLATION OF SEC GAAP RULES
2). VIOLATION OF THE 1964 CIVIL RIGHTS
    ACT AND EQUAL PROTECTION CLAUSE OF
    THE 14TH AMENDMENTOF THE
    AMENDMENT OF THE US CONSTITUTION.
3). RESPA AND TILA VIOLATIONS
4).VIOLATION OF BANKRUPTCY
5).VIOLATION OF 7TH& 8TH AMENDMENT
6).VIOLATION OF OBAMA'S  PROTECTING
    TENANTS AT FORECLOSURE ACT OF 2009
7).FRAUD AND CONCEALMENT

1

8).WRONGFUL FORECLOSURE IN VIOLATION
   OF FLORIDA'S BILL 87
9).NO STANDING TO FORECLOSE
10). FIRST CAUSE OF ACTION AGAINST CLERK
    FOR DESTROYING FILE  IN VIOLATION OF
    FL. STATUE 119. 11(4)

11).VIOLATION OF DUE PROCESS SERVICE
   AND DEPRIVATION OF RIGHTS AND
   PERJURY GENERALLY UNDER COLOR
   LAW BY VIOLATING OF FLA. LAW BY
   VIOLATING OF FLA. STAT. 82 & 83.

]

**Jury trial requested**

INDEX
PARTIES AND JURISDITION
JURY TRIAL REQUESTED
DEMAND CLAIM OF RELIEF
FACTS

**FIRST CAUSE OF ACTION**- VIOLATION OF SEC GAAP,RULES
**SECOND CAUSE OF ACTION**-VIOLATION OF THE 1964 CIVIL RIGHTS ACT ANDEQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT OF THE AMENDMENT OF THE U.S. CONSTITUTION IN AN EFFORT TO KEEP BLACK PEOPLE OUTOF A WHITE NIGHBORHOOD
**THIRD CAUSE OF ACTION**- RESPA AND TILA VIOLATIONS: 15 U.S.C.A. §§ 1640 (a)(1)(2)(a)(i)
**FOURTH CAUSE OF ACTION**-VIOLATION OF BANKRUPTCY 11 U.S. Code § 362(a) (1)(2)(3)(4)(5)(6)(7(8)
**FIFTH CAUSE OF ACTION**-VIOLATION OF 7TH AND 8TH AMENDMENT AND DEPRIVATION OF RIGHTS AND PERJURY GENERALLY UNDER COLOR OF LAW BY VIOLATION OF FLORIDA LAW BY VIOLATING OF FLORIDA STATUE 82 & 83.
**SIXTH CAUSE OF ACTION**-IS VIOLATION OF OBAMAS PROTECTING TENANTS AT FORCLOSURE ACT OF 2009.
**SEVENTH CAUSE OF ACTION**-FRAUD AND CONCEALMENT:475.25 (b)(d1)
**EIGHTH CAUSE OF ACTION**-WRONGFUL FORECLOSURE IS IN VIOLATION OF HOUSE RULE 87
**NINETH CAUSE OF ACTION**-NO STANDING TO FORECLOSE IN VIOLATION OF FEDERAL 3.1 STANDING RULE
**TENTH CAUSE OF ACTION**- IS VIOLATION OF FLOFIDA STATUE 119. 11(4)
**ELEVENTH CAUSE OF ACTION**-VIOLATION OF DUE PROCESS OF SERVICE :FLA. RULES OF CIVIL PROCEEDURE 1.070 (A)(b)(c)(d)(e)(f)(g)(h)(i)

## PARTIES AND JURISDITION

**1)**. Plaintiff Kurt Marin is a resident of Miami Dade County and the prior owner of the single Family residence located at 3320 NE 165th st Miami, Dade County, in the state of Florida the legal description is: Eastern Shores 1 Addn PB 65-39 lot 8 BLK 6 lot size Irregular or 20413 4142 05 2002 1 coc 25872-3682 08 2007 4 or 28094-4012- 0809-11 parcel Identification Number: 07-2210-001-0080

**2)**. Defendant JPM  has operations in Miami Dade County Florida And other states Defendant JPM a New York  Corporation License to do Business in Florida, is in Aquire of certain assets and liabilities of WAMU from the Federal Deposit Insurance corporation ("FDIC) acting as receiver and chase claims to be the, Note Holder beneficiary or servicer for investment trust Of a loan Which is the Subject of this complaint Plaintiff Alfred Davis is a resident of Dade County and prior tenant of said property at 3320 NE 165th st. Miami Fla. 33160. Jerimiah Parham is a Resident of Dade County and a Prior Tenant of said property at 320 NE 165th st. Miami Fla. 33160.

**3)**. Plaintiff Clyde Mcphatter is a resident of Dade county and prior owner Property at 3320 NE 165th street Miami Fl. 33160. Defendant North Miami Beach police Dept. is located at: 16901 N.E. 19th  Ave. North Miami Beach. Defendant North Miami8 Beach Building and Zoning Dept. is Located at 17050 NE 19th Ave. North Miami Beach Fl. 33162 and is a Governmental Organization.

**4)**. Plaintiff Maurice Symonette is a resident of Miami Dade County Florida and Also prior owner of said property at 3320 NE 165th st Miami, Fl. 33160. **4A)**.Plaintiff James Buckman is a resident of Miami Dade County Florida and And a prior tenant of said property at 3320 NE 165th st Miami, fl. 33160.

**5)**. Shapiro Fishman & Gach'e LLP, are Attorneys for JPMorgan Chase Bank and also Washington Mutual Bank FA, and Washington Mutual Bank and they have a office that Is located at 24424 North Federal HWY. Suite 360 Boca Raton Floridan33431

## JURY TRIAL DEMANDED

**6)**. Plantiff requests a jury trial on all issues

## DEMAND CLAIM OF RELIEF

**7)**. Plaintiff's brings this action against JPM and Washington Mutual Bankfor S.E.C. Fraud, Violation of Bankruptcy Stay and Wrongful Foreclosure by fraudulently selling Plaintiff's property at a Foreclosure sale knowing that they don't have standing and knowing that they sold the NOTE on the Stock market and attempting to Evict Plaintiffs to deprive Plaintiff's of their residence Without any lawful claim to the Property and against the Clerk of the Court for assitsting JPM's fraud by deliberately and illegally Destroying the File andthe COPY of theNOTE that JPM Filed to hide JPM's fraud in Violation of Florida Statue 119.11(4) and for Clerk of the Courts Violation of Bankruptcy Stay.


### FACTS


Then JPMORGAN hereinafter called (JPMs) Bank used SEC Fraud by selling NOTE on the Market thereby getting paid off for the NOTE and then illegally foreclosing and trying to Quickly Evict us to hide their SEC FRAUD using discrimination and racism with the excuse of keeping Blacks out of a White neighborhood to illegally evict us because JPM Rep. Barry Gamel said we are NIGGERS who will take the property value down.Three days before the racist incident, Barry Gamel a realtor who claimed he worked with JPM Chase Bank drove by 3320 N.E. 165th St. my house, and said to Maurice, Al, Clyde and James "you Niggers are an insult, NIGGERS bring down the property value, your making it hard for us to sell property here" Gamel also said "your bank has foreclosed on you and I'm going to get you NIGGERS out, because NIGGERS bring the property value down." Then on or about 01/27/11 Barry Gamel was out watching as representatives of the<u>City of Miami Zoning Department accompanied by 11 police officers with rifles and guns out, bullet proof vest on, rammed our front door at 3320 N.E. 165th St. N. Miami Beach FL. 33160 after police hit the door which Maurice opened and police pointed guns at Maurice saying get on the ground, went in the house and the yacht without a warrant, got the yacht workers out through the house and out of the house ordered them down on the ground handcuffed them checked some of our ID's without any probable cause, while Gamel laughed with zoning person Gill Rosenkauf and High Fiveing police while neighbors watched. I asked the police sergeant why, he said the bank has</u>

foreclosed on this house and he said we are not supposed to be in the house with owner Clyde McPhatter, Maurice Symonette said the house is in bankruptcy, **see exb. ( 11 )**never foreclosed, no Judge ordered eviction and only a Sheriff not a regular police can evict. Then the sergeant said we'll talk to the Building Department person Gill Rosenkauf who we saw talking to Barry Gamel before police raided the house. Rosenkauf informed Plaintiffs that we had to vacate the premise because the house was a danger and uninhabitable since Plaintiffs did not receive city water. Plaintiffs home was using well water, like other homes in the community are already doing but no law has been brought up    Against people having well       water but they are charging us a $250.00 fine every day for not using City water **see exhibit**

**# ( 12 ).** Rosenkauf ordered Plaintiffs to vacate the property without probable cause. After asking for the City Hall rule in writing, Rosenkauf stated Chapter 8, Section 5 on the back of his city planning business card. He then posted a red notice on the door to condemn  the property(**see exhibit 13.),** The police searched the residence and ordered all the occupants to leave the home. The Police then locked the doors. Plaintiffs were forced to leave their Vehicles and walk on foot.The next day, Gamel was seen at the residence with anotheChaseBank realtor. They were changing the locks on the doors. Another Chase Bank person was seen removing property from the residence loading it on the Chase Bank Realtor's truck.Plaintiffs approached the JPM Bank Rep. and inquired as to where they were going with Plaintiffs property. They said they were instructed to remove the property by  JPMBank. They showed documents that showed the banks name. Maurice Symonette asked him for his card.  He said hold on a second and went to the truck to get another card, because something was written on his card.  He jumped into the truck and sped off. Defendants stole over $600,000.00 of equipment. The next day after the locks were changed Florida Power and Light (FPL) was observed turning off the power at the Residence.Their reason was that the North Miami Beach Zoning department ordered FPL To cut the power to the because the house was a "grow house" for Marijuana, an illegally controlled substance. When Plaintiffs went to the police department to complain about them calling our house a marijuana grow house the police were embarrassed and said after we have been evicted out of our house for 3 days

5

that we were allowed to go back in because there was no eviction and no Judges order and they were appalled because they (police) searched the whole house the day of the incident and saw no marijuana, just beautiful furniture.   And so therefore we are not going to allow the Zoning department to your house. And while protesting with the help of Tea Party, the police chief said we should sue Miami Beach.  Now the Zoning department and police  chief no longer work with the City of North Miami Beach.Plaintiffs did not grow marijuana at the premises and no evidence was discovered to counter this allegation. The removal of electricity, which caused the generator in our yacht to stop pumping out water from the boat. The 74 foot 4 story yacht sank and was a total loss. The dock**was also damaged while police kept Plaintiffs away from the premises.  See YouTube SymonettePalace bad3.**Defendants committed an illegal self-help eviction. The actions of the Defendants caused great harm and stress. On or about July 23, 2010 Plaintiffs son Jerimiah Parham who lived in the house was brought up on false charges for firing a firearm while defending his home from intruders at 3320 N.E. 165st. Miami Fl. 33160 all in an effort to get us Black people out of this White neighborhood.Plaintiff and his son were arrested because of the incident. Was racially motivated and prejudicial in violation of fourteenth amendment that preserves therights of a defendant in state court. States the following: because they don't want Blacks in their white neighborhood. A Police Officer hit the door which Maurice opened and police pointed guns at Maurice saying get on the ground, went in the house and the yacht without a warrant, got the yacht workers out through the house and out of the house ordered them down on the ground handcuffed them checked some of our ID's without any probable cause, while Gamel laughed with zoning person Gill Rosenkauf and High-Fiving police while neighbors watched. I asked the police sergeant why, he said the bank has foreclosed on this house and he said we are not supposed to be in the house, I said the house is in bankruptcy, never foreclosed, no Judge ordered eviction and only a Sheriff not a

regular police can evict. Then the sergeant said we'll talk to the Building Department person Gill Rosenkauf who we saw talking to Barry Gamel before police raided the house. Made us leave the nouse on foot. Then the next day we caught the JPM Reps. Changing the locks  then they sped away with all of our stuff in their JPM Truck JPM Bank  Was caught stealing $700.000.00 in property and recording equipment out of the house and changing locks to lock us out of our house with no court Order. We  want our property replaced or the money back tripled.  On or about July 25th 2012

detectives led by Detective Catlin searched our house  And Plaintiffs bedroom without a search warrant. While pretending to search Alfred Davis room to further harass us and to force us out of the white neighborhood on July 26th 2012 and they were obviously looking for money to take and detective said to Alfred Davis where is your money with witnesses see (**exhibit 14&15)** all in quest to steal and run black people out of the white neighborhood.Maurice Symonette was driving his Mercedes Benz, in North Miami near Biscayne Blvd. Police Officers  saw Maurice and recognized his face as he drove by them they then turned their Car around and made him pull over on a traffic stop, at the time of the stop the officer had no Objectively reasonable suspicion that Symonette was engaging in any criminal activity, after he Stopped the vehicle officer Marin ordered  Symonette out of the vehicle, in which he did,  officer Catlin searched the vehicle without Symonette's consent , officer Catlin entered the vehicle and Seized a fire arm that he had found in the glove compartment and he lied and said he found it on  The Passenger seat underneath some paperwork, and I have 5, witnesses with affidavits that said They saw Detective Catlin take the gun from out of the glove compartment **see exb. #16,17,18,19,&20**.  The Code and Zoning Department is trying to run us out of town because of the water situation the Zoning Dept. They say It is illegal to have well water in our area **see exhibit# ( 12 )**   but there are people in this neighborhood that have well water and they also said that our gate was to high over 5 feet but lots of White and mostly East Indians gates are well over 5 feet high . They're Acted out Racism and Discrimination to kick us Blacks out of a White Neighborhood also as an Excuse To evict us illegally with the help of Racism and SEC Fraud, as a result of  Said extreme and outrageous conduct by defendants and each of them, Plaintiffs has suffered Severe emotional distress.JPM Bank was caught stealing $700.000.00 in property and recording equipment out of the house and changing locks to lock us out of our house with no court Order. We want our property replaced or the money back tripled. And also in 8/6/2015 plaintiffs were arriving home at their  address again, at the 3320 NE 165thst. to find that there house had been broken into by people from the bank JPMorgan Chase Bank) they were still in the house, and the police was there with them also, they had changed the locks,on see **exhibit video 2b. gods2.com** of police and bank at house and said that they were from the Bank and were there to evict us, but we were still in Bankruptcy at the time and there  they had taken some of the our property out, some from each room, and put a cover over the pool we showed them the Bankruptcy and told them we were not evicted yet, and they had already loaded some of our stuff in a truck that they

drove to the house in. One of the owners of the house told them the bank they had to leave because the house was still under bankruptcy and they would be in a lot of trouble if they tried to take the house without a writ or sheriff then they left after being shown the bankruptcy and still had plaintiffs property on their truck full of our possessions and tools totaling in over $100,000.00 all this done with SEC FRAUD.

## FIRST CAUSE OF ACTION: VIOLATION OF SEC GAAP RULES

According to the SEC Screen Shots in the corner of the this page this NOTE is now and still on the Market as a security/bond/stock as of Jan. 6, 2016 **exhibit#7pg.6.** According to the GAAP FASB FAS 140 Rule says that when a NOTE is sold on the Market as a Security the NOTE must be burned and Destroyed and can never be used as a foreclosure instrument because that is SEC Fraud because the IRS has Written the Destroyed loss off, then the insurance paid the loss off and then the Bank sold the Note on the Market so the bank got the money owed to them by Kurt Marin three times plus all the the different times they sold the Note on the Market Illegally while the GAAP Rules say you cannot foreclose on aNote that's SOLD on the Market they foreclose anyway without being PUNISHED they are just openly taking property this is WAR against the WHITE PEOPLE and BLACK PEOPLE in AMERICA by CAINAAN and ISHMAEL. (RACISTS CHEROKEES) the BANKSTERS/INDIAN GIVERS against Mora and BIBLE LAW Proverbs 22:27-28 don't be a mean man who loans Money and when not paid back take the bed from under our back (PROPERTY) AT THE SEVENTH YEAR JUBILEE YOU FORGIVE THE LOAN (TAX WRIGHTE OFF AS A LOSS) YOU CAN'T TAKE THEIR PROPERTY THE BANK GOT THERE PAY OFF and the Judges are allowing this Piratcy Nehemiah 5:1-8 oh Kings REPENT.

That's why the FDIC P&A (Purchase &AssumptionAgreement)page17 article 3 sec.3.3 says that for JPM to own the NOTE (and give JPM standing to Foreclose) the FDIC must

sign (endorse) the NOTE over to JPM. Before they CAN foreclose and JPM. Never got the Note signed over them from the FDIC so JPM. is just stealing our property and don't use we are deadbeat home owners as your righteous indignatious way to say you don't then you give your house to JPM. ILLEGALLY! And in righteousness it's wrong for JPM. to take the house because they borrowed and didn't pay. In the KJV. Bible Proverbs 22: 26-29 don't be a mean man and take the bed from under my back because I didn't pay. amazingly you can't foreclose on CHEROKEE Indians and your not supposed to foreclose on American Citizens whose properties are Homesteading   Plaintiffs state that they have been beset by continuous bankruptcies, frivolous and inappropriateMotion by appellants. JPMorgan and it's ATTORNIES Shapiro Fishman and Gach are the Lying thieves whocall good evil and evil good ISAIAH 5:20 because we are good guys helping people www.americangala.com and are not Dead Beat Homeowners

seeking to live for free because we were making our payments on time then suddenly they (WAMU)stopped taking our payments without us knowing filed foreclosure all without our knowledge we asked for the NOTE (to make the correct payments after finding out by accident while checking on another case that WAMU filed a Complaint against us for this property 3320 ne 165st MIAMI Fl. Even though we were actually paying on time but with no Notice to us on the Complaint. But when we contacted them by phone WAMU TOLD us we were right and it would be corrected, then suddenly they sent our payments back and JPM took over and all without notice to us and got a Judgement and sent our money back. Then JPMorgan sent the NMB police by and evicted, arrested and handcuffed us on the ground in front of the neighbors at that house and made us walk and leave our cars and then a day after illegal Eviction Police let us back to the house after they found out that JPMorgan lied and we saw who identified themselves as JPM Reps. Changing our locks and they had stole almost everything out of our house wow! And they call us wrong GOD help us we have actually no rights see **exhibits #11**. All this done 01/27/11 **exhibit #13** without the foreclosure sale happening yet or a COURT ORDER and while we were in BANKRUPTCY 11/19/10 through 08/08/11. See **exhibit #11**. JPM does not have standing in any part of this property to make any claims or demands for any payments of any sort, because I now have absolute Proof that JPM committed fraud on the court, as now proof from CertifiedSecuritization Auditor . that is qualiied and experienced to providethe necessaryProfessional service that is trained to navigate and perform searches on the Bloomberg terminal in regards to the  automatic tracking and determination of mortgage and loan related documents and information as seen **on exhibit 7#**. An affidavit from Expert Witness

Eliyshuwa ShaphatYisrael a certified SEC/CFLA AUDITOR  explaining and proving with the Prospectus Screen Shots on Stock Market the transactions that tookPlace on said propery at 3320 NE 165thstreet Mia. Fl. 33165 of all the screen shots that took place with the securities transactions during the time the property Was sold to owner Kurt Marin  up until the present time **see exhibit 7, pgs. 2-5,** and aLicensed BloombergMortgage securitization Auditor(SEC) of the CFLA.**see exb.#7, pg.1.**This shows that Washington Mutual Bank Aa/k/a Federal Savings **exhibit7,pg.2** Bank sold note right after the closing of the property 07/14/06 to WAMU Capital Corp. who on pg. one of the Screen Shot Sold NOTE on Market as a Security 09/26/06 with US BANK National Association as Trustee**Exhibit# 7pg.6** This proves that Washington Mutual Bank FA sold the Note as a Security 09/26/06 &after selling the NOTE one year later April 25. 2007 without noticing us filed a notice of lis **Pendens exhibit A**. Then WAMU was taken over by the FDIC Sept 25 2008 and all WAMU assets to JPM**exhibit 4**. But this did not include our NOTE because our NOTE was already sold as a security on the Market **exhibit7pg.6** and according to the SEC Screen Shots in the corner of the this  page this NOTE  is now and still on the Market as a security/bond/stock as of Jan. 6. 2016 **exhibit#7pg.6.**A ccording to the GAAP FASB FAS 140 Rule says that when a NOTE is sold on the Market as a Security the NOTE must be burned and Destroyed and can never be used as a foreclosure in trument because that is SEC Fraud because the IRS has written the Destroyed loss off,  then the insurance paid the loss off and then sold it on the Market.That's why the FDIC P&A (Purchase &AssumptionAgreement)page 17 article 3 sec.3.3 says that for JPM  to own the NOTE (and give JPM standing to Foreclose) the FDIC must sign (endorse) the NOTE over to JPM.

**A1.**    On page 17 of the Purchase & Assumption Agreement between the FDIC and JPM article 3

section 3.3 says JPM cannot own the NOTE from the FDIC that came from Washington Mutual Bank, the FDIC must Possess the NOTE and sign the NOTE over to JPM before which JPM  cannot own, sale or foreclose on the NOTE.  And our NOTE was never possessed by the FDIC and the FDIC never signed the NOTE over to JPM so therefore JPM  does not own our NOTE and is not the Servicer, why?

A.    Because **Washington Mutual Bank FA** which is ***Federal Savings Bank***  to whom Plaintiffs signed the NOTE with **see exhibit 5& 6**, got Paid off when they sold the NOTE to**Washington Mutual Bank** a different entity which is almost the same name but without the letters ***FA*** at the end of their name **see exhibit (6)** This is also in violation of due

process of the  law  of the 5th and 14th Amendment of the United States Constitution because the TILA Violation of Mortgage Servicing Rules 12-CFR-1026.39 says that the Bank must tell Owner when they Transfer the NOTE but to Committt Fraud they hid the transfer to hide the fact that they were putting the NOTE on the Market that's why  Washington Mutual Bank is the FORECLOSER on, us not Washington Mutual Bank FA. But even in the NOTE itself it says that they must tell the owner when the NOTE is transferred to another entity.

B.  Then Washington Mutual Bank sold the NOTE on the Market through WAMU Capital Corp. put the NOTE under the Cusip # 93363NAA3 see top of page 7 of the screen shot **exhibit #7, Page 7)**lines 3&8 in a pool of 404 other NOTEs called WaMu Mortgage Pass- Through Certificates Series 2006-AR12 Trust sold for $1,694,778,749 divided by 404 NOTES in that pool = $4.194 million made that paid off our 1.9 million dollar NOTE on the Stock Market and with Washington Mutual Bank as Servicer and US Bank NA as Trustee **(NO WHERE IS  JPM  SHOWN AS OWNER OR SERVICER ON SCREEN SHOTS MARKET SELL WHICH IS  STILL TRADING FROM SEPT. 2006 UNTIL JAN. 2016 ). See page 6 at bottom of SCREEN SHOT exhibit 7.**  So JPM is committing S.E.C. Fraud. Why?

C.  GAAP FSAB FSB Rule 140 says that once the NOTE is Traded on Market the NOTE must be Burned & Destroyed because the NOTE is paid off and cannot exist at the same time as the **NOTE** and never be used as foreclosure instrument again because that's Double Dipping and defrauding the investors who are made to believe that the NOTEs that is now a Bond are performing and is SEC Fraud for them to be investing in NOTES that are in Default with no hope unknowingly by investors for a return.

D.  **JPMorgan v. Sharone D. Waisome** The JPM and WAMU  Scheduler of NOTEs Expert Witness LARENCE NARDIS said in his Deposition there is absolutely no Ownership of Property NOTEs from Washington Mutual Bank through the FDIC to JPM,  so therefore JPM   has no Standing to foreclose on Washington Mutual Bank NOTEs.See in the deposition of former employee of WAMU System Analyist  Lawrence Nardi, taken on May 9, 2012, **Exhibit 9,** Lawrence Nardi  testified in court  as seen in Deposition on page 261 From this case that there was no assignments of mortgage, and there was no allonges, and in the thousands of Loans that were a part of the purchase he had never seen an assignment of mortgage and that no assignments exist or allonges or anything

11

transferring ownership from WAMU to JPM  from the FDIC.  In fact in the whole P&A Agreement between the FDIC and JPM from Washington Mutual Bank there are no mortgage loans promisary notes at all. There are only auto notes college loans and credit cards Therefore JPM cannot own any notes and therefore JPM has no standing to foreclose on the promissory notes.

**E.    ERIC MAINS V. JPMORGAN and WASHINGTON MUTUAL ET AL. This FDIC**

Expert Witness and former Employee of the FDIC, responsible for closing WAMU and acting as the failed WAMU's Receiver. see page 6 pargraph 26 of ERIC MAINS  v. JPM, 15-CV-00036SEB-WGH, Complaint, Eric Mains was in charge of Robert  C. Schoppe of the FDIC who signed the Operation of Law Document that JPM  uses in Court to falsely prove Ownership of NOTEs like in Our Case see **exhibit (4).** ERIC MAINS says that JPM doesn't OWN the Washington Mutual Bank NOTEs.

F.    Can't own NOTE through Operation of Law see JAVAHERI V. JPM  and KIM v.  JPM , Judge O.H. EATON in Florida Brevard County) say JPM  admits that they can't own the Note by operation of law. **exhibit# 8.** (a case that JPMorgan is hiding). and the Florida 4th DCA  GAINUS WRIGHT 111  V.  JPM,  JPM vs.  Gary S. Snyder, and Jane Snyder,  Fiorito v.  JPM   Chase  Bank  National  Association  4th  DCA  says  you  can't  own  the  Note  by operation of law!! You must get the note signed over to you to the FDIC and you must file the note with the clerk of the court to have standing to foreclosure.

G.    The sale of Washington Mutual Bank Assets from the FDIC to JPM was never finished while JPM  was foreclosing on us in Sept. 25. 2008 without owning the NOTE because JPM  asked for more time to close the sale up until August 30. 2010 see **exhibit (10)** and until this day (2016) sale has not closed. So that even if WAMU would not have sold the NOTE on the Stock Market they were and are foreclosing without STANDING.

H.     Mclean v. JPM Florida says you can't foreclose on a NOTE before you own it so JPM  has no standing to Foreclose.

I.  **HOUSE BILL 87** Florida's Governor Rick Scott,  Sighed a new foreclosure bill into

Law on 6/07/2013 called " House Bill 87" Requires lender to produce the note with Its

complaint, and limits deficiency Judgments. Starting July 1, 2013 (the plaintiff  the

owner of the loan) must prove its right to foreclose by filing additional items along with the foreclosure Complaint including:

1. A certification that the plaintiff is in possession of the original promissory Note.

2. if the Note has been lost, a lost note affidavit with a clear chain of of endorsements, transfers or assignments of the promissory Note.and the NOTE cannot exist at the sametime as the Security which Is now turned into a **BOND exhibit#7pg.16-18**. because that is SEC Security Fraud because they're defrauding into believing that that BOND (NOTE) is performing when it's actually Defaulted and they are double dipping getting money foreclosing on Property and Stock Market money from investors this is ILLEGAL CRAZY!

**AFFIDAVIT OF EXPERT WITNESS  AND PRIVATE INVESTIGATOR  WILLIAM**

A.  J. PAATALO,  A. PROFESSIONAL LICENSED FORENSIC INVESTIGATOR  WITH PROOF THAT JPMORGAN DOES NOT OWN THE LOAN TO THIS PROPERTY

See **exhibit (8B)  pages 1-18  AFFIDAVIT**

Exhibit # 1  William Paatalo's  Resume, has conducted over 900 investigations
Exhibit # 2  JPMorgan Chase press release
Exhibit # 3  Deposition Transcript
Exhibit # 4  Crystal Davis Deposition
Exhibit # 5 3270 Explorer: Transfer History" screen shot
Exhibit # 6  chase "investor" disclosure letters
Exhibit # 7  unrelated"Assignment of Mortgage"
Exhibit # 8  Affiliated Business Disclosure
Exhibit # 9  Washington Mutual Bank, F.A.

**SECOND CAUSE OF ACTION-VIOLATION OF THE 1964 CIVIL RIGHTS ACT AND EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT OF  THE  U.S. CONSTITUTION INAN EFFORT TO STOP BLACK PEOPLE FROM LIVING IN A**

**WHITE NEIGHBORHOOD**

Al, Clyde and James "you Niggers are an insult, NIGGERS bring down the property value, your making it hard for us to sell property here" Gamel also said "your bank has foreclosed on you and I'm going to get you NIGGERS out, because NIGGERS bring the property value down." Then on or about 01/27/11 Barry Gamel was out watching as representatives of the City of Miami Zoning Department accompanied by 11 police officers with rifles and guns out, bullet proof vest on, rammed our front door at 3320 N.E. 165th St. N. Miami

Beach FL. 33160 after police hit the door which Maurice opened and police pointed guns at Maurice saying get on the ground, went in the house and the yacht without a warrant, got the yacht workers out through the house and out of the house ordered them down on the ground handcuffed them checked some of our ID's without any probable cause, while Gamel laughed with zoning person Gill Rosenkauf and High Fiveing police while neighbors watched. I asked the police sergeant why, he said the bank has foreclosed on this house and he said we are not supposed to be in the house with owner Clyde McPhatter, Maurice Symonette said the house is in bankruptcy, see exb. ( 11 ) never foreclosed, no Judge ordered eviction and only a Sheriff not a regular police can evict. Then the sergeant said we'll talk to the Building Department person Gill Rosenkauf who we saw talking to Barry Gamel before police raided the house. Rosenkauf informed Plaintiffs that we had to vacate the premise because the house was a danger and uninhabitable since Plaintiffs did not receive city water. Plaintiffs home was using well water, like other homes in the community are already doing but no law has been brought up   Against people having well water but they are charging us a $250.00 fine every day for not using City water see exhibit # ( 12 ). Rosenkauf ordered Plaintiffs to vacate the property without probable cause. After

14

asking for the City Hall rule in writing, Rosenkauf stated Chapter 8, Section 5 on the back of

his city planning business card. He then posted a red notice on the door to condemn   the

property**(see exhibit 13.),** The police searched the residence and ordered all the occupants

to leave the home. The Police then locked the doors. Plaintiffs were forced to leave their

Vehicles and walk on foot. The next day, Gamel was seen at the residence with another

Chase Bank realtor. They were changing the locks on the doors. Another Chase Bank

person was seen removing property from the residence loading it on the Chase Bank

Realtor's truck. Plaintiffs approached the JPM Bank Rep. and inquired as to where they

were going with Plaintiffs property. They said they were instructed to remove the property

by  JPM Bank. They showed documents that showed the banks name. Maurice Symonette

asked him for his card.  He said hold on a second and went to the truck to get another card,

because something was written on his card.  He jumped into the truck and sped off.

Defendants stole over $600,000.00 of equipment. The next day after the locks were changed Florida

Power and Light (FPL) was observed turning off the power at the Residence. Their reason was

that the North Miami Beach Zoning department ordered FPL To cut the power to the because

the house was a "grow house" for Marijuana, an illegally controlled substance. When Plaintiffs

went to the police department to complain about them calling our house a marijuana grow

house the police were embarrassed and said after we have been evicted out of our house for 3

days that we were allowed to go back in because there was no eviction and no Judges order

and they were appalled because they (police) searched the whole house the day of the incident

and saw no marijuana, just beautiful furniture.  And so therefore we are not going to allow the

Zoning department to your house. And while protesting with the help of Tea Party, the police

chief said we should sue Miami Beach.  Now the Zoning department and police  chief no longer

work with the City of North Miami Beach. Plaintiffs did not grow marijuana at the premises and

no evidence was discovered to counter this allegation. The removal of electricity, which caused

the generator in our yacht to stop pumping out water from the boat. The 74 foot 4 story yacht

sank and was a total loss. The dock was also damaged while police kept Plaintiffs away from the

15

premises.   See YouTube SymonettePalace_bad3. Defendants committed an illegal self-help eviction. The actions of the Defendants caused great harm and stress. On or about July 23, 2010 Plaintiffs son Jerimiah Parham who lived in the house  was brought up on false charges for firing a firearm while defending his home from intruders at 3320 N.E. 165st. Miami Fl. 33160 all in an effort to get us Black people out of this White neighborhood. Plaintiff and his son were arrested because of the incident. Was racially motivated and prejudicial in violation of fourteenth amendment that preserves the rights of a defendant in state court. States the following: because they don't want Blacks in  their white neighborhood. A Police Officer hit the door which Maurice opened and police pointed guns at Maurice saying get on the ground, went in the house and the yacht without a warrant, got the yacht workers out through the house and out of the house ordered them down on the ground handcuffed them checked some of our ID's without any probable cause, while Gamel laughed with zoning person Gill Rosenkauf and High-Fiving police while neighbors watched. I asked the police sergeant why, he said the bank has foreclosed on this house and he said we are not supposed to be in the house, I said the house is in bankruptcy, never foreclosed, no Judge ordered eviction and only a Sheriff not a regular police can evict. Then the sergeant said we'll talk to the Building Department person Gill Rosenkauf who we saw talking to Barry Gamel before police raided the house. Made us leave the house on foot. Then the next day we caught the JPM Reps. Changing the locks  then they sped away with all of our stuff in their JPM Truck JPM Bank  Was caught stealing $700.000.00 in property and recording equipment out of the house and changing locks to lock us out of our house with no court Order. We  want our property replaced or the money back tripled.  On or about July 25th 2012 detectives led by Detective Catlin searched our house And Plaintiffs bedroom without a search warrant. While pretending to search Alfred Davis room to further harass us and to force us out of the white neighborhood on July 26th 2012 and they were obviously looking for money to take and detective said to Alfred Davis where is your money with witnesses see (**exhibit 14  &15)** all in quest to steal and run black people out of the white neighborhood. Maurice Symonette was driving his Mercedes Benze, in North Miami near Biscayne Blvd. Police Officers  saw Maurice and ιecognized his face as he drove by them they then turned their Car around and made him pull over on a traffic stop, at the time of the stop the officer had  no Objectively reasonable suspicion that Symonette was engaging in any

criminal activity, after he Stopped the vehicle officer Marin ordered  Symonette out of the vehicle, in which he did,  officer Catlin searched the vehicle without Symonette's consent , officer Catlin entered the vehicle and Seized a fire arm that he had found in the glove compartment and he lied and said he found it on The Passenger seat underneath some paperwork, and I have 5, witnesses with affidavits that said They saw Detective Catlin take the gun from out of the glove compartment **see exb. #16,17,18,19,&20**.  The Code and Zoning Department is trying to run us out of town because of the water situation the Zoning Dept. They say It is illegal to have well water in our area **see exhibit# ( 12 )**   but there are people in this neighborhood that have well water and they also said that our gate was to high over 5 feet but lots of White and mostly East Indians gates are well over 5 feet high exhibit . They're Acted out Racism and Discrimination to kick us Blacks out of a White Neighborhood also as an Excuse To evict us illegally with the help of Racism and SEC Fraud, as a result of  Said extreme and outrageous conduct by defendants and each of them, Plaintiffs has suffered Severe emotional distress. JPM Bank was caught stealing $700.000.00 in property and recording equipment out of the house and changing locks to lock us out of our house with no court Order. We want our property replaced or the money back tripled. And also in 8/6/2015 plaintiffs were arriving home at their  address again, at the 3320 NE 165thnst.  to find that there house had been broken into by people from the bank JPMorgan Chase Bank) they were still in the house, and the police was there with them also, they had changed the locks, on see **exhibit video 2b. gods2.com** of police and bank at house and said that they were from the Bank and were there to evict us, but we were still in Bankruptcy at the time and there  they had taken some of the our property out, some from each room, and put a cover over the pool we showed them the Bankruptcy and told them we were not evicted yet, and they had already loaded some of our stuff in a truck that they drove to the house in. One of the owners of the house told them the bank they had to leave because the house was still under bankruptcy and they would be in a lot of trouble if they tried to take the house without a writ or sheirff then they  left after being shown the bankruptcy and still had plaintiffs property on their truck full of our possessions and tools totaling in over $100,000.00 all this done with SEC FRAUD.

## THIRD  CAUSE OF ACTION: RESPA  AND TILLA VIOLATIONS

## 15U.S.C.A. §§ 1640(A)(1)(2)(A)(1)

**JPM ACCUSE US OF DELAYING THE CASE WHEN JPM. WAS THIS CASE'S DELAYER**

JPM is saying our motions,lawsuits and bankruptcys was the reason this case is old an

were making the Case be prolonged because our filings were done to prolong the Case

andwrong when they are the ones who are openly stealing White and Black people's

property wideopen knowing that the Courts will help them. They also know that our

filings were'nt answered including as our QWR that were never answered , yet were

correct to stop their open thievery but they fail to mention the fact if you go through

the Docket none of our motions were ever answered or slowed the case down and only

one Bankruptcy stopped the progress of the case and the fact

is that theydelayed the case themselves several times when they failed To

appear at a hearing that they themselves requested a hearing on **08/07/12 see**

**exb.# 21&22**,Weshowed up for the hearing, but JPM did not show though

we talked to them there and askedfor proof they owned or had possession of the

NOTE. We filed motion for default through the Court see exihibit#2. but the Court did

not Default JPMorgan as the Court would have Defaulted Defandants if we would not

have shown up nothing was ever done. JPM also filed for second Hearing and when

we showed up again they saw us again and would not come in to the because we asked

for the NOTE again. Then we did a Motion to Dismissfor failure to Prosecute but Judge

refused to answer again but now on third time ahearing was called and without

proving NOTE ownership for a sale DATE from differentJudge. So therefore

JPM accuse us Delaying case when they are the Deliberate <u>DELAYS</u> and they

accuse us of wrong doings and yet they have been found guilty of fraudon the Courts

see Pocopanni v. JPM. Dirty hands.

18

**B.** Plaintiffs raises two primary points to establish that Washington Mutual Bank did not

have standing to file their Complaint  see Federal Practice Manuel 3.1 Standing

Rule says Standing can be challenged at anytime during the case including on

APPEAL and so as of April 26, 07. because Washington Mutual Bank FA aka

Federal Savings Bank **see exhibit #6.** sold the NOTE to Washington Mutual Bank

which is totally different from Washington Mutual Bank FA illegally because Note was

sold without Owner's or Title Companie's knowledge who then sold the Note through

WaMu Asset Acceptance Corp as Depositor see**exhibit #7.** Page 12.who then

sold the NOTE on the Stock Market in a pool of 404 other NOTES**see exb.#7,pg.7,**

called WaMuMortgage Pass-Through Certificates, Series 2006-AR12 **see exhibit #7.Page**

**12** of the Prospectus from the SEC – CFLA  Auditor,**see exhibit #5.** As of April 26, 2007
/…………………..
Washington Mutual Bank not Washington Mutual Bank FA to whom Defendant

Dr. Kurt Marin signed the NOTES filed its Washington Mutual

Bank Complaint  see Lis Pendens  **exhibit #25& A**. This complaint which seeks

two types of  Relief: Mortgage Foreclosure and re-establishment of a lost NOTE

see their Complaint **exhibit #25 page (4) line 18**.


### FOURTH CAUSE OF ACTION: VIOLATION OF BANKRUPTCY
### 11U.S. CODE §362(A)(1)(2)(3)(4)(5)(6)(7)(80

on or about 01/27/11 Barry Gamel was out watching as representatives of

the City of Miami Zoning Department accompanied by 11 police officers with rifles and

guns out, bullet proof vest on, rammed our front door at 3320 N.E. 165th St. N. Miami

Beach FL. 33160 after police hit the doorA Police Officer hit the door which Maurice

opened and police pointed guns at Maurice saying get on the ground, went in the house

19

and the yacht without a warrant, got the yacht workers out through the house and out of

the house ordered them down on the ground handcuffed them checked some of our ID's

without any probable cause, while Gamel laughed with zoning person Gill Rosenkauf and

High-Fiving police while neighbors watched. I asked the police sergeant why, he said the

bank has foreclosed on this house and he said we are not supposed to be in the house, I

said the house is in bankruptcy, never foreclosed, no Judge ordered eviction and only a

Sheriff not a regular police can't evict. Then the sergeant said well talk to the Building

Department person Gill Rosenkauf who we saw talking to Barry Gamel before police raided

the house Made us leave the house on foot. Then the next day we caught the JPM Reps.

Changing the locks then they sped away with all of our stuff in their JPM Truck JPM Bank

Was caught stealing $700.000.00 in property and recording equipment out of the house

and changing locks to lock us out of our house with no court Order. We want our property

replaced or the money back tripled.

On 7/29/2016 an officer from Sheriff department came to the home of

Defendants with a writ of possession the officer was shown bankruptcy in

KURT MARIN and BUCKMAN JAMES T and Maurice Symonette's name and the officer

was shown a copy of the bankruptcy and called in and Cancelled the Eviction and told

us that we had to go to the Judge to get a Stay Relief and another 24 hour notice from

the Circuit Judge then they left Then a different officer came back the next day later

with the same cancelled writ of possession and forced defendants out of the house

without a new writ of Possesion or a 24 hour notice for defendants to get out of their

home and while we were still in Bankruptcy at 3320 ne 165th st. Miami fl. 33160. They

broke up our property and threw our property out the house and then let us back in

20

the houseafter gettiing a phone call from their Headquarters. Our property got rained

on bad we took some of the Property back in the house the police came by days later

and said James BUCKMAN had to leave and that Maurice Symonette was not Evicted

and I said he's my guest the officers said ok this is a Civil Matter and they left see

exhibit video on gods2.com

On  7/1/15 while in court  home owner of  the said property Clyde Mcphatter was in

theObjection to sale hearing  being  heard by Judge Barbara Areces, Clyde Mcphatter

Was in Bankruptcy at the time and Judge Areces ran over Clyde Mcphatters

Bankruptcy even though he had been allowed to file bankruptcy before at another time

for the same house by Judge Hubbard **see exhibit 32A** Judge Areces violated the

automatic stay, , but bankruptcy Stay stops all action on Property, stay must be

relieved by Federal bankruptcy Judge first before the state court could make their

decision , **see exhibit #32 . Page 13 lines 10-24**transcript and see Bankruptcy stay

law 11 USC 362(a) (3). And the court violated property owner ClydeMcphatter's  right

to use his bankruptcy to stop the transfer  of  the Title to his house even though it has

been shown in the docket on **exhibit  #29** on dates 07/12/13 thru 07/16/13

McPhatter had  been granted the right to intervene by Judge Hubbard on occasions for

the same property **see exhibit  #29.**Attorney's for Appellee's had never filed an

Appeal to those Decisions by JudgeHubbard so therefore Clyde McPhatters Bankruptcy

was right . And Judge  Areces erred when she ran over the Bankruptcy and must be

overturned because Judge Areces has no right to run over Bankruptcy wherein we

tried to object to Claim and amount owed and now the Judge hasrecused herself to

avoid the appearance of impropriety  **exhibit #33.** Judge Areces did not acknowledge

That Jpmorgan never got the Note from WAMU by operation of Law **see appeal case**

**Onttoniel Cruz v. JPMorgan Chase Bank, and** the court was supposed to eject us

And show clear chain of title not give us an eviction see 66.021(4)(5). And if the

verdct is in favor of the defendant and the balance of the assessment is also in

In defendants favor, a judgement of cost shall be entered against the plaintiff Fla stat.-

66.081  and the plaintiff must pay the balance in cas'n or may give defendant a bond

with surety to be approved by the clerk Fla. Stat. 66.091

**FIFTH CAUSE OF ACTION: VIOLATION OF 7TH & 8TH AMENDMENT AND DEPRIVATION OF RIGHTS AND PERJURY GENERALLY.UNDER COLOR OF LAW BY VIOLATING OF FLORIDA  STATUTE  82 & 83.**

Plaintiffs did not consent to any unconstitutional Judicial foreclose, because according

to the 14th Amendment of US Constitution, "No person shall be deprived of life, liberty,

and property without due process of Law;" therefore, we demand a jury traial to

protect our due process rights and right to a fair trial, in order to settle this issue,

because the amount in question exceeds $20.00 US dollars. According to the 7th

Amendment of the US Constitution, if the amount exceeds $20.00 dollars the right to a

jury trial is preserved.Due to the unconstitutional nature of the said Judicial

foreclosure Notice, this Cease and Desist and Lawsuite is filed in good faith, because I

do not understand why the City of North Miami Beach Police, Zonning Dept. and Dade

County Sheriff's Office has willfully and maliciously violated the Plaintiff's due process

and equal protection rights, and The Plaintiff's right to a fair trial, in order to illegaly

take, evict and sale the plaintiff's property without giving the Plaintiff their day in court

first to prove The Plaintiff's case. This Sheriff's Office's motive for willfully and

maliciously violating The Plaintiff's constitutional rights is for personal gain and an

22

easy out of court victory. The said Sheriff's Office's actions where indeed willful and malicious, because this Sheriff's Office has officers who are officers of the state and are presumed to know the law; therefore, this Sheriff's Office either knew or should have known never to try to deprive a person of life, liberty, and property without due process of law; especially, in light of the fact that this Sheriff's Office has officers who took a sworn oath to uphold and defend the US and Florida Constitution before they can begin professional law enforcement. According to Article VI, Clause 2 of the US Constitution, Known as the Supremacy Clause, establishes, "The U.S. Constitution and treaties as the supreme law of the land; and the judges in every state shall be bound thereby."This Sheriff's Office has acted willfully and maliciously with total disregard towards The Plaintiff's federally secured guaranteed constitutional rights, because the said Sheriff's Office either knew or should have known that the United States Constitution is the Supreme Law of the land, in which all public officials are bound by it, because all public officials took Oaths of Office to uphold and defend the Florida and US Constitution.The said Judicial foreclosure and eviction initiated by this Sheriff's Office is undeniable evidence that the officers of this Sheriff's Office have breached their contracts with the State of Florida because they have perjured their oaths to uphold and defend the state and US Constitution, because this Sheriff's Office is indeed warring against the US Constitution, by evicting, taking and saling our property without poviding eual protection of the law, dueprocess of law, and The Plaintiff's right to a fair trial. According to Cohens vs. Virginia, 19 U.S.C, Section 2381. Title 5 U.S.C, Section 7311( Loyalty and Striking), which explicitly makes it a federal criminal offense (and a violation of oath of office) for anyone employed in th United States

Government (including members of congress) to advocate the overthrow of our constitutional form of government. Title 18 U.S.C,Section 1918(Disloyalty and Asserting the right to Strike against the Government), provides penalties for violation of oath of office described in itle 5 U.S.C, Section 7311, which include: (1) removal from office; an (2) confinement or a fine. The Alien Registration Act of 1940 (Smeith Act, 76th United States Congress, 3d session, ch.439,54 stat. 670, 18 U.S.C, Section 2385 (Advocating the Overthrow of The U.S. government. This Sherrif's Office's said Judicial Foreclosure under power of sale is uncostitutional, because if effectively denies our client, "Access to the Courts, " This Sheriff's Office is attempting to deny the Plaintiff access to the courts by taking The Plaintiff's property away without due process of the law, which is motly the judicial process, Due to the amount of money The plaintiff's property is worth, this issue needs to be presented before officers of law, in order to ensure Access ot the Courts jso that Plaintiff's constitutional rights are protected; and to ensure that The plaintiff's life, liberty and property is not being taken without due process and equal protection of the law."The right to sue and defend in the courts is one of the highest and most essential privleges of citizenship and must be allowed by each State to the citizens of all other States to the sa.ne extent that it is allowed to its own citizens."(See Chambers v. Baltimore & O.R.R., 207 U.S. 142, 148 (1907); Mcknettv. St. Louis & S.F. Ry., 292 U.S. 230 , 233 (1934). "The constitutional requirement is satisfied if the nonresident is given access to the courts of the State upon terms which, in themselves, are reasonable and adequate for the enforcing of any rights he may have, even though they may not be technically the same as those accorded to resident citizens. " (See Canadian Northern Ry. V. Eggen, 252 U.S. 553 (1920. "The right of access to the courts is basic to our system of government and it is well established

24

today that it is one of the fundamental rights protected by the Constitution. "(See Ryland v. Shapiro, 708 F.2d 967, 971 (5th Cir. 1983).This Sheriff's Office with its unconstitutional Final Notice of Eviction and Alias Writ of Possession did indeed advocate the overthrow of our constitutionalForm of Government, in violation of the Smith Act; thereby, violating their oaths of office, because Access ot the Courts is Common Law that is protected by the Florida and US Constitution.

The members of this Sheriff's Office, having taken an oath to support and defend the Florida and the United States Constitution, did wilfully and knowingly violate said oaths by filing a unconstitutional Judicial Final Notice of Eviction, Writ of Possession and did evict some of us on the 24 hour notice to evict on 08/18/16 and then cancelled the eviction and the 24 hour notice to evict which meant by their rules and Florida Statute 82 & 83 they would have to give us another 24 hour notice to evict but they didn't , thehe Sheriffs and North Miami Beach Police came the next day 08/19/16 in violation of the Bankruptcy Stay and Fla. Statute 82 & 83 requiring a 24 hour notice to evict sme of us and put some of our proprty out in the rain but then later told Maurice Symonette he wasn't being evicted just James Buckman is being EVICTED some days later NMB Police came by saying some one called them to see about the house. The Officer said he's not asking me to leave because of our Bankruptcy and this is a Civil Matter. The next day while Maurice was gone JPMorgan stole all my property out of the property. And before that on or about 01/27/11  Washington Mutual Rep. Barry Gamel was with the representatives of the City of Miami Zoning Department accompanied by 11 police officers with rifles and guns out, bullet proof vest on, rammed our front door at 3320 N.E. 165th St. N. Miami Beach FL. 33160 after police hit the doorA Police Officer hit

the door which Maurice opened and police pointed guns at Maurice saying get on the

ground, went in the house and the yacht without a warrant, got the yacht workers out

through the house and out of the house ordered them down on the ground handcuffed

them checked some of our ID's without any probable cause, while Gamel laughed with

zoning person Gill Rosenkauf and High-Fiving police while neighbors watched. I asked the

police sergeant why, he said the bank has foreclosed on this house and he said we are not

supposed to be in the house, I said the house is in bankruptcy, never foreclosed, no Judge

ordered eviction and only a Sheriff not a regular police can't evict. Then the sergeant said

well talk to the Building Department person Gill Rosenkauf who we saw talking to Barry

Gamel before police raided the house Made us leave the house on foot. Then the next day

we caught the JPM Reps. Changing the locks then they sped away with all of our stuff in

their JPM Truck JPM Bank was caught stealing $700.000.00 in property and recording

equipment out of the house and changing locks to lock us out of our house with no court

Order. We want our property replaced or the money back tripled.see exhibit video on
gods2.com Because this is **totally contrary to well-established Common Law,**

**Access to the violation of Title 18 U.S.C, Section 241 – Conspiracy Against Rights,**

**and Title 18 U.S.C, Section 242 – Deprivations of Rights under color  of state law;**

**and perjury Generally.**

   **Other criminal and civil causes of action if this Sheriff's Office has persisted**

**and has not ceased and desisted with their unconstitutional Judicial Foreclosure:**

**running an artificial sham, breach of trust, extortion, embezzlement, law**

**enforcement malpractice, official oppression, RICO, Conspiracy to commit RICO,**

**suppression of evidence, obstruction of justice, violations of the honest service**

**clause, misprision of treason, piracey upon the high seas, advocating the**

overthrow of our constitutional form of government, and Insurrection and

Rebellion!


### SIXTH CAUSE OF ACTION: VIOLATION OF FEDERAL OBAMAS PROTECTING TENANTS AT FORECLOSURE ACT OF 2009

Tenant James Buckman's rights were violated when he attended State Court  in

October of 2015, when he asked Judge  Barbara Aresces could he finish out the

The Lease agreement in accordance with Obama's protecting tenants at foreclosure

Act of 2009 which expired Dec. 31, 2014, but tenants that already had leases before

That time period ended still were supposed to be allowed to carry out their leases

To the end of their lease period as seen on the second page of the 2009 foreclosure act

**See exb.#36,** The Court would not allow him to finish his lease which ends in Dec. 31,

2016, and the Courts gave him 90 days to vacate the property  as seen in **exhibit #35,**

and they did not honor the protecting Tenants at foreclosure Act of 2009 that was put

out by the Dodd-Frank Wall Street Reform and Consumer Protection Act, **see exb. 37.**


### SEVENTH  CAUSE OF ACTION: FRAUD AND CONCEALMENT
### FLA STATUE 475.25 (B)(D1)

On July 14, 2006 Kurt Marinsigned a promissory Note for said Property at 3320

NE 165th st. Miami, Fl. 33160. The basis of the identification of Loan in WAMU

MORTGAGE PASS-THROUGH CERTIFICATE TRUST 2006-AR12 was made from the

Following factors/information that exactly corresponds with Kurt Marin Loan

Documents provided: Loan number 3010215659097; original $2,180,000.00, For a

single family home. But on Sept. 26, 2006, the same Washington Mutual

Mortgage was sold on the Bloomberg Securities exchange as seen on exhibit #7.pg. 6,

On the 15th line from the top but not to JPMorgan who claim that they own all loans,

Assets, and all loan commitments, of Washington Mutual From an affidavit from the

FDIC in Sept. 26, 2008  claiming JPMorgan Chase became owner by operation of law

From this affidavit that was never finalized, but its not possible for JPMorgan to own

The Note since it was already sold as a security in Sept. 26, 2006, right after it had been

Bought by Kurt Marin in 07/14/06.   In another instance of fraud on this same house

An objection to sale was entered in the county courthouse in Miami Fl. for  real estate

case no: 2007-12402-CA01 on 02/24/2014,  by defendants **see Exb.B** . While checking

The records at the courthouse on 7/17/2014, looking in this same case we found new

Documents has been entered into the court file on 7/14/2014, they were documents

from JPMorgan Chase Bank , **See exhibit A1**, the documents that they entered in the

court records On 7/14/2014 was a motion titled " MOTION TO RATIFY CLERKS SALE

AND DIRECT ISSUANCE OF CERTIFICATE OF TITLE" , as stated in the documents a

foreclosure sale was held on Feb. 13, 2014, the real property was sold to the plaintiff,

an objection to sale was entered in the file on 2/24/14, JPMorgan then attached to

those documents **exhibit A**, which is a copy of the Objection to sale, upon close

examination of the Defendants objection to sale that Plaintiffs Entered into the Court

Dockets the objection to sale copy  they entered in 7/14/2014  Differs from The

28

Original documents that was put in on Feb. 24, 2014, See exhibit A, the Copy they (JPMorgan Chase Bank) put in with their motion had at least two pages missing and A different date on the Certficate of service than the Original and some different font sizes in the certificate of service and also in that same area the on the original it reads On the last line on top of the signature the word is spelled "MIS" , while on the copy of the JPMorgan it reads "M/S" the document put in the file by JPMorgan has been altered and is incomplete and is Fraud, we can never hope to get a fair hearing on this case, because these Documents are Tampered with by the Plaintiffs , and what happened is JP Morgan Lawyer in their motion to Ratify Clerks sale put in an exhibit "A"saying (Lying) to the judge that this exhibit A was the defendants exhibit A (motion to object to sale) which only had 17 items listed, but this was tampered with false document that JPMorgan Lawyers made up and change to escape defendants powerful motion to Object to sale see our **exhibit B**with 29 items = red stamped copy and **exibit A =** JPmorgan false copies now JPMorgan has change the docket Aug. 20, 2014. Jpm Atty's shapiro, fishman & gach'e and their associates Attorney Julie herzlich have dirty hands in this case, they have commited Fraud and forgery in this case by changing and altering our motion to object to sale and forging defendants signatures to illegally take our home knowing that Jpm does not own our Note.


## EIGHTH CAUSE OF ACTION: WRONGFUL FORECLOSURE IN VIOLATION OF RULE 87

This is an unlawful foreclosure because JPM docs'nt own the Note, they cannot possibly own the Note, read **exhibit #8** from Brevard County Florida Judge O.H. Eaton Jr. order granting

Defendants Motion for Summary JudgmentOn item 4 says by <u>Operation of Law</u> , JPMorgan admitted that it is not the owner or Holder of the NOTE.

So therefore they cannot foreclose on a Note they don't Own.

## <u>NINTH CAUSE OF ACTION:NO STANDING TO FORECLOSE</u>
### <u>IN VIOLATION OF 3.1 STANDING RULE</u>

JPM does not have standing in any part of this property to make any claims or demands for any payments of any sort, because I now have absolute Proof that JPM committed fraud on the court, as now proof from a CertifiedSecuritization Auditor that is qualified and experienced to providethe necessaryProfessional service that is trained to navigate and perform searches on the Bloomberg terminal in regards to the automatic tracking and determination of mortgage and loan related documents and information as seen **on exhibit 7#.** An <u>affidavit from Expert Witness Eliyshuwa ShaphatYisrael a certified SEC/CFLA AUDITOR</u> explaining and proving with the Prospectus Screen Shots on Stock Market the transactions that tookPlace on said propery at 3320 NE 165<sup>th</sup>street Mia. Fl. 33165 of all the screen shots that took place with the securities transactions during the time the property Was sold to owner Kurt Marin up until the present time **see exhibit 7, pgs. 2-5,** and aLicensed BloombergMortgage securitization Auditor(SEC) of the CFLA.**see exb.#7, pg.1.**This shows that Washington Mutual Bank Aa/k/a Federal Savings **exhibit7,pg.2** Bank sold note right after the closing of the property 07/14/06 to WAMU Capital Corp. who on pg. one of the Screen Shot Sold NOTE on Market as a Security 09/26/06 with US BANK National Association as Trustee**Exhibit# 7pg.6** This proves that Washington Mutual Bank FA sold the Note as a Security 09/26/06

& after selling the NOTE one year later April 25. 2007 without noticing us filed a

notice of lis **Pendens exhibit A**. Then WAMU was taken over by the FDIC Sept 25

2008 and all WAMU assets to JPM**exhibit 4**. But this did not include our NOTE

because our NOTE was already sold as a security on the Market **exhibit7pg.6**

## TENTH CAUSE OFACTION AGAINST CLERK FOR DESTROYING FILE IN VIOLATION OF FLORIDA STATUTE 119.11(4)

The State court clerk were Hiding the File and telling us the File & note was destroyed when it

wasn't and then telling us the note was destroyed on camera, and they said that Mack

Wells,Bankruptcy would not stop the sale while on video. Clyde McPhatter and Maurice

Symonette's Bankruptcy would not stop the sale while on video. On the date of 2/3/2016

Plaintiff was in the state court House on Flagler Street in Miami Fl. I requested the court

Records to my property at 3320 NE 165thst. Miami Fl. 33160  From the Clerk but the clerk

Informed me that they had been ordered to burn my property foreclosure records on 1/1/15,

**See exhibit# AA,** Affidavits **exhibit #1a.&1b,** and **exhibit# 2 videoon gods2.com** my

property records should not Have been destroyed because at the time and for years I've had

lawsuits and appeals in state court, federal court and now they've destroyed the files making it

very difficult for me to go on with my case against  JPM,  in violation of Florida Statue

119.11(4) which says "service of a complaint, counter claim or cross claim in a civil action

brought to enforce provisions of this chapter, the custodian of the public record that is the

subject matter of such civil action shall not transfer custody, alter, destroy or otherwise

dispose of the public record sought to be inspected and examined , not withstanding the

applicability of an exemption or the assertion that the requested record is not public record

subject to inspection and examination under s.119.07(1) until the court directs otherwise. The person who has custody of such public record may, however at anytime permit inspection of the requested record as provided in s. 119.07(1) and other provisions of the law." We have witnesses who saw the whole FILE and there was no Original blue ink NOTE in the File see Affidavit **exhibit 3.** The only thing JPM had as any proof of NOTE ownership was two FDIC Documents stating that JPM by Operation Law JPMorgan now owns all of Washington Mutual Bank's Assets but never showing our NOTE as one of the assets **see exhibit 4. Now when we come to see the whole FILE to see the original NOTE of which we are witness that there was never an original NOTE Filed but the CLERK OF THE COURT is helping JPM BANK by saying they have DESTROYED the FILE so that we cannot see the Phathom NOTE when in actuality the only paper JPM BANK used to show their ownership of NOTE is the by OPERATION OF LAW LETTER from the FDIC which the Courts have totally REJECTED KIM V. JPM.**

FEDERAL RULE <strong>3.1 STANDING RULE</strong>

J.      Standing can be questioned anytime during a case. The Supreme Court has made it clear that the burden of establishing Standing rest on the plaintiff (the owner of the Note). At each stage of the litigation from the initial pleading stage. Through summary judgment and trail-the plaintiff must carry the burden. Standing must exist on the date that the complaint is filed and throughout the litigation. Moreover, standing cannot be conferred by agreement and can be challenged at any time in the litigation, Including on appeal by the defendants or in some circumstances by the court Sua Sponte.  Finally plaintiffs must demonstrate standing for each claim and each request for relief. There is no supplemental standing: standing to assert NOTE cannot exist at the same  time as the Security which Is now turned into a **BOND exhibit #7 pg. 16-18**. because that is SEC Security Fraud because they're defrauding into believing that that BOND (NOTE) is performing when it's actually Defaulted and they are double dipping getting money foreclosing on Property and Stock Market money from

investors this is ILLEGAL CRAZY! one claim does not create standing to assert claims arising from the same nucleus of operative facts. Washington Mutual Bank FA, Washington Mutual Bank nor JPMorgan Chase was not in possession of the Note Prior to the date of filing LisPendens of the Final Judgment.

9.     JPMorgan admits in **exhibit # 8** that by operation of law that JPMorgan it is not the owner or holder of the original note, as was held in court by Judge O.H. Eaton where on that case defendants were granted motion for Summary Claimed to have acquired to have acquired all of Washington Mutual's loans And assets through the FDIC by Operation of Law, and in fact the record is Utterly Bereft of any evidence as to the manner in which that Note ultimately Came into Possession of Washington Mutual Bank FA subsequent to the Filing of its Complaint. Accordingly there exist genuine material issues of Fact which operate to legally preclude entry of a Summary Judgment. Therefore JPMorgan foreclosed on us before they actually owned the note They can't foreclose on a Note before they own it see (Robert Mclean v. JPM),

## ELEVENTH <u>CAUSE OF ACTION: VIOLATION OF DUE PROCESS OF SERVICE</u>
## FLORIDA RULES OF CIVIL PROCEEDURE 1.070 (A)(B)(C)(D)(E)(F)(G)(H)(I)

We now have found newly found evidence Found after the Judge released file from Judge's office back to Clerk of the Courts where we now able to get the proof of filings proving that *appellant's Had been claiming that they were never Served from the beginning one Month after Judgement see exhibit #27 and then six months later in exhibit #28,Lawyer for Appellant's Nashid Sabir entered a motion to vacate default Into the files Because we were never served so therefore the rule that said You must file a motion on the fact that you* were never served before one Year after Judgement or wait until the last minute to say you were not served See Well Fargo v. Lopez and Indy Mac v. DeCastro. We clearly were well Within the time required twice we did Motions concerning not being Served.

10.

On page 3, 2nd paragraph  of  JPMorgan's answer to our Brief see appeal case 3D15-1672 they admit That they did not have NOTE to show ownership after we have been asking Fom the beginning of this case to produce  but instead says by OPERATION OF LAW from the WAMU through the FDIC to JPMorgan they own the NOTE

A.  See JPMorgan  v. Wright 4th DCA of Florida,  Judge O.H. Eaton  Brevard

B.  County Florida, Kim v. JPMorgan, Javaheri  v. JPMorgan all say you


C.  can't Own NOTE through Operation of  Law

D.  The FDIC Rules say in the  Purchase & Assumption Agreement between the  FDIC and JPMorgan on page 17 article 3 section 3.3 says in order for JPMorgan to own a WAMU NOTE the FDIC must sign the NOTE to JPMorgan who then must file that NOTE with the Clerk of the Courts not by Operation Of  Law which was created for the FDIC Gov. branch only not the Banks


E.  On item #2, page. 8, Appellees state that appellants argument concerning Standing was not a proper ground on which to oppose the issuance of the Certificate of title, but the fact is we filed our Motion to Object to Sale and prove standing was set for hearing before Banks Motion to issuance of the title the Judge just aid them at the same time even though our should have been heard first now they say it was the wrong forum. Well it was also in Bankruptcy and should have not been heard at all and Bank say our motion was meritless in any event because of rocket hearings never gave us a chance to show Merrits which was because we were never late on payments and JPMorgan does not own the NOTE!


F.                                                                                                          On

pg. 9 second paragraph appellees say it therefore necessarily follows that if an argument as to the

as to the validity of the foreclosure judgment cannot be raised as a challenge to the sale, and it certainly cannot be raised as a challenge to the mere "ministerial act" of issuing the subsequent certificate of title, but they never gave us a hearing now that the judge recused herself.

**G.** On page 10 second paragraph appellees state that the record does not demonstrate that Marin preserved his right to challenge the personal jurisdiction of the trial court by timely arguing a failure of service, But Marin's argument as is well understood because now there is newly Found evidence because the Judge in the state court had kept the files in their office. After finding the documents it clearly shows that we did preserved it on record one month after judgement **See exhibit 27**

H. Again here on page 10, marin apparently filed an answer to the complaint On 05/04/2007 yet fails to include the answer in the record on appeal, appellant had asked for the note, called bank after seeing file while checking on another house.

I. On page 11 they appellees say proper service was given under section 48.031(1)(a), Fl. Statues, and that appellants do not even attempt to dispute the affidavit of the process server , but affidavit from tenant says as never served and no person by that name ever lived at 1220 at that time or ever see exhibit **#38-39** the law is law and the rules are the

rules they can't work one sided this what the criminal want's is for you to be rendered helpless with no weapons to fight back against their thievery so they can enforce the American Black Code of the South right after Civil War which said "X Slaves are not allowed to own PROPERTY , Meet together to Start and Own Business or OWN WEAPONS (law) to Defend ourselves google this. The Banks are using Judges to enforce their BLACK CODE on now Blacks and Whites by asking you Judges to not follow the law and rules that would PROTECT US. making the fight lop sided Protecting and Cheating for the BANKS our hope is lost because the LAW clearly states that Defendants must be NOTICED!

J.last paragraph pg. 11, it says automatic stay does not apply to the issuance of certificate of title. JPmorgan down played the fact that that they broke the law and ran over clyde Mcphatters bankruptcy calling it a mere "ministerial task"(on pg.2) that does not violate an

automatic stay In bankruptcy, but bankruptcy Stay stops all action on Property, stay must be relieved by Federal bankruptcy Judge that's typing) to see if Mcphatter had intervened  see exhibit #32 . Page 13 lines 10-24transcript and see Bankruptcy stay law 11 USC 362(a) (3). And the court violated property owner Clyde Mcphatter's  right to use his bankruptcy to stop the transfer  of  the Title to his house even though it has been shown in the docket on exhibit  #29 on dates 07/12/13 thru 07/16/13  McPhatter had  been granted the right to

intervene by Judge Hubbard on occasions for the same property see exhibit  #29.Attorney's for Appellee's had never filed an Appeal to those Decisions by Judge  Hubbard so therefore Clyde McPhatter Bankruptcy was right . And Judge  Areces erred when she ran over the Bankruptcy and must be overturned because Judge Areces has no right to run over Bankruptcy wherein we tried to object to Claim and amount owed and now the Judge hasrecused herself to avoid the appearance of impropriety  exhibit #33. Only the FDIC  RULES say That the only way that JPM can take over the Note is not by operation of law, operation of law was created by the united states Government using the FDIC Which is an insurance company to protect the people so they wouldn't have to do a run on the bank but if the bank failed they were insuredup to $100,000.00 by the peoples money from the Treasury  Department which is tax dollars the FDIC was created to protect them so they wouldn't have to do a runon the bank and they can get their money back and then the FDIC would be allowed to act Through operation of law as if they are the bankthat's as if they are WAMU to be them by getting the note signed over to them so that they could sell the assets freely without going through all of the regular rules acting as if they are the bank(WAMU bank) and then whoever they sell the Note to they recover their money to give back to the people  for victims to recover their money from the failed bank Then WAMU is out the way then whoever they sold it to would have to then getThe note signedover to you from the FDIC according to the FDIC rule which Is the Purchsae & Assumption agreement page 17. Article 3 sec. 3.3 where They must sign the Note over to the bank that they sold it to like JPM, JPM  is not designed by the US Gov. To help the people they are designed to make money and act as a bank they Cannot own Note through operation of law according to **Kim v. JPMorgan** Supreme Court of Michigan and according to certain rules in the state of Florida like Florida Statute 87 which says the NOTE must signed over to you for you to own the NOTE. Of which JPM does not have our NOTE signed over to them from the FDIC or WAMU and therefore has no standing to foreclose orEVICT.When the Sherriffs come theymust have a copy of the

signed NOTE which is now a BOND so Sherriffs must have the BOND that is in JPM's namebut the BOND is not in JPM's name **exhibit#7pg.16-18**. WAMU mortgage passed the certificates 2006 AR 12 has been desolved since 2009 and is no longer a trustand U.S Bank as Trustee cannot conduct a lawsuit for a trust that no longer exist so the U.S. Bank will be breaking the law if they were conducting a lawsuit or a foreclosure in the name of a trust that no longer

exist also Washington mutual its self is bankrupt and was already taken over by the FDIC it does not exist therefore they cannot conduct a foreclosure Case in the name of Washington Mutual Bank FA. We know that in the Interest of Justice a Judge would say you must pay your Mortgage and the fact is we we're paying our Mortgage and after JPM took over sent our moneyback. So in the promissory note we promised to make full payment but we never promised how we would pay it back, we could have paid them back by borrowing the money from my Grand Father or any other kind of way so therefore we're not responsible for the fact that they helped us pay them back by selling the note for us and securitizing the note and making much more money off of what we were supposed to pay back than what we owed therefore they have been paid and they can no longer ask us for the money, example you buy a car for $100,000 you make

payments on a car up to $80,000, now you owe $20,000, you can't finishpaying, the bank Reposses the car, then the Bank sells the Car for $80,000 the bank is supposed to take their $20,000 and give u back the $60,000 as per Federal Law TILA. So now back to our JPMorgan case. Our Note is in a Bundle of 400 other Notes converted into a Bond and is now trading on the market from 09/2006-01/2016 and made $1.7 billion divided by 400 Notes=they made over four million which is over twice what the 1.9mil. we owe. This was done off of the 404 notes that were packagedand securitized in 2006 and they collected off of the insurance and they collected off of our payments and the IRS gave them a write off in the form of cash so they have been well $700 billion bailout they've been well compensated compensated even though they act like they are the Damsel in distress and then they got a $700 billion bailout they've been well compensated they are not the Damsel in distress we the people (Home Owners) are. And trying to make us look like the criminal when they're the ones who are the criminals who made the money off of our signature and note. After the Civil War the now EX SLAVE MASTERS of the South in America passed a Law called the American Black Code of the South.Here are Some of the excerpts, A. Niggers cannot OWN PROPERTY (so JPM financers of Slavery see google, can without

Standing just take our property).   B. NIGGERS  ARE NOT ALLOWED TO BE A WITTNESS OR TESTIFY IN COURT AGAINST WHITES (like our AFFIDAVITS of all of our Witnesses of all of the atrocities the Defendants have done to us is considered frivolous and  futile, so the Defendants can break all laws to destroy us even using RACISM and open Police Abuse and Robbery and now accuse us of doing of what they have done Wrong. Revelations 12:10. And hold themselves not guilty.  Zacheriah 11:5 says Oppressors kill us and hold themselves not Guilty. C. NIGGERS ARE NOT ALLOWED TO HAVE GUNS TO PROTECT THEMSELVES (like Shapiro, Fishman & Gach'e asked the Judge to take away our right to defend ourselves PRO SE  so that only the Criminals and Vampires have teeth (fangs) and bullets (weapons) and can just kill us while we are defenseless  to PRO SE defend ourselves.   See Google or Bing RULES AND LAWS OF THE LOUSIANA BLACK  CODE OF  THE SOUTH. **See exhibit #34  or www. Bing.com**T*he things that were done to us is absolutely inhuman and proof that we are just Broken like a horse slave*

*and the sad thing is that White People (Gentiles my Brothers) are being done the same way (Reverse Discrimination), we have  absolutely no rights or hope for JUSTICE against the sons of Perdition   2Thess.21-11 Lawyers (Ishmael, Canaan & Ham all of them aren't Evil but must Repent to be Saved) LUKE 11:42-54. If your parents were treated like they did us,*

### PRAYER

WHEREFORE, Plaintiff requests judgment as follows:

1. That this court issue an Order to Show Cause and, after a hearing, issue a Temporary Restraining Order and Preliminary Injunction restraining Defendants, and each of them, during the pendency of this action, from continuing with their efforts to conduct a Trustee's Sale of the Property.

2. That foreclosure of the Property be declared Illegal and that Defendants be forever enjoined and restrained from selling the Property or

attempting to sell it or causing it to be sold, either under power of sale pursuant to trust deed or by foreclosure action, and from posting, publishing, or recording any notice of default or notice of trustee's sale contrary to state or federal law.

3. That the underlying loan transaction be declared void as a result of Defendant's and WaMu's misrepresentations, fraud, concealment, and predatory loan practices.

4. That Defendants make restitution to Plaintiff according to proof.

5. For a judgment determining that Plaintiff is the owner in fee simple of the Property against the adverse claims of Defendants and that Defendants have no interest in the property adverse to Plaintiff.

6. For damages in an amount of $8,000,000.00.

7. For costs of suit and reasonable fees.

8. For any and all other and further relief thatMay be just in this matter.

The State court is participating in helping the Bank (JPMorgan ) to defeat Plaintiffs. The Chief Judge said if we want a long hearing we should get it to prove our Case, and not be forced to into a rocket docket which is scheduled to last only 5 minutes.

I HEREBY CERTIFY THAT A TRUE AND CORRECT COPY OF THE FOREGOING WAS SERVED BY US MAIL TO: Julie Herzlich, Esq. Fl. Bar#9459 of SHAPIRO, FISHMAN AND GACH'E, LLP Attorneys for plaintiff, 2424 North Fed. Highway Ste. 360 Boca Raton, Fl. 33431. Ph: 561-998-6700

James Buckman
3320 NE 165th st
Miami, Fl. 33160

Maurice Symonette
3320 NE 165th st.
Miami, Fl. 33160

39

KURT MARIN
3320 NE 165th st.
Miami, Fl. 33160

Clyde Mcphatter
3320 NE 165th st.
Miami, Fl. 33160

Alfred Davis
3320 NE 165th st.
Miami, Fla. 33160

Jerimial Parham
3320 NE 165th st.
Miami, Fla. 33160

07-12402

United States Bankruptcy Court
Southern District of Florida

Exhibit # 11

*Washington Mutual Bank*

## Notice of Bankruptcy Case Filing



A bankruptcy case concerning the debtor(s) listed below was filed under Chapter 13 of the United States Bankruptcy Code, entered on 11/19/2010 at 4:02 PM and filed on 11/19/2010.

**FILED**
**11/19/2010**
**3:54 PM**

**Kurt Marin** ✓
10671 NE Quaybridge Ct.
Miami Shores, FL 33138
SSN / ITIN: xxx-xx-7450

The bankruptcy trustee is:

**Nancy N Herkert**
www.ch13herkert.com
POB 279806
Miramar, FL 33027
954-443-4402



THE ORIGINAL FILED
IN THE OFFICE OF
CLERK CIRCUIT COURT, DADE CO., FLA.
2/10/11

2011 FEB 10 PM 2: 57
PRISCILLA HAMILTON

The case was assigned case number 10-45600-LMI to Judge Laurel M Isicoff.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our *Internet* home page www.flsb.uscourts.gov or at the Clerk's Office. .

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth important deadlines.



Certified to be a true and correct
copy of the original
Katherine Gould Feldman, Clerk
U.S. Bankruptcy Court
District of Florida
By _____ Deputy Clerk
Date: 2-10-2011

**Katherine Gould Feldman**
**Clerk, U.S. Bankruptcy**
**Court**

*Exhibit 12*

CITY OF NORTH MIAMI BEACH, MIAMI-DADE COUNTY, FLORIDA
CODE COMPLIANCE DIVISION

N O T I C E   O F   V I O L A T I O N

Date: 02/26/2015

Folio: 07-2210-001-0080
Complaint: 150226-34
Case    : 156696

MAURICE SYMONETTE
CLYDE MC PHATTER
3320 NE 165 STREET
NORTH MIAMI BEACH, FL 33160

PROPERTY ADDRESS: 3320 NE 165 ST
                  NORTH MIAMI BEACH, FL 33162

CODE SECTION VIOLATED: 14-1
    ILLEGAL CONSTRUCTION

DESCRIPTION OF VIOLATION:
    ILLEGAL CONSTRUCTION OR FAILURE TO COMPLETE CONSTRUCTION
    IN PROGRESS.

WHAT YOU MUST DO TO CORRECT THIS VIOLATION AND TIME FRAME:
    STOP ALL WORK, OBTAIN REQUIRED PERMITS, PAY ALL APPLICABLE
    FEES AND PASS ALL FINAL INSPECTIONS.
    AS PER BV11-150USC
    AS PER CHAPTER 8-5(A)(2), 8-5(2)(4), 8-5(B)(2)(V). 8-5(B)(2)
    (VI), 8-5(B)(2)(VII), AND 8-5(B)(3)(I) OF THE MIAMI-DADE
    COUNTY ORDINANCE 07-147, UNSAFE STRUCTURES.
    THIS STRUCTURE IS CONSIDERED UNSAFE DUE TO THE LACK OF
    ELECTRICITY OR POTABLE WATER TO THE HOME.  ILLEGAL
    ELECTRICAL PANE AND WATER SERVICE.
    ***AS OF 5/16/2013, EM13-377 WAS ISSUED FOR "INSTALL
    EXTERIOR DISTRIBUTION PANEL, REPAIR METER CAN, UPGRADE
    GROUNDING"***
    ***AS OF 5/30/2013, PERMIT EM13-377 WAS FINAL***
    ***AS OF 2/26/2015, VERIFIED NO WATER SERVICE TO PROPERTY***

COMPLIANCE DATE: Mar 28, 2015

Please correct this violation by the compliance date.   Failure to correct
the violation may result in ;

1) A hearing before a Code Enforcement Board Or Special Magistrate who has
   the authority to assess fines and lien the property, OR;
2) A citation may be issued which carries a fine of $ 50 for the first
   offense, $100 for the second offense and $250 for the third and
   subsequent offenses.

If the violation is corrected before the compliance date, please contact
the Compliance Officer to reinspect the property.

Violation issued by:

____ Code Compliance, 17050 NE 19 Ave, NMB, 305-948-2964, Fax 305-787-6012

Exhibit 13

# CITY OF NORTH MIAMI BEACH
# UNSAFE BUILDING

This building or structure is, in the opinion of the Building Official, unsafe, as defined in Chapter 8 Building Code Dade County Ordinances

# SHALL BE VACATED

– Shall not be occupied. Action shall be taken by the owner as further prescribed by written notice previously served.

# THIS NOTICE SHALL NOT BE REMOVED EXCEPT BY THE BUILDING OFFICIAL.

BUILDING OFFICIAL _____

*Exhibit (14)*

**AFFIDAVIT**

I JAMES BUCKMAN AM A WITNESS THAT DETECTIVE CATLIN ASKED ALFRED DAVIS THE QUESTION "WHERE IS HIS MONEY" AS THEY SEARCHED HIS ROOM AND THE REST OF THE HOUSE WHERE HE LIVED DURING AN UNANOUNCED VISIT AT ALFRED DAVIS HOME WHERE HE LIVED WITHOUT A SEARCH WARRANT. ON OR ABOUT JULY 26, 2012.

**JAMES BUCKMAN**
**10290 SW 102 AVE**
**MIAMI, FL, 33173**

Exhibit ( 15 )

### AFFIDAVIT

I MAURICE SYMONETTE AM A WITNESS THAT DETECTIVE CATLIN ASKED ALFRED DAVIS THE QUESTION "WHERE IS HIS MONEY" AS THEY SEARCHED HIS ROOM AND THE REST OF THE HOUSE WHERE HE LIVED DURING  AN UNANOUNCED VISIT AT ALFRED DAVIS HOME WHERE HE LIVED WITHOUT A SEARCH WARRANT. ON OR ABOUT JULY 26, 2012, ALL IN A QUEST TO STEAL AND RUN BLACK PEOPLE OUT OF WHITE NEIGHBOR HOODS

MAURICE SYMONETTE

3320 NE 165TH ST.

MIAMI FL. 33173

**AFFIDAVIT**

*Exb.# 16*

I   MAURICE SYMONETTE WAS THEIR AS A WITNESS ON 01/31/2012 WHEN I WAS AT

162RD ST. NEAR BISCAYNE BLVD.,  AND I HAD BEEN PULLED OVER BY THE POLICE

AND I SAW  DETECTIVE CATLIN GO IN MY  GLOVE COMPARTMENT TAKE THE  GUN OUT OF IT.

*Maurice S.*

MAURICE SYMONETTE

*2-28-2012 Fannie Mitchell*



Exb. # 17

**AFFIDAVIT**

I MICAHIEL NICHLOSN WAS THEIR AS A WITNESS ON 01/31/2012 WHEN MAURICE

SYMONETTE WAS AT 162RD ST. NEAR BISCAYNE BLVD. AND HAD BEEN STOPPED BY THE POLICE

AND I SAW DETECTIVE CATLIN GO IN THE GLOVE COMPARTMENT OF THE BLACK MERCEDES

MAURICE WAS DRIVING AND TOOK THE GUN OUT OF IT.

*Micahiel Nichloson*

**MICAHIEL NICHLOSON**

2-28-2012 *Fannie Mitchell*



*Exb. #18*

**AFFIDAVIT**

I   JAMES LITTLEJOHN WAS THEIR AS A WITNESS ON 01/31/2012 WHEN MAURICE

SYMONETTE WAS AT 162RD ST. NEAR BISCAYNE BLVD. AND HAD BEEN STOPPED BY THE POLICE

AND I SAW  DETECTIVE CATLIN GO IN THE GLOVE COMPARTMENT OF THE BLACK MERCEDES

MAURICE WAS DRIVING AND TOOK THE  GUN OUT OF IT.

**JAMES LITTLEJOHN**

2-28-2012  *Fannie Mitchell*



Exb.# 19.

**AFFIDAVIT**

I  ALFRED DAVIS WAS THEIR AS A WITNESS ON 01/31/2012 WHEN MAURICE

SYMONETTE WAS AT 162RD  ST. NEAR BISCAYNE BLVD. AND HAD BEEN STOPPED BY THE POLICE

AND I SAW  DETECTIVE CATLIN GO IN THE GLOVE COMPARTMENT OF THE BLACK MERCEDES

MAURICE WAS DRIVING AND TOOK THE  GUN OUT OF IT.

ALFRED DAVIS

2-28-2012   Fannie Mitchell



Exb. #20

### AFFIDAVIT

I  JAMES BUCKMAN WAS THEIR AS A WITNESS ON 01/31/2012 WHEN MAURICE

SYMONETTE WAS AT 162RD ST. NEAR BISCAYNE BLVD. AND HAD BEEN STOPPED BY THE POLICE

AND I SAW  DETECTIVE CATLIN GO IN THE GLOVE COMPARTMENT OF THE BLACK MERCEDES

MAURICE WAS DRIVING AND TOOK THE  GUN OUT OF IT.

**JAMES BUCKMAN**

2-28-2012  Fannie Mitchell



EXHIBIT [AA]

# IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| | CASE NUMBER 2007-12402 CA 01<br><br>Section: 23 |
|---|---|
| **JPMORGAN CHASE BANK (NA)**<br>**PLAINTIFF**<br><br>**VS**<br>**GARCIA, GEORGE, LEVITIN, JEFFREY, MARIN, KURT, WEXFORD HIGH YIELD DEBT FUND I (LC)**<br>**DEFENDANT** | **CLOCK IN** |

## CLERK'S CERTIFICATE OF DESTROYED FILE

I, **HARVEY RUVIN**, Clerk of the Circuit and County Court of the Eleventh Judicial Circuit in and For Miami-Dade County, Do Hereby Certify that:

**Case number: 2007-12402 CA 01 was destroyed on January 1, 2015 in accordance with Florida Statutes governing file destruction.**

In **Witness Whereof**, I have set my hand and affixed the Seal of the Said Court in Miami-Dade County, Florida, this 4th day of **February, 2016.**

| HARVEY RUVIN<br>CLERK OF COURTS | BY: *Elsie Powell*<br>DEPUTY CLERK | 2/4/2016<br>DATE |
|---|---|---|



**AFFIDAVIT**

ON THE DATE OF FEB. 3 2016 I MAURICE SYMONETTE WAS AT THE DADE COUNTY COURT HOUSE

ON FLAGLER STREET WHEN AND THE CLERK TOLD ME THAT THE FILES THAT BELONG TO

CASE: 07-012402CA23, FORECLOSURE CASE HAD BEEN DESTROYED.

MAURICE SYMONETTE
3320 NE 165TH ST.
MIAMI, FL. 33160

*Exhibit #[1B]*

## AFFIDAVIT

ON THE DATE OF FEB. 3, 2016 I JAMES BUCKMAN WAS THEIR AT THE DADE COUNTY COURT HOUSE ON FLAGLER STREET WHEN THE CLERK TOLD MAURICE THAT THE FILES THAT BELONG TO CASE: 07-012402CA23, FORECLOSURE CASE HAD BEEN DESTROYED.

JAMES BUCKMAN
3320 NE 165TH ST.
MIAMI, FL. 33160

*Exhibit [ 3 ]*

## AFFIDAVIT

I  Micahiel Nichloson  have many times viewed the files at the state courthouse In Miami for court case no: 2007-012402CA01, even after the time of 08/04/2009 When JPMorgan claimed the original Note was supposed to be in the files According to the docket and have never seen the original Note to the property In the file.

MICAHIEL NICHLOSON
3320 NE 165th street
MIAMI, FLA. 33165

CFN 2007R0438403
OR Bk 25580 Pgs 1174 - 1175; (2pgs)
RECORDED 05/01/2007 12:05:59
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

*Exhibit #A3*

---

space reserved for recording information

## IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
## OF FLORIDA, IN AND FOR MIAMI-DADE COUNTY

Washington Mutual Bank

        Plaintiff,

-vs-

Kurt Marin; George Garcia; Jeffrey Levitin,
As Trustee; Wexford High Yield Debt Fund I,
LLC; Sima Hadad; Unknown Parties in
Possession #1; Unknown Parties in
Possession #2; If living, and all Unknown
Parties claiming by, through, under and
against the above named Defendant(s) who
are not known to be dead or alive, whether
said Unknown Parties may claim an interest
as Spouse, Heirs, Devisees, Grantees, or
Other Claimants

        Defendant(s).

Case #:
Division #:  **07-12402 CA 02**

UNC:

## NOTICE OF LIS PENDENS

TO:   THE ABOVE NAMED DEFENDANT(S) AND ALL OTHERS WHOM IT MAY
CONCERN:

     YOU are hereby notified that suit was instituted by the above-named Plaintiff against the
above-named Defendant(s) on April 25, 2007, in the above styled cause, involving the following
described property, situated, lying and being in Miami-Dade County, Florida, to-wit:

Book25580/Page1174   CFN#20070438403

Page 1 of 2

OR BK 25580 PG 1175
LAST PAGE

*Exhibit* #

LOT 8, BLOCK 6, EASTERN SHORES 1ST ADDITION, ACCORDING TO THE
PLAT THEREOF, AS RECORDED IN PLAT BOOK 65, PAGE 39, OF THE PUBLIC
RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

Relief sought as to such property is for foreclosure of mortgage held by Plaintiff against
the premises.

YOU will, therefore, please govern yourselves accordingly.

By: _____
COLLEEN M. COLTON
FL Bar #0015167

SHAPIRO & FISHMAN, LLP
Attorneys for Plaintiff
2424 North Federal Highway
Suite 360
Boca Raton, Florida 33431
Telephone: (561) 998-6700
Fax: (561) 998-6707

JOSEPH N. RYAN
FL BAR #0356650

07-76750B

*Exhibit* *# 4*

Recording Requested By and
When Recorded Mail to:

Washington Mutual Bank
Office of the Corporate Secretary
1301 2nd Ave., WMC3501
Seattle, WA 98101

---

**Space Above for Recording Information**

## AFFIDAVIT OF THE
## FEDERAL DEPOSIT INSURANCE CORPORATION

I, Robert C. Schoppe, having been first duly sworn, hereby make this Affidavit and say that:

1.      I am an authorized representative of the Federal Deposit Insurance Corporation, an agency of the United States government (the "FDIC").

2.      On September 25, 2008, Washington Mutual Bank, formerly known as Washington Mutual Bank, FA ("Washington Mutual"), was closed by the Office of Thrift Supervision and the FDIC was named receiver.

3.      As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d)(2)(G)(i)(II), the FDIC, as receiver of Washington Mutual, may transfer any asset or liability of Washington Mutual without any approval, assignment, or consent with respect to such transfer.

4.      Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of Washington Mutual and JPMorgan Chase Bank, National Association ("JPMorgan Chase"), dated September 25, 2008 (the "Purchase and Assumption Agreement"), JPMorgan Chase acquired certain of the assets, including all loans and all loan commitments, of Washington Mutual.

5.      As a result, on September 25, 2008, JPMorgan Chase became the owner of the loans and loan commitments of Washington Mutual by operation of law.

Executed this _2ND_ day of October, 2008 in Seattle, King County, Washington.

By: _____

Print Name: Robert C. Schoppe
Title: Receiver In Charge for FDIC as
Receiver of Washington Mutual Bank

DOCSSEA/186745.v1

## NOTARY'S ACKNOWLEDGMENT

STATE OF WASHINGTON    )
                           ) SS.
COUNTY OF KING           )

I certify that I know or have satisfactory evidence that Robert C. Schoppe is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Receiver In Charge of the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual Bank to be the free and voluntary act of such party for the uses and purposes mentioned therein.

Dated this 2nd day of October, 2008.

Notary Public in and for the State of
Washington, residing in Redmond
My commission expires: 11/7/10

39FL
M39

*Exhibit #5*

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

3010215659

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%__ OF THE ORIGINAL AMOUNT (OR $___2,398,000.00___). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__JULY 14, 2006__                __MIAMI__                , __FLORIDA__
                                         CITY                            STATE

__3320 NE 165TH STREET, NORTH MIAMI BEACH, FL  33160__
                            PROPERTY ADDRESS

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ ___2,180,000.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA__ . I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2.  INTEREST
Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __7.645_%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.250__%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
### (A) Time and Place of Payments
I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
I will make my monthly payments on __1ST__ day of each month beginning on __SEPTEMBER, 2006__ . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __AUGUST 01, 2036__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".
I will make my monthly payments at __P.O. BOX 78148 PHOENIX, AZ 85062-8148__ _____, or at a different place if required by the Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $___7,264.89___, unless adjusted at an earlier time under Section 4(H) of this Note.

32281 (11-01)                    **Page 1 of 6**                LN76QFLA (VERSION 1.0)



3010215659

### (C) Payment Changes

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may further change on the ___1ST___ day of ___SEPTEMBER, 2006___, and on that day every month thereafter. Each such day is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___THREE AND 213/1000___ percentage points ___3.213___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than ___TEN AND 513/1000___ percentage points ___10.513___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing ___SEPTEMBER 01, 2007___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

### (F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.



3010215659

### (G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

### (H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to __110%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __110%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

### (I) Required Full Monthly Payment

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

### (J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.



32281 (11-01)    Page 3 of 6    LN780FLC (VERSION 1.0)

39F2

3010215659

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ __15.00__ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of __FIFTEEN__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if i give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

LN RECORD (VERSION 1.0)

32281 (11-01)                    **Page 4 of 6**

3010215659

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

### Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of any breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

3010215669

**13. DOCUMENTARY TAX**
The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

_____       _____

KURT MARIN

_____       _____

_____       _____

_____       _____

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK, FA

BY _____
CYNTHIA RILEY
VICE PRESIDENT



(VERSION 1.0)

32281 (11-01)

Case ...-...-.....-...-JW    Document ...    Entered on FLSD Docket 02/12/2018    Page 65 of 233

Exhibit # 6



**Washington Mutual**

William L. Lynch
Secretary

Legal Department
1201 Third Avenue
WMT1706
Seattle, Washington 98101



(206) 461-3140
FAX: (206) 377-5409

Notification of:
January 25, 2005

☐ Approval        ☑ Notice Appropriately
☐ No Objection        Filed and Accepted
☐ File Closed        ☑ Compliance Materials
☐ No Further Action        Filed and Accepted
Required        ☑ As of 2/2/05

By: _Penny D. Marshall_
Title: _Regional Application Manager_

Ms. Penny Marshall
Office of Thrift Supervision
101 Stewart Street, Suite 1010
Seattle, WA 98101

Re:    Change of Corporate Title

Dear Ms. Marshall:

Washington Mutual Bank, FA (the "Association") proposes to change its corporate title to "Washington Mutual Bank." The Association is providing this notice to the OTS under OTS regulations as codified at 12 C.F.R. § 543.1(b), 12 C.F.R §552.4(b)(1) and 12 C.F.R §552.5(b)(2).

Responding to the Association's October 15, 2004, notice about an amendment of the Association's bylaws to state specifically that the Association may do business under the name "Washington Mutual Bank," Mr. Dyer of the OTS confirmed in his October 21, 2004, letter that the OTS would not object to the bylaw amendment as proposed. On December 21, 2004, the Association's board of directors approved the bylaw amendment, to become effective upon the merger between the Association's acquisition, by merger, of its sister federal savings bank, which had the corporate title of Washington Mutual Bank. This merger was consummated on January 1, 2005.

_Fed. Savings Bank_

The Association now proposes to take the additional step of actually changing its corporate title to Washington Mutual Bank. A copy of certain resolutions to be submitted to the Association's board of directors for this purpose is enclosed. The first resolution would amend Section 1 of the Association's Federal Stock Charter (No. 4539) to read as follows:

Section 1.    Corporate Title. The corporate title of the savings bank is Washington Mutual Bank.

The second resolution, as shown on the enclosure, would amend Article I, Section 1 of the Association's bylaws to read as follows:

Section 1.    Corporate Title and Name. The corporate title of the savings bank is Washington Mutual Bank. The savings bank also may do business under the name Washington Mutual Bank, FA.

Both of these amendments would become effective as of April 4, 2005.

Thank you for your consideration. If you have any questions or comments, please do not hesitate to call me at 461-3140.

Sincerely,

William Lynch

cc:    John Robinson
Enclosure

EX6,7

PAGE 1

CERTIFIED FORENSIC LOAN AUDITORS

# CERTIFICATE OF COMPLETION

(Mortgage Securitization Auditor Training Course — 24 hr)

AWARDED TO

## Eliyshuwa Shaphat Yisrael

Congratulations for successfully completing the 24 hour CFLA Mortgage Securitization Auditor Training Class. You have satisfactorily met all requirements and passed all examinations necessary to be a CFLA accredited Mortgage Securitization Auditor (cont)

Andrew Lehman, J.D.



# AFFIDAVIT OF FACTS

STATE OF ILLINOIS        )

                                       ) VS.: AFFIDAVIT

COUNTY OF COOK        )

## RE: KURT MARIN

I, ELIYSHUWA SHAPHAT YISRAEL, a citizen of the United States and the State of Florida over the age of 21 years, and declare as follows under penalty of perjury that the facts stated herein are true, correct and complete. The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein:

1.    That I am a subscriber of the Bloomberg Professional Service, certified and to use such service. I have completed the required training and engaged in continuing education with Bloomberg - both online and at Bloomberg live training events, to stay abreast with Bloomberg's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the Bloomberg terminal.

2.    I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced approximately one hundred Securitized Analysis Reports in residential real estate mortgage investigation in 15 states and in United States, I have Not testified as an expert witness In Any Court I have Completed auditors in California, Florida, New Jersey, Nevada, New York and Virginia and via the internet in webinar format.

3.    I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automated tracking and determination of mortgage and loan related documents and information.

4.    The contents of this report are factual but it is provided for information purposes only and is not to be construed as "legal advice.'"

5.    On DECEMBER 8, 2015, I researched the Bloomberg online Database at the request of KURT MARIN. Whose property address is 3320 NE 165 STREET NORTH MIAMI BEACH.

6.    Based on the information I was provided, Kurt Marin signed a Promissory Note in favor of Federal Saving Bank, Home Loan on July 14, 2006.

7.    Loan was identified in the WAMU MORTGAGE PASS- THROUGH CERTIFICATE.TRUST 2006-AR12.

8.    The basis of the identification of Loan in WAMU MORTGAGE PASS-THROUGH CERTIFICATE TRUST 2006-AR12 was made from the following factors/information that exactly corresponds with Kurt Marin loan documents provided: Loan Number. 3010215659097; Original Amount: $2,180.000.00. Origination Date: July 14, 2006; Location of Property: MD; Property Type: Single Family Residence; Occupancy: Owner Occupied; Zip Code: 33160; Type Loan: 30 Year Fixed Rate Mortgage.

pg #2

*pg.3*

9.    Kurt Marin Note was split-apart or fractionalized a Separate accounting entries and deposited separately into Classes. Each Class is insured up to 3 Times the face value of each Note therein which is permissible under the Federal Reserve System.

10.    Pursuant to my extensive research. I have found the Loan in **TWENTY FOUR (29) Classes** of the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12. These classes represent the Sections that the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRSUT 2006-AR12 is divided into. Individuals invest in these Classes based on their desired maturities, yield, credit rating and other factors. The WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12 pays interest, usually monthly, to investors and principal payments are paid out in the order of the maturity and as specified in trust agreements.

11.    Below are the classes the WAMU MORTGAGE PASS THROUGH CERTIFICATE has been divided into and their CUSIP number which is a nine (9) character alphanumeric code identifying any North American security for the purpose of facilitating clearing and settlement of trades



*pg# 3*

12. There are a total of _TWETY FOUR(29) classes_ in the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12.

13. The loan is in <u>TWENTY NINE  (29) classes</u>.  Four (1) classes out of the <u>TWENTY NINE  (29 )</u> have been paid (Pd.).The loan is in the all collateral group and group 2.

14. Generally, if the Mortgage and the Note are not together with the same entity, there can be no Legal enforcement of the Note. The Mortgage enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Mortgage and the Note are separated, foreclosure legally cannot occur. The Note cannot be enforced by the Mortgage if each contains a different mortgagee/beneficiary; and, if the Mortgage is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

15. No Entity can be a CREDITOR if they do not hold/own the asset in question (i.e. the NOTE and/or the property);a Mortgage Pass Through Trust (I.e. R. E. M. I. C., as defined in Title 26,Subtitle A, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is void abinitio.  This is an indication that either the Trust has either voided its intended Tax Free Status, or the asset is not in fact owned by it.

16. In the event that the loan was sold, pooled and turned into a security, such event would indicate that the alleged holder can no longer claim that it is a real _party_ of interest, as the original lender has been paid in full.

17. Further said, once the Note was converted into a stock, or stock equivalent, that event would indicate that the Note is no longer a Note.  If both the Note and the stock, or stock equivalent, exist at the same time, that is known as double dipping.  Double dipping is a form of securities fraud.

18. Once a loan has been securitized, which the aforementioned loan _may_ have been done _many_ times, that event would indicate that the loan forever loses it security component (i.e., the Mortgage), and the right to foreclose through the Mortgage is forever lost.

19. The findings of this report indicate that the Promissory Note has been converted into a stock as a permanent fixture. As a stock it is governed as a stock under the rules and regulations of the SEC; hence, the requirement for the filings of the registration statements, pooling and servicing agreements. form 424B-5,et.al.There is no evidence on Record to indicate that the Mortgage was ever transferred concurrently with the purported legal transfer of the Note, such that the Mortgage and Note has been irrevocably separated, thus making a nullity out of the purported security in a property, as claimed

20. Careful review and examination reveals that this was a securitized loan. The Assignment of Mortgage pretended to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales, where A is the original lender, B the sponsor/seller, C the bankruptcy-remote depositor ,and D, the issuing mortgage-backed securities trust. They also hid the legal SEC filings, governing the transaction according to our findings. But to be controlled By those SEC filings, the true original loan Note and Mortgage had to be provided by the Document Custodian certified to have been in possession of them by them on or about Aug 14, 2006. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement. I supply this report as written testimony and am available for oral testimony.

P5 5 #

STATE OF ILLINOIS )

                                    ) vs.: **ACKNOWLEDGEMENT**

COUNTY OF COOK        )
On 01 - 14 - 2016 before me, *Eliyshuwa Shaphat Yisrael*
                                         (Notary Public)

personally appeared **ELIYSHUWA SHAPHAT YISRAEL**, who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument under the penalty of perjury.

**1** certify under PENALTY OF PERJURY under the laws of the State of Florida that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

"OFFICIAL SEAL"
TARA BLAKE
Notary Public - State of Illinois
(Seal)
My Commission Expires December 03, 2016

My commission Expires    12 / 03 / 2016

Pg # 5





**Marin**

No findings in any publicly-reporting trust.  Exact identification of securitization trust or corporate bank portfolio may be gotten through a QWR, Request for Information under Regulations X and Z, a FOIA request, voluntary lender disclosure or discovery through litigation.

The following is a Washington Mutual Bank trust meeting the qualifications for securitization:

**Prospectus Supplement form 424(b)5**

http://www.sec.gov/Archives/edgar/data/1317069/000095011706003996/a42770.htm

**Pooling and Servicing Agreement**

http://www.sec.gov/Archives/edgar/data/1374624/000127727706000721/exh41to8kpsawamu2006_ar12.pdf









pg 9

WAMU 2006-AR12 1A1 Mtge · SFNS · Related Functions Menu

WAMU 2006-AR12 1A1

**ID Documents**                                              **Structured Finance Notes**

Underwriter

Original Servicer                          Trustee

                                           Paying Agent

Originator                    Deal         Asset Manager

                                           Swap Counterparty

Issuer                        Deal #

---

WAMU 2006-AR12 1A1 Mtge · RCHG · Related Functions Menu

**WAMU 2006-AR12 1A1 Mtge**      Setup Alert                   **Ratings History**

                                           Appraisal

Agency                        Rating Type       Rating

                              No Change

pg # 9

pg 10



Pg (11)



# $ PG
(12)

Prospectus Supplement to Prospectus Dated January 6, 2006

# WaMu Mortgage Pass-Through Certificates, Series 2006-AR12

## WaMu Asset Acceptance Corp.
Depositor

## Washington Mutual Bank
Sponsor and Servicer

## $1,694,778,749
(Approximate)

Consider carefully the risk factors beginning on page S-16 in this prospectus supplement and page 5 in the accompanying prospectus.

The certificates will represent interests only in the issuing entity which is WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust and will not represent interests in or obligations of Washington Mutual Bank, WaMu Asset Acceptance Corp., Washington Mutual, Inc. or any of their affiliates.

Neither these certificates nor the underlying mortgage loans are guaranteed by any agency or instrumentality of the United States.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

The WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust will issue twenty three classes of offered certificates and six classes of privately placed certificates. Each class of offered certificates will be entitled to receive monthly distributions of interest, principal or both, beginning on October 25, 2006. The certificate interest rate for some classes of offered certificates will be variable. The table on page S-6 of this prospectus supplement contains a list of the classes of offered certificates, including the initial class principal balance, certificate interest rate, and special characteristics of each class.

The primary asset of the Trust will be a pool of first lien single-family residential mortgage loans whose interest rates (after an initial fixed-rate period) adjust annually. The Trust will also contain other assets, which are described on page S-29 of this prospectus supplement.

### Offered Certificates

| | |
|---|---|
| Total principal amount (approximate) | $1,694,778,749 |
| First payment date | October 25, 2006 |
| Interest and/or principal paid | Monthly |
| Last payment date | October 25, 2036 |

Credit enhancement for the Class 1-A1, Class 1-A2, Class 1-A3, Class 1-A4, Class 1-A5, Class 2-A1, Class 2-A2, Class 2-A3, Class 2-A4, Class 1-X, Class 2-X, Class 2-P, Class L-B-1, Class L-B-2 and Class L-B-3 Certificates is being provided by three classes of privately offered certificates, which have an aggregate principal balance of approximately $16,100,805. Credit enhancement for the Class 3-A1, Class 3-A2, Class 3-A3, Class 3-A4, Class 3-B-1, Class 3-B-2 and Class 3-B-3 Certificates is being provided by three classes of privately offered certificates, which have an aggregate principal balance of approximately $2,499,831. Additional credit enhancement for the offered senior certificates is being provided by the related classes of offered subordinate certificates. Losses otherwise allocable to some senior certificates will instead be allocated to other senior certificates.

The underwriter listed below will offer the offered certificates at varying prices to be determined at the time of sale. The proceeds to WaMu Asset Acceptance Corp. from the sale of the offered certificates will be approximately 100.25% of the principal balance of the offered certificates plus accrued interest, before deducting expenses. The underwriter's commission will be the difference between the price it pays to WaMu Asset Acceptance Corp. for the offered certificates and the amount it receives from the sale of the offered certificates to the public.

Neither the SEC nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

*Underwriter*

# WaMu Capital Corp.

September 22, 2006

Pg. 13



Pg. #13

pg.(14)

WAMU 2006-AR12 1A1 Mtge   ·   BBLS   ·   Related Functions   Menu   ▼

Menu to Return

1 Search    2 Preference    3 Save    4 Clear    5 Options    6 Feedback

Content Searches

WaMu Mortgage Pass-Through Certificates Series
2006-AR12

Exact Match

All Dates

<Enter Source name or ? to Browse>
1) Favorite Sources

1) Individual Parties

Any

Include All

Include                                          Lookup

WAMU 2006-AR12 1A1 Mtge   ·   BBLS   ·   Related Functions   Menu   ▼

to Search Result Title Only   <MENU> to return

<Narrow Search>    1) Save Alert    2) Edit Search    3) Options    Page   Documents

Dockets                    All Dockets              mm/dd/yyyy    01/06/2016

Keywords/w... X  Documents /... X
1) Nature of Suit                                        1) Court

pg.#14





*Pg 16*

CUSTOMER SERVICE    OPEN AN ACCOUNT    REFER A FRIEND    LOG OUT

Accounts & Trade | News & Insights | Research | Guidance & Retirement | Investment Products

Research > Fixed Income > Individual Bonds > Search Results

# WAMU MTG CERT SER 2006-AR12
CL 1-A1 2.43112% 10/25/20362006-AR12 BOND

Overview    Price & Performance

## Details

| | |
|---|---|
| CUSIP | 93363NAA3 |
| ISIN | -- |
| SEDOL | -- |
| Pay Frequency | MONTHLY |
| Coupon | 2.431 |
| Maturity Date | 10/25/2036 |
| Moody's Rating | NR |
| S&P Rating | D |
| Issuer Events | NO |
| Survivor Option | N/A |
| Bond Type | Corporate |
| Sector | N/A |
| Interest Accrual Date | 09/01/2006 |

## Redemptive Features

| | |
|---|---|
| Call Protection | YES |
| Continuously Callable | -- |
| Called Bonds | NO |
| Make Whole Call | NO |
| Sinking Fund Protection | YES |
| Sink Defeased | NO |
| Extraordinary Redemption | -- |
| Special Mandatory Redemption | NO |
| Special Optional Redemption | NO |
| Put Option | NO |
| Pre Refunded | -- |
| Escrow End Date | -- |

## Security Features

| | |
|---|---|
| Minimum Investment Qty | 25 |
| Incremental Investment Qty | 1 |
| Marginable | NO |
| Original Issue Discount [OID] | N/A |
| Current Factor | 0.05798875 |
| Current Factor Effective Date | 12/25/2015 |
| Previous Factor | 0.05831332 |
| Previous Factor Effective Date | 11/25/2015 |
| 2nd Previous Factor | 0.05881164 |
| 2nd Previous Factor Effective Date | 10/25/2015 |
| Tranche Type | SEQUENTIAL |
| Delivery | BOOK ENTRY |
| Listed | NO |
| Symbol | -- |
| Exchange | OTC |
| TRACE Eligibility | YES |

## Issuer Information

| | |
|---|---|
| Issuer Date | 09/22/2006 |
| Dated Date | 09/01/2006 |
| First Coupon Date | 10/25/2006 |
| Next Coupon | -- |
| Last Coupon | -- |
| Work out Date | 10/25/2036 |
| Original Issue Amount | $429,891,000.00 |
| Issue Price | -- |

## Coupon Information

| | |
|---|---|
| Coupon Type | FLOATING |
| Current Rate Effective Date | 11/01/2015 |
| Day Count Basis | 30/360 |
| Reset Frequency | ONE TIME |
| Benchmark Reference | -- |
| Benchmark Formula | -- |
| Next Reset Date | -- |
| Next Reset Rate | -- |
| Minimum Rate | -- |
| Maximum Rate | -- |

## Convertible Information

| | |
|---|---|
| Convertible | NO |
| Share Amount | -- |
| CUSIP (of equity security) | -- |
| Date (Convertible Information) | -- |

## Foreign Information

| | |
|---|---|
| Global Indicator | NO |
| Foreign | NO |
| International | NO |
| Issuance Country | -- |
| Domicile Country | -- |

## Latest Company Reports
There are currently no reports available.

## Latest Industry Reports
There are currently no reports available.

*Pg #16*

Fidelity's Fixed Income Search Results

https://fixedincome.fidelity.com/ftgw/fi/FIIndividualBondsSearch?cus...

pg. (17)

CUSTOMER SERVICE   OPEN AN ACCOUNT   REFER A FRIEND   LOG OUT

Search or get a quote

| Accounts & Trade | News & Insights | Research | Guidance & Retirement | Investment Products |

- Research >
- Fixed Income >
- Individual Bonds >
- Search Results

- Help/Glossary

# Bond Results

View other important information and risks of investing in fixed income securities

- Table View

- Price/Yield Calculator
- Taxable Equivalent Yield Calculator

**Attributes Legend**

**Your Key Search Criteria**

| IE: | Issuer Event | SFP: | Sinking Fund Protection | CP: | Call Protection | HY: | High Yield | SO: | Survivor's Option |

| D: | Depth of Book Available | ER: | Extraordinary Redemption |

| | |
|---|---|
| Search Name | All to All All to All |
| Maturity Date | All |
| Moody's Rating | All |
| S&P Rating | All to All |
| Call Protection | All |
| Sinking Fund Protection | All |

As of 01/12/2016 at 08:44 p.m.

## Total Bonds Found: 1

Select Action

| Description | Coupon | Maturity Date | Rating | | | Bid | | Ask | | Depth of Book | 3rd Party Price / Recent Trades | Attributes and Issuer Events | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Moody's | S&P | Yield | Price Qty(min) | Price Qty(min) | Yield to Worst | Yield to Maturity | | | | |

Fidelity is not currently offering this security.

| 1 | WAMU MTG CERT SER 2006-AR12 CL 1-A1 2.43112% 10/25/20362006-AR12 BOND | 2.431 | 10/25/2036 | NR | D | -- | -- --(--) | -- --(25) | -- | -- | 88.377 -- | CP SFP HY | • Buy • Sell |

Select Action

Bond and CD prices, yields, and availability are time sensitive and subject to change based upon market conditions and other factors.

Bonds and CDs with higher yields generally carry greater risk than lower yielding bonds.

The yields displayed are estimates based on the bid/ask prices quoted and do not reflect concessions charged by Fidelity Brokerage Services LLC. Prices and yields will be recalculated for your review prior to placement of an order.

Ratings, if provided, are opinions and not recommendations to purchase, hold or sell securities, and they do not address the market value of securities or their suitability for investment purposes. Ratings should not be relied on as investment advice. Please read important disclaimer information.

🔷 Fidelity

pg. # 17

© 1998 – 2014 FMR LLC.

1/12/2016 5:44 PM

Corporate Bond Overview | Fidelity Investments

https://fixedincome.fidelity.com/ftgw/fi/FIBondDetails?requestType=

pg 18

Bond Details and related news is supplied by various third-party companies that are not affiliated with Fidelity or its affiliates. Fidelity does not explicitly or implicitly endorse or approve such content. Content is provided for informational and/or educational purposes only. You must make your own evaluation of how the information may influence your investment decision. Although content is continuously supplied, it is only valid as of the date published and may become unreliable because of subsequent market conditions or other reasons.

Consult the security's prospectus for more complete information regarding the details listed.

Recent trade information contains actual trade data as reported to the Financial Industry Regulatory Authority (FINRA)'s Trade Reporting and Compliance Engine (TRACE) for Corporate Bonds, and from the Municipal Securities Rulemaking Board (MSRB) for Municipal bonds. The prices quoted provide insight into recent historical transaction levels and are not necessarily reflective of current market value. Fidelity reports TRACE and MSRB information on a real-time basis.



© 1998 – 2014 FMR LLC.
All rights reserved.
Terms of Use   Privacy   Security   Site Map

pg #18

1/12/2016 5:45 PM

Exhibit 8

IN THE CIRCUIT COURT OF THE
EIGHTEENTH JUDICIAL CIRCUIT IN
AND FOR BREVARD COUNTY, FL

CASE NO.:   05-201 -CA-0    7

JPMORGAN CHASE BANK, N.A.,

                **Plaintiff,**

v.

R                ET AL,

                **Defendant.**

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE having come before this Court on October 17, 2013 upon the Defendant's Motion for Summary Judgment.   The Court having reviewed the pleadings, the subject motion and heard argument of counsel does hereby ORDER and ADJUDGE.

1. The Defendant served requests for admission July 22, 2013.  The Plaintiff failed to serve and files responses within thirty days of service of the requests for admission.

2. After Plaintiff failed to reply to Defendant's request for admissions, on September 11, 2013, Defendant served a motion for summary judgment which set forth that Plaintiff's failure to reply to requests for admission would be a basis for Defendant seeking summary judgment against the Plaintiff.

3. Defendant's second request for admission was "Plaintiff is not the current holder of the original mortgage note.  Defendant's third request for admission was "Plaintiff is not the owner of the original mortgage note."

4. By operation of law, Plaintiff admitted that it is not the owner or holder of the note.

5. Based upon the admissions the Court finds that Plaintiff does not own or hold the note.

6. Summary judgment and Final Judgment is granted in favor of the Defendant and against the Plaintiff.

7. The Plaintiff shall recover nothing from this action and the Defendant shall go forth without day.

8. The Defendant is the prevailing party and is entitled to reasonable attorney's fees and costs. Jurisdiction is reserved to determine the amount of attorney's fees.

**DONE and ORDERED** in Chambers in on this _17_ day of October, 2013.

_____

Honorable O.H. Eaton, Jr.

Copies Furnished to:
Richard Shuster, Attorney for Defendant, and
_____, Attorney for Plaintiff

Case 1:18-cv-20539-KMW   Document 1   Entered on FLSD Docket 02/12/2018   Page 86 of 233
Case 15-21548-RBR   Doc 25   Filed 08/25/15   Page 7 of 48

*Exhibit #9*

Lawrence Nardi - 5/9/2012

Page 1

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT, IN AND
FOR LAKE COUNTY, FLORIDA

CASE NO.: 2009 CA 005717

JPMORGAN CHASE BANK, N.A.
as Successor in Interest to
WASHINGTON MUTUAL BANK,

    Plaintiff,

VS

SHERONE D. WAISOME, et al,

    Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:    LAWRENCE NARDI, VOLUME 1 OF 2

DATE TAKEN:    MAY 9, 2012

TIME:    9:03 A.M.

PLACE:    121 SOUTH ORANGE AVENUE
    SUITE 800
    ORLANDO, FLORIDA

REPORTED BY:    CINDY CONNER, CSR, RPR AND
    NOTARY PUBLIC

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Lawrence Nardi - 5/9/2012

Page 57

1        A    No.

2        Q    And do you know anything about the loss-share

3    agreement, specifically the calculation of losses and

4    how they are shared with the FDIC?

5        A    No.

6        Q    Okay.  Who in the bank would have that

7    knowledge?

8        A    I don't know of a specific name.  It sounds

9    like the items that you're looking for encompass more

10   than just the mortgage banking portion.  It probably

11   encompasses all of the bank's losses in the loss

12   sharing, so I -- you know, it would likely be someone

13   quite a bit higher up the chain and, you know, probably

14   in a -- in a much larger office than mine.

15       Q    Okay.

16       A    So I don't know any specific names, but it

17   would be someone who's in a control position in the

18   bank, I imagine.

19       Q    Okay.  The -- are you aware of any type of

20   schedule of loans that would have been created to

21   represent the -- either the loans that were asset loans

22   or the loans that were serviced by WAMU?  Are you -- was

23   the -- do you know if there is a schedule or database of

24   loans like that?

25            MS. CREWS:  Object to form.

Lawrence Nardi - 5/9/2012

Page 58

1 A I know that there was a schedule contemplated

2 in certain documents related to the purchase. That

3 schedule has never materialized in any form. We've

4 looked for it in countless other cases. We've never

5 been able to produce it in any previous cases. It would

6 certainly be a wonderful thing to have, but it's -- as

7 far as I know, it doesn't exist, although it was -- it

8 was contemplated in the documents.

9 Q (By Ms. Mack) Do you -- do you know how

10 the -- well, okay. If -- for purposes of this question,

11 let's assume that the Waisome loan was an asset of WAMU.

12 Okay?

13 A Okay.

14 Q And if it was assumed by JPMorgan Chase

15 because of the purchase and assumption, how would you be

16 able to tell what the book value was at the time --

17   MS. CREWS: Object to the form.

18 Q (By Ms. Mack) -- of the closure of the bank,

19 WAMU?

20 A For the individual loan level?

21 Q Yes.

22 A I -- the answer is I don't know if there was

23 any book level assigned to individual loans. My

24 understanding of the transaction is it was a whole bank

25 purchase, and there was not individual values assigned

Lawrence Nardi - 5/9/2012

Page 261

1      Q    (By Ms. Mack)  Right.

2      A    No, there is no assignments of mortgage.

3  There's no allonges.  There's no -- in the thousands of

4  loans that I have come in contact with that were a part

5  of this purchase, I've never once seen an assignment of

6  mortgage.  There is simply not -- they don't exist.  Or

7  allonges or anything transferring ownership from WAMU to

8  Chase, in other words.  Specifically, endorsements and

9  things like that.

10     Q    This would be actually specifically through

11  the FDIC and would contain the language that is in 3.3.

12     A    No.

13          MS. CREWS:  Object to form.

14     A    I haven't seen the document.

15          MS. MACK:  Well, I'm clarifying this and

16          talking about certain documents.

17     Q    (By Ms. Mack)  So you just don't -- you don't

18  think that is something that was performed --

19          MS. CREWS:  Object to form.

20     Q    (By Ms. Mack)  -- as far as transferring the

21  properties in the manner indicated in the purchase and

22  assumption agreement?

23          MS. CREWS:  Object to form.

24     A    Again, I -- I don't know of any requirement or

25  process that was followed regarding the language in this

First Choice Reporting & Video Services
Worldwide Scheduling

www.firstchoicereporting.com                              800.939.0093

Electronically signed by Cindy Conner (301-016-457-7653)
Electronically signed by Cindy Conner (301-016-457-7653)

e6eaab86-8de3-4186-b620-7a9b984956f0

*Exhibit 10*

# PURCHASE AND ASSUMPTION AGREEMENT
## AMONG
### FEDERAL DEPOSIT INSURANCE CORPORATION,
### Receiver of Washington Mutual Bank
### Henderson, NV
### and
### JPMorgan Chase Bank, National Association, Seattle, WA
## DATED AS OF
### September 25, 2008

## AMENDMENT TO ARTICLE 1
## FINAL SETTLEMENT DATE

Pursuant to Article 1: "means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date."

The purpose of this **Amendment** is to extend the time period for the **Final Settlement** to August 30, 2010.


**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**Receiver of Washington Mutual Bank**


BY: _John E. Eveland_  6/18/20__
John E. Eveland                  Date
Manager
Receivership Oversight

*ExHibit [88]*

*Part 1*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DR. KURT MARIN, MAURICE SYMONETTE AND CLYDE MCPHATTER, | )) )) )) )) | CASE No: *2007* |
| Plaintiffs, | )) )) | |
| vs. | )) )) )) | **AFFIDAVIT OF EXPERT WITNESS WILLIAM J. PAATALO** |
| WASHINGTON MUTUAL BANK, F.A., WASHINGTON MUTUAL BANK and J.P. MORGAN CHASE BANK, | )) )) )) )) )) ) | |
| Defendant(s) | | |

---

I, William Paatalo, being first duly sworn, hereby declare as follows:

1.     I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

1. Affidavit of William J. Paatalo

2.      I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this declaration, and if called to testify, I could and would competently testify thereto.

3.      I have 17 years combined experience in law enforcement and the mortgage industry.  My Resume ("CV") is attached as "**Exhibit 1.**"

4.      I have worked exclusively over the last 6 - years investigating foreclosure fraud, chain of title, and issues related to the securitization of residential and commercial mortgage loans, and have spent nearly 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis.

5.      I have performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Arizona, Nevada, Florida, Ohio, Texas, Montana, New Jersey, and several other states.

6.      As of this date, I have conducted close to 900 investigations in this area.

7.      As a result of my education and experience I am familiar with and have sufficient training and expertise to qualify as an expert, and I have testified as

an expert in state and federal judicial proceedings in various jurisdictions

throughout the United States.

8.    Most recently, I was admitted to testify at trial as an expert witness on

February 25, 2015 in the following California Federal Bankruptcy case:

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

9.  Some specific areas of my expertise that have been deemed qualified by

the courts are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use, as well as the interpretation of "MBS Data" showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

10.     In developing the opinions in this affidavit, I relied upon documents filed under penalty of perjury with the U.S. Securities & Exchange Commission (SEC), publicly recorded documents in the Federal Court's PACER System, documents provided by the Plaintiff(s) in this action, and documents from past investigations.

11.     I was retained by Maurice Symonette to review the chain of title and securitization of the Marin Mortgage executed with "Washington Mutual Bank, F.A." dated July 14, 2006. I was asked to point out any discrepancies or issues of fact regarding the chain of title and the securitization of the loan.

12.     The following documents were inspected and/ or marked as exhibits:

- Complaint filed April 26, 2007 Case No. 2007-012402-CA-01

- Washington Mutual Bank's Motion for Summary Judgment filed May 20, 2009.

- Final Judgment filed July 23, 2009

**Exhibit 2** – JPMorgan Chase "Press Release" September 25, 2008.

**Exhibit 3** –  Deposition Transcript – Crystal Davis

**Exhibit 4** – Crystal Davis Deposition Exhibit – Private Investor Codes

**Exhibit 5** – "3270 Explorer: Loan Transfer History" screenshot – Kelley

**Exhibit 6** – Chase "Investor" disclosure letters

**Exhibit 7** – Unrelated "Assignment of Mortgage" recorded 12/14/2007 –

Miami Dade County, FL

**Exhibit 8** - Affiliated Business Disclosure

**Exhibit 9** - Washington Mutual Bank, F.A. – Board of Directors Resolution –

1/25/2005.

13.    Having reviewed the above documents, my professional opinions are

as follows:

a.  The Plaintiff in Case No. 2007-012402-CA-01 ("Washington

Mutual Bank") (WMB) was not the "Lender" that originated the subject Mortgage.

The originating "Lender" was "Washington Mutual Bank, F.A." (WMBFA) which

was operating as a "broker," disguising itself as a "federal savings bank," was

separate and distinct from WMB, and was not a part of the FDIC's Receivership on

September 25, 2008.

b.  WMBFA brokered the Marin Mortgage and Note through one of its

non-bank subsidiaries who then securitized the subject loan and sold the securities

to private investors. These sales transactions prior to the FDIC's takeover of WMB

were concealed from the Court, along with the identity of the private investor(s)

for the subject loan. And,

c.  As such, JPMorgan Chase Bank, N.A. acquired no ownership or

mortgagee rights by virtue of the "Purchase & Assumption Agreement" (PAA) with the FDIC. At most, JPMC acquired only the servicing rights on behalf of undisclosed private investors.

## EVIDENCE IN SUPPORT OF OPINIONS

### "Washington Mutual Bank"(WMB) and "Washington Mutual Bank, F.A." (WMBFA) were operating as separate and distinct entities, to which WMBFA was operating as a "broker," not a "federal savings bank."

14.     The Marin Mortgage was originated on July 14, 2006 naming the lender as "Washington Mutual Bank, F.A. a Federal Savings Bank" with an address of "2273 N. Green Valley Parkway, Suite 14, Henderson, NV 89014" The Plaintiff in the foreclosure action filed on April 26, 2007 was named as "Washington Mutual Bank."

15.     According to "Washington Mutual Inc.'s" "10-K" filing under oath with the Securities & Exchange Commission (SEC) on March 15th, 2006, the following disclosure is made on page 6:

> *"On January 1, 2005, the Company's state savings bank, the former Washington Mutual Bank merged into Washington Mutual Bank, FA, and ceased to exist; subsequently, Washington Mutual Bank, FA changed its name to Washington Mutual Bank ("WMB")."*

(http://www.sec.gov/Archives/edgar/data/933136/000110465906016786/a06-2446_110k.htm)

16.     As of April 4th, 2005, Washington Mutual Inc. owned only two

federal banking subsidiaries: "*Washington Mutual Bank*" and "*Washington Mutual Bank, fsb.*" The "10-K" filed on March 15, 2006 states on page 8:

> "*One of the Company's federal savings associations, WMB, currently is a member of the San Francisco FHLB. The other federal savings association, Washington Mutual Bank fsb ("WMBfsb"), is a member of the Seattle FHLB.*"

17.    This means there are three possible scenarios related to the existence of "Washington Mutual Bank, F.A. – a federal savings bank" at the time the Marin Mortgage was originated in 2006.

(1) "Washington Mutual Bank, F.A." was <u>not</u> a federal savings bank as represented on the Mortgage.

(2) "Washington Mutual Bank, F.A." was using an unregistered "D/B/A" or assumed / fictitious name on the document, failing to disclose the identity of the legally named lender. Or,

(3)  "Washington Mutual Bank, F.A." was a separate and distinct entity operating at arms-length from "Washington Mutual Bank."

18.    Attached as **Exhibit 7** is a "Washington Mutual Bank, F.A. – Board of Directors Resolution" dated January 25, 2005 which states that beginning April 4, 2005, "*The corporate title of the savings bank is Washington Mutual Bank. The*

*savings bank also may do business under the name Washington Mutual Bank, F.A."*

19.     From experience investigating hundreds of "Washington Mutual Bank, F.A." cases throughout the United States, JPMorgan Chase Bank argues that both "Washington Mutual Bank, F.A." and "Washington Mutual Bank" were simply one in the same and interchangeable, yet nowhere on any mortgage or deed of trust is the corporate title "Washington Mutual Bank" followed by "D/B/A Washington Mutual Bank, F.A.," or "Washington Mutual Bank a/k/a Washington Mutual Bank, F.A."

20.     However, evidence shows that WMB and WMBFA were entities operating in separate capacities.  Attached as **Exhibit 7** is an "Assignment of Mortgage" that was recorded in Miami-Dade County, Florida on December 14, 2007 as Doc. No. 2007R1184686, Bk 2610, pg. 0401." This assignment shows a negotiated transfer of a mortgage and note in the year 2007 from the assignor "Washington Mutual Bank, F.A." to the assignee "Washington Mutual Bank" for *"consideration of the sum of $1.00 Dolla[r.]"*

21.     Attached as **Exhibit 8** is an "Affiliated Business Arrangement – Disclosure Statement Notice" from my own personal loan transaction in January 2007. I too, executed a deed of trust with "Washington Mutual Bank, F.A." on January 30, 2007.

22.     This document discloses that "Washington Mutual Bank, F.A." and "Washington Mutual Bank" were operating as affiliated businesses which not only corroborates the assignment (**Exhibit 7**), but it conflicts with "Board of Directors Resolution" (**Exhibit 9**.) I wrote an article on this precise issue which can be found at:

http://bpinvestigativeagency.com/washington-mutual-bank-f-a-and-washington-mutual-bank-were-used-for-different-purposes-primarily-fraud/

23.     It is my opinion that WMBFA was being used as a brokering entity for purposes of securitization. Nowhere in the PAA with the FDIC is WMBFA mentioned, and nowhere in the record is there documentation of any negotiated sale from WMBFA to WMB.

## WaMu's "Off-Balance Sheet Activities"

24.     On April 13, 2011, the U.S. Senate's "Permanent Subcommittee On Investigations" published an investigative report that includes a detailed analysis of WaMu's securitization activities leading up to the financial collapse in 2008. The report can found be found at the following government website address:

**https://www.hsgac.senate.gov/subcommittees/investigations/media/senat
e-investigations-subcommittee-releases-levin-coburn-report-on-the-
financial-crisis**

25.     The findings of fact in this report, combined with evidence in this Case and affidavit, lead me to the opinions I've outlined above.

9. Affidavit of William J. Paatalo

26.    Key excerpts from the report are as follows:

Pg.116 –

**E. Polluting the Financial System**

Washington Mutual, as the nation's largest thrift, was a leading issuer of home loans. When many of those loans began to go bad, they caused significant damage to the financial system.

According to a 2007 WaMu presentation, by 2006, Washington Mutual was the second largest non agency issuer of mortgage backed securities in the United States, behind Countrywide.

By securitizing billions of dollars in poor quality loans, WaMu and Long Beach were able to decrease their risk exposure while passing along risk to others in the financial system. They polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss. At times, WaMu securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank.

Pg. 117 -

According to a 2007 WaMu presentation at a securities investor meeting in New York, in 2004, WaMu issued $37.2 billion in RMBS securitizations and was the sixth largest RMBS issuer in the United States.  In 2005, it doubled its production, issuing $73.8 billion in securitizations, and became the third largest issuer. In 2006, it issued $72.8 billion and was the second largest issuer, behind Countrywide.

Pg. 119 -

"WaMu Capital Corp. acted as an underwriter of securitization transactions generally involving Washington Mutual Mortgage Securities Corp. or WaMu

Asset Acceptance Corp. Generally, one of the two entities would sell loans into a securitization trust in exchange for securities backed by the loans in question, and WaMu Capital Corp. would then underwrite the securities consistent with industry standards. As an underwriter, WaMu Capital Corp. sold mortgage-backed securities to a wide variety of institutional investors. WCC sold WaMu and Long Beach loans and RMBS securities to insurance companies, pension funds, hedge funds, other banks, and investment banks. It also sold WaMu loans to Fannie Mae and Freddie Mac. <u>WCC personnel marketed WaMu and Long Beach loans both in the United States and abroad.</u>

Before WCC was able to act as a sole underwriter, WaMu and Long Beach worked with a variety of investment banks to arrange, underwrite, and sell its RMBS securitizations, including Bank of America, Credit Suisse, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch, Royal Bank of Scotland, and UBS. To securitize its loans, WaMu typically assembled and sold a pool of loans to a qualifying special-purpose entity (QSPE) that it established for that purpose, typically a trust.

The QSPE then issued RMBS securities secured by future cash flows from the loan pool. Next, the QSPE – working with WCC and usually an investment bank – sold the RMBS securities to investors, and used the sale proceeds to repay WaMu for the cost of the loan pool. Washington Mutual Inc. generally retained the right to service the loans.

27.   This analysis is also supported by Washington Mutual, Inc.'s 10-Q

filing with the U.S. Securities and Exchange Commission (SEC) on June 30, 2008

which states on (p.60),

## Off-Balance Sheet Activities

The Company transforms loans into securities through a process known as securitization. When the Company securitizes loans, the loans are usually sold to a qualifying special-purpose entity ("QSPE"), typically a trust. The QSPE, in turn,

11. Affidavit of William J. Paatalo

issues securities, commonly referred to as asset-backed securities, which are secured by future cash flows on the sold loans. The QSPE sells the securities to investors, which entitle the investors to receive specified cash flows during the term of the security. The QSPE uses the proceeds from the sale of these securities to pay the Company for the loans sold to the QSPE. These QSPEs are not consolidated within the financial statements since they satisfy the criteria established by Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. In general, these criteria require the QSPE to be legally isolated from the transferor (the Company), be limited to permitted activities, and have defined limits on the types of assets it can hold and the permitted sales, exchanges or distributions of its assets.

28.    Having investigated the WaMu/FDIC/Chase fact pattern for more than six-years, and having investigated hundreds of foreclosure cases where JPMC claims sole ownership of specific WMB loans by virtue of the "Purchase & Assumption Agreement" (PAA), one fact is now well established – no schedule or inventory of assets listing any specific WMB mortgage loan acquired by JPMC exists, or has ever been produced or disclosed. The reason for this fact is the vast majority of residential mortgage loans were securitized through WaMu's "Off-Balance Sheet Activities," and simply were not on the "books" of WMB.

29.    During the time period in which the initial foreclosure complaint was filed in 2007 and the ultimate final judgment in 2009, WMB failed and went into receivership on September 25, 2008; not WMBFA. Yet, JPMC substituted into the foreclosure action claiming it had acquired the Marin loan as an asset.

**JPMC did not acquire the Assets of WaMu's Non-Bank subsidiaries.**

30.    For years now, JPMC has been getting away with a massive

presumption that it acquired everything Washington Mutual by virtue of the PAA with the FDIC, yet the mortgage loans they claim to have acquired were again, never "on the books" of "Washington Mutual Bank."

31.   Attached as **Exhibit 2** is JPMorgan Chase's own press release from September 25, 2008 which states the following on **p.1, ¶5**, "*JPMorgan Chase will not be acquiring any assets or liabilities of the bank's parent holding company (WM) or the holding company's non-bank subsidiaries.*"

32.   As outlined above, the two non-bank subsidiaries of Washington Mutual responsible for the securitization of mortgage-backed securities were "Washington Mutual Asset Acceptance Corporation" (WMAAC) and "Washington Mutual Mortgage Securities Corporation" (WMMSC).

33.   Both WMAAC and WMMSC are still active and continue to file regular "ABS 15G – Asset Backed Security Reports" with the SEC. Here are the SEC links to both of these entities most recent filings:

**WMAAC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1Du.htm

**WMMSC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1dt.htm

34.   Both WMMSC and WMAAC have regularly disclosed the following in these SEC filings:

WaMu Asset Acceptance Corp., as Securitizer, is filing this Form ABS-15G in respect of all mortgage-backed securities representing interests in pools of residential mortgage loans for which it acted as depositor and which are outstanding during the reporting period.  On September 25, 2008, JPMorgan Chase Bank, National Association ("*JPMCB*") acquired the banking operations of Washington Mutual Bank from the Federal Deposit Insurance Corporation ("*FDIC*").  It is JPMCB's position that certain of the repurchase obligations of Washington Mutual Bank remain with the FDIC receivership.  Assets are reported herein in accordance with Rule 15Ga-1 regardless of the validity of the demand or defenses thereto, and nothing in this report shall constitute, or be deemed, a waiver of any rights, defenses, powers or privileges of any party relating to these assets.

35.   There have been voluminous "ABS 15G" reports filed by these entities post receivership, and each one contains an attached "Exhibit 99.1" listing "Demand in Dispute" assets, or what is commonly referred to as "put-back demands" against these entities by investors. The disputed amounts are enormous, and appear to total somewhere in the area of $145,000,000,000.00.

36.   I searched JPMorgan Chase's 10-K filings with the SEC to find out if there was any mention of these potential liabilities to its investors. I could not find any disclosures of these potential "repurchase" liabilities. Thus it appears that the investors who own these loans want their money back but are being ignored. JPMC, as servicer for these investors, has harvested, and continues to harvest the assets belonging to these investors through foreclosures, when by its own admission, it did not acquire these non-bank assets.

**Private investors owned the subject loan at the time of the original complaint, and their identity was concealed from the Court.**

37.     From experience, I have seen and reviewed JPMC's servicing records for WMBFA originated loans within JPMC's "3270 Explorer" servicing platform. This system / platform contains a specific screenshot which shows the "loan transfer history" (Screen: "Explorer 3270 – LNTH") for these loans.

38.     From experience, I have seen complete LNTH screenshots for these WMBFA loans provided by JPMC, but usually they are produced with great reluctance and through motions to compel. When produced, these LNTH screens tell an entirely different story about the loans; specifically, all the sales and transfers conducted by WaMu prior to the FDIC's receivership.

39.   Attached as **Exhibit 5** is a "3270 Explorer: Loan Loan Transfer History (LNTH)" screenshot provided by JPMC in a very similar case which I have been involved captioned *Kelley v. JPMorgan Chase Bank, N.A.*, U.S. BK CT, ND CA, Adv. Case No. 10-05245.

40.  Like the Marin loan, the Kelley loan was also originated by WMBFA. **Exhibit 5** shows the entire LNTH from origination through the FDIC receivership. The beginning "Investor Code" at the inception of the loan is "030" on 08/07/07. The loan is then sold and transferred to a "New/Inv" (new investor) on 09/01/07 with the "Investor Code – AO1." This evidence shows that the loan had been sold prior to the FDIC receivership, yet JPMC took the position that the loan had never been securitized or sold prior to the FDIC takeover.

41.   It should be noted that upon information and belief, no Note was ever produced in the foreclosure action.

42.   A deposition of JPMC employee "Crystal Davis" occurred in the Kelley case on August 13, 2014. A copy of the Davis Deposition Transcript was filed in the *PACER* System and a copy is attached to this affidavit as **Exhibit 3**. **Exhibit 4** is a glossary of codes exhibit provided by JPMC in that deposition.

43.   Crystal Davis explains the investor codes on p.42 as follows:

(In reference to **Exhibit 4**)

*Q. Now if you look to the right of that, it states that the claim – the investor IDs begin with an A through V; is that correct?*

*A. In the current MSP platform, yes, indicates private investor loans.*

*Q. And what would X,Y,Z indicate?*

*A. Those would indicate bank-owned assets.*

33.   It is very likely that a complete LNTH screenshot for the subject loan, if ever produced, will show similar sales transactions from WMBFA to "New/Inv – AO1." The identity of investor "AO1" has never been disclosed and is being concealed from the Courts in thousands of cases, and I believe this is intentional.

### Chase Admits Then Denies

34.   In cases I have reviewed all across the country, borrowers have made and continue to make, inquiries to their servicer "Chase" for the identity of the investor(s) of their WaMu loan(s) only to be told,

STATE OF MONTANA       )

                       ) ss.             July 7, 2016

COUNTY OF STILLWATER)

On this 7th day of July 2016, before me, the undersigned officer, personally appeared William Paatalo, whose identity was satisfactorily proved to me, and who executed the foregoing instrument as his free act and deed and for the purposes therein contained, and acknowledged that the foregoing statements are true and correct.

In witness whereof I hereunto set my hand.

FAYE A. WADLSON
NOTARY PUBLIC for the
State of Montana
Residing at Nye, Montana
My Commission Expires
July 14, 2016

Notary Public
My Commission Expires: 7-14-16

18. Affidavit of William J. Paatalo

*Exhibit 1*

# William J. Paatalo
### Private Investigator – Oregon PSID# 49411
### BP Investigative Agency, LLC
### P.O. Box 838
### Absarokee, MT 59001
### (406) 328-4075
### Bill.bpia@gmail.com

## Curriculum Vitae

William Paatalo has been a licensed private investigator since September of 2009. He has 17 years combined experience in both law enforcement and the mortgage industry which he has utilized to become a leading expert in the areas of chain of title analyses and securitization. He was a police officer with the St. Paul, Minnesota Police Department from 1990-1996 where he was assigned "Field Training Officer" duties in only his second year on the job, and also received multiple commendations.

Mr. Paatalo worked in the mortgage industry as a "loan officer" with Conseco Home Finance from 1999 – 2000, followed by two years of being a branch manager for multiple mortgage brokering firms. From 2002 – 2008, he became the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota. As President of Wissota Mortgage, LLC, Mr. Paatalo was responsible for overseeing the origination, processing, and underwriting of mortgage loans, as well as managing a staff of 17 employees.

Mr. Paatalo has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to alleged "defaults."  Mr. Paatalo is also a Certified Forensic Mortgage Loan Auditor through ("CFLA"), and has spent more than 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. He has performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Nevada, Florida, Montana, Texas, Arizona, Ohio, New Jersey, and several other states. To date, Mr. Paatalo has conducted nearly 900 investigations and has provided written

expert testimony in the form of affidavits and declarations in approximately 90 -100 cases nationwide. Mr. Paatalo has been qualified in both state and federal courts as an expert, and personally appeared and testified at trial in the four cases outlined below. This experience has lead to Mr. Paatalo becoming one of the leading experts in this relatively new field.

Mr. Paatalo's specific areas of expertise allowed by the courts in the cases referenced below are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use of ABSNet, and the interpretation of its internal accounting data showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

## Relevant Experience:

- Police Officer / "Field Training Officer" – St. Paul, MN 1990-1996.
- Oregon licensed private investigator under ORS 703.430, and has met the necessary requirements under ORS 703.415. To obtain his PI license, Mr. Paatalo met the requirement of 5,000 hours of investigation experience in the law enforcement field, and passed a thorough background investigation and criminal history check.
- Member of the "Oregon Association of Licensed Investigators" (OALI.)
- President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

**Education:**

A.A.S. – Law Enforcement – Normandale C.C., Bloomington, MN – 1986
Marketing Management Certificate – Concordia University, St. Paul, MN 2001
Forensic Loan Auditor Certification Training Course (CFLA) – 32 hrs. – San Diego, CA 2011

**Expert Testimony (Trial):**

## FEDERAL CASES

*Robert T. Fanning, Debtor – U.S.Bankruptcy Court, District of Montana – BK Case No. 10-61660*

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

## STATE CASES

### OHIO

*Washington Mutual Bank fka Washington Mutual Bank, F.A. v. Jon A. Smetana, et al.,In The Court of Common Pleas, Cuyahoga County, Ohio Case No.CV-08-652392.*

### OREGON

*U.S. Bank, N.A.as Trustee v. Natache D. Rinegard-Guirma, et al. - Circuit Court For The State Of Oregon, County Of Multnomah - Case No. 1112-16030*

*Exhibit 2#*

JPMorgan Chase & Co.

« Previous Release | Next Release »

September 25, 2008

# JPMorgan Chase Acquires the Deposits, Assets and Certain Liabilities of Washington Mutual's Banking Operations

**Highly attractive, strategic transaction significantly strengthens consumer franchise.**

**Deal expected to be accretive to earnings immediately. Adds large, stable deposit base and recurring earnings stream to company.**

**Company intends to raise additional capital in conjunction with this transaction to maintain strong capital position.**

- *Acquisition creates largest U.S. depository institution, with over $900 billion of customer deposits*

- *Expansion into attractive California, Florida and Washington State markets creates nation's second-largest branch network; also strengthens existing presence in New York, Texas, Illinois, Arizona, New Jersey, Colorado, Connecticut and Utah*

- *Larger branch footprint will allow company to further extend and grow commercial banking, business banking, credit card, consumer lending and wealth management efforts*

New York, Sept. 25, 2008 - JPMorgan Chase & Co. (NYSE: JPM) tonight announced it has acquired all deposits, assets and certain liabilities of Washington Mutual's banking operations from the Federal Deposit Insurance Corporation (FDIC), effective immediately. Excluded from the transaction are the senior unsecured debt, subordinated debt, and preferred stock of Washington Mutual's banks. JPMorgan Chase will not be acquiring any assets or liabilities of the banks' parent holding company (WM) or the holding company's non-bank subsidiaries. As part of this transaction, JPMorgan Chase will make a payment of approximately $1.9 billion to the FDIC.

The acquisition expands Chase's consumer branch network into the attractive states of California, Florida and Washington State and creates the nation's second-largest branch network - with locations reaching 42% of the U.S. population. The combined 5,400 branches in 23 states will also serve as an excellent base to extend the reach of the business banking, commercial banking, credit card, consumer lending and wealth management businesses. The acquisition also extends Chase's retail branch network to additional states, including Georgia, Idaho, Nevada and Oregon.

The acquisition of Washington Mutual's banking operations is expected to be immediately accretive to earnings and to add more than 50

cents per share in 2009. JPMorgan Chase expects to incur pretax merger costs of approximately $1.5 billion while achieving annual pretax cost savings of approximately $1.5 billion by 2010, net of significant investments in the business. The bank plans to complete most systems integrations and rebranding by year-end 2010, closing less than 10% of branches in the combined network in overlapping markets.

In conjunction with this acquisition, JPMorgan Chase will be marking down the acquired loan portfolio by approximately $31 billion, which primarily represents our estimate of remaining credit losses related to the impaired loans. JPMorgan Chase intends to raise additional capital in connection with this transaction to maintain the company's strong capital position.

"This deal makes excellent strategic sense for our company and our shareholders. Our people have worked hard to build a strong franchise and balance sheet - making this compelling transaction possible," said Jamie Dimon, Chairman and CEO. "As we have said in the past, increasing our regional banking presence not only strengthens our Retail business, but also benefits other business lines across our firm, including our commercial banking, business banking, credit card, and asset management groups."

"JPMorgan Chase is strongly committed to both a strong banking system and our responsibility as a good corporate citizen. We are active in the states and local communities where we do business," Dimon said. In July, the bank earned an outstanding rating from the Office of the Comptroller of the Currency for the company's work helping families buy homes, financing small businesses and making its communities better.

"We look forward to welcoming Washington Mutual's employees to JPMorgan Chase and working with them as we build a great company together," Dimon added.

"This acquisition makes us more convenient and valuable to our customers and meets our strategic goal of broadening our footprint to serve our current and future customers better," said Charlie Scharf, head of Chase's Retail business. He added: "Following a transition, Washington Mutual customers will be able to take advantage of Chase's broader network and a wider product range - all backed by the strength and security of JPMorgan Chase." Over time, Chase will provide more personal bankers, business bankers, loan officers and investment advisers to serve the needs of Washington Mutual customers and to expand their relationship with Chase.

Customers of both companies may continue banking as usual, and feel confident that their deposits are secure, now backed by the strength and security of JPMorgan Chase. Employees and vendors should continue to operate business as usual.

Chase expects to convert Washington Mutual's consumer banking, home lending and credit card businesses to the Chase brand and technology platforms over the next two years. Chase and Washington Mutual customers should be able to access the combined network of 14,000 ATMs without fees in the coming months.

## About JPMorgan Chase

JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.0 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity. A component of the Dow Jones Industrial Average, JPMorgan Chase serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients under its JPMorgan and Chase brands. Information about the firm is available at www.jpmorganchase.com.

JPMorgan Chase will host a conference call at 9:15 p.m. (Eastern Time) tonight, September 25, 2008. You may access the conference call

by dialing 1-877-238-4671 (U.S. and Canada) / 1-719-785-5594 (International) - access code: 814030 or via live audio webcast at the jpmorganchase.com website under Investor Relations/Investor Presentations. Materials and further communication will be available on this website at the time of the call.

A replay of the conference call will be available beginning at approximately 1:00 a.m. on September 26 through midnight, Thursday, October 9 by telephone at (888) 348-4629 (U.S. and Canada); access code: 942856 or (719) 884-8882 (International). The replay will also be available via webcast on www.jpmorganchase.com under Investor Relations, Investor Presentations.

This press release includes contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are based upon the current beliefs and expectations of JPMorgan Chase's management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements. Factors that could cause JPMorgan Chase's actual results to differ materially from those described in the forward-looking statements can be found in JPMorgan Chase's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2008 and June 30, 2008, Annual Report on Form 10-K for the year ended December 31, 2007 and Current Reports on Form 8-K, filed with the Securities and Exchange Commission and available on JPMorgan Chase's website (www.jpmorganchase.com) and on the Securities and Exchange Commission's website (www.sec.gov). JPMorgan Chase does not undertake to update the forward-looking statements to reflect the impact of circumstances or events that may arise after the date of the forward-looking statements.

| | | | |
|---|---|---|---|
| **Select Business Metrics** | | | |
| Footprint (states) | 17 | 15 | 23 states |
| Total Assets | $1776 | $310 | $2,036 |
| Total Managed Loans | $617 | $231 | $848 |
| Branches[1] | 3,203 | 2,207 | 5,410 |
| Total Deposits | $722.9 | $181.9 | $904.8 |
| Checking Accounts | 11.3mm | 12.7mm | 24.0mm |
| ATMs | 9,310 | 4,962 | 14,272 |
| Managed Credit Card Loans | $154.7 | $26.4 | $181.1 |
| Credit Cards Issued | 157.6mm | 12.7mm | 170.3mm |
| Employees | 195,594 | 43,198 | 238,792 |
| **Network Comparisons** | | | |
| U.S. Households | 25.0% | 30.3% | 42.3% |
| Average Income | $71,595 | $74,747 | $72,332 |

| Businesses | 26.5% | 33.0% | 45.6% |
|---|---|---|---|
| US Population in Footprint | 75.0mm | 94.1mm | 129.9mm |
| 5yr US Population Growth Rate ('07-'12) | 3.3% | 5.6% | 4.9% |
| % of Population Growth in Footprint | 18.0% | 37.9% | 46.2% |

[1] Branch data is as of September 18, 2008

## What Washington Mutual Customers Should Know and Do

- Feel confident that their deposits are secure

- Continue banking as you have - assured that your bank is now backed by the strength and security of JPMorgan Chase

- Continue to use the same checks. All checks will be processed as usual

- Continue to use the same account numbers

- Continue to use the same ATM card and credit card

- Continue to use the same ATMs

- Continue to use the same branches

- Continue paying your mortgage and credit card as you have. Checks should be made payable the same as they have been in the past, and payment addresses remain unchanged

- Continue using the same contact phone numbers, online service and websites

- Know that you will learn well in advance of improvements, additional conveniences and other changes

Copyright 2015 JPMorgan Chase & Co.

Close window | Back to top

# In Re:

## *JAMES MADISON KELLEY v.*
## *JPMORGAN CHASE BANK*

---

## *DEPOSITION OF CRYSTAL DAVIS*
### *August 13, 2014*

---



| Toll Free | **866.760.DEPO** |
|-----------|------------------|
| Main | 408.371.0464 |
| Fax | 408.371.0402 |
| | www.torreano-depos.com |
| | torreano-depos@sbcglobal.net |

1999 South Bascom Avenue  Suite 700
Campbell, CA 95008

BP Investigative Agency
Exhibit 3

**Page 1**

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2       NORTHERN DISTRICT OF CALIFORNIA - DIVISION 5

 3   In Re:
     JAMES MADISON KELLEY,       )   Chapter 11
 4                               )   Adv. Case No.
         Debtor.                 )   10-05245
 5                               )
 6
 7   JAMES MADISON KELLEY,       )   Hon. Weissbrodt
                                 )
 8       Plaintiff,             )
                                 )
 9       vs.                     )
                                 )
10   JPMORGAN CHASE BANK, NA,    )
     WASHINGTON MUTUAL BANK,     )
11   DOES (1-20),                )
                                 )
12       Defendants.             )
13
14
15               DEPOSITION
16             of CRYSTAL DAVIS
17
18            Taken at Regus
19        470 Olde Worthington Road
20           Westerville, Ohio
21   on August 13, 2014, at 9:05 a.m.
22
23      Reported by: Rhonda Lawrence
               -=0=-
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3       James M. Kelley
         14390 Douglass Lane
 4       Saratoga, CA  95070
         408.402.1915
 5       jmadisonkelley@gmail.com
 6          Pro Se.
 7
     S. Christopher Yoo
 8   ALVARADO SMITH
     1 MacArthur Place, Suite 200
 9   Santa Ana, California  92707
     714.852.6800
10   cyoo@alvaradosmith.com
11       on behalf of the Defendants.
12              -=0=-
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1              STIPULATIONS
 2        It is stipulated by and between
 3   counsel for the respective parties that the
 4   deposition of CRYSTAL DAVIS, the Witness herein,
 5   called by the Plaintiff under the applicable
 6   Rules of Federal Civil Court Procedure, may be
 7   taken at this time by the notary pursuant to
 8   notice; that said deposition may be reduced to
 9   writing in stenotypy by the notary, whose notes
10   thereafter may be transcribed out of the
11   presence of the witness; and that the proof of
12   the official character and qualification of the
13   notary is waived.
14              -=0=-
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1           INDEX OF EXAMINATION
 2                                        PAGE
 3   BY MR. KELLEY:                         5
 4           INDEX OF EXHIBITS
 5   EXHIBIT        DESCRIPTION           PAGE
 6      1    Excerpts from Purchase and    17
            Assumption Agreement
 7
 8      2    Chase annual report           26
 9      3    Accounting for Certain Loans  27
            or Debt Securities
10      4    10-Q                          30
11      5    Office of Thrift Supervision  33
            Fact Sheet
12
13      6    Notes to Consolidated         33
            Financial Statements
14      7    10K                           35
15      8    FFIEC guidelines              38
16      9    Bates number JPM002040        41
17     10    Loan history                  45
18     11    Loan Transfer Screen          49
19     12    Account Activity              55
20     13    Summary of 745 transactions   58
21     14    Spreadsheet                   67
22
23
24
```

**Page 5**

1   CRYSTAL DAVIS
2   being first duly sworn, as hereinafter
3   certified, deposes and says as follows:
4   EXAMINATION
5   BY MR. KELLEY:
6   Q. This is the deposition of Crystal Davis
7   in the Kelley versus JPMorgan Chase Bank in a
8   case. Got it?
9   My name is James Kelley, and I'm the
10  plaintiff in the case. I guess we have
11  Christopher Yoo from Alvarado Smith, outside
12  attorney for Chase, and Crystal Davis -- right?
13  A. Yeah.
14  Q. -- present. So I'm just going to start
15  out by just asking you a little bit about your
16  background. You don't have to go back to grade
17  school.
18  A. Okay.
19  Q. So your -- first of all, what's your
20  educational background?
21  A. I graduated high school.
22  Q. Okay.
23  A. And I had some college. I studied
24  English at OSU Newark. Did not graduate, did

**Page 6**

1   not get a degree.
2   Q. Okay. Did you take any courses in
3   accounting?
4   A. I did not.
5   Q. You did not. Okay.
6   What is your current job function?
7   A. Associate controller.
8   Q. Okay.
9   A. Well, that's the title.
10  Q. And what are -- what does that entail?
11  A. I supervise a department of accountants
12  who manage the corporate advance reconciliation.
13  Q. How many people do that?
14  A. I have -- under me, I have eight
15  employees.
16  Q. Eight.
17  A. Accountants.
18  Q. And this is at the Polaris facility?
19  A. No; Easton.
20  Q. Easton facility. Okay.
21  And how did you come to that position
22  with an English background?
23  A. So I worked at Harry & David Corporation
24  for seven years where I learned accounting and

**Page 7**

1   did payroll.
2   Q. Okay. So you have a practical
3   background?
4   A. Yes.
5   Q. Okay. And when did you join Chase?
6   A. 2005.
7   Q. 2005. Okay.
8   So you've been there for a while?
9   A. Nine years.
10  Q. Nine years. Okay.
11  And what position did you start in at
12  Chase?
13  A. I started at an entry-level treasury
14  accounting position.
15  Q. Okay.
16  A. So I managed just cash flow to the fed.
17  Q. And how did you progress from there?
18  A. I was in that position about two years,
19  and then I got an offer for a different position
20  within the REO accounting group, and I went to
21  that accounting group, and then got another
22  position in the corporate advance accounting
23  several years after that.
24  Q. Okay. So how long have you been in

**Page 8**

1   corporate advance accounting?
2   A. I have been there for two years.
3   Q. Two years.
4   A. Uh-huh.
5   Q. Okay. So how long were you -- so prior
6   to corporate advance accounting, what were
7   you -- what were you doing? I'm not quite
8   clear.
9   A. REO accounting, so real estate owned.
10  We managed all the accounting for that, all the
11  REO sales.
12  Q. And what kind of software do you use for
13  your accounting?
14  A. Mainly MSP.
15  Q. So you are using MSP?
16  A. Uh-huh.
17  Q. Any other?
18  A. We use SAP.
19  Q. SAP. Okay. That's a pretty well known
20  software brand.
21  A. Yes.
22  Q. Anything else?
23  A. That's it for accounting.
24  Q. Pretty much it?

**Page 9**

1   A. Uh-huh.
2   Q. Okay. So you don't have general ledger
3 experience?
4       MR. YOO: Objection. Vague and
5 ambiguous.
6   A. General ledger meaning?
7   Q. Well, you know, starting from the
8 general ledger down to the sub-ledgers.
9   A. So all of our sub-ledgers are part of
10 the general ledger.
11  Q. Sure.
12  A. So I do have experience within specific
13 accounts of the general ledger.
14  Q. Probably characterized as REO -- the 745
15 advances are -- you consider those REO?
16  A. They can be. So 745 is any kind of
17 accounting adjustment.
18  Q. So we'll be getting a little bit more
19 into that in a moment.
20      So are you the only group doing this?
21      MR. YOO: Objection. Vague and
22 ambiguous as to "doing this."
23  Q. Are you the only operational group doing
24 corporate advances in this area --

**Page 10**

1   A. No.
2   Q.  -- or are there other groups like
3 yours?
4   A. There are other groups like mine.
5   Q. That you know of, right?
6   A. Yes.
7   Q. How many other groups?
8   A. I don't specifically know. Sorry.
9   Q. Is it two?
10      MR. YOO: Objection. Asked and
11 answered.
12  Q. I'm just asking you approximately how
13 many.
14      MR. YOO: She said she doesn't know.
15  A. I don't know, to be honest.
16  Q. But there are other groups?
17  A. There are other groups, yes.
18  Q. And how do you know there are other
19 groups?
20  A. They're within accounting, and because
21 my group only owns a number of the payees, so
22 other groups would have to own the other payees.
23  Q. Okay. So it's divided by -- partitioned
24 by payees?

**Page 11**

1   A. Yes.
2   Q. I'm going to -- one reason for this
3 deposition is that Mr. Smith, who was a 30(B)(6)
4 witness in this case, indicated that he spoke
5 with you probably several months ago. Do you
6 recall talking to Mr. Smith?
7   A. I do.
8   Q. Okay. Could you tell me approximately
9 how much time you spent talking with him?
10  A. It was very brief. Our phone
11 conversation was brief. So probably five, ten
12 minutes.
13  Q. Okay. And what did he want to know?
14  A. He was asking me specifically about the
15 reason codes on the DDCH screen and what they
16 represented.
17  Q. And that would be codes like LTCO and
18 stuff like that?
19  A. Correct.
20  Q. And we'll get back to those.
21      Did you talk with anyone in preparation
22 for this deposition today?
23  A. Anyone within Chase?
24  Q. Well, anyone, about this deposition.

**Page 12**

1   A. Yes.
2   Q. Okay. Like who?
3   A. I spoke to Thomas from the --
4   Q. Thomas Van?
5   A. Yes.
6   Q. Okay.
7   A. And I spoke to Anne Fitz -- I forget
8 what her last name is. Fitzpatrick.
9   Q. Is that an Alvarado Smith employee?
10      MR. YOO: She's in-house counsel with
11 Chase.
12  Q. Oh, in-house counsel. So you spoke with
13 in-house counsel?
14  A. Yes.
15  Q. How much time did you spend speaking
16 with her?
17  A. Probably two hours.
18  Q. So you spent more time with them than
19 you did with Mr. --
20  A. Yes.
21  Q.  -- Smith? So Mr. Smith didn't ask you
22 about the corporate advances?
23  A. He did.
24  Q. Did he? Okay. Did he ask you about

**Page 13**

1  what they were for?
2  A. Only certain transactions he asked
3  about.
4  Q. Okay. Well, yeah, there are several
5  different types of transactions. We'll get to
6  the details later.
7  So how much time did you spend speaking
8  with Mr. Yoo in preparation for the deposition?
9  A. I got here at 8:15.
10 Q. This is the first time?
11 A. Yes.
12 Q. Okay. Sometimes they do it over the
13 phone.
14 The other thing is, did you review any
15 documents in preparation for this deposition?
16 A. I did.
17 Q. Okay. Could you tell me which ones they
18 were?
19 A. There were a lot. I don't know
20 specifically. I did review the transcript.
21 MR. YOO: She's talking the deposition
22 transcript.
23 Q. You mean Smith?
24 A. Mr. Smith, yeah.

**Page 14**

1  Q. I've got one here. I got the brief
2  form.
3  A. And then the print screens, DDCH
4  history, and I think that's all I reviewed.
5  Q. Okay. Did you look at the payee codes?
6  A. Uh-huh. I did.
7  Q. Are you familiar with the payee codes?
8  A. I am.
9  Q. Okay. Good.
10 Because there's been some ambiguity in
11 the previous depositions, a little confusion --
12 it's not just here. It's everywhere -- I'm
13 going to ask that when we refer to a -- that we
14 not use the term WAMU, because WAMU is a logo,
15 it's not a corporation. So I'll refer to
16 Washington Mutual Bank when I mean Washington
17 Mutual Bank. I'll refer to Washington Mutual
18 Bank FA when I mean Washington Mutual Bank FA.
19 And similarly, Washington Mutual Bank FSB, which
20 was not a subject of a receivership.
21 MR. YOO: Objection. Assumes facts not
22 in evidence.
23 MR. KELLEY: I believe it is in evidence
24 in the Smith deposition already.

**Page 15**

1  MR. YOO: I don't recall that, so my
2  objection stands. I'm not instructing her not
3  to answer. I'm just simply inserting objections
4  as to the general legal conclusions you're
5  making as to what all those entities are or are
6  not and whether those entities were under
7  receivership or not.
8  MR. KELLEY: Those are legal
9  conclusions. I think they're statements of
10 fact. It's well known.
11 MR. YOO: All right. According to you.
12 MR. KELLEY: Okay.
13 BY MR. KELLEY:
14 Q. So anyway --
15 MR. YOO: I think it would be -- I think
16 it would speed up the deposition -- I'll let you
17 ask any questions that you have for my witness,
18 and just let me insert my objections without
19 going back and forth. Because they're
20 ultimately for the Court to decide at the time
21 of trial. Whenever you intend to introduce
22 Ms. Davis' testimony, the Court will have to
23 determine whether my objection is valid or not.
24 So why don't we simply --

**Page 16**

1  MR. KELLEY: I understand.
2  MR. YOO: I'm not going to interrupt,
3  you and it will probably help me if you don't
4  retort my objection. Because it's really
5  irrelevant to the deposition of Ms. Davis. That
6  way it will go faster. Ask your questions.
7  I'll object. If I have think that she shouldn't
8  answer something, I'll instruct her not to
9  answer. We'll let the Court decide. I have no
10 intention of instructing her not to answer any
11 questions at this time unless the question is
12 improper. But if you simply ask your questions,
13 let me insert my objections for the record. If
14 I don't say anything more than objection, I'm
15 not instructing her not to answer. So it will
16 go much quicker. Rather than retorting whether
17 my objection is proper or improper. We're
18 wasting more time, you and me, cluttering the
19 record rather than you simply retorting to my
20 objections.
21 MR. KELLEY: Okay. Let's move on.
22 BY MR. KELLEY:
23 Q. I'm going to introduce into evidence
24 some documents here. This is part of the -- to

**Page 17**

1 make things clearer, these are excerpts from the
2 purchase and assumption agreement between the
3 FDIC receiver and JPMorgan Chase Bank.
4          -=0=-
5          (Deposition Exhibit 1 marked.)
6          -=0=-
7      Q. On page 1 of the exhibit the term "book
8 value" is defined. And could you read that over
9 and see if --
10         MR. YOO: Let the record reflect that
11 page 1 of Exhibit 1 appears -- is identified by
12 page 3.
13         MR. KELLEY: Of the purchase and
14 assumption agreement, yes.
15         MR. YOO: What Mr. Kelley represents is
16 that a portion of the purchase and assumption
17 agreement, and the book value is the first
18 paragraph of page 1 of Exhibit 1 -- or page 3,
19 which is the first page of Exhibit 1.
20         MR. KELLEY: You're right.
21     A. Okay.
22     Q. So the main interest here, I guess, is
23 they're saying book value means with respect to
24 any asset or any liability assumed.

**Page 18**

1          MR. YOO: Objection. The document
2 speaks for itself.
3      Q. So I want to make the distinction
4 between assets with book value and liabilities
5 with book value, just for precision.
6          Okay. Page 2.
7          MR. YOO: Of Exhibit 1.
8      Q. Yes. Exhibit 1, which is page 5 of the
9 purchase and assumption agreement. I
10 highlighted loans, and here they're defining
11 what loans the agreement applies to. And could
12 you read that over and just make sure you got
13 it.
14     A. Uh-huh.
15     Q. Under I, which is a subparagraph to
16 loans, it says, "Loans (including loans which
17 have been charged off the Accounting Records of
18 the Failed Bank in whole or in part prior to
19 Bank Closing)..."
20          And then it goes on and it says,
21 "participation agreements, interest in
22 participations, overdrafts of customers,"
23 et cetera. I'm not so much interested in
24 overdrafts here.

**Page 19**

1          "-- revolving commercial lines of
2 credit, home equity lines of credit,
3 Commitments," and so on.
4          So do you understand what a
5 participation agreement is?
6          MR. YOO: Objection. Calls for a legal
7 conclusion. Calls for testimony beyond this
8 person's knowledge.
9          If you understand what that means.
10     A. I don't know specifically what they're
11 speaking of there.
12         MR. YOO: Also, Ms. Davis is not the
13 person with the most knowledge regarding the
14 purchase and assumption agreement.
15     Q. So you don't know what a participation
16 agreement is?
17         MR. YOO: Asked and answered.
18         She works as an associate controller for
19 escrow advances. She may not have that much
20 knowledge about the purchase and assumption
21 agreement. So the document speaks for itself.
22         I'm going to give you some leeway to ask
23 her questions about it, but she clearly is here
24 based upon a short conversation that she had

**Page 20**

1 with Mr. Smith. She's not here as the person
2 most knowledgeable of Chase regarding the
3 purchase and assumption agreement.
4          MR. KELLEY: You've already said that.
5          MR. YOO: So again, I would caution you
6 to ask the types of questions that you're going
7 to ask her, because they're really -- at some
8 point it may become harassing.
9          MR. KELLEY: I'm not harassing her.
10         MR. YOO: I said at some point it might
11 become harassing as you keep on asking her
12 questions.
13         MR. KELLEY: I would ask you --
14         MR. YOO: Let me --
15         MR. KELLEY: -- to stop interrupting my
16 deposition. This is my deposition. I'm paying
17 for it. And you're running off at three or four
18 minutes a shot on your objections. That's
19 ridiculous.
20         MR. YOO: I'm entitled to it. I feel
21 comfortable.
22         MR. KELLEY: All you have to do is say
23 objection.
24         MR. YOO: Mr. Kelley, let me finish.

| | Page 21 | | | Page 23 |
|---|---|---|---|---|

**Page 21**

1  All right?  Otherwise this deposition will be
2  over pretty soon.  Let me finish, then you can
3  ask your next question.
4      At some point, if you keep asking her
5  questions relating to the purchase and
6  assumption agreement, it will become harassing.
7  I'm going to give you leeway to ask questions.
8  But understand that she's here --
9      MR. KELLEY: It is -- it is necessary to
10  ask those questions, and under Rule 26, I am
11  allowed to ask any question I want, as long as
12  it leads to or has the possibility of leading to
13  admissible evidence.
14      MR. YOO: Exactly.
15      MR. KELLEY: You can't restrict my
16  deposition arbitrarily like you're trying to do.
17      MR. YOO: I told you that at some point
18  it's going to become harassing.  Once it becomes
19  harassing, I'm going to instruct her not to
20  answer.
21  BY MR. KELLEY:
22      Q.  Down the page it defines obligor.  Could
23  you read that over and let me know if you
24  understand what that means?

**Page 22**

1      MR. YOO: Objection.  Document speaks
2  for itself.  And calls for a legal conclusion.
3      Q.  I'm just asking you if you understand
4  what it is?
5      A.  Yes.
6      Q.  You do?  Okay.  So it indicates that
7  there are different types of obligors, right?
8      A.  Yes.
9      Q.  Direct, indirect, primary, secondary,
10  joint --
11      MR. YOO: Objection.  The document
12  speaks for itself.
13      MR. KELLEY: I am defining the terms
14  that are going to be used later on.
15      MR. YOO: Again, I'm just asserting my
16  objections.
17      MR. YOO: Yes, you are.
18      MR. YOO: Can you just stop from
19  retorting to my objections.
20      MR. KELLEY: Why are you retorting to
21  me?
22      MR. YOO: I'm not retorting anything.
23  I'm inserting objections.  Perhaps you should
24  have counsel representing you so this will go

**Page 23**

1  smoothly.
2  BY MR. KELLEY:
3      Q.  The next page, please.  Borrower's
4  claims.  That would be page 9 of the purchase
5  and assumption agreement.  A little bit further
6  down the page I've highlighted assets purchased
7  by the assuming bank.  And they're saying that
8  they're subject to all the liabilities
9  associated with them.
10      A.  Yes.
11      Q.  And then finally, we get down to asset
12  purchase price, and could you read that over.
13      A.  Yes.
14      Q.  So it states that the asset purchase
15  price will be the book value if there's no
16  Schedule 3.2.  And I'll represent that there is
17  no Schedule 3.2.
18      MR. YOO: Objection.  The document
19  speaks for itself.
20      MR. KELLEY: And there is no Schedule
21  3.2 there in the document.
22      MR. YOO: Can you please just -- you
23  don't have to respond to my objections.
24      MR. KELLEY: I don't have to.

**Page 24**

1  BY MR. KELLEY:
2      Q.  Then the next page, which is page 20 of
3  the purchase and assumption agreement, I have,
4  "The Assuming Bank has submitted to the Receiver
5  $1.888 billion for the Assets purchased and
6  Liabilities Assumed hereunder," right?
7      MR. YOO: Objection.  Document speaks
8  for itself.
9      Q.  I'm going to skip one page of the
10  exhibit and go to page 29 of the purchase and
11  assumption agreement.  These are indemnification
12  clauses within the contract, as you see from the
13  heading.  Do you understand indemnification?
14      MR. YOO: Objection.  Calls for legal
15  conclusion.
16      MR. KELLEY: I asked for her
17  understanding.
18      MR. YOO: Let me just assert my
19  objections.  You don't have to respond to my
20  objections.  It's really annoying.  Objection.
21  Calls for legal conclusion.
22      Q.  Do you understand what it is?  You can
23  answer the question.
24      A.  Yes.

**Page 25**

1    Q.  Okay.  So you understand it.  It talks
2  about obligation supplemental?
3        MR. YOO: Objection.  Document speaks
4  for itself.
5    Q.  That's just another form of
6  indemnification?
7        MR. YOO: Document speaks for itself.
8  Asking for legal conclusion.
9    Q.  Do you understand that?
10   A.  Yes.
11   Q.  And limited guaranty of a corporation?
12   A.  I'm sorry, where is that?
13   Q.  Bottom.  It says the corporation
14  guarantees the receivers.  By corporation, I
15  mean FDIC.
16   A.  Yes.
17   Q.  That is the corporation, not Chase.
18       Okay.  Next page.  Subrogation clause.
19  Do you understand what they mean by receiver
20  corporation acting as a guarantor?
21   A.  Yes.
22       MR. YOO: Objection.  Document speaks
23  for itself.  Calls for legal conclusion.
24   Q.  And then the next page -- oh, there is a

**Page 26**

1  Schedule 3.2.  It says -- lists -- highlighted
2  portion is loans, right?  It says book value?
3    A.  Yes.
4        MR. YOO: Document speaks for itself.
5    Q.  And then on page 36 of the purchase and
6  assumption agreement, which is the last page of
7  the exhibit, it states that the mortgage
8  servicing rights would be at book value.
9        So we're done with that exhibit.  Those
10  form the starting point here.
11       MR. KELLEY: This will be Exhibit 2.
12            -=0=-
13       (Deposition Exhibit 2 marked.)
14            -=0=-
15   Q.  On Exhibit 2, this is a page -- page 109
16  from the JPMorgan Chase annual report in 2009.
17  And the term of interest is purchased
18  credit-impaired loans.  And they're setting the
19  purchased credit-impaired loans at 81.2 billion.
20       MR. YOO: Objection.  Document -- lacks
21  foundation as to the document.
22   Q.  The document is the JPMorgan Chase &
23  Company 2009 annual report.
24       MR. YOO: Same objection.

**Page 27**

1    Q.  Do you understand the term "purchased
2  credit-impaired"?
3    A.  Yes --
4    Q.  Okay.  Because it shows up everywhere.
5  Okay.  So keep moving.
6            -=0=-
7       (Deposition Exhibit 3 marked.)
8            -=0=-
9    Q.  Accounting for Certain Loans or Debts
10  Securities acquired in a transfer.
11       MR. YOO: Do you have a copy for me?
12       MR. KELLEY: Yes.
13       MR. YOO: If you could, just for ease of
14  this deposition, as you're introducing exhibits,
15  if you can provide me a copy, as well.
16       MR. KELLEY: I have been providing you
17  with copies.
18       MR. YOO: Thank you.
19  BY MR. KELLEY:
20   Q.  So are you familiar with this statement?
21   A.  I have not seen this statement.
22   Q.  Okay.  This governs the acquisition of
23  loans?
24   A.  Okay.

**Page 28**

1        MR. YOO: Objection.  Assumes facts not
2  in evidence.
3    Q.  Okay.  I left the first page on there
4  just to identify the document.  Could you turn
5  to page 2.  And it's showing the accounting for
6  a loan that has been purchased.  Have you done
7  anything with this, or are you familiar with it?
8        MR. YOO: Objection.  Vague and
9  ambiguous.
10   A.  I don't understand.
11   Q.  Let's back up.  Are you familiar with
12  the purchase method of accounting?
13   A.  It's really outside of my accounting
14  scope, so I'm not familiar.
15   Q.  Okay.  All right.  So I'm going to give
16  a little background here.  The purchase method
17  of accounting is dictated by FASB 141, which is
18  the Federal Accounting Standards Board 141.  A
19  loan that's acquired, whether it's impaired or
20  not, has to be accounted for individually.  In
21  other words, each one has to be examined.  So if
22  you have a pool of loans, if you acquired a pool
23  of loans, you'd have to examine each one
24  individually.  And then once that's done, then

Page 29

1  the loan could be aggregated into a pool of
2  loans, but it can't be done -- it can't be
3  aggregated into a pool of loans until the
4  accounting is done. And then once that's done,
5  then the SOP governs the rest of it, the actual
6  accounting for the stuff.
7       In this case they're using a single
8  loan, but that could be a pool of loans. And
9  what they're saying here, if you look at this
10 page, is the purchase amount has to be
11 determined, and they start it as the beginning
12 carrying amount. So this loan was purchased at
13 under price. So $4 million was paid for. And
14 then they calculate what they think the future
15 cash flows are going to be and create a basis
16 for that.
17      MR. YOO: Objection. Assumes facts not
18 in evidence.
19  Q. All right. So anyway -- so this page 2
20 gives the actual accounting -- SOP accounting
21 for a single loan, but it would also apply to a
22 pool of loans.
23      MR. YOO: Objection. The document
24 speaks for itself.

Page 30

1  Q. Okay. So let's go to page 3. And on
2  page 3, if you go to B33, it reiterates what I
3  just kind of paraphrased earlier, and that was
4  loans subject to this SOP are acquired
5  individually and in pools, and arm's length
6  transactions should be recorded at their
7  acquisition price presumed to be fair value.
8       MR. YOO: The document speaks for
9  itself.
10  Q. And then at the bottom I highlighted, it
11 says, "The face amount of the loans may be
12 substantially different from the
13 acquisition-date fair value of the loans due to
14 changes in market interest rates, credit risk,
15 and expected prepayments."
16      I'm going to skip over these other two.
17 If you go back to the last -- oh, this is
18 actually a new thing here. Make that exhibit 4.
19          -=0=-
20      (Deposition Exhibit 4 marked.)
21          -=0=-
22      MR. YOO: Do you have a copy for me?
23      THE WITNESS: It's the same.
24      MR. YOO: No, it's different.

Page 31

1       Do you have an Exhibit 4 for me?
2       THE WITNESS: This is all part of
3  Exhibit 3. This is a portion.
4       MR. KELLEY: Oh, is that part of 3?
5       MR. YOO: I assume they're not part of
6  3, right?
7       MR. KELLEY: So you got one.
8       MR. YOO: This was attached as part of
9  Exhibit 3. Did you mean to include that?
10      MR. KELLEY: Well, just wait a minute,
11 will you? I've got to look at this stuff.
12      MR. YOO: Well, I wish you had come
13 better prepared.
14      MR. KELLEY: Could you keep your
15 personal remarks to yourself, Mr. Yoo.
16      MR. YOO: If you keep your personal
17 remarks to yourself, maybe I'll do the same.
18      MR. KELLEY: I don't make personal
19 remarks, Mr. Yoo; you do.
20      MR. YOO: Just let us know because I
21 think what Ms. Davis has is the actual Exhibit
22 3. So if you believe it needs to be part of
23 Exhibit 3, then give it back to us.
24      MR. KELLEY: I understand all that. You

Page 32

1  don't have to explain. Okay. Let's forget
2  about all that. It's not necessary. So this is
3  not part of Exhibit 3.
4       MR. YOO: So that's going to be Exhibit
5  4?
6       MR. KELLEY: Yeah, could you --
7       MR. YOO: That is already Exhibit 4.
8       MR. KELLEY: Oh, you want to make that
9  Exhibit 4?
10      MR. YOO: She's already done that. Do
11 you have a copy for me of this particular
12 document?
13      MR. KELLEY: Apparently not, or if it is
14 there, it will be hard to find. So we'll make a
15 copy for you. Could you look on hers?
16      MR. YOO: Sure.
17 BY MR. KELLEY:
18  Q. All this is is a footnote that indicates
19 the amount of purchased credit impaired loans
20 obtained from Washington Mutual. And it says
21 that there are 78.1 billion. And they didn't
22 include these in their accounting. This is
23 JPMorgan Chase 10-Q, footnote to the 10-Q. And
24 it says they were recorded at fair value on the

**Page 33**

1 transaction date including adjustment for credit
2 impairment. So the credit impairment adjustment
3 they're referring to is SOP-3.
4     MR. YOO: Objection. Lacks foundation.
5 Objection document speaks for itself.
6 Objection, also, assumes facts not in evidence.
7     -=0=-
8     (Deposition Exhibit 5 marked.)
9     -=0=-
10   Q. Exhibit 5 is obtained from the Senate
11 Permanent Subcommittee and Investigations.
12 That's the Senate Subcommittee and
13 Investigations. And it is an OTS fact sheet on
14 Washington Mutual Bank issued on September 25th
15 of 2008, which was a bank close date.
16     MR. YOO: Objection. Document speaks
17 for itself. Lacks foundation.
18   Q. Okay. We may refer back to this. So I
19 don't have any questions for you.
20     -=0=-
21     (Deposition Exhibit 6 marked.)
22     -=0=-
23     MR. KELLEY: Did I give you two pages or
24 one?

**Page 34**

1     MR. YOO: Two pages.
2     MR. KELLEY: Yeah, this is a separate
3 one.
4     MR. YOO: Exhibit 6 appears to be a
5 document that indicates Washington Mutual, Inc.
6 and Subsidiaries, Notes to Consolidated
7 Financial Statements (Unaudited).
8     MR. KELLEY: Oh, excuse me. They do go
9 together. Sorry. They actually do go together.
10 So that's the end of it.
11     MR. YOO: Do you have a second page for
12 me? I already have the first page.
13 BY MR. KELLEY:
14   Q. So if you take a look at that,
15 guarantees. I'll tie these two corporate
16 advances later. Have you had any exposure to
17 guarantee payments?
18   A. No, I have not.
19   Q. So this exhibit is being used to
20 identify the guarantees made by Washington
21 Mutual, Inc. on the loans that it created.
22     MR. YOO: Objection. Lacks foundation.
23 Assumes facts not in evidence.
24     -=0=-

**Page 35**

1     (Deposition Exhibit 7 marked.)
2     -=0=-
3     MR. KELLEY: I've highlighted the areas
4 of interest. This has to do with mortgage
5 repurchase liability. And if you take a look at
6 the highlighted footnotes, it shows the type of
7 payments and other issues surrounding the
8 repurchase of loans. So the purpose of this
9 exhibit is to highlight that the acquisition of
10 the loans by Chase was not necessarily through
11 the purchase -- through the receiver, but
12 through the liabilities acquired by Chase when
13 it purchased certain assets and certain
14 liabilities. So the loans could be acquired
15 through the liabilities and not be transferred
16 as assets. So that's the purpose of this
17 exhibit.
18     MR. YOO: For the record, Exhibit 7
19 appears to be a portion of some type of a
20 filing. It's identified by the date number on
21 top May 26, 2014, Corp 10K, 2013, and this
22 appears to be page 79 of that document. If it
23 is what it is, again, as to Mr. Kelley's
24 statement, assumes facts not in evidence, lacks

**Page 36**

1 foundation.
2     MR. KELLEY: Let me highlight that a
3 little bit more. At the bottom of the page it
4 indicates where this is from, it's JPMorgan
5 Chase & Company 2013 annual report.
6   Why don't we take a five-minute break.
7     MR. YOO: Okay.
8     (Recess.)
9 BY MR. KELLEY:
10   Q. Do you understand the difference between
11 book value and fair value?
12     MR. YOO: Objection. Vague and
13 ambiguous.
14   A. Yes.
15   Q. So could you give me an explanation?
16   A. So I believe fair value to be what the
17 market value is of the property, what somebody
18 would pay for the property. Whereas, book value
19 is what the bank carries that asset on its
20 books.
21   Q. So based on what we've seen earlier, the
22 loans were to be acquired at book value, but
23 then they had to be accounted for at fair value,
24 right, by these standards, so there's actually

**Page 37**

1 two things, one is whatever was on the books on
2 September 25, 2008 -- yeah, '8, and then
3 sometime thereafter they do a fair value
4 calculation. Do you know how they do the fair
5 value calculation?
6 A. I do not.
7 Q. So they could, I guess, appraise the
8 property or they could -- if it's a security or
9 something, they could see what it trades for.
10 MR. YOO: She said she doesn't know.
11 Q. So you're not familiar with the actual
12 fair value calculation?
13 A. No.
14 MR. YOO: Asked and answered.
15 Q. But I do agree with your definition.
16 Are you familiar with pool accounting?
17 A. I'm not.
18 Q. You're not? Okay. So your activities
19 are pretty much loan level activities?
20 A. Yes.
21 Q. And then somebody else would aggregate?
22 A. Yes.
23 Q. Are you familiar with the FFIEC, the
24 Federal Financial Institutions Examinations

**Page 38**

1 Council, guidelines?
2 A. I'm not. I've heard that term, but I'm
3 not familiar.
4 Q. So you haven't -- maybe we should just
5 define it. It shows up in the comments field.
6 A. Okay.
7 —=0=—
8 (Deposition Exhibit 8 marked.)
9 —=0=—
10 Q. That's another page from the JPMorgan
11 Chase --
12 MR. YOO: Do you have a copy for me?
13 MR. KELLEY: Actually, no. We're going
14 to have to copy that. So this defines the FFIEC
15 cross-border disclosure requirements.
16 MR. YOO: Objection. Document speaks
17 for itself. Assumes facts not in evidence.
18 Lacks foundation.
19 Q. Okay. The document is relevant to the
20 comments field in some of the 745 transactions.
21 Anyway, I'll just put that in there.
22 Does that make sense? Read it over. Is
23 it clear-cut?
24 A. Yes.

**Page 39**

1 Q. Okay. Before we move on going through
2 some of these things, I wanted to ask you a few
3 questions. There was a -- I think Mr. Smith in
4 his deposition referred to a MSP conversion.
5 Are you familiar with that?
6 A. Yes.
7 Q. Could you explain to me exactly what was
8 going on with the so-called conversion?
9 MR. YOO: Objection. Vague and
10 ambiguous.
11 If you understand his question, go ahead
12 and respond.
13 A. So I think you're speaking about the
14 conversion of the MSP servicing system. So when
15 we acquired -- when Chase acquired the WAMU Bank
16 loans, they were on an MSP servicing system and
17 Chase was also on an MSP servicing system, so it
18 was really just meshing those two systems into
19 one, into our servicing system.
20 Q. Did you participate in that?
21 A. Just related to corporate advances.
22 Q. So they asked you to check things over,
23 make sure they were coming out --
24 A. Yes.

**Page 40**

1 Q. -- the same?
2 A. We had to make sure they balanced. Once
3 everything was brought over, that it balanced to
4 the beginning and ending balances.
5 Q. And was that all done within the same
6 program, or was it --
7 A. Yes.
8 Q. -- two different programs?
9 A. Just the one program.
10 Q. Okay. Anything remarkable about that?
11 MR. YOO: Objection. Vague and
12 ambiguous.
13 Q. Different chart of accounts?
14 A. I mean, I guess I don't understand
15 specifically the question. But there were
16 different accounts that we housed, yes.
17 Q. So you put them in the right box?
18 A. Yes.
19 Q. Make sure they add up at the end of the
20 day?
21 A. That's right.
22 Q. When was that completed?
23 A. Around December 2009.
24 Q. Did you then begin to use the system?

**Page 41**

1 You had the converted system?
2 A. Yes.
3 Q. But only when it was finished, right?
4 A. Yes.
5 -=0=-
6 (Deposition Exhibit 9 marked.)
7 -=0=-
8 MR. YOO: For the record, Exhibit 9 is
9 document identified by Bates stamp number
10 JPM002040.
11 MR. KELLEY: That's right.
12 Q. So I've highlighted 91T00. What's
13 91T00?
14 A. It is a corporate advance pay.
15 Q. And what corporate advance payee?
16 A. It's a third party, so the T of the
17 91T00 indicates that it's a third-party payee.
18 Q. Okay.
19 A. And it's used to house private investor
20 claim funds. So when Chase makes a claim to the
21 investor and they pay the claim, funds would be
22 applied to this payee.
23 Q. Okay. So they sent them a bill?
24 A. Yeah.

**Page 42**

1 Q. They pay. Okay. Now, if you look to
2 the right of that, it states that the claim --
3 the investor IDs begin with an A through V; is
4 that correct?
5 A. In the current MSP platform, yes,
6 indicates private investor loans.
7 Q. And what would X, Y, Z indicate?
8 A. Those would indicate bank-owned assets.
9 Q. Okay. So W, X, Y, Z. Have you ever
10 seen a W?
11 A. I have.
12 Q. You have?
13 A. Uh-huh.
14 Q. Okay. What if there's no letter there?
15 Suppose it's just a number. What would that
16 indicate?
17 A. That would indicate another type of
18 investor. So it could be Fannie Mae, Freddie
19 Mac, Ginnie Mae.
20 Q. Oh, really?
21 A. Which are not considered private
22 investors.
23 Q. They're kind of quasi private?
24 A. Hybrid.

**Page 43**

1 Q. Yeah, they're hybrid. Okay. Thanks.
2 You're the first person who's known what that
3 is. I was in -- just as an aside, I was in
4 court and a judge said -- he was looking at a
5 screen shot, not from Chase, but from Bank of
6 New York, and he said, I never had anyone that
7 could explain a screen shot before in court. So
8 congratulations.
9 Do you happen to recall what the numbers
10 would be for Fannie Mae, Ginnie Mae?
11 MR. YOO: Objection. Completely
12 irrelevant to the subject matter of this
13 lawsuit. Not likely to lead to discoverable
14 evidence.
15 Q. Do you know?
16 A. Generally, Freddie Mac are in a 5
17 series, a 500 series, could be 5 whatever.
18 Q. 5 something?
19 A. Yeah, and then Fannie is in a 4 series.
20 and Ginnie Maes are in, I believe, 7 and 6
21 series.
22 Q. Have you ever seen a 1 or 2?
23 A. Not that I can recall.
24 Q. Okay. How about a 3?

**Page 44**

1 A. No, I don't recall.
2 Q. How high do the numbers go?
3 A. Investor IDs can be any number, and so
4 they can go all the way up to like the 900
5 series.
6 Q. So basically three digits?
7 A. Yes. Three characters.
8 Q. Okay. One other thing, this has come up
9 a number of times and people don't seem to know
10 it. If I take an investor ID like 801/0006,
11 what's the /0006? Is that part of the investor
12 ID, or is that some other category?
13 A. It's what we call a category code. And
14 it doesn't always carry a lot of significance
15 other than to -- those categories drive that --
16 where the loan resides into a different account
17 or call center. So it may be the same type of
18 loan, but in order to get those loans to be
19 driven to a different balance sheet we'd have to
20 change that category and have that category map
21 to the GL that it drives to.
22 Q. Excellent explanation. So it just
23 breaks the books up into a series of books?
24 A. Correct.

**Page 45**

1  Q. Okay. Are you familiar with the LPS
2  desktop system? You may not be.
3  A. If it's interchangeable with MSP, I
4  don't know if they use those interchangeably,
5  but specifically I've never logged into an LPS
6  desktop.
7  Q. It's usually external, I think, to
8  Chase, but it's done between -- out in the LPS
9  third-party providers for the banks.
10  MR. YOO: Objection. Assumes facts not
11  in evidence. Lacks foundation.
12  MR. KELLEY: Why don't we take a little
13  break, because I need to get a couple copies
14  made.
15  -=0=-
16  (Deposition Exhibit 10 marked.)
17  -=0=-
18  MR. KELLEY: Can you share that?
19  MR. YOO: I have no choice.
20  MR. KELLEY: It turns out you do have a
21  choice. I do have a copy of it.
22  MR. YOO: For the record, Exhibit 10 is
23  a three-page document identified as JPM001546
24  and 47.

**Page 46**

1  BY MR. KELLEY:
2  Q. You might want to look that over a
3  little bit. I've kind of highlighted some of
4  the areas of interest, but there may be more.
5  Have you seen this type of report
6  before?
7  A. I have not.
8  Q. Okay. It appears that it's a -- some
9  sort of MSP summary report, right?
10  MR. YOO: Objection. Lacks foundation.
11  Assumes facts not in evidence.
12  Go ahead and respond, if you can. If
13  you know what it is.
14  A. I've not seen this. It may be a screen
15  that I'm just not familiar with.
16  Q. Okay. But if you look at the top you
17  see the history year to date and INV 801 cat 13,
18  and then investor number. That's the loan
19  number. I'll represent that that is the loan
20  number. And then it has a date there. Do you
21  know what any of those things are, T13, for
22  example, cat 13, 013?
23  A. I don't know what T13 is. Cat 13,
24  again, drives where the -- where the loan will

**Page 47**

1  reside on the balance sheet, and typically a cat
2  13 indicates an arm loan.
3  Q. Okay. So the balance sheets are
4  segregated by loan type?
5  A. Correct.
6  Q. Okay. And if you look down there a
7  little bit further it says PLGD-LN.
8  A. Okay.
9  Q. Have you run across the pledged loans in
10  your dealings?
11  A. No, I have not.
12  Q. You might not. It's more of an investor
13  thing.
14  Let's go to the next page. There's some
15  payee numbers there at the bottom. Are you
16  familiar with that? 95R21.
17  A. Somewhat, yes.
18  Q. Okay. Could you explain? I guess T was
19  third party. I don't know what R is.
20  A. So R would indicate that it's a
21  recoverable balance, meaning recoverable to the
22  borrower.
23  Q. Okay.
24  A. I do know that 95R21 was a payee used

**Page 48**

1  pre-Chase. Chase no longer uses this payee. It
2  would have been converted over.
3  Q. So this was like a Washington Mutual
4  payee code?
5  A. That's correct. Yes.
6  Q. What code would they use now?
7  A. I don't know for this specific payee.
8  Q. Okay. Do you have any idea what in IV
9  means?
10  A. I do. That's a user ID, but it's used
11  by the invoice team, so it's new invoice.
12  Q. Does this refer to a specific person, or
13  just a group that does this function?
14  A. This specific user is referencing a
15  group, but users can be specific to a person.
16  Q. They could be -- they could be specific,
17  or it could be a small group of people using
18  this code to identify their group?
19  A. Yes.
20  Q. Got it. Okay. That helps.
21  And then what's the AR over here at the
22  far right on these entries?
23  A. I honestly don't know.
24  Q. So some of it is the same, some of it

---

**Page 49**

1  isn't. Down on the third page they have a list
2  of things that look like kind of definitions.
3     A. Okay.
4     Q. And have you ever seen stuff like this?
5  These are kind of like codes. Do you use these
6  now, or did you ever use them?
7     A. None of these codes look familiar.
8  They're probably specific to this screen, and
9  that's not one that I use.
10    Q. Okay. All right.
11          --=0=--
12       (Deposition Exhibit 11 marked.)
13          --=0=--
14       MR. YOO: Exhibit 11 is identified by
15  JPM Bates stamp number 002035.
16    Q. It says loan transfer screen, and then
17  we have at the top -- if you go down there's
18  headers and go down further it says client 156.
19  Who is client 156?
20    A. Client 156 is just the platform where
21  Heritage WAMU loans are housed on MSP. So MSP
22  has two platforms, one being 465, which is for
23  Heritage Chase, and the other platform or client
24  is 156, which is Heritage WAMU.

---

**Page 50**

1     Q. And what does that mean?
2     A. It just means that those loans on client
3  156 were originated by WAMU.
4     Q. So it doesn't indicate how they were
5  acquired?
6     A. No.
7     Q. So they could have been acquired as a
8  liability repurchase or -- they're just
9  Washington Mutual Bank loans or Washington
10 Mutual Bank, FA loans?
11    A. Yes.
12    Q. Are there any Washington Mutual, FSP
13 loans in the Heritage thing? I don't think so.
14    A. I don't know the difference.
15    Q. It's a technical difference.
16 Apparently, Washington Mutual Bank, FSB wasn't
17 in receivership; it was just transferred as an
18 operating subsidiary.
19       MR. YOO: Objection. Assumes facts not
20 in evidence, lacks foundation. She said she
21 doesn't know.
22    Q. So what about client 908, who is that
23 client 908?
24    A. So 908 is just in reference to when --

---

**Page 51**

1  before conversion, WAMU had its own MSP, they
2  had platforms. So like Chase today has client
3  465 and 156, they had their own separate
4  platforms or clients on MSP. That's just
5  referring to one of those.
6     Q. So is 908 a Washington Mutual Bank
7  number, or is it a Chase number?
8       MR. YOO: Asked and answered.
9     Q. I didn't understand.
10    A. It's WAMU.
11    Q. And then it says pre-9-1-09. Does that
12 sound like a conversion date?
13    A. Preconversion.
14    Q. And then after that they use something
15 else which they don't indicate here on this
16 screen, I guess. Let's go down to the bottom
17 because they're in reverse order date-wise.
18 What we're seeing here is a date 8-7-07. Could
19 you explain this? The captions are old/INV and
20 old/INV and EFF date and then we have tran date
21 and then date paid. Could you explain to me the
22 80707 entry transaction date?
23    A. It appears that's a transaction that
24 happened prior to conversion, so that happened

---

**Page 52**

1  in the WAMU servicing system. I can explain it
2  as far as how Chase would currently -- what
3  these would represent in Chase today, but I
4  don't know what they were doing here.
5  Typically, when you see these transfers and they
6  just say maintenance investor, it could be that
7  they were just moving it into a different GL, so
8  they had to move it into a different investor
9  category to record it in that GL account.
10    Q. You spoke earlier this apparently --
11 they're indicating the investor number here is
12 030. Do you know what that is?
13    A. I do not. Those are all preconversion
14 and WAMU had their own logic for the investor
15 IDs that is different than Chase is. Where we
16 had W, X, Y, Z are bank owned, they had a
17 different logic.
18    Q. So if you move to the column next to
19 that you see the 801006, which I think you've
20 already explained adequately.
21    A. Uh-huh.
22    Q. And what they're saying is that the loan
23 was transferred from 030 to 801; is that
24 correct?

---

Page 53

1   A. Appears to be.
2   Q. And then let's move up to the next line.
3   I'll just make a note that that 30183559 is a
4   loan number at issue here. On 12-17 of '07 it
5   shows another transfer.
6   A. That appears correct.
7   Q. So the investor went from A01 to A11.
8   Would that be a correct read?
9   A. Yes.
10   Q. And then later on in 12-19 of '08 it
11   shows the -- well, go ahead and tell me what
12   happened there.
13   A. Looks like it moved from investor ID,
14   A11 category 006 into A01 category 013.
15   Q. Okay. And again, we don't place special
16   interest on the 006013?
17   A. Correct.
18   Q. So if you look at the dates below that
19   it says the transaction date is 12-19 of '08,
20   right?
21   A. Right.
22   Q. It says the effective date is 3-1 of
23   '08.
24   A. Correct.

Page 54

1   Q. How can you effect a backwards transfer?
2   Have you ever seen this done?
3   A. I have. I don't know what that
4   indicates.
5   Q. And it refers to -- do you know what the
6   N refers to?
7   A. I do not.
8   Q. You're doing better than most people.
9   Congratulations. Most of them are baffled by
10   this.
11   And then on 9-2 of '09 it shows an
12   entirely new investor, X01, right?
13   A. Yes.
14   Q. And what's the 228 here?
15   A. Again, just a category that drives
16   ledger.
17   Q. Okay. This one here is -- what's it
18   doing? It's going from AX01 to A01?
19   A. I believe this is when conversion
20   happened, and what you're seeing there is these
21   loans being loaded onto the Chase servicer. So
22   it's really just loading them into this kind of
23   generic investor ID, and then you see a changing
24   back to the correct one that it came from. So

Page 55

1   it's really just a step in the conversion.
2   Q. Okay. So just to be clear, the very top
3   of the page it has JPMorgan Chase Bank NA-156?
4   A. Yes.
5   Q. Is that Chase's number?
6   A. 156 indicates that's on the platform for
7   Heritage WAMU.
8   Q. Okay. Platform Heritage WAMU. All
9   right. Okay. Thank you.
10   -=0=-
11   (Deposition Exhibit 12 marked.)
12   -=0=-
13   MR. YOO: Do you have a copy for me?
14   MR. KELLEY: Will you share, please. I
15   have one here, but it's not worth searching for.
16   BY MR. KELLEY:
17   Q. So this is JPM001134 Bates number. I've
18   highlighted the thing at the top. This appears
19   to refer to an investor change and effective
20   date. So apparently that matches with this?
21   A. Yes.
22   Q. So even though this is not a Chase --
23   Chase uses this system, obviously, but it's not,
24   I don't think, an internal accounting system,

Page 56

1   it's an LPS?
2   A. No.
3   Q. So anyway, that matches.
4   MR. YOO: Let the record reflect that
5   Mr. Kelley's referring to -- when he says it
6   matches, he's referring to the top line of
7   Exhibit 11.
8   Q. Investor change and effective date
9   9-2-09.
10   Did you look at MSP for this loan prior
11   as part of your preparation for this deposition?
12   A. I did review it, just the corporate
13   advance screens.
14   Q. Okay. You didn't look at anything else?
15   A. No.
16   Q. I might ask you, how do you get your
17   instructions to apply a corporate advance? I
18   mean, how do you know what to do in your job?
19   Do you get orders?
20   MR. YOO: Objection. Vague and
21   ambiguous.
22   If you understand his question, go ahead
23   and respond.
24   A. We don't apply the corporate advance, so

1    those are paid out through an invoice system.
2    So the vendor submits an invoice, the invoice is
3    paid through another system and is booked into
4    MSP. What my team does is we reconcile the
5    activity within the payee to ensure if the payee
6    is for inspections that we're only getting
7    inspection transactions in that payee.
8        Q. So every 745 transaction will have,
9    what, an invoice?
10       A. Not a 745. So a 745 is a non-monetary
11   transaction. It's an adjusting entry. It could
12   just be us moving it from one payee to another.
13   Invoices are booked with a 600 series
14   transaction code.
15       Q. I think we have something on that. So
16   how would you know to move to a different payee
17   code?
18       A. We would see transaction with reason
19   codes that do not apply to that payee. So if a
20   payee is set up as an inspection payee, we
21   should only see inspection reason codes. So if
22   we saw a reason code hit that was not
23   inspection-related, we would know that it didn't
24   belong.

1        Q. So for every 745 is there going to be a
2    600 or 500?
3        A. No. A 745 is going to be offset with
4    another 745. So in order to do a 745
5    transaction there has to be a debit and a
6    credit, but there's no invoice. So it's moving
7    things internally on our books. There's no cash
8    received and we're not paying cash out.
9        Q. As an example, if an appraisal was
10   ordered by Chase by an outside firm, then that
11   firm would send Chase an invoice, it would be
12   recorded as a 600?
13       A. 600 series tran, yes.
14       Q. And would there also possibly be a 745
15   entry?
16       MR. YOO: Objection. Asked and
17   answered. Twice.
18       A. Only if the funds needed to be moved
19   into a different account.
20       MR. KELLEY: I want to take a
21   five-minute break.
22       (Recess.)
23          -=0=-
24       (Deposition Exhibit 13 marked.)

1          -=0=-
2        MR. YOO: Exhibit 13 appears to be --
3        MR. KELLEY: This is a summary.
4        MR. YOO: That's something that you
5    generated, right, Mr. Kelley?
6        MR. KELLEY: Right.
7        MR. YOO: Summary of 745 transactions is
8    the title of the document.
9        MR. KELLEY: Yes. And it's a summary of
10   the Chase discovery referencing the Chase Bates
11   number in the first column. So that would be
12   the go-to page. And it has a user column, a
13   date, it's got the payee codes, and the comments
14   field is extracted from those documents.
15       MR. YOO: Again, this document was
16   generated by Mr. Kelley. This is not a Chase
17   document.
18       MR. KELLEY: No, it's not.
19   BY MR. KELLEY:
20       Q. Take a look at that for a minute.
21       A. Okay.
22       Q. I guess starting at the top, the 10 and
23   14, do you know what that is?
24       A. I do.

1        Q. What is it?
2        A. So the 10 and 14 is a contra payee.
3        Q. Is that a real payee?
4        A. By payee, I mean that it's a number
5    assigned to a GL.
6        Q. General ledger?
7        A. Yes.
8        Q. So it doesn't have any further
9    identification?
10       A. No, other than it would just indicate a
11   general ledger account that this activity would
12   be hitting.
13       Q. Okay. So it's headed that way?
14       A. Yes.
15       Q. All right. And when it gets over there,
16   then somebody else does something with it,
17   right?
18       A. Yes.
19       Q. So it's a partitioning of the accounting
20   functions, I take it?
21       A. Yes.
22       Q. And then 16 and 14?
23       A. That is the -- it's a credit loss, GL.
24       Q. What is a credit loss?

Page 61

1    A. It's just where we record potential
2  losses on our books.
3    Q. So if it's minus, is that a loss?
4    A. None of these will specifically be
5  losses, they're just kind of paper accounting,
6  where we're saying a credit is typically a --
7  I'm sorry, a minus would indicate a credit, and
8  something that was just a positive number would
9  be a debit.
10    Q. So the bottom there's a 435 number as
11  positive?
12    A. Uh-huh.
13    Q. There's a debit?
14    A. On the right, yes.
15    Q. So is that -- so which one is the right
16  one?
17      MR. YOO: Object.
18    A. All of these appear to be.
19    Q. Well, they're plus and minus.
20    A. Some of them are just changing the
21  reason code, so if you look over to the right,
22  that 435 transaction --
23      MR. YOO: Let the record reflect that
24  the witness is pointing to numbers 9 and 10,

Page 62

1  LTCO.
2    A. So that -- they're actually just
3  changing a reason code there from LTCO to CMVC.
4  During conversion WAMU had their own reason code
5  system. Chase has our reason code system. So
6  they're just doing an entry to change the reason
7  code in how it's recorded.
8    Q. So the LT stands for what?
9    A. That was a WAMU reason code showing
10  their conversion balance.
11    Q. Why are there -- if you notice, there
12  are three sets of entries under 9-24-2009.
13  That's only one loan. Why are there three sets
14  of entries?
15    A. Again, that goes back to if they were
16  doing an entry, they're just flipping the reason
17  code. So it's not truly a write-down. It's
18  adjusting that reason code. In order to do that
19  they have to reverse what was done on the other
20  reason code and then do an entry for the new
21  reason code.
22    Q. And the reason code is LTCO?
23    A. Well, that was the old reason code, so
24  they changed it to CMVC.

Page 63

1    Q. What's CMVC mean?
2    A. That's a contra conversion balance.
3    Q. Does this relate to the fair value of
4  the loan?
5    A. It does.
6    Q. You're not familiar with fair value
7  calculations. I think we asked that one.
8      MR. YOO: Asked and answered.
9    Q. Some other group does that; is that
10  correct?
11    A. That's correct.
12      MR. YOO: Asked and answered.
13    Q. Do you know what group does it? Do they
14  have a name?
15    A. I don't know.
16    Q. There's over 150,000 employees.
17    A. Right.
18    Q. So the CAMV on the line 7, what's that
19  refer to?
20    A. CAMV refers to a contra anniversary.
21    Q. So sounds like a drug deal, contras. So
22  what's that all about? Why do they have to do
23  this on anniversary dates?
24    A. Because a loan can depreciate over time.

Page 64

1  So they have to keep their value, their fair
2  value analysis current. So they make these
3  adjusting entries.
4    Q. But a loan might not depreciate over
5  time, it might appreciate, right?
6      MR. YOO: Objection.
7    Q. Is that correct?
8    A. That's correct.
9    Q. So what do you do in that circumstance?
10    A. They could do a write-up on the loan.
11    Q. Okay. All right. So what are these?
12  Are these write-ups or write-downs?
13    A. Which one?
14    Q. I'm talking about the CAMV on 6 and 7.
15    A. Those would be write-downs.
16    Q. So these guys are write-downs.
17    A. Uh-huh.
18    Q. Okay. And then if we go to lines 3 and
19  4, it says CAMV?
20    A. Again, that's anniversary contra.
21    Q. So they're adjusting them annually, is
22  that what that means?
23    A. They could be, yes.
24    Q. Because these are 9-25 and the other

Page 65

1  ones were 9-24-09. Okay. Anyway, are those
2  write-ups or write-downs?
3  A. Lines 3 and 4?
4  Q. Uh-huh.
5  A. Those are -- those appear to be
6  write-downs. They are going -- I'm sorry,
7  write-ups.
8  Q. So the loan is appreciating in value?
9  A. It appears that way.
10  Q. That's quite a bit. And then we have
11  the mysterious line 2. It just shows the one
12  entry. This is the actual document production
13  from Chase. So there is no 10 and 14 in line 2.
14  So I'm not sure what that means.
15  A. If this was a 745 tran, there would have
16  to be an offsetting entry.
17  Q. So why isn't it there, I wonder?
18  A. I'm not sure where this came from. It
19  would have to be there. If we looked probably
20  through the system.
21  Q. You guys may have to fix that.
22  A. In my review of the loan, I believe that
23  there was the offset because my balance on 10
24  and 14 and 16 were, you know, equal offsets.

Page 66

1  Q. That's kind of what I was expecting.
2  Then it's a write -- so is 463 -- excuse me,
3  line 2, the 463,000, is that a write-up or
4  write-down?
5  A. Assuming that there was an offset of the
6  463, that looks like it would be a write-down.
7  Q. Do you know how they obtain this
8  write-up or write-down, or do they just hand it
9  to you?
10  A. I do not.
11  Q. So they give you the number and you see
12  it's put in right?
13  A. These payees are managed by another
14  group in accounting outside of what my group
15  does.
16  Q. Okay. When you were looking at these,
17  did you look at any adjustments made prior to
18  September 25, 2008?
19  A. I don't recall specifically what the
20  transactions were, but I reviewed all of the
21  DDCH screen.
22  Q. There's a little mystery here.
23  Okay. I probably need to make a copy of
24  this. This is the best one. Why don't we make

Page 67

1  this -- I know this by heart anyway.
2  -=0=-
3  (Deposition Exhibit 14 marked.)
4  -=0=-
5  MR. YOO: Obviously, you don't have a
6  copy for me?
7  MR. KELLEY: Share, and then I'll use
8  this thing here, which I don't want to put into
9  evidence because it's missing the origin.
10  MR. YOO: All right. Exhibit 14 appears
11  to be some type of a spreadsheet. It's
12  identified by filing date with the court on
13  September 11, 2012, page 18 out of 30.
14  BY MR. KELLEY:
15  Q. Okay. And this is the lawsuit between
16  LSI -- that the FDIC receiver made against LSI
17  Appraisal Company asserting that the loans were
18  made grossly negligent. And on that page you'll
19  notice that the loan in question, 3018113559, is
20  there. It's about 11 above the bottom. It
21  says, Saratoga, gives the address, 14390
22  Douglass Lane.
23  A. Okay.
24  MR. YOO: On the bottom, right?

Page 68

1  Q. From the bottom, yeah. And if you move
2  over to column 3, it --
3  MR. YOO: The loss amount?
4  Q. The loss amount is stated as
5  $436,506.26; is that right?
6  MR. YOO: All right.
7  Q. In this case they're claiming that this
8  is a natural loss --
9  MR. YOO: Okay.
10  Q. -- that apparently Washington Mutual
11  incurred prior to the receivership. Otherwise,
12  the receiver wouldn't be able to bring this
13  suit.
14  MR. YOO: Okay. Assumes facts not in
15  evidence. Lacks foundation.
16  MR. KELLEY: Well, foundation, or I'll
17  take judicial notice of this elsewhere in the
18  case.
19  MR. YOO: This is a spreadsheet that was
20  created by the FDIC, correct?
21  MR. KELLEY: By their attorneys.
22  MR. YOO: Right.
23  MR. KELLEY: Yes.
24  MR. YOO: Again, not by Chase, not by

---

**Page 69**

1 Washington Mutual.
2     MR. KELLEY: That's correct. It was
3 created by the --
4     MR. YOO: Counsel --
5     MR. KELLEY: -- counsel for the
6 receiver.
7     MR. YOO: FDIC?
8     MR. KELLEY: Right.
9 BY MR. KELLEY:
10   Q. And I was wondering if you saw any
11 reference to this loss amount in there.
12 Incidentally, if there was a loss, how would
13 that be reported? Would that be reported
14 through your group in any way?
15   A. No, my group doesn't directly handle
16 losses.
17   Q. So if a -- if a loss occurred based on
18 they bought the loan for a million and they sold
19 it for half a million, they take a -- record a
20 half-a-million-dollar loss, you wouldn't see any
21 of that in your group?
22   A. Not my team directly, no.
23   Q. You might get some sort of thing --
24 order to move things around or whatever. Okay.

---

**Page 70**

1 Okay. That's it on that one.
2     We see in the documents -- I'm just
3 going to ask you some questions -- that the
4 investor number or IDX99 appears on the loan
5 transfer screen. Actually, X02 appears on the
6 loan transfer screen. And my question to you
7 is: How many -- and it refers to a pool, I
8 think, investor pool.
9     MR. YOO: Objection. Lacks foundation,
10 assumes facts not in evidence.
11   Q. How many numbers -- Xs are there? Have
12 you seen an X01 and X7 or 13?
13   A. Yes, there are multiple.
14   Q. There's lots of them?
15   A. Uh-huh.
16   Q. And is there -- what are these
17 categories?
18   A. The investor -- it can represent
19 different kinds of things, but all Xs are Chase
20 owned, so they're bank-owned loans.
21   Q. And they're consistent with that code
22 that we discussed earlier?
23   A. Yes.
24   Q. So how many have you seen? Are there 50

---

**Page 71**

1 of them or 20 of them?
2   A. No, there's --
3   Q. 99?
4   A. It can go the whole spectrum.
5   Q. So it could be X99 -- there could be 99
6 different Xs?
7   A. That's correct.
8   Q. And you work with how many of those?
9   A. It would be all of them.
10   Q. Sooner or later, right?
11   A. Yeah.
12   Q. Thank you. You answered a question that
13 Mr. Smith couldn't answer. He didn't know who
14 client 908 was.
15   A. Good.
16   Q. I'm going to ask you this: I've never
17 seen any document production relating to the
18 HELOC that's in this case. Do you also handle
19 HELOCs?
20   A. If they're outside of the MSP servicing
21 system, I would not.
22   Q. So they could be outside the MSP
23 servicing system?
24   A. There are other systems that service

---

**Page 72**

1 HELOC loans, yes.
2   Q. Could you explain what other systems
3 might be.
4   A. I believe they're VLS for Fortracs,
5 F-O-R-T-R-A-C-S.
6   Q. Anything else?
7   A. Just VLS. So those are the systems that
8 are outside MSP. Not knowing specifically what
9 this loan -- if it would be on MSP or these
10 other systems.
11   Q. I was just curious as to why they would
12 account -- wouldn't MSP be able to handle a
13 HELOC, or is this just a legacy thing?
14   A. No, there are issues with that servicing
15 system that they can't do everything that's
16 required, so they use another servicing system.
17 I don't know what those things are.
18   Q. So they need to use another servicing
19 system?
20   A. Yes.
21   Q. Okay. You also answered a question
22 Mr. Smith couldn't answer with the A through B.
23     Okay. What does CI refer to? It says
24 like a prime or CI.

---

**Page 73**

1   A. That refers to credit impaired.
2   Q. Oh, okay. So that's the stuff we were
3   talking about earlier, credit-impaired loans?
4   A. Yes.
5   Q. They call them PCI loans in the annual
6   statement?
7   A. Yes.
8   Q. So some of the loans that were acquired
9   apparently weren't credit impaired. It's not
10  clear from the annual report whether they were
11  included -- you know, they mixed them altogether
12  or what, but I think they didn't.
13      Did Mr. Smith ask you at all about the
14  corporate advance adjustments, the contra
15  accounts? Do you recall him asking?
16      MR. YOO: Objection. Vague and
17  ambiguous.
18      If you understand his question, you can
19  respond.
20  A. I don't specifically recall him asking
21  anything other than what those reason codes mean
22  as a CAMV, and then I explained the contra.
23  Q. So he didn't ask in more detail.
24      I think I asked you earlier, you don't

**Page 74**

1   deal with Washington Mutual, FSB loans?
2       MR. YOO: Asked and answered.
3   A. I don't believe so.
4   Q. Yeah, probably not.
5       On these 745 transactions, they indicate
6   the direction of the flow of money, whether it's
7   virtual or real, right?
8   A. (Nods.)
9   Q. It could go A to B or B to A, right?
10  A. Yes.
11  Q. Okay. And have you seen a lot of these
12  very large 745 transactions like the ones you
13  see here where they're 400,000 or 546,000?
14  A. Yes.
15  Q. You have?
16  A. Yes.
17  Q. Okay. And are they -- have you ever
18  seen them where the -- these numbered
19  transactions exceed the actual amount of the
20  loan?
21      MR. YOO: Objection. Vague and
22  ambiguous as phrased.
23  A. Not that I recall.
24  Q. I was reviewing someone else's loan file

**Page 75**

1   and I found they had a $570,000 loan and he had
2   $700,000 in his 745 transactions, and they
3   weren't listed as contra, they were just --
4   A. It's possible, because fees could
5   compound over time.
6   Q. Well, that would be a lot of
7   compounding. Okay. So if they had a situation
8   where a hurricane came in and blew down the
9   garage and there was no insurance, would that be
10  handled as a 745 adjustment?
11      MR. YOO: Objection. Improper
12  hypothetical. Irrelevant to the subject matter
13  of the lawsuit and not likely to lead to the
14  discovery of admissible evidence.
15  A. I don't know how that would work and how
16  it would be recorded.
17  Q. I'm just looking at these huge amounts
18  of money flowing back and forth. Okay. Let's
19  see what else we have here.
20      Do you ever work -- you don't work
21  directly with any of the subsidiaries of Chase,
22  do you?
23  A. No.
24  Q. You're just totally internal?

**Page 76**

1   A. Internal.
2   Q. So you've never processed something for
3   Washington Mutual Securities Corporation?
4   A. No.
5   Q. Washington Mutual asset?
6   A. No.
7   Q. Do you ever use LEZA?
8   A. No. I've never heard of it.
9   Q. You don't need it?
10  A. Huh-uh.
11  Q. That's another software program.
12      Are you familiar with GAAP, generally
13  accepted accounting principles?
14  A. Yes.
15  Q. Under GAAP, is it permissible to write
16  up something after it's been written down?
17      MR. YOO: Objection. Calls for
18  testimony -- expert testimony, and calls for
19  testimony that's completely irrelevant to the
20  subject matter of the lawsuit and not likely to
21  lead to any discovery of any admissible
22  evidence.
23  A. That would be outside of what I do, so I
24  wouldn't be familiar with those policies or

**Page 77**

1  procedures under GAAP.
2    Q. So you're not familiar with the GAAP?
3    A. With that portion of the GAAP.
4    Q. Okay. What portions of the GAAP are you
5  familiar with?
6    A. Anything that would be related to
7  corporate advance recording, accounts
8  receivable, those type of policies.
9    Q. I should have let you read that. Okay.
10       So if I understood you correctly, you
11  actually don't work with HELOCs?
12   A. Correct.
13   Q. You don't work with iVolt either?
14  Probably don't need to?
15   A. No.
16   Q. Do you know about it?
17   A. (Nods.)
18   Q. Have you ever looked at it?
19   A. Yes.
20   Q. Okay. Are the loan documents displayed
21  in color?
22   A. I don't recall.
23   Q. Smith got that one. He said they are.
24  So...

**Page 78**

1       I might ask you, is there -- do you have
2  an internal document guidelines and procedures,
3  business practices for what you do, or do you
4  just work off of the accounting standards?
5       MR. YOO: Objection. Vague and
6  ambiguous as phrased.
7   A. I'm not sure what you're asking there.
8   Q. Do you have a book that they give you of
9  procedures, here's what you need to do, you can
10  go refer to that book?
11   A. For some things, but not all.
12   Q. Partially?
13   A. Yeah.
14   Q. Now, one other thing we were talking
15  about, which we didn't go into in a lot of depth
16  was the -- this FFIEC write-up thing. It says
17  C150, FFIEC write-up. Do you know what that is?
18   A. I don't know outside of just the
19  description that it's a 150-day contra. I don't
20  know what the 150-day would indicate, from what
21  point.
22   Q. So C150 is 150 days?
23   A. It does indicate 150 days, but I'm not
24  sure 150 days from what point.

**Page 79**

1    Q. Great. So the FFIEC, of course, appears
2  to be referring to that entity. Apparently,
3  this is rather huge. I mean, an institution
4  nobody's ever heard of. My understanding is it
5  says between the federal reserve, the OCC, the
6  FDIC, and the treasury department. So this
7  write-up refers to a report required by the
8  FFIEC. They do have a reporting mechanism. So
9  would you be writing -- is that a write-up or
10  write-down there?
11   A. Based on the signage, it looks as if
12  it's a write-up.
13   Q. So it's a write-up going to -- reporting
14  a write-up to the FFIEC. I guess the question
15  is, since they require foreign reporting, what
16  that has to do with anything. So another
17  mystery.
18   A. Yeah.
19   Q. Okay. Is there any group at Chase that
20  handles these FFIEC write-ups or write-downs or
21  whatever?
22   A. It would be the same group that does the
23  write-downs, but I don't know who specifically
24  that group is.

**Page 80**

1    Q. So the C150, you said it was 150 days?
2    A. Uh-huh.
3    Q. That's an odd number of days. Do you
4  know any more about that sort of thing?
5    A. I don't.
6    Q. Have you ever seen C300 or --
7    A. I believe there's a C360.
8    Q. That would be like annual or something,
9  right?
10       So you have a C180, C150?
11   A. I think it's just those two
12  specifically.
13       MR. KELLEY: Maybe we can go off the
14  record here for a second.
15       (A discussion is held off the record.)
16       MR. KELLEY: So will you make that
17  representation again, Mr. Yoo.
18       MR. YOO: Sure. Off the record
19  Mr. Kelley had asked that Chase produce to him a
20  FFIEC report that was sent by Chase to some type
21  of governmental agency sometime in 2012. I told
22  him that I would look into it, but I did not
23  promise or guarantee him that we would produce
24  such a report if such a report exists.

Page 81

1    MR. KELLEY: Okay. And now you're
2  representing that you're going to look into it?
3    MR. YOO: I'm going to look into it.
4  But that's all I'm representing to you.
5    MR. KELLEY: Okay. And that refers to
6  Chase Bates number document JPM002000.
7    While we're on the record with this
8  stuff, I want to make note that no documents
9  were produced today. Documents were requested
10  at the deposition. They were not produced.
11    MR. YOO: Ms. Davis is appearing in her
12  individual capacity as an employee. She's not a
13  custodial record of Chase. She has no
14  obligation to produce any documents, especially
15  the document that was requested. That's not in
16  her possession. She has no obligation to look
17  for them.
18  BY MR. KELLEY:
19    Q. I might ask you, have you ever run
20  across the initials FNFS in the comment fields
21  of some of these documents?
22    A. I don't recall that, no.
23    Q. You might not because it generally shows
24  up in LPS documents.

Page 82

1    In connection with the payee code 16 and
2  14, the comment field they have CI. What does
3  that indicate?
4    MR. YOO: Asked and answered.
5    A. Credit impaired.
6    Q. Oh, okay. Got it.
7    MR. YOO: Do you need time to gather
8  your thoughts? It seems like it's not conducive
9  to wait five minutes for you to ask one
10  question.
11    MR. KELLEY: Be patient.
12    MR. YOO: That's not how a deposition
13  should be taken.
14    MR. KELLEY: Well, that's your opinion.
15    MR. YOO: Let the record reflect that
16  Mr. Kelley's browsing through the deposition of
17  Mr. Smith to generate a question, and, in fact,
18  we've been here waiting five, six minutes for
19  each question to be asked.
20    MR. KELLEY: That's not true.
21    MR. YOO: I've been counting the time.
22  In fact, one question was posed to me, and in
23  seven minutes only one question has been asked
24  to the deponent.

Page 83

1    MR. KELLEY: The purpose of the
2  deposition is to determine the facts in the
3  case; it doesn't matter if it takes one minute
4  or five minutes.
5    MR. YOO: All right. So admitted by
6  you.
7    MR. KELLEY: Okay. I'm done. Thank you
8  very much, Crystal. I appreciate it.
9    THE WITNESS: No problem.
10    MR. KELLEY: Your responses were very
11  clear.
12    MR. YOO: She answered every question
13  she knew.
14    -=O=-
15    Thereupon, the testimony of August 13,
16  2014, was concluded at 11:23 p.m.
17    -=O=-
18
19
20
21
22
23
24

Page 84

1                  CERTIFICATE
2  STATE OF OHIO       :
                       :  SS:
3  COUNTY OF FRANKLIN :
4    I, Rhonda Lawrence, a Notary Public in
   and for the State of Ohio, duly commissioned and
5  qualified. do hereby certify that the
   within-named CRYSTAL DAVIS was first duly sworn
6  to testify to the truth, the whole truth, and
   nothing but the truth in the cause aforesaid;
7  that the testimony then given was reduced to
   stenotypy in the presence of said witness,
8  afterwards transcribed; that the foregoing is a
   true and correct transcript of the testimony;
9  that this deposition was taken at the time and
   place in the foregoing caption specified.
10
11    I do further certify that I am not a
   relative, employee or attorney of any of the
12  parties hereto; that I am not a relative or
   employee of any attorney or counsel employed by
13  the parties hereto; that I am not financially
   interested in the action; and further, I am not,
14  nor is the court reporting firm with which I am
   affiliated, under contract as defined in Civil
15  Rule 28(D).
16    In witness whereof, I have hereunto
   set my hand and affixed my seal of office at
17  Columbus, Ohio, on this 27th day of August,
   2014.
18
19
20
21
22
23              Rhonda Lawrence
                Notary Public, State of Ohio.
24  My commission expires:  October 8, 2018

*Exhibit 4*

*INVESTOR Codes*

| | | | |
|---|---|---|---|
| 76T41 | T | WAMU-EMC MIP RECOVERABLE | MIP Recoverable Insufficient funds collected at close for MI premiums Advances are billed to originating channel |
| 93T20 | T | TECH FEE | REO Tech Fees Invoices paid to LPS on behalf of REO vendors for the use of the LPS desktop system Advances are then recovered from the vendor |
| 91T00 | T | PRIVATE INVESTOR CLAIM | Used for Claim Funds for Private Investors (Investor ID beginning with A - V) |
| 91T17 | T | CLAIM FUNDS FNMA/FHLMC | Used for Claim Funds for Government Investor or Lo Type Loans |
| 99N35 | N | HAFA RESERVE | Reserve for over 60 HAFA balances on Serviced loans |
| 99T30 | T | HAFA SHRT SALE DIL INCEN | Payees are used for receivable due from US Treasury for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to Investor or applied to Principal 99T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000      99T31 - Subordinate Lien Release Amount (maximum $8,500), reimburseable portion - 2/3 of SLRA to maximum of $5,000 Also referred to as SLRA or Jr Lien |
| 99T31 | T | HAFA SHRT SALE DIL INCEN | Payees are used for receivable due from US Treasury for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to Investor or applied to Principal 99T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000      99T31 - Subordinate Lien Release Amount (maximum $8,500), reimburseable portion - 2/3 of SLRA to maximum of $5,000 Also referred to as SLRA or Jr Lien |
| 99T59 | T | CHASE MOD PROGRAMS | Payee is used for receivable due from Investor for Borrower Outreach amounts that were paid outside of the normal HUD process primarily as a result of insufficient sales proceeds to cover outreach amount |
| 30N01 | N | PRIME SERVICE RECOVERY | Recovery collections received on Serviced accounts previously charged off |
| 30R01 | R | RECOVERY SERVICED-NP | Recovery collections received on Serviced accounts previously charged off |
| 31N01 | N | NON-PRIME SERVICED RECOV | Recovery collections received on Serviced accounts previously charged off |
| 91R11 | R | SERV OUT OF POCKETS | Payee 91R11- This Payee holds Mortgagor Recoverable advances for investor loans and Bank owned Government Loans. Fcl Receivable- CMMC servicing- Receivables are created by payment of invoices on Borrower's behalf for foreclosure related costs by invoice processing and are life of loan entries |
| 91T11 | T | SERVICED OOP | Payee 91T11- This Payee holds Third Party Recoverable advances for investor loans and Bank owned Government Loans Fcl Receivable- CMMC servicing- Receivables are created by invoice processing payment of invoices for foreclosure related costs that should be reimbursable by the vendor and are life of Loan entries |
| 92T19 | T | A/R HOPE NOW CNSLNG | Client 465 Hope Now credit counseling fees provided by Homeowners Preservation Foundation that are collectable from investor. |
| 90T27 | T | FNMA LQUDTION ADV | Client 465 FNMA Pool Buyout |

CONFIDENTIAL

JPM002040

BP Investigative Agency
Exhibit 4



## $

**$1.888 (1)**
24:5
**$4 (1)**
29:13
**$436,506.26 (1)**
68:5
**$570,000 (1)**
75:1
**$700,000 (1)**
75:2

## /

**/0006 (1)**
44:11

## =

**=0= (28)**
17:4,6;26:12,14;
27:6,8;30:19,21;33:7,9,
20,22;34:24;35:2;38:7,
9;41:5,7;45:15,17;
49:11,13;55:10,12;
58:23;59:1;67:2,4
**=0= (2)**
83:14,17

## A

**A01 (3)**
53:7,14;54:18
**A11 (2)**
53:7,14
**able (2)**
68:12;72:12
**above (1)**
67:20
**accepted (1)**
76:13
**According (1)**
15:11
**account (5)**
44:16;52:9;58:19;
60:11;72:12
**accountants (2)**
6:11,17
**accounted (2)**
28:20;36:23
**accounting (33)**
6:3,24;7:14,20,21,
22;8:1,6,9,10,13,23;
9:17;10:20;18:17;27:9;
28:5,12,13,17,18;29:4,
6,20,20;32:22;37:16;
55:24;60:19;61:5;
66:14;76:13;78:4
**accounts (5)**
9:13;40:13,16;73:15;
77:7

**acquired (12)**
27:10;28:19,22;30:4;
35:12,14;36:22;39:15,
15;50:5,7;73:8
**acquisition (3)**
27:22;30:7;35:9
**acquisition-date (1)**
30:13
**across (2)**
47:9;81:20
**acting (1)**
25:20
**activities (2)**
37:18,19
**activity (2)**
57:5;60:11
**actual (6)**
29:5,20;31:21;37:11;
65:12;74:19
**actually (7)**
30:18;34:9;36:24;
38:13;62:2;70:5;77:11
**add (1)**
40:19
**address (1)**
67:21
**adequately (1)**
52:20
**adjusting (4)**
57:11;62:18;64:3,21
**adjustment (4)**
9:17;33:1,2;75:10
**adjustments (2)**
66:17;73:14
**admissible (3)**
21:13;75:14;76:21
**admitted (1)**
83:5
**advance (11)**
6:12;7:22;8:1,6;
41:14,15;56:13,17,24;
73:14;77:7
**advances (6)**
9:15,24;12:22;19:19;
34:16;39:21
**again (11)**
20:5;22:15;35:23;
46:24;53:15;54:15;
59:15;62:15;64:20;
68:24;80:17
**against (1)**
67:16
**agency (1)**
80:21
**aggregate (1)**
37:21
**aggregated (2)**
29:1,3
**ago (1)**
11:5
**agree (1)**
37:15
**agreement (15)**

17:2,14,17;18:9,11;
19:5,14,16,21;20:3;
21:6;23:5;24:3,11;26:6
**agreements (1)**
18:21
**ahead (4)**
39:11;46:12;53:11;
56:22
**allowed (1)**
21:11
**altogether (1)**
73:11
**Alvarado (2)**
5:11;12:9
**always (1)**
44:14
**ambiguity (1)**
14:10
**ambiguous (10)**
9:5,22;28:9;36:13;
39:10;40:12;56:21;
73:17;74:22;78:6
**amount (8)**
29:10,12;30:11;
32:19;68:3,4;69:11;
74:19
**amounts (1)**
75:17
**analysis (1)**
64:2
**Anne (1)**
12:7
**anniversary (3)**
63:20,23;64:20
**annoying (1)**
24:20
**annual (6)**
26:16,23;36:5;73:5,
10;80:8
**annually (1)**
64:21
**answered (12)**
10:11;19:17;37:14;
51:8;58:17;63:8,12;
71:12;72:21;74:2;82:4;
83:12
**Apparently (7)**
32:13;50:16;52:10;
55:20;68:10;73:9;79:2
**appear (2)**
61:18;65:5
**appearing (1)**
81:11
**appears (15)**
17:11;34:4;35:19,22;
46:8;51:23;52:1,6;
55:18;59:2;65:9;67:10;
70:4,5;79:1
**applied (1)**
41:22
**applies (1)**
18:11
**apply (4)**

29:21;56:17,24;
57:19
**appraisal (2)**
58:9;67:17
**appraise (1)**
37:7
**appreciate (2)**
64:5;83:8
**appreciating (1)**
65:8
**approximately (2)**
10:12;11:8
**AR (1)**
48:21
**arbitrarily (1)**
21:16
**area (1)**
9:24
**areas (3)**
35:3;46:4
**arm (1)**
47:2
**arm's (1)**
30:5
**Around (2)**
40:23;69:24
**aside (1)**
43:3
**assert (1)**
24:18
**asserting (2)**
22:15;67:17
**asset (5)**
17:24;23:11,14;
36:19;76:5
**assets (6)**
18:4;23:6;24:5;
35:13,16;42:8
**assigned (1)**
60:5
**Associate (2)**
6:7;19:18
**associated (1)**
23:9
**assume (1)**
31:5
**assumed (2)**
17:24;24:6
**Assumes (12)**
14:21;28:1;29:17;
33:6;34:23;35:24;
38:17;45:10;46:11;
50:19;68:14;70:10
**assuming (3)**
23:7;24:4;66:5
**assumption (12)**
17:2,14,16;18:9;
19:14,20;20:3;21:6;
23:5;24:3,11;26:6
**attached (1)**
31:8
**attorney (1)**
5:12

**attorneys (1)**
68:21
**August (1)**
83:15
**AX01 (1)**
54:18

## B

**B33 (1)**
30:2
**back (10)**
5:16;11:20;15:19;
28:11;30:17;31:23;
33:18;54:24;62:15;
75:18
**background (5)**
5:16,20;6:22;7:3;
28:16
**backwards (1)**
54:1
**baffled (1)**
54:9
**balance (7)**
44:19;47:1,3,21;
62:10;63:2;65:23
**balanced (2)**
40:2,3
**balances (1)**
40:4
**Bank (22)**
5:7;14:16,17,18,18,
19;17:3;18:18,19;23:7;
24:4;33:14,15;36:19;
39:15;43:5;50:9,10,16;
51:6;52:16;55:3
**bank-owned (2)**
42:8;70:20
**banks (1)**
45:9
**based (4)**
19:24;36:21;69:17;
79:11
**basically (1)**
44:6
**basis (1)**
29:15
**Bates (5)**
41:9;49:15;55:17;
59:10;81:6
**become (4)**
20:8,11;21:6,18
**becomes (1)**
21:18
**begin (2)**
40:24;42:3
**beginning (2)**
29:11;40:4
**belong (1)**
57:24
**below (1)**
53:18
**best (1)**

66:24
**better (2)**
31:13;54:8
**beyond (1)**
19:7
**bill (1)**
41:23
**billion (3)**
24:5;26:19;32:21
**bit (7)**
5:15;9:18;23:5;36:3;
46:3;47:7;65:10
**blew (1)**
75:8
**board (2)**
28:18
**book (13)**
17:7,17,23;18:4,5;
23:15;26:2,8;36:11,18,
22;78:8,10
**booked (2)**
57:3,13
**books (5)**
36:20;37:1;44:23,23;
58:7;61:2
**borrower (1)**
47:22
**Borrower's (1)**
23:3
**Bottom (9)**
25:13;30:10;36:3;
47:15;51:16;61:10;
67:20,24;68:1
**bought (1)**
69:18
**box (1)**
40:17
**brand (1)**
8:20
**break (3)**
36:6;45:13;58:21
**breaks (1)**
44:23
**brief (3)**
11:10,11;14:1
**bring (1)**
68:12
**brought (1)**
40:3
**browsing (1)**
82:16
**business (1)**
78:3

## C

**C150 (4)**
78:17,22;80:1,10
**C180 (1)**
80:10
**C300 (1)**
80:6
**C360 (1)**

80:7
**calculate (1)**
29:14
**calculation (3)**
37:4,5,12
**calculations (1)**
63:7
**call (3)**
44:13,17;73:5
**Calls (8)**
19:6,7;22:2;24:14,
21;25:23;76:17,18
**came (3)**
54:24;65:18;75:8
**camera (4)**
63:18,20;64:14,19;
73:22
**can (20)**
9:16;21:2;22:18;
23:22;24:22;27:15;
43:23;44:3,4;45:18;
46:12;48:15;52:1;54:1;
63:24;70:18;71:4;
73:18;78:9;80:13
**capacity (1)**
81:12
**captions (1)**
51:19
**carries (1)**
36:19
**carry (1)**
44:14
**carrying (1)**
29:12
**case (8)**
5:8,10;11:4;29:7;
68:7,18;71:18;83:3
**cash (4)**
7:16;29:15;58:7,8
**cat (4)**
46:17,22,23;47:1
**categories (2)**
44:15;70:17
**category (8)**
44:12,13,20,20;52:9;
53:14,14;54:15
**caution (1)**
20:5
**center (1)**
44:17
**certain (4)**
13:2;27:9;35:13,13
**certified (1)**
5:3
**cetera (1)**
18:23
**change (4)**
44:20;55:19;56:8;
62:6
**changed (1)**
62:24
**changes (1)**
30:14

**changing (3)**
54:23;61:20;62:3
**characterized (1)**
9:14
**characters (1)**
44:7
**charged (1)**
18:17
**chart (1)**
40:13
**Chase (47)**
5:7,12;7:5,12;11:23;
12:11;17:3;20:2;25:17;
26:16,22;32:23;35:10,
14,17,18,20,21,21,23;
17:41:20;43:5;45:8;
48:1;49:23;51:2,7;
52:2,3,15;54:21;55:3,
22,23;58:10,11;59:10,
10,16;62:5;65:13;
68:24;70:19;75:21;
79:19;80:19,20;81:6,
13
**Chase's (1)**
55:5
**check (1)**
39:22
**choice (2)**
45:19,21
**Christopher (1)**
5:11
**CI (3)**
72:23,24;82:2
**circumstance (1)**
64:9
**claim (4)**
41:20,20,21;42:2
**claiming (1)**
68:7
**claims (1)**
23:4
**clause (1)**
25:18
**clauses (1)**
24:12
**clear (4)**
8:8;55:2;73:10;
83:11
**clear-cut (1)**
38:23
**clearer (1)**
17:1
**clearly (1)**
19:23
**client (9)**
49:18,19,20,23;50:2,
22,23;51:2;71:14
**clients (1)**
51:4
**close (1)**
33:15
**Closing (1)**
18:19

**cluttering (1)**
16:18
**CMVC (3)**
62:3,24;63:1
**code (21)**
44:13;48:4,6,18;
57:14,17,22;61:21;
62:3,4,5,7,9,17,18,20,
21,22,23;70:21;82:1
**codes (10)**
11:15,17;14:5,7;
49:5,7;57:19,21;59:13;
73:21
**college (1)**
—
**color (1)**
77:21
**column (4)**
52:18;59:11,12;68:2
**comfortable (1)**
20:21
**coming (1)**
39:23
**comment (2)**
81:20;82:2
**comments (3)**
38:5,20;59:13
**commercial (1)**
19:1
**Commitments (1)**
19:3
**Company (3)**
26:23;36:5;67:17
**completed (1)**
40:22
**Completely (2)**
43:11;76:19
**compound (1)**
75:5
**compounding (1)**
75:7
**concluded (1)**
83:16
**conclusion (6)**
19:7;22:2;24:15,21;
25:8,23
**conclusions (2)**
15:4,9
**conducive (1)**
82:8
**confusion (1)**
14:11
**congratulations (2)**
43:8;54:9
**connection (1)**
82:1
**consider (1)**
9:15
**considered (1)**
42:21
**consistent (1)**
70:21
**Consolidated (1)**

34:6
**contra (8)**
60:2;63:2,20;64:20;
73:14,22;75:3;78:19
**contract (1)**
24:12
**contras (1)**
63:21
**controller (2)**
6:7;19:18
**conversation (2)**
11:11;19:24
**conversion (1)**
39:4,8,14;51:1,12,
—
63:2
**converted (2)**
41:1;48:2
**copies (2)**
27:17;45:13
**copy (11)**
27:11,15;30:22;
32:11,15;38:12,14;
45:21;55:13;66:23;
67:6
**Corp (1)**
35:21
**corporate (15)**
6:12;7:22;8:1,6;
9:24;12:22;34:15;
39:21;41:14,15;56:12,
17,24;73:14;77:7
**Corporation (8)**
6:23;14:15;25:11,13,
14,17,20;76:3
**correctly (1)**
77:10
**Council (1)**
38:1
**counsel (6)**
12:10,12,13;22:24;
69:4,5
**counting (1)**
82:21
**couple (1)**
45:13
**course (1)**
79:1
**courses (1)**
6:2
**Court (6)**
15:20,22;16:9;43:4,
7;67:12
**create (1)**
29:15
**created (3)**
34:21;68:20;69:3
**credit (14)**
19:2,2;30:14;32:19;
33:1,2;58:6;60:23,24;
61:6,7;73:1,9;82:5
**credit-impaired (1)**
26:18,19;27:2;73:3

Min-U-Script®
**TORREANO REPORTING AND VIDEO**
www.torreano-depos.com    (866) 760-DEPO
(2) better - credit-impaired

**cross-border (1)**
38:15
**CRYSTAL (4)**
5:1,6,12;83:8
**curious (1)**
72:11
**current (3)**
6:6;42:5;64:2
**currently (1)**
52:2
**custodial (1)**
81:13
**customers (1)**
18:22

**D**

**date (17)**
33:1,15;35:20;46:17,
20;51:12,18,20,20,21,
22;53:19,22;55:20;
56:8;59:13;67:12
**dates (2)**
53:18;63:23
**date-wise (1)**
51:17
**David (1)**
6:23
**DAVIS (7)**
5:1,6,12;16:5;19:12;
31:21;81:11
**Davis' (1)**
15:22
**day (1)**
40:20
**days (5)**
78:22,23,24;80:1,3
**DDCH (3)**
11:15;14:3;66:21
**deal (2)**
63:21;74:1
**dealings (1)**
47:10
**debit (3)**
58:5;61:9,13
**Debts (1)**
27:9
**December (1)**
40:23
**decide (2)**
15:20;16:9
**define (1)**
38:5
**defined (1)**
17:8
**defines (2)**
21:22;38:14
**defining (2)**
18:10;22:13
**definition (1)**
37:15
**definitions (1)**
49:2

**degree (1)**
6:1
**department (2)**
6:11;79:6
**deponent (1)**
82:24
**deposes (1)**
5:3
**deposition (35)**
5:6;11:3,22,24;13:8,
15,21;14:24;15:16;
16:5;17:5;20:16,16;
21:1,16;26:13;27:7,14;
30:20;33:8,21;35:1;
38:8;39:4;41:6;45:16;
49:12;55:11;56:11;
58:24;67:3;81:10;
82:12,16;83:2
**depositions (1)**
14:11
**depreciate (2)**
63:24;64:4
**depth (1)**
78:15
**description (1)**
78:19
**desktop (2)**
45:2,6
**detail (1)**
73:23
**details (1)**
13:6
**determine (2)**
15:23;83:2
**determined (1)**
29:11
**dictated (1)**
28:17
**difference (3)**
36:10;50:14,15
**different (18)**
7:19;13:5;22:7;
30:12,24;40:8,13,16;
44:16,19;52:7,8,15,17;
57:16;58:19;70:19;
71:6
**digits (1)**
44:6
**Direct (1)**
22:9
**direction (1)**
74:6
**directly (1)**
69:15,22;75:21
**disclosure (1)**
38:15
**discoverable (1)**
43:13
**discovery (3)**
59:10;75:14;76:21
**discussed (1)**
70:22
**discussion (1)**

80:15
**displayed (1)**
77:20
**distinction (1)**
18:3
**divided (1)**
10:23
**document (34)**
18:1;19:21;22:1,11;
23:18,21;24:7;25:3,7,
22;26:4,20,21,22;28:4;
29:23;30:8;32:12;33:5,
16;34:5;35:22;38:16,
19;41:9;45:23;59:8,15,
17;65:12;71:17;78:2;
81:6,15
**documents (10)**
13:15;16:24;59:14;
70:2;77:20;81:8,9,14,
21,24
**done (2)**
26:9;28:6,24;29:2,4,
4;32:10;40:5;45:8;
54:2;62:19;83:7
**Douglass (1)**
67:22
**down (11)**
9:8;21:22;23:6,11;
47:6;49:1,17,18;51:16;
75:8;76:16
**drive (1)**
44:15
**driven (1)**
44:19
**drives (3)**
44:21;46:24;54:15
**drug (1)**
63:21
**due (1)**
30:13
**duly (1)**
5:2
**During (1)**
62:4

**E**

**earlier (6)**
30:3;36:21;52:10;
70:22;73:3,24
**ease (1)**
27:13
**Easton (2)**
6:19,20
**educational (1)**
5:20
**EFF (1)**
51:20
**effect (1)**
54:1
**effective (1)**
53:22;55:19;56:8
**eight (2)**

6:14,16
**either (1)**
77:13
**else (7)**
8:22;37:21;51:15;
56:14;60:16;72:6;
75:19
**else's (1)**
74:24
**elsewhere (1)**
68:17
**employee (2)**
12:9;81:12
**employees (2)**
6:15;63:16
**end (2)**
34:10;40:19
**ending (1)**
40:4
**English (2)**
5:24;6:22
**ensure (1)**
57:5
**entail (1)**
6:10
**entirely (1)**
54:12
**entities (2)**
15:5,6
**entitled (1)**
20:20
**entity (1)**
79:2
**entries (4)**
48:22;62:12,14;64:3
**entry (8)**
51:22;57:11;58:15;
62:6,16,20;65:12,16
**entry-level (1)**
7:13
**equal (1)**
65:24
**equity (1)**
19:2
**escrow (1)**
19:19
**especially (1)**
81:14
**estate (1)**
8:9
**et (1)**
18:23
**even (1)**
55:22
**everywhere (2)**
14:12;27:4
**evidence (19)**
14:22,23;16:23;
21:13;28:2;29:18;33:6;
34:23;35:24;38:17;
43:14;45:11;46:11;
50:20;67:9;68:15;
70:10;75:14;76:22

**Exactly (2)**
21:14;39:7
**EXAMINATION (1)**
5:4
**Examinations (1)**
37:24
**examine (1)**
28:23
**examined (1)**
28:21
**example (2)**
46:22;58:9
**exceed (1)**
74:19
**Excellent (1)**
44:22
**excerpts (1)**
17:1
**excuse (2)**
34:8;66:2
**Exhibit (47)**
17:5,7,11,18,19;18:7,
8;24:10;26:7,9,11,13,
15;27:7;30:18,20;31:1,
3,9,21,23;32:3,4,7,9;
33:8,10,21;34:4,19;
35:1,9,17,18;38:8;41:6,
8;45:16,22;49:12,14;
55:11;56:7;58:24;59:2;
67:3,10
**exhibits (1)**
27:14
**exists (1)**
80:24
**expected (1)**
30:15
**expecting (1)**
66:1
**experience (2)**
9:3,12
**expert (1)**
76:18
**explain (8)**
32:1;39:7;43:7;
47:18;51:19,21;52:1;
72:2
**explained (2)**
52:20;73:22
**explanation (2)**
36:15;44:22
**exposure (1)**
34:16
**external (1)**
45:7
**extracted (1)**
59:14

**F**

**FA (3)**
14:18,18;50:10
**face (1)**
30:11

Min-U-Script®
**TORREANO REPORTING AND VIDEO**
www.torreano-depos.com    (866) 760-DEPO
(3) cross-border - face

**facility (2)**
6:18,20
**fact (4)**
15:10;33:13;82:17,
22
**facts (13)**
14:21;28:1;29:17;
33:6;34:23;35:24;
38:17;45:10;46:11;
50:19;68:14;70:10;
83:2
**Failed (1)**
18:18
**fair (12)**
30:7,13;32:24;36:11,
16,23;37:3,4,12;63:3,6;
64:1
**familiar (19)**
14:7;27:20;28:7,11,
14;37:11,16,23;38:3;
39:5;45:1;46:15;47:16;
49:7;63:6;76:12,24;
77:2,5
**Fannie (3)**
42:18;43:10,19
**far (2)**
48:22;52:2
**FASB (1)**
28:17
**faster (1)**
16:6
**FDIC (6)**
17:3;25:15;67:16;
68:20;69:7;79:6
**fed (1)**
7:16
**Federal (3)**
28:18;37:24;79:5
**feel (1)**
20:20
**fees (1)**
75:4
**few (1)**
39:2
**FFIEC (9)**
37:23;38:14;78:16,
17;79:1,8,14,20;80:20
**field (4)**
38:5,20;59:14;82:2
**fields (1)**
81:20
**file (1)**
74:24
**filing (2)**
35:20;67:12
**finally (1)**
23:11
**Financial (2)**
34:7;37:24
**find (1)**
32:14
**finish (2)**
20:24;21:2

**finished (1)**
41:3
**firm (2)**
58:10,11
**first (9)**
5:2,19;13:10;17:17,
19;28:3;34:12;43:2;
59:11
**Fitz (1)**
12:7
**Fitzpatrick (1)**
12:8
**five (4)**
11:11;82:9,18;83:4
**five-minute (2)**
36:6;58:21
**fix (1)**
65:21
**flipping (1)**
62:16
**flow (2)**
7:16;74:6
**flowing (1)**
75:18
**flows (1)**
29:15
**FNFS (1)**
81:20
**follows (1)**
5:3
**footnote (2)**
32:18,23
**footnotes (1)**
35:6
**foreign (1)**
79:15
**forget (2)**
12:7;32:1
**form (3)**
14:2;25:5;26:10
**forth (2)**
15:19;75:18
**Fortracs (1)**
72:4
**F-O-R-T-R-A-C-S (1)**
72:5
**found (1)**
75:1
**foundation (12)**
26:21;33:4,17;34:22;
36:1;38:18;45:11;
46:10;50:20;68:15,16;
70:9
**four (1)**
20:17
**Freddie (2)**
42:18;43:16
**FSB (3)**
14:19;50:16;74:1
**FSP (1)**
50:12
**function (2)**
6:6;48:13

**functions (1)**
60:20
**funds (3)**
41:20,21;58:18
**further (4)**
23:5;47:7;49:18;
60:8
**future (1)**
29:14

**G**

**GAAP (6)**
76:12,15;77:1,2,3,4
**garage (1)**
75:9
**gather (1)**
82:7
**general (8)**
9:2,6,8,10,13;15:4;
60:6,11
**Generally (3)**
43:16;76:12;81:23
**generate (1)**
82:17
**generated (2)**
59:5,16
**generic (1)**
54:23
**gets (1)**
60:15
**Ginnie (3)**
42:19;43:10,20
**gives (2)**
29:20;67:21
**GL (5)**
44:21;52:7,9;60:5,23
**goes (2)**
18:20;62:15
**Good (2)**
14:9;71:15
**go-to (1)**
59:12
**governmental (1)**
80:21
**governs (2)**
27:22;29:5
**grade (1)**
5:16
**graduate (1)**
5:24
**graduated (1)**
5:21
**Great (1)**
79:1
**grossly (1)**
67:18
**group (19)**
7:20,21;9:20,23;
10:21;48:13,15,17,18;
63:9,13;66:14,14;
69:14,15,21;79:19,22,
24

**groups (7)**
10:2,4,7,16,17,19,22
**guarantee (2)**
34:17;80:23
**guarantees (3)**
25:14;34:15,20
**guarantor (1)**
25:20
**guaranty (1)**
25:11
**guess (8)**
5:10;17:22;37:7;
40:14;47:18;51:16;
59:22;79:14
**guidelines (2)**
38:1;78:2
**guys (2)**
64:16;65:21

**H**

**half (1)**
69:19
**half-a-million-dollar (1)**
69:20
**hand (1)**
66:8
**handle (3)**
69:15;71:18;72:12
**handled (1)**
75:10
**handles (1)**
79:20
**happen (1)**
43:9
**happened (4)**
51:24,24;53:12;
54:20
**harassing (6)**
20:8,9,11;21:6,18,19
**hard (1)**
32:14
**Harry (1)**
6:23
**headed (1)**
60:13
**headers (1)**
49:18
**heading (1)**
24:13
**heard (3)**
38:2;76:8;79:4
**heart (1)**
67:1
**held (1)**
80:15
**HELOC (3)**
71:18;72:1,13
**HELOCs (2)**
71:19;77:11
**help (1)**
16:3
**helps (1)**

**48:20
**hereinafter (1)**
5:2
**here's (1)**
78:9
**hereunder (1)**
24:6
**Heritage (6)**
49:21,23,24;50:13;
55:7,8
**high (2)**
5:21;44:2
**highlight (2)**
35:9;36:2
**highlighted (9)**
18:10;23:6;26:1;
30:10;35:3,6;41:12;
46:3;55:18
**history (2)**
14:4;46:17
**hit (1)**
57:22
**hitting (1)**
60:12
**home (1)**
19:2
**honest (1)**
10:15
**honestly (1)**
48:23
**hours (1)**
12:17
**house (1)**
41:19
**housed (2)**
40:16;49:21
**huge (2)**
75:17;79:3
**Huh-uh (1)**
76:10
**hurricane (1)**
75:8
**Hybrid (2)**
42:24;43:1
**hypothetical (1)**
75:12

**I**

**ID (5)**
44:10,12;48:10;
53:13;54:23
**idea (1)**
48:8
**identification (1)**
60:9
**identified (6)**
17:11;35:20;41:9;
45:23;49:14;67:12
**identify (3)**
28:4;34:20;48:18
**IDs (3)**
42:3;44:3;52:15

**IDX99 (1)**
70:4
**impaired (5)**
28:19;32:19;73:1,9;
82:5
**impairment (2)**
33:2,2
**improper (3)**
16:12,17;75:11
**Inc (2)**
34:5,21
**Incidentally (1)**
69:12
**include (2)**
31:9;32:22
**included (1)**
73:11
**including (2)**
18:16;33:1
**incurred (1)**
68:11
**indemnification (3)**
24:11,13;25:6
**indicate (13)**
42:7,8,16,17;47:20;
50:4;51:15;60:10;61:7;
74:5;78:20,23;82:3
**indicated (1)**
11:4
**indicates (9)**
22:6;32:18;34:5;
36:4;41:17;42:6;47:2;
54:4;55:6
**indicating (1)**
52:11
**indirect (1)**
22:9
**individual (1)**
81:12
**individually (3)**
28:20,24;30:5
**in-house (1)**
12:10,12,13
**initials (1)**
81:20
**insert (2)**
15:18;16:13
**inserting (2)**
15:3;22:23
**inspection (3)**
57:7,20,21
**inspection-related (1)**
57:23
**inspections (1)**
57:6
**institution (1)**
79:3
**Institutions (1)**
37:24
**instruct (2)**
16:8;21:19
**instructing (3)**
15:2;16:10,15

**instructions (1)**
56:17
**insurance (1)**
75:9
**intend (1)**
15:21
**intention (1)**
16:10
**interchangeable (1)**
45:3
**interchangeably (1)**
45:4
**interest (7)**
17:22;18:21;26:17;
30:14;35:4;46:4;53:16
**interested (1)**
18:23
**internal (4)**
55:24;75:24;76:1;
78:2
**internally (1)**
58:7
**interrupt (1)**
16:2
**interrupting (1)**
20:15
**into (20)**
9:19;16:23;29:1,3;
39:18,19;44:16,23;
45:5;52:7,8;53:14;
54:22;57:3;58:19;67:8;
78:15;80:22;81:2,3
**introduce (2)**
15:21;16:23
**introducing (1)**
27:14
**INV (1)**
46:17
**Investigations (2)**
33:11,13
**investor (23)**
41:19,21;42:3,6,18;
44:3,10,11;46:18;
47:12;52:6,8,11,14;
53:7,13;54:12,23;
55:19;56:8;70:4,8,18
**investors (1)**
42:22
**invoice (8)**
48:11,11;57:1,2,2,9;
58:6,11
**Invoices (1)**
57:13
**irrelevant (4)**
16:5;43:12;75:12;
76:19
**issue (1)**
53:4
**issued (1)**
33:14
**issues (2)**
35:7;72:14
**IV (1)**

48:8
**iVolt (1)**
77:13

**J**

**James (1)**
5:9
**job (2)**
6:6;56:18
**join (1)**
7:5
**joint (1)**
22:10
**JPM (1)**
49:15
**JPM001134 (1)**
55:17
**JPM001546 (1)**
45:23
**JPM002000 (1)**
81:6
**JPM002040 (1)**
41:10
**JPMorgan (8)**
5:7;17:3;26:16,22;
32:23;36:4;38:10;55:3
**judge (1)**
43:4
**judicial (1)**
68:17

**K**

**keep (6)**
20:11;21:4;27:5;
31:14,16;64:1
**KELLEY (88)**
5:5,7,9;14:23;15:8,
12,13;16:1,21,22;
17:13,15,20;20:4,9,13,
15,22,24;21:9,15,21;
22:13,17,20;23:2,20,
24;24:1,16;26:11;
27:12,16,19;31:4,7,10,
14,18,24;32:6,8,13,17;
33:23;34:2,8,13;35:3;
36:2,9;38:13;41:11;
45:12,18,20;46:1;
55:14,16;58:20;59:3,5,
6,9,16,18,19;67:7,14;
68:16,21,23;69:2,5,8,9;
80:13,16,19;81:1,5,18;
82:11,14,20;83:1,7,10
**Kelley's (3)**
35:23;56:5;82:16
**kind (10)**
8:12;9:16;30:3;
42:23;46:3;49:2,5;
54:22;61:5;66:1
**kinds (1)**
70:19
**knew (1)**

83:13
**knowing (1)**
72:8
**knowledge (3)**
19:8,13,20
**knowledgeable (1)**
20:2
**known (3)**
8:19;15:10;43:2

**L**

**lacks (11)**
26:20;33:4,17;34:22;
35:24;38:18;45:11;
46:10;50:20;68:15;
70:9
**Lane (1)**
67:22
**large (1)**
74:12
**last (3)**
12:8;26:6;30:17
**later (5)**
13:6;22:14;34:16;
53:10;71:10
**lawsuit (4)**
43:13;67:15;75:13;
76:20
**lead (3)**
43:13;75:13;76:21
**leading (1)**
21:12
**leads (1)**
21:12
**learned (1)**
6:24
**ledger (8)**
9:2,6,8,10,13;54:16;
60:6,11
**leeway (2)**
19:22;21:7
**left (1)**
28:3
**legacy (1)**
72:13
**legal (8)**
15:4,8;19:6;22:2;
24:14,21;25:8,23
**length (1)**
30:5
**letter (1)**
42:14
**level (1)**
37:19
**LEZA (1)**
76:7
**liabilities (6)**
18:4;23:8;24:6;
35:12,14,15
**liability (3)**
17:24;35:5;50:8
**likely (3)**

43:13;75:13;76:20
**limited (1)**
25:11
**line (6)**
53:2;56:6;63:18;
65:11,13;66:3
**lines (4)**
19:1,2;64:18;65:3
**list (1)**
49:1
**listed (1)**
75:3
**lists (1)**
26:1
**little (10)**
5:15;9:18;14:11;
23:5;28:16;36:3;45:12;
46:3;47:7;66:22
**loaded (1)**
54:21
**loading (1)**
54:22
**loan (34)**
28:6,19;29:1,8,12,
21;37:19;44:16,18;
46:18,19,24;47:2,4;
49:16;52:22;53:4;
56:10;62:13;63:4,24;
64:4,10;65:8,22;67:19;
69:18;70:4,6;72:9;
74:20,24;75:1;77:20
**loans (42)**
18:10,11,16,16,16;
26:2,18,19;27:9,23;
28:22,23;29:2,3,8,22;
30:4,11,13;32:19;
34:21;35:8,10,14;
36:22;39:16;42:6;
44:18;47:9;49:21;50:2,
9,10,13;54:21;67:17;
70:20;72:1;73:3,5,8;
74:1
**logged (1)**
45:5
**logic (2)**
52:14,17
**logo (1)**
14:14
**long (3)**
7:24;8:5;21:11
**longer (1)**
48:1
**look (22)**
14:5;29:9;31:11;
32:15;34:14;35:5;42:1;
46:2,16;47:6;49:2,7;
53:18;56:10,14;59:20;
61:21;66:17;80:22;
81:2,3,16
**looked (2)**
65:19;77:18
**looking (3)**
43:4;66:16;75:17

**Looks (3)**
53:13;66:6;79:11
**loss (1)**
60:23,24;61:3;68:3,
4,8;69:11,12,17,20
**losses (3)**
61:2,5;69:16
**lot (5)**
13:19;44:14;74:11;
75:6;78:15
**lots (1)**
70:14
**LPS (5)**
45:1,5,8;56:1;81:24
**LSI (2)**
67:16,16
**LT (1)**
62:8
**LTCO (4)**
11:17;62:1,3,22

**M**

**Mac (2)**
42:19;43:16
**Mae (4)**
42:18,19;43:10,10
**Maes (1)**
43:20
**main (1)**
17:22
**Mainly (1)**
8:14
**maintenance (1)**
52:6
**makes (1)**
41:20
**making (1)**
15:5
**manage (1)**
6:12
**managed (3)**
7:16;8:10;66:13
**many (7)**
6:13;10:7,13;70:7,
11,24;71:8
**map (1)**
44:20
**marked (14)**
17:5;26:13;27:7;
30:20;33:8,21;35:1;
38:8;41:6;45:16;49:12;
55:11;58:24;67:3
**market (2)**
30:14;36:17
**matches (3)**
55:20;56:3,6
**matter (4)**
43:12;75:12;76:20;
83:3
**may (1)**
19:19;20:8;30:11;
33:18;35:21;44:17;

45:2;46:4,14;65:21
**maybe (3)**
31:17;38:4;80:13
**mean (13)**
13:23;14:16,18;
25:15,19;31:9;40:14;
50:1;56:18;60:4;63:1;
73:21;79:3
**meaning (2)**
9:6;47:21
**means (7)**
17:23;19:9;21:24;
48:9;50:2;64:22;65:14
**mechanism (1)**
79:8
**meshing (1)**
39:18
**method (2)**
28:12,16
**might (11)**
20:10;46:2;47:12;
56:16;64:4,5;69:23;
72:3;78:1;81:19,23
**million (3)**
29:13;69:18,19
**mine (1)**
10:4
**minus (3)**
61:3,7,19
**minute (3)**
31:10;59:20;83:3
**minutes (6)**
11:12;20:18;82:9,18,
23;83:4
**missing (1)**
67:9
**mixed (1)**
73:11
**moment (1)**
9:19
**money (2)**
74:6;75:18
**months (1)**
11:5
**more (9)**
9:18;12:18;16:14,18;
36:3;46:4;47:12;73:23;
80:4
**mortgage (2)**
26:7;35:4
**most (4)**
19:13;20:2;54:8,9
**move (8)**
16:21;39:1;52:8,18;
53:2;57:16;68:1;69:24
**moved (2)**
53:13;58:18
**moving (4)**
27:5;52:7;57:12;
58:6
**MSP (20)**
8:14,15;39:4,14,16,
17;42:5;45:3;46:9;

49:21,21;51:1,4;56:10;
57:4;71:20,22;72:8,9,
12
**much (9)**
8:24;11:9;12:15;
13:7;16:16;18:23;
19:19;37:19;83:8
**multiple (1)**
70:13
**Mutual (20)**
14:16,17,17,18,19;
32:20;33:14;34:5,21;
48:3;50:9,10,12,16;
51:6;68:10;69:1;74:1;
76:3,5
**mysterious (1)**
65:11
**mystery (2)**
66:22;79:17

**N**

**NA-156 (1)**
55:3
**name (3)**
5:9;12:8;63:14
**natural (1)**
68:8
**necessarily (1)**
35:10
**necessary (2)**
21:9;32:2
**need (7)**
45:13;66:23;72:18;
76:9;77:14;78:9;82:7
**needed (1)**
58:18
**needs (1)**
31:22
**negligent (1)**
67:18
**new (5)**
30:18;43:6;48:11;
54:12;62:20
**Newark (1)**
5:24
**next (8)**
21:3;23:3;24:2;
25:18,24;47:14;52:18;
53:2
**Nine (2)**
7:9,10
**nobody's (1)**
79:4
**Nods (2)**
74:8;77:17
**None (2)**
49:7;61:4
**non-monetary (1)**
57:10
**note (2)**
53:3;81:8
**Notes (1)**

34:6
**notice (3)**
62:11;67:19;68:17
**number (24)**
10:21;35:20;41:9;
42:15;44:3,9;46:18,19,
20;49:15;51:7,7;52:11;
53:4;55:5,17;59:11;
60:4;61:8,10;66:11;
70:4;80:3;81:6
**numbered (1)**
74:18
**numbers (5)**
43:9;44:2;47:15;
61:24;70:11

**O**

**object (2)**
16:7;61:17
**Objection (48)**
9:4,21;10:10;14:21;
15:2,23;16:4,14,17;
18:1;19:6;20:23;22:1,
11;23:18;24:7,14,20;
25:3,22;26:20,24;28:1,
8;29:17,23;33:4,5,6,16;
34:22;36:12;38:16;
39:9;40:11;43:11;
45:10;46:10;50:19;
56:20;58:16;64:6;70:9;
73:16;74:21;75:11;
76:17;78:5
**objections (11)**
15:3,18;16:13,20;
20:18;22:16,19,23;
23:23;24:19,20
**obligation (3)**
25:2;81:14,16
**obligor (1)**
21:22
**obligors (1)**
22:7
**obtain (1)**
66:7
**obtained (2)**
32:20;33:10
**obviously (2)**
55:23;67:5
**OCC (1)**
79:5
**occurred (1)**
69:17
**odd (1)**
80:3
**off (6)**
18:17;20:17;78:4;
80:13,15,18
**offer (1)**
7:19
**offset (3)**
58:3;65:23;66:5
**offsets (1)**

65:24
**offsetting (1)**
65:16
**old (1)**
62:23
**old/INV (1)**
51:20
**Once (4)**
21:18;28:24;29:4;
40:2
**one (3)**
11:2;14:1;24:9;
28:21,23;31:7;33:24;
34:3;37:1;39:19;40:9;
44:8;49:9,22;51:5;
54:17,24;55:15;57:12;
61:15,16;62:13;63:7;
64:13;65:11;66:24;
70:1;77:23;78:14;82:9,
22,23;83:3
**ones (3)**
13:17;65:1;74:12
**only (10)**
9:20,23;10:21;13:2;
41:3;57:6,21;58:18;
62:13;82:23
**onto (1)**
54:21
**operating (1)**
50:18
**operational (1)**
9:23
**opinion (1)**
82:14
**order (5)**
44:18;51:17;58:4;
62:18;69:24
**ordered (1)**
58:10
**orders (1)**
56:19
**origin (1)**
67:9
**originated (1)**
50:3
**OSU (1)**
5:24
**Otherwise (2)**
21:1;68:11
**OTS (1)**
33:13
**out (7)**
5:15;39:23;45:8,20;
57:1;58:8;67:13
**outside (9)**
5:11;28:13;58:10;
66:14;71:20,22;72:8;
76:23;78:18
**over (20)**
13:12;17:8;18:12;
21:2,23;23:12;30:16;
38:22;39:22;40:3;46:2;
48:2,21;60:15;61:21;

63:16,24;64:4;68:2;
75:5
**overdrafts (2)**
18:22,24
**own (5)**
10:22;51:1,3;52:14;
62:4
**owned (2)**
8:9;52:16;70:20
**owns (1)**
10:21

## P

**page (39)**
17:7,11,12,18,18,19;
18:6,8;21:22;23:3,4,6;
24:2,2,9,10;25:18,24;
26:5,6,15,15;28:3,5;
29:10,19;30:1,2;34:11,
12;35:22;36:3;38:10;
47:14;49:1;55:3;59:12;
67:13,18
**pages (2)**
33:23;34:1
**paid (4)**
29:13;51:21;57:1,3
**paper (1)**
61:5
**paragraph (1)**
17:18
**paraphrased (1)**
30:3
**part (11)**
9:9;16:24;18:18;
31:2,4,5,8,22;32:3;
44:11;56:11
**Partially (1)**
78:12
**participate (1)**
39:20
**participation (3)**
18:21;19:5,15
**participations (1)**
18:22
**particular (1)**
32:11
**partitioned (1)**
10:23
**partitioning (1)**
60:19
**party (2)**
41:16;47:19
**patient (1)**
82:11
**pay (4)**
36:18;41:14,21;42:1
**payee (23)**
14:5,7;41:15,17,22;
47:15,24;48:1,4,7;57:5,
5,7,12,16,19,20,20;
59:13;60:2,3,4;82:1
**payees (4)**

10:21,22,24;66:13
**paying (2)**
20:16;58:8
**payments (2)**
34:17;35:7
**payroll (1)**
7:1
**PCI (1)**
73:5
**people (4)**
6:13;44:9;48:17;
54:8
**Perhaps (1)**
22:23
**Permanent (1)**
33:11
**permissible (1)**
76:15
**person (5)**
19:13;20:1;43:2;
48:12,15
**personal (3)**
31:15,16,18
**person's (1)**
19:8
**phone (2)**
11:10;13:13
**phrased (2)**
74:22;78:6
**place (1)**
53:15
**plaintiff (1)**
5:10
**platform (5)**
42:5;49:20,23;55:6,8
**platforms (1)**
49:22;51:2,4
**please (3)**
23:3,22;55:14
**pledged (1)**
47:9
**PLGD-LN (1)**
47:7
**plus (1)**
61:19
**pm (1)**
83:16
**point (7)**
20:8,10;21:4,17;
26:10;78:21,24
**pointing (1)**
61:24
**Polaris (1)**
6:18
**policies (2)**
76:24;77:8
**pool (9)**
28:22,22;29:1,3,8,
22;37:16;70:7,8
**pools (1)**
30:5
**portion (5)**
17:16;26:2;31:3;

35:19;77:3
**portions (1)**
77:4
**posed (1)**
82:22
**position (6)**
6:21;7:11,14,18,19,
22
**positive (2)**
61:8,11
**possession (1)**
81:16
**possibility (1)**
21:12
**possible (1)**
75:4
**possibly (1)**
58:14
**potential (1)**
61:1
**practical (1)**
7:2
**practices (1)**
78:3
**pre-9-1-09 (1)**
51:11
**pre-Chase (1)**
48:1
**precision (1)**
18:5
**Preconversion (2)**
51:13;52:13
**preparation (4)**
11:21;13:8,15;56:11
**prepared (1)**
31:13
**prepayments (1)**
30:15
**present (1)**
5:14
**presumed (1)**
30:7
**pretty (4)**
8:19,24;21:2;37:19
**previous (1)**
14:11
**price (4)**
23:12,15;29:13;30:7
**primary (1)**
22:9
**prime (1)**
72:24
**principles (1)**
76:13
**print (1)**
14:3
**prior (6)**
8:5;18:18;51:24;
56:10;66:17;68:11
**private (4)**
41:19;42:6,21,23
**Probably (10)**
9:14;11:5,11;12:17;

16:3;49:8;65:19;66:23;
74:4;77:14
**problem (1)**
83:9
**procedures (3)**
77:1;78:2,9
**processed (1)**
76:2
**produce (3)**
80:19,23;81:14
**produced (2)**
81:9,10
**production (2)**
65:12;71:17
**program (3)**
40:6,9;76:11
**programs (1)**
40:8
**progress (1)**
7:17
**promise (1)**
80:23
**proper (1)**
16:17
**property (3)**
36:17,18;37:8
**provide (1)**
27:15
**providers (1)**
45:9
**providing (1)**
27:16
**purchase (18)**
17:2,13,16;18:9;
19:14,20;20:3;21:5;
23:4,12,14;24:3,10;
26:5;28:12,16;29:10;
35:11
**purchased (9)**
23:6;24:5;26:17,19;
27:1;28:6;29:12;32:19;
35:13
**purpose (3)**
35:8,16;83:1
**put (4)**
38:21;40:17;66:12;
67:8

## Q

**quasi (1)**
42:23
**quicker (1)**
16:16
**quite (2)**
8:7;65:10

## R

**rates (1)**
30:14
**Rather (3)**
16:16,19;79:3

**read (7)**
17:8;18:12;21:23;
23:12;38:22;53:8;77:9
**real (3)**
8:9;60:3;74:7
**really (8)**
16:4;20:7;24:20;
28:13;39:18;42:20;
54:22;55:1
**reason (18)**
11:2,15;57:18,21,22;
61:21;62:3,4,5,6,9,16,
18,20,21,22,23;73:21
**recall (11)**
11:6;15:1;43:9,23;
44:1;66:19;73:15,20;
74:23;77:22;81:22
**receivable (1)**
77:8
**received (1)**
58:8
**receiver (7)**
17:3;24:4;25:19;
35:11;67:16;68:12;
69:6
**receivers (1)**
25:14
**receivership (4)**
14:20;15:7;50:17;
68:11
**Recess (2)**
36:8;58:22
**reconcile (1)**
57:4
**reconciliation (1)**
6:12
**record (17)**
16:13,19;17:10;
35:18;41:8;45:22;52:9;
56:4;61:1,23;69:19;
80:14,15,18;81:7,13;
82:15
**recorded (5)**
30:6;32:24;58:12;
62:7;75:16
**recording (1)**
77:7
**Records (1)**
18:17
**recoverable (2)**
47:21,21
**refer (9)**
14:13,15,17;33:18;
48:12;55:19;63:19;
72:23;78:10
**reference (1)**
50:24;69:11
**referencing (2)**
48:14;59:10
**referred (1)**
39:4
**referring (5)**
33:3;51:5;56:5,6,

79:2
**refers (7)**
54:5,6;63:20;70:7;
73:1;79:7;81:5
**reflect (4)**
17:10;56:4;61:23;
82:15
**regarding (2)**
19:13;20:2
**reiterates (1)**
30:2
**relate (1)**
63:3
**related (2)**
39:21;77:6
**relating (2)**
21:5;71:17
**relevant (1)**
38:19
**remarkable (1)**
40:10
**remarks (3)**
31:15,17,19
**REO (5)**
7:20;8:9,11;9:14,15
**report (10)**
26:16,23;36:5;46:5,
9;73:10;79:7;80:20,24,
24
**reported (2)**
69:13,13
**reporting (3)**
79:8,13,15
**represent (4)**
23:16;46:19;52:3;
70:18
**representation (1)**
80:17
**represented (1)**
11:16
**representing (3)**
22:24;81:2,4
**represents (1)**
17:15
**repurchase (3)**
35:5,8;50:8
**requested (2)**
81:9,15
**require (1)**
79:15
**required (2)**
72:16;79:7
**requirements (1)**
38:15
**reserve (1)**
79:5
**reside (1)**
47:1
**resides (1)**
44:16
**respect (1)**
17:23
**respond (6)**

23:23;24:19;39:12;
46:12;56:23;73:19
**responses (1)**
83:10
**rest (1)**
29:5
**restrict (1)**
21:15
**retort (1)**
16:4
**retorting (5)**
16:16,19;22:19,20,
22
**reverse (2)**
51:17;62:19
**review (4)**
13:14,20;56:12;
65:22
**reviewed (2)**
14:4;66:20
**reviewing (1)**
74:24
**revolving (1)**
19:1
**ridiculous (1)**
20:19
**right (46)**
5:12;10:5;15:11;
17:20;21:1;22:7;24:6;
26:2;28:15;29:19;31:6;
36:24;40:17,21;41:3,
11;42:2;46:9;48:22;
49:10;53:20,21;54:12;
55:9;59:5,6;60:15,17;
61:14,15,21;63:17;
64:5,11;66:12;67:10,
24;68:5,6,22;69:8;
71:10;74:7,9;80:9;83:5
**rights (1)**
26:8
**risk (1)**
30:14
**Rule (1)**
21:10
**run (2)**
47:9;81:19
**running (1)**
20:17

**S**

**sales (1)**
8:11
**Same (8)**
26:24;30:23;31:17;
40:1,5;44:17;48:24;
79:22
**SAP (2)**
8:18,19
**Saratoga (1)**
67:21
**saw (2)**
57:22;69:10

**saying (5)**
17:23;23:7;29:9;
52:22;61:6
**Schedule (4)**
23:16,17,20;26:1
**school (2)**
5:17,21
**scope (1)**
28:14
**screen (10)**
11:15;43:5,7;46:14;
49:8,16;51:16;66:21;
70:5,6
**screens (2)**
14:3;56:13
**searching (1)**
55:15
**second (2)**
34:11;80:14
**secondary (1)**
22:9
**Securities (2)**
27:10;76:3
**security (1)**
37:8
**seeing (2)**
51:18;54:20
**seem (1)**
44:9
**seems (1)**
82:8
**segregated (1)**
47:4
**Senate (2)**
33:10,12
**send (1)**
58:11
**sense (1)**
38:22
**sent (2)**
41:23;80:20
**separate (2)**
34:2;51:3
**September (4)**
33:14;37:2;66:18;
67:13
**series (8)**
43:17,17,19,21;44:5,
23;57:13;58:13
**service (1)**
71:24
**servicer (1)**
54:21
**servicing (11)**
26:8;39:14,16,17,19;
52:1;71:20,23;72:14,
16,18
**set (1)**
57:20
**sets (2)**
62:12,13
**setting (1)**
26:18

**seven (2)**
6:24;82:23
**several (3)**
7:23;11:5;13:4
**share (3)**
45:18;55:14;67:7
**sheet (3)**
33:13;44:19;47:1
**sheets (1)**
47:3
**short (1)**
19:24
**shot (3)**
20:18;43:5,7
**showing (2)**
28:5;62:9
**shows (8)**
27:4;35:6;38:5;53:5,
11;54:11;65:11;81:23
**signage (1)**
79:11
**significance (1)**
44:14
**similarly (1)**
14:19
**simply (4)**
15:3,24;16:12,19
**single (2)**
29:7,21
**situation (1)**
75:7
**six (1)**
82:18
**skip (2)**
24:9;30:16
**small (1)**
48:17
**Smith (16)**
5:11;11:3,6;12:9,21,
21;13:23,24;14:24;
20:1;39:3;71:13;72:22;
73:13;77:23;82:17
**smoothly (1)**
23:1
**so-called (1)**
39:8
**software (3)**
8:12,20;76:11
**sold (1)**
69:18
**somebody (3)**
36:17;37:21;60:16
**someone (1)**
74:24
**sometime (2)**
37:3;80:21
**Sometimes (1)**
13:12
**Somewhat (1)**
47:17
**soon (1)**
21:2
**Sooner (1)**

71:10
**SOP (3)**
29:5;20;30:4
**SOP-3 (1)**
33:3
**Sorry (5)**
10:8;25:12;34:9;
61:7;65:6
**sort (3)**
46:9;69:23;80:4
**sound (1)**
51:12
**sounds (1)**
63:21
**speaking (4)**
12:15;13:7;19:11;
39:13
**speaks (5)**
18:2;19:21;22:1,12;
23:19;24:7;25:3,7,22;
26:4;29:24;30:8;33:5,
16;38:16
**special (1)**
53:15
**specific (7)**
9:12;48:7,12,14,15,
16;49:8
**specifically (7)**
10:8;11:14;13:20;
19:10;40:15;45:5;61:4;
66:19;72:8;73:20;
79:23;80:12
**spectrum (1)**
71:4
**speed (1)**
15:16
**spend (2)**
12:15;13:7
**spent (2)**
11:9;12:18
**spoke (5)**
11:4;12:3,7,12;52:10
**spreadsheet (2)**
67:11;68:19
**stamp (2)**
41:9;49:15
**Standards (3)**
28:18;36:24;78:4
**stands (2)**
15:2;62:8
**start (3)**
5:14;7:11;29:11
**started (1)**
7:13
**starting (3)**
9:7;26:10;59:22
**stated (1)**
68:4
**statement (4)**
27:20,21;35:24;73:6
**statements (2)**
15:9;34:7
**states (1)**

23:14;26:7;42:2
**step (1)**
55:1
**stop (2)**
20:15;22:18
**studied (1)**
5:23
**stuff (6)**
11:18;29:6;31:11;
49:4;73:2;81:8
**Subcommittee (2)**
33:11,12
**subject (6)**
14:20;23:8;30:4;
43:12;75:12;76:20
**sub-ledgers (2)**
9:8,9
**submits (1)**
57:2
**submitted (1)**
24:4
**subparagraph (1)**
18:15
**Subrogation (1)**
25:18
**Subsidiaries (2)**
34:6;75:21
**subsidiary (1)**
50:18
**substantially (1)**
30:12
**suit (1)**
68:13
**summary (4)**
46:9;59:3,7,9
**supervise (1)**
6:11
**supplemental (1)**
25:2
**Suppose (1)**
42:15
**Sure (11)**
9:11;18:12;32:16;
39:23;40:2,19;65:14,
18;78:7,24;80:18
**surrounding (1)**
35:7
**sworn (1)**
5:2
**system (20)**
39:14,16,17,19;
40:24;41:1;45:2;52:1;
55:23,24;57:1,3;62:5,
5;65:20;71:21,23;
72:15,16,19
**systems (5)**
39:18;71:24;72:2,7,
10

**T**

**T13 (2)**
46:21,23

**talk (1)**
11:21
**talking (6)**
11:6,9;13:21;64:14;
73:3;78:14
**talks (1)**
25:1
**team (3)**
48:11;57:4;69:22
**technical (1)**
50:15
**ten (1)**
11:11
**term (5)**
14:14;17:7;26:17;
27:1;38:2
**terms (1)**
22:13
**testimony (6)**
15:22;19:7;76:18,18,
19;83:15
**Thanks (1)**
43:1
**thereafter (1)**
37:3
**Thereupon (1)**
83:15
**third (3)**
41:16;47:19;49:1
**third-party (2)**
41:17;45:9
**Thomas (2)**
12:3,4
**though (1)**
55:22
**thoughts (1)**
82:8
**three (5)**
20:17;44:6,7;62:12,
13
**three-page (1)**
45:23
**tie (1)**
34:15
**times (1)**
44:9
**title (2)**
6:9;59:8
**today (4)**
11:22;51:2;52:3;
81:9
**together (2)**
34:9,9
**told (2)**
21:17;80:21
**top (8)**
35:21;46:16;49:17;
51:19;55:2,18;56:6;
59:22
**totally (1)**
75:24
**trades (1)**
37:9

**tran (3)**
51:20;58:13;65:15
**transaction (10)**
33:1;51:22,23;53:19;
57:8,11,14,18;58:5;
61:22
**transactions (11)**
13:2,5;30:6;38:20;
57:7;59:7;66:20;74:5,
12,19;75:2
**transcript (2)**
13:20,22
**transfer (6)**
27:10;49:16;53:5;
54:1;70:5,6
**transferred (3)**
35:15;50:17;52:23
**transfers (1)**
52:5
**treasury (2)**
7:13;79:6
**trial (1)**
15:21
**true (1)**
82:20
**truly (1)**
62:17
**trying (1)**
21:16
**turn (1)**
28:4
**turns (1)**
45:20
**Twice (1)**
58:17
**two (14)**
7:18;8:2,3;10:9;
12:17;30:16;33:23;
34:1,15;37:13;39:18;
40:8;49:22;80:11
**type (9)**
35:6,19;42:17;44:17;
46:5;47:4;67:11;77:8;
80:20
**types (3)**
13:5;20:6;22:7
**typically (3)**
47:1;52:5;61:6

**U**

**ultimately (1)**
15:20
**Unaudited (1)**
34:7
**under (8)**
6:14;15:6;18:15;
21:10;29:13;62:12;
76:15;77:1
**understood (1)**
77:10
**unless (1)**
16:11

**up (12)**
15:16;27:4;28:11;
38:5;40:19;44:4,8,23;
53:2;57:20;76:16;
81:24
**upon (1)**
19:24
**use (14)**
8:12,18;14:14;40:24;
45:4;48:6;49:5,6,9;
51:14;67:7;72:16,18;
76:7
**used (5)**
22:14;34:19;41:19;
47:24;48:10
**user (3)**
48:10,14;59:12
**users (1)**
48:15
**uses (2)**
48:1;55:23
**using (3)**
8:15;29:7;48:17
**usually (1)**
45:7

**V**

**Vague (10)**
9:4,21;28:8;36:12;
39:9;40:11;56:20;
73:16;74:21;78:5
**valid (1)**
15:23
**value (26)**
17:8,17,23;18:4,5;
23:15;26:2,8;30:7,13;
32:24;36:11,11,16,17,
18,22,23;37:3,5,12;
63:3,6;64:1,2;65:8
**Van (1)**
12:4
**vendor (1)**
57:2
**versus (1)**
5:7
**virtual (1)**
74:7
**VLS (2)**
72:4,7

**W**

**wait (2)**
31:10;82:9
**waiting (1)**
82:18
**WAMU (14)**
14:14,14;39:15;
49:21,24;50:3;51:1,10;
52:1,14;55:7,8;62:4,9
**Washington (20)**
14:16,16,17,18,19;

**32:20;33:14;34:5;20;
48:3;50:9,9,12,16;
51:6;68:10;69:1;74:1;
76:3,5
**wasting (1)**
16:18
**way (5)**
16:6;44:4;60:13;
65:9;69:14
**weren't (2)**
73:9;75:3
**what's (9)**
5:19;41:12;44:11;
48:21;54:14,17;63:1,
18,22
**Whenever (1)**
15:21
**Whereas (1)**
36:18
**whole (2)**
18:18;71:4
**who's (1)**
43:2
**wish (1)**
31:12
**within (7)**
7:20;9:12;10:20;
11:23;24:12;40:5;57:5
**without (1)**
15:18
**witness (6)**
11:4;15:17;30:23;
31:2;61:24;83:9
**wonder (1)**
65:17
**wondering (1)**
69:10
**words (1)**
28:21
**work (7)**
71:8;75:15,20,20;
77:11,13;78:4
**worked (1)**
6:23
**works (1)**
19:18
**worth (1)**
55:15
**write (2)**
66:2;76:15
**write-down (5)**
62:17;66:4,6,8;79:10
**write-downs (7)**
64:12,15,16;65:2,6;
79:20,23
**write-up (10)**
64:10;66:3,8;78:16,
17;79:7,9,12,13,14
**write-ups (4)**
64:12;65:2,7;79:20
**writing (1)**
79:9
**written (1)**

Case 1:19-cv-20592-KMW Document 1 Entered on FLSD Docket 02/12/2019 Page 147 of 233
JAMES MADISON KEELEY v.
JPMORGAN CHASE BANK

DEPOSITION OF CRYSTAL DAVIS

76:16

## X

**X01 (2)**
54:12;70:12
**X02 (1)**
70:5
**X7 (1)**
70:12
**X99 (1)**
71:5
**Xs (3)**
70:11,19;71:6

## Y

**year (1)**
46:17
**years (7)**
6:24;7:9,10,18,23;
8:2,3
**Yoo (131)**
5:11;9:4,21;10:10,
14;12:10;13:8,21;
14:21;15:1,11,15;16:2;
17:10,15;18:1,7;19:6,
12,17;20:5,10,14,20,
24;21:14,17;22:1,11,
15,18,22;23:18,22;
24:7,14,18;25:3,7,22;
26:4,20,24;27:11,13,
18;28:1,8;29:17,23;
30:8,22,24;31:5,8,12,
15,16,19,20;32:4,7,10,
16;33:4,16;34:1,4,11,
22;35:18;36:7,12;
37:10,14;38:12,16;
39:9;40:11;41:8;43:11;
45:10,19,22;46:10;
49:14;50:19;51:8;
55:13;56:4,20;58:16;
59:2,4,7,15;61:17,23;
63:8,12;64:6;67:5,10,
24;68:3,6,9,14,19,22,
24;69:4,7;70:9;73:16;
74:2,21;75:11;76:17;
78:5;80:17,18;81:3,11;
82:4,7,12,15,21;83:5,
12
**York (1)**
43:6

## 0

**002035 (1)**
49:15
**006 (1)**
53:14
**006013 (1)**
53:16
**013 (2)**
46:22;53:14

**030 (2)**
52:12,23
**07 (1)**
53:4
**08 (1)**
53:10,19,23
**09 (1)**
54:11

## 1

**1 (10)**
17:5,7,11,11,18,18,
19;18:7,8;43:22
**10 (7)**
45:16,22;59:22;60:2;
61:24;65:13,23
**109 (1)**
26:15
**10K (1)**
35:21
**10-Q (2)**
32:23,23
**11 (5)**
49:12,14;56:7;67:13,
20
**11:23 (1)**
83:16
**12 (1)**
55:11
**12-17 (1)**
53:4
**12-19 (2)**
53:10,19
**13 (8)**
46:17,22,23;47:2;
58:24;59:2;70:12;
83:15
**14 (8)**
59:23;60:2,22;65:13,
24;67:3,10;82:2
**141 (2)**
28:17,18
**14390 (1)**
67:21
**150 (4)**
78:22,23,24;80:1
**150,000 (1)**
63:16
**150-day (2)**
78:19,20
**156 (7)**
49:18,19,20,24;50:3;
51:3;55:6
**16 (3)**
60:22;65:24;82:1
**18 (1)**
67:13

## 2

**2 (10)**
18:6;26:11,13,15;

28:5;29:19;43:22;
65:11,13;66:3
**20 (2)**
24:2;71:1
**2005 (2)**
7:6,7
**2008 (3)**
33:15;37:2;66:18
**2009 (3)**
26:16,23;40:23
**2012 (2)**
67:13;80:21
**2013 (2)**
35:21;36:5
**2014 (2)**
35:21;83:16
**228 (1)**
54:14
**25 (2)**
37:2;66:18
**25th (1)**
33:14
**26 (2)**
21:10;35:21
**29 (1)**
24:10

## 3

**3 (16)**
17:12,18;27:7;30:1,
2;31:3,4,6,9,22,23;
32:3;43:24;64:18;65:3;
68:2
**3.2 (4)**
23:16,17,21;26:1
**30 (1)**
67:13
**3018113559 (1)**
67:19
**30183559 (1)**
53:3
**30B6 (1)**
11:3
**3-1 (1)**
53:22
**36 (1)**
26:5

## 4

**4 (9)**
30:18,20;31:1;32:5,
7,9;43:19;64:19;65:3
**400,000 (1)**
74:13
**435 (2)**
61:10,22
**463 (2)**
66:2,6
**463,000 (1)**
66:3
**465 (2)**

49:22;51:3
**47 (1)**
45:24

## 5

**5 (6)**
18:8;33:8,10;43:16,
17,18
**50 (1)**
70:24
**500 (2)**
43:17;58:2
**546,000 (1)**
74:13

## 6

**6 (4)**
33:21;34:4;43:20;
64:14
**600 (4)**
57:13;58:2,12,13

## 7

**7 (5)**
35:1,18;43:20;63:18;
64:14
**745 (17)**
9:14,16;38:20;57:8,
10,10;58:1,3,4,4,14;
59:7;65:15;74:5,12;
75:2,10
**78.1 (1)**
32:21
**79 (1)**
35:22

## 8

**8 (2)**
37:2;38:8
**8:15 (1)**
13:9
**801 (2)**
46:17;52:23
**801/0006 (1)**
44:10
**801006 (1)**
52:19
**80707 (1)**
51:22
**81.2 (1)**
26:19
**8-7-07 (1)**
51:18

## 9

**9 (4)**
23:4;41:6,8;61:24
**900 (1)**

44:4
**908 (5)**
50:22,23,24;51:6;
71:14
**91T00 (3)**
41:12,13,17
**9-2 (1)**
54:11
**9-2-09 (1)**
56:9
**9-24-09 (1)**
65:1
**9-24-2009 (1)**
62:12
**9-25 (1)**
64:24
**95R21 (2)**
47:16,24
**99 (2)**
71:3,5

*Exhibit 5*

## 3270 Explorer: Loan Transfer History (LNTH)
### JPMORGAN CHASE BANK, N A  –  156

**Loan Number: 3018113559**  **Borrower Name:  KELLEY, JAMES M**

LNTH 3018113559         LOAN TRANSFER HISTORY         04/17/14  09:56:42

```
TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EPF BALANCE   INV LOAN #   OLD S/F    NEW S/F   EF AFT B/B
------- CLIENT 156 PRE 10-01-11 -------- CLIENT 208 PRE 09 01 09
09/02/09  X01/228  A01/013 1  N  MAINT INVESTOR
__/_/_   03/01/08  3045704.34  3018113559  .00000000   00000000 +00.000000

12/19/08  A01/006  A01/013 1  N  MAINT INVESTOR
12/19/08  03/01/08  3045704.34  3018113559  00000000  .00000000 +00.000000

12/17/07  A01/006  A01/006 1  N  MAINT INVESTOR
12/17/07  01/01/08  3022794.12  3018113559  00000000   00000000 +00.000000

08/07/07  030/106  A01/006 1  N  MAINT INVESTOR
08/07/07  09/01/07  2992265.00  3018113559  .00000000   00000000 +00.000000
```

BP Investigative Agency
Exhibit 5

Printed By: E207946  on 4/18/2014 9 56 46 AM                    Page 1 of 1

*Exhibit 6[?]*
*Investor Disclosure Letters*

Chase (OH4-7302)
3415 Vision Drive
Columbus, OH 43219-6009

**CHASE ○**

March 31, 2011



Santa Barbara, CA 93108-1718

Re:   Account Number: ******8823

Loan Investor

I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank NA and may include a number of investors. As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf. The address of your investor is:

        3415 Vision Drive
        Columbus, OH 43219
        (800)848-9136

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,

*Larry Thode*

Larry Thode
Vice President
Chase Home Lending
(800) 848-9136 Customer Care
(800) 582-0542 TDD / Text Telephone
www.chase.com

CC278

Chase (OH4-7302)
3415 Vision Drive
Columbus, OH 43219-6009

 **CHASE**

April 25, 2011

02524-01 IF1A 110-00000000000

Mound, MN 55364-9008

Re:  Account Number: ******2426

Loan Investor

Dear

I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank NA and may include a number of investors.  As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf.  The address of your investor is

3415 Vision Drive
Columbus  OH 43219
Prime Conv Arm (CI)

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,

Chase
(800) 848-9136
(800) 582-0542 TDD / Text Telephone
www.chase.com

CC.278

Exhibit FW

HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

Prepared by:          Tenia Hunter, Esquire

Record &Return to: Law Office of Marshall C. Watson
                   1800 NW 49ᵗʰ Street, Suite 120
                   Fort Lauderdale, Florida 33309
                   Telephone:    (954) 453-0365
                   Facsimile:    (954) 771-6052

**RECORD AND**
**RETURN TO** ⟶

### ASSIGNMENT OF MORTGAGE

*KNOW ALL MEN BY THESE PRESENTS:*

*THAT* WASHINGTON MUTUAL BANK, FA, A FEDERAL ASSOCIATION residing or located at 400 E. MAIN ST. 2ND FL STOCKTON, CA 96202 herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto WASHINGTON MUTUAL BANK residing or located at: 400 E. MAIN ST. 2ND FL STOCKTON, CA 95202 herein designated as the assignee, the mortgage executed by ████████ recorded November 1, 2002 in Dade County, Florida at ████████ and ████████ encumbering the property more particularly described as follows:

together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and assigns forever, but without recourse on the undersigned, effective as of ___11.13.2007___

*In Witness Whereof,* the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed this __13__ day of __NOV__ 2004

                              WASHINGTON MUTUAL BANK, FA, A FEDERAL
                              ASSOCIATION
                              ATTEST: _____
                              PRINT NAME: ___Laura Hescott___  AVP

Signed in the presence of:

WITNESS: _____
Print Name: _____

WITNESS: _____
Print Name: _____

STATE OF __MN__

COUNTY OF __Dakota__

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid county and state, on this the __13__ day of ___NOV___ 2007, within my jurisdiction, the within named who acknowledged to me that (s)he is ___Laura Hescott___ and that for and on behalf of Washington Mutual Bank, Fa, A Federal Association and as its act and deed (s)he executed the above and foregoing instrument, after first having been duly authorized by Washington Mutual Bank, Fa, A Federal Association to do so.

NOV WITNESS my hand and official seal in the County and State last aforesaid this __13__ day of __ 2007.

                              NOTARY PUBLIC

BP Investigative Agency
Exhibit 7

Exhibit 8

CBDB   M30

■ Washington Mutual

## AFFILIATED BUSINESS ARRANGEMENT
### DISCLOSURE STATEMENT NOTICE

Loan Number: 3013265663-039

Date: JANUARY 25, 2007

Applicant(s): WILLIAM PAATALO

Property: 43 STANLEY COULEE WAY
NYE, MT 59061

This is to give notice of the business relationship between WASHINGTON MUTUAL BANK, FA and certain other members of the Washington Mutual family of companies you may have been referred to for settlement services in connection with your home loan transaction. The company identified above and each of the companies listed below is 100% owned, directly or indirectly by Washington Mutual, Inc. ("WMI"). Because of this relationship, a referral of business between these companies may provide these companies or WMI a financial or other benefit.

Shown below is the estimated charge or range of charges for the settlement services listed. You are NOT required to use the listed providers as a condition for settlement of your loan, or the purchase sale, or refinance of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES. Your choice of a settlement service provider will not influence the lender's credit decision in any way.

| Settlement Service Provider and Range of Charges |
|---|
| **Washington Mutual Insurance Services, Inc.** |
| **Washington Mutual Insurance Agency** places real estate hazard insurance and flood insurance in certain states. The appropriate agency may offer to place hazard insurance and/or flood insurance for you, but is not obligated to do so. Ask your loan consultant for more information regarding availability. |
| • Hazard insurance premiums range from $250 to $4,000 depending on the replacement costs of the dwelling. |
| • Flood insurance premiums are determined by the National Flood Insurance Program and are based on various characteristics of the property securing the loan. The average estimated premium range from $500 to $1,500. |
| **Washington Mutual Bank** |
| **Washington Mutual Bank, FA** provide a variety of first and second lien residential mortgage loan products. |
| • Charges for application, commitment, appraisal, inspection, processing, underwriting, funding and review, wire transfer, and tax services generally range from 1% to 5% of the loan amount. |
| • Charges for origination and/or discount fees range from 0% to 4% of the loan amount. |
| *Please refer to the enclosed Good Faith Estimate of Settlement Costs for an estimate of the charges applicable to your loan transaction.* |

### ACKNOWLEDGEMENT

I/We have read this disclosure form and understand that WASHINGTON MUTUAL BANK, FA is referring me/us to purchase one or more of the above described settlement services and may receive a financial or other benefit as a result of the referral.

WILLIAM PAATALO

_____     _____

_____     _____

_____     _____

3002 (12-05)

LNCSZUSA (Version 3.0)

BP Investigative Agency
Exhibit 8     CHASE 00319


*Exhibit # 9*

**WASHINGTON MUTUAL BANK, FA**
**BOARD OF DIRECTORS RESOLUTION**

**AMENDMENT TO FEDERAL STOCK CHARTER (No. 4536)**

**RESOLVED,** that Section 1 of the Federal Stock Charter of the Association (the "Charter") is hereby amended as follows:

Section 1.    Corporate Title.  The corporate title of the savings bank is Washington Mutual Bank.

**AMENDMENT TO BYLAWS**

**RESOLVED FURTHER,** that Article I, Section 1 of the Bylaws of the Association shall be amended in its entirety to read as follows:

Section 1.    Corporate Title and Name.  The full corporate title of the savings bank is Washington Mutual Bank.  The savings bank also may do business under the name Washington Mutual Bank, FA.

**RESOLVED FURTHER,** that the foregoing amendments shall become effective as of April 4, 2005.

**RESOLVED FURTHER,** that the Senior Executive Vice President, the Secretary and the Assistant Secretary, and each of them acting alone, are hereby authorized to execute and deliver any and all documents, and to take such other actions, as may be necessary or appropriate to effect such amendments.



DOCSSEA/108908.1  1-13-2005 12:10

---

BP Investigative Agency   **CHASE 001049**
Exhibit 9

in the CIRCUIT COURT of the 11th Judicial Court Circui
miami Dade County Florida Civil Division

Washington Mutual
                plaintiff

                                        #07-12402-CA01

       VS
Kurt MARIN
            Defendant                          Exhibit
                                                   27

FILED FOR RECORD
2009 AUG -3 PM 4:46
CLERK CIRCUI & COUNTY COURTS
MIAMI-DADE COUNTY FLA
CIVIL

_Motion To Reconsider_

Washington Mutual was asked to show proof That they ha
The NoTE: and own it they Responded by say that it was
Frivolous then just showing the Mortgage not the
Note. But in Case # 07-07522 CA01 washington Mutual vs
Wexford Bank: Washington Mutual asked Wexford for proof
of Note But don't want to give us the proof, thats
A double standard. we want see Note. So Stop the
For closure because   I   was never served+never got due process
see Back+ for proof.

                    K t——      8/3/2009

            10671 NE Quaybridge Cart, Unit C11
        Miami  Shows, FL 33138

Exhibit 28

P9L

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

JP MORGAN CHASE BANK NATIONAL
ASSOCIATION,
PLAINTIFF

UNC: GENERAL JURISIDICTION DIVISION

V.

CASE NO. 07-12402CA-1

KURT MARIN, ET AL
DEFENDANT (S)

DIV - 2

AND
EMERGENCY EX PARTE MOTION TO STAY SALE TO VACATE DEFAULT

Comes, the Defendants, Kurt Marin, by and through the undersigned counsel, hereby files this Motion to Stay Sale and Vacate Default.

1. This is a residential foreclosure case.

2. Defendant, Kurt Marin, was without an attorney when default was granted.

3. Defendant was not served notice and was without knowledge of that said request and the order granting default.

4. Defendant was acting temporary in Pro Se on withdrawal of counsel.

5. That there are issues of law that have not been resolved.

6. That there is a bona fide cause of action of ownership.

7. That the court issued a sale of the property without Plaintiff's answering objections that were presented by the Defendant(s), and the qualified written request for disclosure in accordance with the Real Estate Settlement Act.

8. Under the shield of the 14th Amendment to the States, it is well settled law that a pro-se defendant(s) motion should be treated liberally and not defeated by captious objection where issue of law may change the outcome.

9. The Plaintiff(s) pleads Defendant's nul tiel is irrelevant because a Defendant has failed to appear, however, their plea does not reach far

10.   That the granting of default enriched the Plaintiff 2.5 million without a clear showing and proof of ownership.

11.   The court inadvertently gave Plaintiffs the license to steal without Plaintiff showing its hand, over the Defendants objection to sell the property, which motion that was never heard.

12.   Therefore, the court should stay the sale and vacate default, until such time as the facts can be presented, as it should be known by both Plaintiff and the Defendants. And for one of the parties to forever be silent.

Wherefore, the Defendant, Kurt Marin, requests this court to allow his demand upon Plaintiff to be heard, the court stay the sale, vacate the default and set a date to resolve the clouded record as soon as can be heard.

For these and such other further relief as the court may deem just and fair and proper.


Nashid Sabir

pg. #3

## Certificate of Service

I, hereby certify that a true and correct copy of the foregoing has been furnished by fax at 9 a.m. and by U.S. Mail on this ___5___ day of January 2010 to the following:

SMOLLER, LERMAN, BENTE AND WHITEBROOK, P.A.
CARLOS D. LERMAN
2611 Hollywood Boulevard
Hollywood, FL 33020
Telephone: (954) 922-2811

SHAPIRO & FISHMAN, LLP
JAMES KARROT
2424 N. Federal Highway, Suite 360
Boca Raton, FL 33431
Telephone: (561) 998-6700
Fax: (561) 998-6707

Nashid Sabir, Attorney
18350 NW 2 Avenue, Suite 500
Miami, FL 33169
Telephone: (305) 770-1778
Fax: (305) 653-5286
FB: 363091

### The ADA Statement for the Eleventh Judicial Center

In accordance with the Americans with Disabilities Act, Persons with disabilities needing a special accommodation to participate in this proceeding should contact the Court Administration, at the Dade County Courthouse, Voice Telephone 305/375-2006; Text Telephone 305/375-2007, No later than SEVEN business days prior to the Proceeding. If hearing impaired, telephone Florida Relay Service Number for assistance at 800/955-8771.

*Docket*

EXHIBIT
SEE PG 5/11
Items 1-4
[29]

ome (http://www.miami-dadeclerk.com/home.asp)
nline Services (http://www.miami-dadeclerk.com/online_services.asp)
bout Us (http://www.miami-dadeclerk.com/about.asp)
ontact Us (http://www.miami-dadeclerk.com/contact.asp)
y Account (http://www2.miami-dadeclerk.com/PremierServices/login.aspx)



Clerk of the Courts
MIAMI-DADE COUNTY, FLORIDA

# Miami-Dade County Civil, Family and Probate Courts Online System

◄◄ Back to Results

## JPMORGAN CHASE BANK (NA) VS MARIN, KURT

Local Case Number: 2007-012402-CA-01

Filing Date: 04/26/2007

State Case Number: 132007CA012402000001

Case Type: ∠ DO NOT USE - Legacy Mortgage Foreclosure

Consolidated Case No.: N/A

Judicial Section: CA23

Case Status: CLOSED

## Parties

Number of Parties: 5

## Hearing Details

Number of Hearing: 1

## Dockets

Dockets Retrieved: 177

| Date | Book/Page | Docket Entry | Event Type | Comments |
|------|-----------|--------------|------------|----------|
| 07/02/2015 | | Receipt: | Event | RECEIPT#:3030013 AMT PAID:$10.00 ALLOCATION CODE |

| | | | | QUANTITY UNIT AMOUNT 3120-COPY 10 $1.00 $10.00 TENDER TYPE:CASH TENDER AMT:$10.00 RECEIPT DATE:07/02/2015 REGISTER#:303 CASHIER:GINOG |
|---|---|---|---|---|
| | 07/01/2015 | | Order: | Event | RATIFING CLERK'S SALE AND DIRECTING ISSUANCE OF CERTIFICATE OF TITLE AND DENYING DEFENDANT'S OBJECTION TO SALE |
| | 07/01/2015 | 29681:1901 | Recorded Document | Event | NOTICE OF BANKRUPTCY CASE - CLYDE THOMAS MCPHATTER |
| | 07/01/2015 | | Memorandum of Disposition | Event | PLTF.MOT.TO RATIFY SALE,DEF.OBJECTION TO SALE |
| | 07/01/2015 | | 5 Minute Motion Calendar | Hearing | P- MOT TO RATIFY CLRERKS SA |
| | 06/30/2015 | | Objections to Sale | Event | |
| | 06/19/2015 | | Notice of Filing: | Event | |
| | 06/19/2015 | | Receipt: | Event | RECEIPT#:2610008 AMT PAID:$1.00 ALLOCATION CODE QUANTITY UNIT AMOUNT 3120-COPY 1 $1.00 $1.00 TENDER TYPE:CASH TENDER AMT:$1.00 RECEIPT DATE:06/19/2015 REGISTER#:261 CASHIER:GINOG |
| | 06/18/2015 | | Objections to Sale | Event | |
| | 06/18/2015 | | Objections to Sale | Event | |
| | 06/18/2015 | | Notice of Hearing- | Event | 07/01/2015 @ 09:00AM |
| | 06/18/2015 | | Notice of Hearing- | Event | 07/01/2015 @ 09:00AM |
| | 06/17/2015 | | Motion: | Event | FOR HEARING |
| | 06/17/2015 | | Motion: | Event | FOR HEARING |
| | 06/11/2015 | | Motion: | Event | TO SOP HEARING TO RATIFY CLERKS SALE |
| | 06/05/2015 | | Notice of Hearing- | Event | 07/01/2015 |
| | 05/13/2015 | 29618:3427 | Mandate From | Event | (AFFIRMED) |

*Clyde McPhatter Filed* (handwritten annotation)

Appeals Court

| | 10/30/2014 | | Text | Event | STATEMENT OF COSTS |
|---|---|---|---|---|---|
| | 09/02/2014 | | Order: | Event | 3RD DCA ORDER REINSTATING APPEAL 3D14-1745 |
| | 08/20/2014 | | Letter of Correspondence | Event | |
| | 08/08/2014 | | Order: | Event | 3RD DCA ORDER DISMISSING APPEAL |
| | 07/18/2014 | 29241:3112 | Notice of Appeal | Event | B: 29241 P: 3112 |
| | 07/14/2014 | | Motion: | Event | TO RATIFY CLERK'S SALE & ISSUE OF CERT OF TITLE |
| | 07/14/2014 | | Entered Or Duplicated In Error | Event | MOTI ENTERED OR DUPLICATED IN ERROR |
| | 07/08/2014 | | Motion: | Event | FOR RECONSIDERATION |
| | 07/01/2014 | | Notice: | Event | OF ORDER TO MOTION TO QUASH SERVICE |
| | 06/27/2014 | 29219:1103 | Court Order (Recordable) | Event | B: 29219 P: 1103 DENYING DEFENDANT'S TO VOID FORECLOSURE SALE |
| | 06/27/2014 | 29219:1103 | Court Order (Recordable) | Event | B: 29219 P: 1103 DENYING DEF.MARIN MTN TO QUASH SVC,VACATE JUDGMENT |
| | 05/18/2014 | | Notice of Hearing- | Event | MOTIONS 06/27/2014 11:15 AM |
| | 05/15/2014 | | Notice of Hearing- | Event | SPECIAL APPT 06/27/2014 11:15 AM |
| | 02/28/2014 | | Motion: | Event | TO QUASH SERVICE, VACATE FORECLOSURE |
| | 02/26/2014 | | Motion: | Event | TO QUASH SERVICE, VACATE FORECLOSURE JUDGMENT |
| | 02/25/2014 | | Notice of Filing: | Event | |
| | 02/24/2014 | | Objection: | Event | TO SALE |
| | 02/19/2014 | | Certificate of Sale | Event | |
| | 02/14/2014 | | Mortgage Foreclosure | Event | $ 5176.80 SURTAX |

| | | Deposit | | |
|---|---|---|---|---|
| | 02/14/2014 | Mortgage Foreclosure Deposit | Event | $ 6902.40 DOC STAMPS |
| | 02/14/2014 | Bid Amount | Event | $1,150,400.00/PL/5067 |
| | 02/06/2014 | Mortgage Foreclosure Publication Fee | Event | 180.00 SALE DATE OF 02/13/2014 |
| | 01/16/2014 | Notice of Sale | Event | |
| | 12/11/2013 | Order Resetting Foreclosure Sale | Event | **TO FEBRUARY 13, 2014 AND CANCEL SALE OF 12/12/13-NFC** |
| | 12/11/2013 | No Further Judicial Action | Event | **NFC / NO FURTHER CANCELLATIONS** |
| | 12/11/2013 | Mortgage Foreclosure Sale Date | Event | **MTGE FORECLSU 02/13/2014 09:00 AM** |
| | 12/11/2013 | Mortgage Foreclosure Sale Cancelled | Event | **12/12/2013 09:00 AM CANCELLED PER COURT ORDER** |
| | 12/10/2013 | Motion for Extension of Time | Event | |
| | 12/10/2013 | Notice of Hearing- | Event | **MOTIONS 12/11/2013 08:30 AM** |
| | 12/09/2013 | Notice of Hearing- | Event | **MOTIONS 12/10/2013 08:30 AM** |
| | 12/09/2013 | Motion: | Event | **FOR EMERGENCY HEARING (SALE)** |
| | 12/03/2013 | Mortgage Foreclosure Publication Fee | Event | **180.00 FOR THE SALE OF 12/12/2013** |
| | 11/14/2013 | Notice of Sale | Event | |
| | 10/10/2013 | Mortgage Foreclosure Sale Date | Event | **MTGE FORECLSU 12/12/2013 09:00 AM** |
| | 10/09/2013 | Order Resetting Foreclosure Sale | Event | **TO 12/12/2013** |
| | 09/05/2013 | Request for Hearing | Event | |
| | 09/05/2013 | Notice of Hearing- | Event | **MOTIONS 10/09/2013 09:00 AM** |
| | 08/21/2013 | Motion: | Event | **TO RESCHEDULE FORECLOSURE SALE** |
| | 07/16/2013 | Order: | Event | **GRT. DEFT MOTION TO CANCEL** |

SALE DUE TO BKC-13-26377-LMI

| | | | | | |
|---|---|---|---|---|---|
| *1.* | | 07/16/2013 | | Mortgage Foreclosure Sale Cancelled | Event | 07/16/2013 09:00 AM CANCELLED PER COURT ORDER |

C/late follow Intred

| 2. | 07/12/2013 | 28724:2306 | Recorded Document | Event | B: 28724 P: 2306 NOTICE OF BANKRUPTCY ( DEFENDANT NOT PART OF THE CASE) |
|---|---|---|---|---|---|

| 3. | 07/12/2013 | | Notice of Hearing- | Event | MOTIONS 07/16/2013 08:30 AM (DN' NAME NOT IN SYSTEM OR CASE NUMBER INCORRECT) |
|---|---|---|---|---|---|

Line

| 4. | 07/12/2013 | | Motion: | Event | FOR BANKRUPTCY STAY |
|---|---|---|---|---|---|

| 5. | 07/03/2013 | | Mortgage Foreclosure Publication Fee | Event | 165.00 SALE OF 07/11/2013 *Parties: Marin Kurt* |
|---|---|---|---|---|---|

| 6. | 06/17/2013 | | Notice of Sale | Event | |
|---|---|---|---|---|---|

| 7. | 05/21/2013 | | Motion: | Event | TO RECONCIDER |
|---|---|---|---|---|---|

| 8. | 05/15/2013 | | Order Resetting Foreclosure Sale | Event | TO 07/16/2013 |
|---|---|---|---|---|---|

| 9. | 05/15/2013 | | Mortgage Foreclosure Sale Date | Event | MTGE FORECLSU 07/16/2013 09:00 AM |
|---|---|---|---|---|---|

| 10 | 04/23/2013 | | Request for Hearing | Event | |
|---|---|---|---|---|---|

| 11 | 04/23/2013 | | Notice of Hearing- | Event | MOTIONS 05/15/2013 09:00 AM |
|---|---|---|---|---|---|

| 12 | 03/11/2013 | | Motion to Dismiss | Event | FOR FAILURE TO PROSECUTE |
|---|---|---|---|---|---|

→ 13   02/27/2013   Notice of Hearing Set-   Event   MOTIONS 03/12/2013 10:30AM   LS:01/30

JP morgan partys did not show up for this hearing either.

| 14 | 02/22/2013 | | Notice of Hearing- | Event | MOTIONS 03/12/2013 10:30 AM |
|---|---|---|---|---|---|

| 15 | 08/14/2012 | | Motion for Default | Event | never Filed Defalt Exb."O" |
|---|---|---|---|---|---|

| 16 | 08/13/2012 | | Motion for Default | Event | Hearing was on 8/7/12 Jpmorgan did not show up   Exhibit "4" |
|---|---|---|---|---|---|

| 17 | 06/21/2012 | | Motion to Reset Sales Date | Event | ATY:00070451 |
|---|---|---|---|---|---|

| 18 | 05/09/2012 | | Motion: | Event | REQUIRE LANDLORD'S COMPLIANCE WITH FL. STATUTE 83.51 |
|---|---|---|---|---|---|

| 19 | 04/27/2012 | 28093:1635 | Recorded Document | Event | B: 28093 P: 1635 NOTI OF FILING BANK ORDR GRANTING RELIEF FROM STAY |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1. | 05/31/2011 | | Notice: | Event | OF CHANGE OF FIRM NAME & ATTY OF RECORD WITHIN FIRM |
| 2. | 02/28/2011 | | Order Case Pending Bankruptcy Stay | Event | |
| 3. | 02/10/2011 | | Mortgage Foreclosure Sale Cancelled | Event | 02/15/2011 09:00 AM CANCELLED PER BANKRUPTCY |
| 4. | 02/10/2011 | 27585:0859 | Recorded Document | Event | B: 27585 P: 0859 NOTICE OF FILING BANKRUPTCY 10-45600-LMI DN01 |
| 5. | 02/08/2011 | | Mortgage Foreclosure Publication Fee | Event | 150.00 SALE DATE FEBRUARY 15, 2011 |
| 6. | 01/07/2011 | | Notice of Sale | Event | |
| 7. | 01/04/2011 | | Mortgage Foreclosure Sale Date | Event | MTGE FORECLSU 02/15/2011 09:00 AM |
| 8. | 01/03/2011 | | Mortgage Foreclosure Publication Fee | Event | 150.00 |
| 9. | 01/03/2011 | | Order Resetting Foreclosure Sale | Event | TO 02/15/2011 |
| 10. | 10/14/2010 | | Motion | Event | FOR JUDGE TO ANSWER |
| 11. | 07/15/2010 | | Notice of Filing: | Event | |
| 12. | 07/15/2010 | | Motion to Reset Sales Date | Event | ATY:00065514 |
| 13. | 01/15/2010 | | Motion: | Event | TO RECONSIDER BOTH DENIAL STAY AND TO VACATE DEFAULT |
| 14. | 01/15/2010 | | Motion: | Event | TO STAY PROCEEDINGS PENDING ASSIGNMENT OF MORTGAGE |
| 15. | 01/15/2010 | | Request: | Event | FOR DISCLOSURES REQUIRED BY THE REAL ESTATE SETTLEMENTS |
| 16. | 01/08/2010 | | Order: | Event | DENYING MTN TO STAY SALE TO VACATE DEFAULT |
| 17. | 01/07/2010 | 27141:1754 | Recorded Document | Event | B: 27141 P: 1754 NOTICE OF BANKRUPTCY CASE FILING (CLYDE T.MCPHATTER) |
| 18. | 01/05/2010 | | Motion: | Event | TO STAY SALE & TO VACATE DEFAULT |

OCS Search

| | | | | |
|---|---|---|---|---|
| 1. | 12/18/2009 | Notice of Sale | Event | |
| 2. | 11/06/2009 | Motion to Stay | Event | |
| 3. | 08/04/2009 | Notice of Filing: | Event | ORIGINAL MORTGAGE AND NOTE |
| 4. | 08/04/2009 | Motion: | Event | AMENDMENT TO MOTION TO BE CONSIDERED |
| 5. | 08/03/2009 | Motion: | Event | TO RECONSIDER |
| 6. | 07/23/2009 | Final Judgment by Judge | Judgment | J $ 2712019.36 BK:26952 PG:4678 |
| 7. | 07/23/2009 | Letter of Correspondence | Event | KURT MARIN |
| 8. | 07/23/2009 | Text | Event | SALE DATE 01-07-2010 |
| 9. | 07/23/2009 | 26952:4678 | Final Judgment | Event | J $ 2712019.36 BK:26952 PG:4678 Parties: Marin Kurt; Garcia George; Levitin Jeffrey (tr); Wexford High Yield Debt Fund I (llc) |
| 10. | 06/24/2009 | Notice of Hearing Set- | Event | MOTIONS 07/23/2009 08:30AM |
| 11. | 05/28/2009 | Notice of Filing: | Event | AFFIDAVIT OF PLTFS COUNSEL,ACOS ETC.. |
| 12. | 05/28/2009 | Motion for Summary Judgment | Event | |
| 13. | 05/28/2009 | Notice of Hearing Set- | Event | MOTIONS 06/11/2009 08:30AM |
| 14. | 05/14/2009 | Answer | Event | ATTORNEY:88888888 Parties: Marin Kurt |
| 15. | 05/13/2009 | Answer | Event | ATTORNEY:88888888 Parties: Marin Kurt |
| | 04/27/2009 | Affidavit of Indebtedness | Event | |
| | 04/27/2009 | Aff In Support of Mtn for Final/summary Judgment | Event | |
| | 04/27/2009 | Affidavit as to Costs | Event | |
| | 04/27/2009 | Affidavit of: | Event | PLT COUNSEL |
| | 04/27/2009 | Motion for Summary Judgment | Event | |

| Date | Description | Type | |
|---|---|---|---|
| 03/30/2009 | Order on Motion to Strike | Event | |
| 03/19/2009 | Motion to Strike | Event | |
| 03/09/2009 | Motion for Summary Judgment | Event | |
| 02/25/2009 | Motion: | Event | TO SUBSTITUTE PARTY PLT |
| 02/25/2009 | Order: | Event | ON MOTION TO SUBSTITUTE PARTY PLTFS |
| 02/19/2009 | Order: | Event | GRANTING MOTION TO WITHDRAW |
| 01/28/2009 | Notice Has Wrong Time | Event | 02/19/2009 09:00 AM |
| 01/14/2009 | Motion to Withdraw | Event | |
| 01/14/2009 | Notice Not Processed, Cal Full | Event | 01/29/2009 09:00 AM |
| 01/07/2009 | Order to Consolidate | Event | 07-007522-CA-01 |
| 12/02/2008 | Notice of Hearing Set- | Event | MOTIONS 01/07/2009 09:00AM |
| 10/16/2008 | Notice Not Processed, Cal Full | Event | 10/29/2008 09:00 AM |
| 09/22/2008 | Notice of Unavailability/absence | Event | 12/5/08-12/12/08 |
| 09/22/2008 | Motion: | Event | TO CONSOLIDATE |
| 09/22/2008 | Notice Not Processed, Cal Full | Event | 10/08/2008 09:00 AM |
| 10/26/2007 | Motion to Strike | Event | & OBJECTIONS TO DEMAND FOR DISCLOSURE REQUIRED BY,ETC. |
| 10/18/2007 | Order: | Event | GRANTING PERMITTING WITHDRAWAL OF ATTY |
| 10/09/2007 | Letter of Correspondence | Event | FROM KURT MARIN |
| 10/04/2007 | Notice of Hearing- | Event | MOTIONS 10/18/2007 09:00 AM |
| 10/04/2007 | Motion to Withdraw | Event | |
| 10/02/2007 | Notice of Hearing Set- | Event | MOTIONS 10/18/2007 09:00AM |

*Exhibit #38*

## AFFIDAVIT

I Thelma Burns am living at the house at 1220 nw 200th st Miami Fla.,

33169, For many years, and no one has ever came to this house and served any

Documents from Washington Mutual or JPMorgan  Chase Bank to be served to

Anyone named Melissa Jones nor has anyone by that name Melissa Jones ever

Been known to Live here at this address.



Thelma Burns
1220 NW 200th st.
Miami, Fla. 33169

*Exhibit 39*

## AFFIDAVIT

I KURT MARIN NEVER RECEIVED NOTICE OF SERVICE CONCERNING
THE FORECLOSURE COMPLAINT FROM BNC MORTGAGE AND NO ONE BY THE
NAME OF MELLISA JONES EVER LIVED AT MY PROPERTY AT 1220 NW 200TH
STREET NEITHER DO I KNOW ANYONE BY THAT NAME , AND NO PAPERS
EVER CAME TO ME FROM HER.

KURT MARIN
3320 NE 165TH ST.
MIAMI, FL. 33167

2/10/2015 Fannie Mitchell





IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO. 2007 CA 012402 02


JPMorgan Chase Bank,
National Association,

        Plaintiff,

vs.

Kurt Marin; et al.,

        Defendants.

_____/


TRANSCRIPT OF PROCEEDINGS

MOTIONS


The above-entitled cause came on for hearing
before the Honorable BARBARA ARECES, Circuit Court
Judge, presiding at the Miami-Dade County Courthouse,
73 West Flagler Street, Miami, Florida, on July 1,
2015, commencing on or about 9:15 a.m.

1                          <u>APPEARANCES</u>

2
     For the Plaintiff:    EILEEN E. NAVARRO, ESQUIRE
3                          Law Offices of Eileen E. Navarro, P.A.
                           8950 Southwest 74th Court
4                          Suite 2201
                           Miami, Florida 33156
5

6    For the Defendants:   Pro Se
                           KURT MARIN
7                          MAURICE SYMONETTE
                           CLYDE McPHATTER
8

9    REPORTER:            Elsy M. Altuve

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    * * * * * * * * *

 2          (Thereupon, the following proceedings were had:)

 3          THE COURT:  First case is going to be --

 4          MS. NAVARRO:  Number one.

 5          THE COURT:  I don't know what number one is.  It's

 6    JP Morgan v. Kurt Marin.

 7          THE COURT REPORTER:  Your Honor, reporter.

 8          THE COURT:  There's a reporter on this one?

 9          THE COURT REPORTER:  Yes.

10          THE COURT:  Okay.  I'm going to need your

11    information please.

12          THE COURT REPORTER:  Absolutely.

13          THE COURT:  Thank you.

14          It's JP Morgan v. Kurt Marin.

15          MS. NAVARRO:  Yes, your Honor.  Eileen Navarro on

16    behalf of JP Morgan Chase Bank.

17          THE COURT:  I have a lot of people in front of me,

18    I don't have any of their names.  May I have your name,

19    sir?

20          MR. SYMONETTE:  Maurice Symonette.

21          MR. McPHATTER:  Clyde McPhatter.

22          MR. MARIN:  Kurt Marin.

23          THE BAILIFF:  You have a court reporter, Judge, on

24    this one.

25          THE COURT:  I know.  So just let me get the names.
```

1          Kurt Marin is one of the defendants.  And I'm going to

2     need the other names repeated because, unlike the court

3     reporters that seem to get things that other people

4     don't understand, I'm a little slower.

5          MR. SYMONETTE:  Maurice Symonette.  M-A-U-R-I-C-E.

6          THE COURT:  M-A-U-R-I-C-E, okay.  Symonette?

7          MR. SYMONETTE:  Symonette, S-Y-M-O-N-E-T-T-E.

8          THE COURT:  And the gentleman next to you?

9          MR. McPHATTER:  Clyde McPhatter.  C-L-Y-D-E.

10         THE COURT:  Okay.

11         MR. McPHATTER:  McPhatter, M-C-P-H-A-T-T-E-R.

12         THE COURT:  And we're here on, I guess plaintiff's

13    motion --

14         MS. NAVARRO:  To ratify sale.

15         THE COURT:  -- to ratify sale and defendant's

16    objection.  Actually, all I have is the objection of

17    sale.  Nothing else was submitted via e-courtesy.

18         MS. NAVARRO:  I have a motion --

19         THE COURT:  The only thing I received was the

20    objection to sale.

21         MS. NAVARRO:  I'm sorry, one of pages is --

22         THE COURT:  I was just handed a copy of

23    plaintiff's motion to ratify first sale and to direct

24    the clerk to issue the certificate of title.

25         All right.  And your objection to sale --

1          MS. NAVARRO:  There was an amended objection, yes,

2     your Honor.  I don't know if that's the one you have

3     before you, it was filed on the 30th.

4          THE COURT:  I did see that on the docket.  So...

5          MR. SYMONETTE:  Yes, ma'am.  Judge Blake, last

6     time we came here, promised us that we would get to

7     hear our objection to sale before we went to the

8     ratify, and it appears as though they try to circumvent

9     that by submitting a fraudulent document saying that we

10    shouldn't get to go to the objection of sale because of

11    the way our objection to sale was written.

12         But the only problem with that, we have the proof

13    here, is that the -- what they wrote on there and what

14    they said we wrote was not what we wrote.  They

15    actually changed the whole document and we got the

16    document that's in the clerk's office and we got the

17    document that they submitted to the judge.

18         THE COURT:  What document are you referring to?

19         MR. SYMONETTE:  This one here.  Can I --

20         Yes, ma'am.  Right here, if you read this here,

21    then you go --

22         THE COURT:  You just handed me a copy of the

23    amended objection to sale that's says that JP Morgan

24    has no standing.

25         MR. SYMONETTE:  Yeah.  But also in there -- is

1          that the one —— oh, I'm sorry.

2              THE COURT:  All right.  Just so you know motion

3          calendars are five minutes total and it looks like it's

4          going to be a while, so you've got two minutes.

5              MR. SYMONETTE:  Yes, ma'am.

6              THE COURT:  Starting now.

7              MR. SYMONETTE:  Right there it explains that they

8          did —— on there it explains that what they did was they

9          changed the document which is illegal.  Then the next

10         thing is that we're not supposed to be to the ratify

11         until after we at least get a chance to ask the Judge

12         to reconsider if she goes against us, objection to

13         sale, according to the Florida Rules of Procedure.  But

14         they're doing the ratify right now when we're supposed

15         to just be on the objection, like you said.  That's

16         what supposed to be before the Court, an objection to

17         sale.

18             THE COURT:  What's the basis for the objection to

19         sale?

20             MR. SYMONETTE:  The basis is, in Brevard County ——

21         we just got a —— we got —— you know, here they obtained

22         this note through operation of law.  And in the State

23         of the Michigan, the Supreme Court said that you can't

24         obtain the note through operation of law, only the FDIC

25         can do that.  And, Brevard County, in Florida, just

1          said the exact same thing.  And, in fact, JP Morgan

2          said -- and we got it in writing here -- and according

3          to the Judge's order, that JP Morgan admits that they

4          cannot obtain the not from operation -- I mean, through

5          a foreclosure through operation of law.

6                In other words, the FDIC is the only one that can

7          come in through operation of law and take over

8          Washington Mutual, and then let -- and then as if

9          they're Washington Mutual.  But JP Morgan has to go

10         through the whole thing of getting -- giving it to them

11         in writing, and they have to go and put it into the

12         Clerk of the Court if they bought the note from the

13         FDIC.  But they're acting as if they are the FDIC and

14         they're just going right to foreclosures without going

15         through the procedures of the Court that said you must

16         get the deed, put it into the Clerk of the Courts, and

17         then you file foreclosure.

18               THE COURT:  Okay, good.

19               Response?

20               MS. NAVARRO:  Yes, your Honor.

21               THE COURT:  Two minutes.

22               MS. NAVARRO:  This is a 2007 case.  Final judgment

23         was entered July of 2009 at a summary judgment hearing.

24         The basis for the objection is standing, that was

25         resolved at summary judgment.  This is an extremely old

1          case, your Honor.

2              They filed an appeal regarding a motion to quash,

3      the Third DCA affirmed the trial court's orders.  All

4      of the orders that were appealed, just last month they

5      were affirmed.  There's no basis, they're not objecting

6      to any -- to anything concerning the actual sale which

7      is the only basis that they would have for the

8      objection.  Their sole objection is standing.

9              MR. SYMONETTE:  No, it's not.

10             THE COURT:  Okay.  Objection's overruled and

11     denied at this point --

12             MR. SYMONETTE:  Can I -- can I --

13             THE COURT:  -- as untimely --

14             MR. SYMONETTE:  Can I respond to that?  Because we

15     -- we responded.  We asked them for the note all

16     throughout the time, they never gave us a chance.  And

17     then when they held the papers in the Judge's office

18     for the last time, that's why we had the Supreme Court

19     on the other things to newly found evidence.

20             So what I'm saying is that we objected and have

21     been objecting.  The people that delayed the case is

22     them.  I have the proof here that every time we went to

23     court they didn't show up twice, and then we asked the

24     Judge that they should be dismissed because they didn't

25     show up two times.  And they're the ones that made the

1    case delayed, and now they here claiming that we are

2    the ones that delayed the case and now it's untimely.

3    But we was asking for it at the time.  As long as you

4    ask for it with- —— before a year was out —— we ask for

5    it before a year was out.  We have the proof right

6    here.

7         What I would like for the Judge to do is to give

8    time to read our objection.  This one here so that you

9    —— before you overrule it, and look at it first, and

10   let us come back to the court and look at it because ——

11        THE COURT:  I did look at it.

12        MR. SYMONETTE:  You didn't look at this one here.

13        THE COURT:  Yes, I did.  She asked me if I saw it,

14   and I said, yes, I saw it on the docket, and I did read

15   it.  Attached to it is the document having to do with

16   the operation of law ——

17        MR. SYMONETTE:  No, not the operation ——

18        THE COURT:  —— it's the third —— it's the third

19   document ——

20        MR. SYMONETTE:  I'm not talking about the

21   operation of law ——

22        THE COURT:  —— attached to that.

23        I'm saying I read it, I reviewed it.  At this

24   point it's all untimely.  The basis for the objection

25   ——

1          MR. SYMONETTE:  Okay.

2          THE COURT:  -- is not legally sufficient --

3          MR. SYMONETTE:  Before we go through it --

4          THE COURT:  -- and I'm sorry --

5          MR. SYMONETTE:  -- we would also --

6          THE COURT:  Sir --

7          MR. SYMONETTE:  -- going to be in bankruptcy.

8          THE COURT:  Sir --

9          MR. SYMONETTE:  We just -- we filed bankruptcy,

10    and we put it in the court yesterday so you should have

11    seen it.  And we don't want this case to go --

12          THE COURT:  Okay.  That was not on the docket so

13    --

14          MR. SYMONETTE:  Okay.  That, we already filed

15    bankruptcy so we want this case stopped because we have

16    to go before the bankruptcy judge --

17          MS. NAVARRO:  Your Honor --

18          MR. SYMONETTE:  -- because all this is illegal.

19          MS. NAVARRO:  -- my firm obtained relief from stay

20    in a 2012 bankruptcy to proceed with this foreclosure.

21    I don't know that document --

22          MR. SYMONETTE:  We just filed that bankruptcy.

23          MS. NAVARRO:  -- he has before you.  But there has

24    been multiple bankruptcy filings on this case.

25          MR. SYMONETTE:  Two.

1     MS. NAVARRO:  Like I said, it's a 2007 case, final

2     judgment entered in 2009, your Honor, and it's --

3         THE COURT:  I understand but they just handed me a

4     document that appears to reflect that they filed

5     bankruptcy --

6         MS. NAVARRO:  Who is the debtor?

7         THE COURT:  -- in Fort Lauderdale.

8         I'm checking.  It's Clyde McPhatter.

9         MS. NAVARRO:  Your Honor, that is a non-party.

10    That bankruptcy does not affect this foreclosure --

11        MR. SYMONETTE:  No, Judge Blake gave him the right

12    to be in this -- in this case.

13        THE COURT:  Clyde McPhatter is a defendant?

14        MS. NAVARRO:  No, he's not --

15        THE COURT:  He's not a defendant.

16        MS. NAVARRO:  He's not.  That does not affect this

17    foreclosure.

18        THE COURT:  Okay.

19        MS. NAVARRO:  He's a nonparty.

20        MR. SYMONETTE:  He is -- he's a party 'cause Judge

21    Blake ordered that he be a part of this case --

22        MS. NAVARRO:  M-mm.

23        MR. SYMONETTE:  -- and that's how even I got on

24    here, Judge --

25        THE COURT:  Is he not a defendant --

```
 1            MS. NAVARRO:  No.

 2            THE COURT:  -- is he not on the final judgment?

 3            MR. SYMONETTE:  He's on that piece of paper right

 4       there.

 5            MS. NAVARRO:  He's not -- he's not a defendant in

 6       this case, your Honor.  I have specific instruction

 7       from my office that Clyde McPhatter is a nonparty.  He

 8       filed --

 9            MR. SYMONETTE:  He's the one that --

10            MS. NAVARRO:  -- for bankruptcy --

11            MR. SYMONETTE:  --- owns the house --

12            MS. NAVARRO:  -- back in 2010 and the sale was

13       incorrectly canceled because he's a nonparty.  He

14       became an owner to the property post complaint --

15            MR. SYMONETTE:  And then Judge Blake gave us the

16       right to be on the case and told me because we --

17            THE COURT:  Did he allow him to intervene?

18            MR. SYMONETTE:  Yes, he did.

19            MS. NAVARRO:  Your Honor, I don't have -- I don't

20       have that --

21            MR. SYMONETTE:  Two judges did.

22            MS. NAVARRO:  I don't see it on the docket as

23       allowing him to intervene.  I am going to check right

24       now.

25            MR. SYMONETTE:  We did an emergency hearing where
```

1    the judge allowed Clyde McPhatter to intervene and do a

2    thing that JP Morgan tricked us on again saying that we

3    were allowed to go in and modify the loan, and then at

4    the last minute they didn't let it happen.

5         THE COURT:   when was he allowed to intervene?

6         MR. SYMONETTE:   At the last hearing, and the

7    hearing before that where the Judge -- I got it right

8    here on the docket, where they -- where they allowed

9    him to do a modification.

10        MS. NAVARRO:   Your Honor, there is no motion to

11   intervene on the docket.

12        MR. SYMONETTE:   I know --

13        MS. NAVARRO:   And my office is certainly not in

14   possession of an order allowing him to intervene.

15   There would be no basis for an intervention.

16        THE COURT:   I know.   But sometimes it's allowed

17   mistakenly --

18        MS. NAVARRO:   Okay.

19        THE COURT:   -- so I'm checking.   I don't see one

20   either.

21        MR. SYMONETTE:   At every hearing the Judge has

22   allowed us to come in and defend ourselves and --

23        THE COURT:   Okay.   I'm sorry, this does not stay,

24   so my ruling stands.   The objection is denied, and

25   motion to ratify on this issue final.

1          MS. NAVARRO:  Thank you, your Honor.

2          MR. SYMONETTE:  Thank you, ma'am.

3          (Thereupon, other proceedings were held, after

4     which the following proceedings continued as follows:)

5          MR. SYMONETTE:  Oh I got one other thing --

6          THE COURT:  No, I'm sorry --

7          THE BAILIFF:  We're done.

8          THE COURT:  -- we're beyond the five minutes.

9     There's a lot of hearings --

10         MR. MARSHALL:  We did a bankruptcy last time too

11    with Mack Wells.

12         (Thereupon, the proceedings were concluded at

13    9:33 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

15

COURT CERTIFICATE

1

2

3    STATE   OF   FLORIDA   )

4                          )  SS:

5    COUNTY OF MIAMI—DADE)

6

7         I, Elsy M. Altuve, Court Reporter and Notary

8    Public for the State of Florida at Large, certify that

9    I was authorized to and did stenographically report the

10   foregoing proceedings and that the transcript is a true

11   and complete record of my stenographic notes.

12        DATED this 9th day of July 2015.

13

14

15                              _____

                                ELSY M. ALTUVE, Notary

16                              Public, State of Florida

                                Commission No.  FF 144043

17                              Expires on July 22, 2018

18

19

20

21

22

23

24

25

Exhibit
32A

Defendant
Kurt Marin, Maurice Symonette
And Clyde McPhatter

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

Plaintiff

vs.

Washington Mutual

Case No.: 2007012402 CA 01

FILED FOR RECORD
2013 DEC -9 PM 1:
CLERK, CIRCUIT & COUNTY COURT
DADE COUNTY, FLA.
CIVIL #11

~~Defendant~~

MOTION FOR Emergency Hearing

Plaintiff(s)/Defendant(s) _____ hereby
move this court for the following relief:

We have A Sale Date Dec. 11 2013.
we are in the process of completing a Banks
Short Sale and need Additional time to complete
The Short Sale, Thank you Sir.

I HEREBY CERTIFY that the original of this Motion was filed with the court and a
true and correct copy was on this _9th_ day of _Dec_____, 20_13_ mailed
and/or hand-delivered to the below addressee(s).

cc: Washington Mutual Bank          Filed By: Maurice Symonette Clyde McPhatter and
Shapiro, Fishman and Gehch LLP                De. Kurt marein
2424 N. Fed. Highway Ste 3°          Address: 3320 NE 16 St. Miami
                                              Fl. 33160

                                     Telephone: 786 859 9421

Interview

**NFC**

**NO FURTHER JUDICIAL ACTION IS REQUIRED**
**THIS CASE IS CLOSED**

**FORECLOSURE**

*Exhibit 32A*

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO: 2007 ___ CA 12402

JP Morgan Chase
_____
Plaintiff(s),

vs.

Kurt Marin
_____
Defendant(s).

**ORDER**
☐ **DENYING REQUEST FOR EMERGENCY**
**HEARING**
**OR**
☐ **DENYING** ☐ **GRANTING**
☐ **PLAINTIFF'S** ☑ **DEFENDANT'S**
**EMERGENCY**
**MOTION FOR CANCELLATION OF SALE**

THIS CAUSE was reviewed by the Court upon a request for emergency hearing.

☐ THE COURT HAS EXAMINED SAME AND DETERMINED THAT THIS MATTER DOES NOT
CONSTITUTE AN EMERGENCY. Any urgency is due to ☐ Plaintiff's ☐ Defendant's failure to act diligently
and failure to attend to the impending sale date. The ☐ Plaintiff's ☐ Defendant's inaction until ☐ one ☐ two
day(s) before the foreclosure sale does not constitute an emergency. THE REQUEST FOR AN EMERGENCY
HEARING IS THEREFORE DENIED.

☐ THE COURT HAS EXAMINED SAME AND DETERMINED THAT THIS MATTER DOES
CONSTITUTE AN EMERGENCY and thus, having come on to be heard on this ____ ____ day of
_____, 20__ on the above Motion and the Court being advised in the Premises, it is hereupon,

ORDERED AND ADJUDGED that said Motion be, and the same is hereby

☐ GRANTED due to:
☐ loss mitigation evidence
☑ viable short sale evidence
☐ agreement of all parties
☐ forbearance agreement

☐ payoff evidence
☐ Bankruptcy Case # _____
☐ (other) _____

**NFC**

2013 DEC 11 AM 9: 57
FILED FOR RECORD

☑ Therefore, the sale scheduled for 12/12/20 ___ is cancelled.

☐ DENIED due to:
☐ lack of supporting documentation to
    evidence grounds
☐ lack of consent of condominium or
    homeowner's association
☐ evidence of tenant

☐ The Court specifically finds that Plaintiff did not
    make reasonable efforts to move to cancel the sale
☐ (other) _____

Denial does not prevent any party from moving to vacate the subject sale. If a party so moves, the party is ordered to
send notice of the hearing to all parties and the buyer of the subject property.

☑ The Foreclosure Sale shall be rescheduled for the 13 day of February, 2014     60 DAYS

DATED this 11 day of December, 20 2013

Copies to: Shapiro, Fishman & Gache
Kurt Marin

CIRCUIT JUDGE
**GERALD D. HUBBART**
**SENIOR JUDGE**

**DEC 1 1 2013**



*Exhibit*

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

JP MORGAN CHASE BANK,

              Plaintiff,

vs.

KURT MARIN, et al

              Defendants.

_____/

CIRCUIT CIVIL DIVISION

CASE NO.   07-12402 CA [23]



## ORDER OF RECUSAL

THIS CAUSE came on to be heard on the Court's own Motion for Recusal, and in order to avoid the appearance of impropriety, it is hereby:

ORDERED AND ADJUDGED that the undersigned Circuit Court Judge hereby recuses herself from further consideration of this case.

IT IS FURTHER ORDERED AND ADJUDGED that this cause shall be reassigned to another section of this Court in accordance with established procedure.

DONE AND ORDERED in Miami-Dade County, Florida this 3 day of February, 2016.

              BARBARA ARECES
              Circuit Court Judge

Copies furnished to:

All persons/parties/counsel on the attached list.

FILING TO SECTION _____ 06
PER ORDER OF ADM. JUDGE
THIS DATE _____ FEB 1 2 2016
           D.C.

*Exhibit 34*

# CENGAGE
## Learning

*Online Study Center*

**Students**

⊕ Return to Discipline

⊕ Resource Centers

**The Reader's Companion**

**Primary Sources**

**Web Links**

⊕ Go to Bookstore

**United States Resource Center**

## Primary Sources

Introduction | Questions to Consider | Source

Louisiana Black Code
(1865)
Louisiana

Introduction
After the region's slaves were freed, Southern communities passed laws called "black codes" to control black citizens. The first states to pass black codes were Mississippi and South Carolina; other Southern states soon followed. Exact provisions of these laws varied from state to state, but their effect was similar. Read the following provisions of a Louisiana parish's black codes and evaluate their impact.

Questions to Consider

1. What were the black codes?

2. List some of the restrictions placed on black citizens in this Louisiana parish.

3. Why were these black codes so restrictive?

4. Speculate about how these laws were enforced.

5. What impact would these laws have had on the black community?

Source
. . . Sec. 1. Be it ordained by the police jury of the parish of St. Landry, That no negro shall be allowed to pass within the limits of said parish without special permit in writing from his employer. Whoever shall violate this provision shall pay a fine of two dollars and fifty cents, or in default thereof shall be forced to work four days on the public road, or suffer corporeal punishment as provided hereinafter. . . .

Sec. 3. . . . No negro shall be permitted to rent or keep a house within said parish. Any negro violating this provision shall be immediately ejected and compelled to find an employer; and any person who shall rent, or give the use of any house to any negro, in violation of this section, shall pay a fine of five dollars for each offence.

Sec. 4. . . . Every negro is required to be in the regular service of some white person, or former owner, who shall be held responsible for the conduct of said negro. But said employer or former owner may permit said negro to hire his own time by special permission in writing, which permission shall not extend over seven days at any one time . . .

Sec. 5. . . . No public meetings or congregations of negroes shall be allowed within said parish after sunset; but such public meetings and congregations may be held between

the hours of sunrise and sunset, by the special permission in writing of the captain of patrol, within whose beat such meetings shall take place. . . .

Sec. 6. . . . No negro shall be permitted to preach, exhort, or otherwise declaim to congregations of colored people, without a special permission in writing from the president of the police jury. . . .

Sec. 7. . . . No negro who is not in the military service shall be allowed to carry fire-arms, or any kind of weapons, wi'hin the parish, without the special written permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol. . .

Sec. 8. . . . No negro shall sell, barter, or exchange any articles of merchandise or traffic within said parish without the special written permission of his employer, specifying the article of sale, barter or traffic. . . .

Sec. 9. . . . Any negro found drunk, within the said parish shall pay a fine of five dollars, or in default thereof work five days on the public road, or suffer corporeal punishment as hereinafter provided.

Sec. 11. . . . It shall be the duty of every citizen to act as a police officer for the detection of offences and the apprehension of offenders, who shall be immediately handed over to the proper captain or chief of patrol. . . .

Home | About Us | Contact Us | Press Releases
Privacy Statement | Terms of Use | Copyright Notices

*Evb 35 #*

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 07 - 012402 CA 01

JPM Chase

Plaintiff(s),

vs.

Marin, Kurt

Defendant(s),

ORDER
GRANTING/DENYING
PLAINTIFF'S/DEFENDANT'S

THIS CAUSE having come on to be heard on _10/28/15_
on Plaintiff's/Defendant's Motion

TO STAY WRIT

and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

ORDERED AND ADJUDGED that:

THE WRIT OF POSSESSION IS STAYED FOR 90 DAYS
CONDITIONED ON UPON JAMIE RUCKMAN DEPOSIT
OF RENT INTO THE REGISTRY OF THE COURT ON
OR BEFORE THE FIFTH (5ᵗʰ) DAY OF EACH MONTH
BEGINNING NOVEMBER 2015. RENT IS $2,500 ᵒᵒ
PER MONTH. FAILURE OF MR. RUCKMAN TO
DEPOSIT RENT PURSUANT TO THIS ORDER SHALL ALLOW

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 28
PLAINTIFF'S WRIT TO ISSUE IMMIDIATELY UPON THE
day of

OCTOBER, 2015

FILING OF AN AFFIDAVIT ON NON-COMPLIANCE.

Conformed Copy
OCT 28 2015

CIRCUIT COURT JUDGE Barbara Areces
Circuit Court Judge

Copies furnished to: Counsel of Record

117_01-354   3/11

As of November 20, 2013, this guidance applies to federal savings associations in addition to national banks.*



CCE-PTFA

**Comptroller of the Currency**
**Administrator of National Banks**

*Exhibit #*
*(36)*

# Protecting Tenants at Foreclosure Act of 2009

## Comptroller's Handbook

~~~~~~@ Tl ¨%#$$

*References in this guidance to national banks or banks generally should be read to include federal savings associations (FSA). If statutes, regulations, or other OCC guidance is referenced herein, please consult those sources to determine applicability to FSAs. If you have questions about how to apply this guidance, please contact your OCC supervisory office.

# CCE

**Consumer Compliance Examination**

# Protecting Tenants at Foreclosure Act of 2009

## Background and Summary

The Protecting Tenants at Foreclosure Act[1] protects tenants from eviction because of foreclosure on the properties they occupy. These provisions took effect on May 20, 2009, and originally were scheduled to expire on December 31, 2012.  However, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) changed the expiration date to December 31, 2014.

The tenant protection provisions apply in the case of any foreclosure on a "federally related mortgage loan"[2] or on any dwelling or residential real property. They provide that "any immediate successor in interest" in such a foreclosed property, including a bank that takes title to a house upon foreclosure, will assume the interest subject to the rights of any bona fide tenant and will need to comply with certain notice requirements.

Under this law, the immediate successor in interest of a dwelling or residential real property must provide tenants with a notice to vacate at least 90 days before the effective date of such notice.

The date of a "notice of foreclosure" is defined as the date on which complete title to a property is transferred to a successor entity or a person as a result of a court order or pursuant to provisions in a mortgage, deed of trust, or security deed.[3]

Tenants also must be permitted to stay in the residence until the end of their leases, with two exceptions:

(1)     When the property is sold after foreclosure to a purchaser who will occupy the property as a primary residence or,

(2)     When there is no lease or the lease is terminable at will under state law.

---

[1] Title VII of the Helping Families Save Their Homes Act of 2009.

[2] The law states that "federally related mortgage loan" has the same meaning as in section 3 of the Real Estate Settlement Procedures Act of 1974 (12 USC 2602).  The definition includes any loan secured by a lien on one-to-four family residential real property, including individual units of condominiums and cooperatives.

[3] Section 1484 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

However, even when these exceptions apply, tenants must still receive 90 days notice before they may be evicted.

The protections of this law apply to tenants under a "bona fide" lease or tenancy. A lease or tenancy is "bona fide" only if:

(1)     The mortgagor or a child, spouse, or parent of the mortgagor under the contract is not the tenant;

(2)     The lease or tenancy was the product of an arm's-length transaction; and

(3)     The lease or tenancy requires the receipt of rent that is not substantially less than fair market rent or the rent is reduced or subsidized due to a federal, state, or local subsidy.

# Expanded Procedures—Protecting Tenants at Foreclosure Act

**Objective:** Determine the bank's level of compliance with Title VII of the Helping Families Save Their Homes Act of 2009 – Protecting Tenants at Foreclosure Act.

Assess the bank's level of compliance by using the Protecting Tenants at Foreclosure Act Examination Worksheet.

## Protecting Tenants at Foreclosure Act

This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Complete only those sections that specifically relate to the issue being reviewed, evaluated, or tested, and retain the completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "no" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "no" answer indicates a violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

## Protecting Tenants at Foreclosure Act Examination Worksheet
Underline the applicable use:

## Audit      Bank Policies      Expanded Procedures

|  | Yes | No | NA |
|---|---|---|---|
| 1. In the case of any foreclosure on a federally-related mortgage loan or on any dwelling or residential real property that has a bona fide tenant, whether or not the tenant is subject to a bona fide lease, has the bank, as immediate successor in interest in such property:<br><br>a) Provided a notice to vacate to the tenant at least 90 days before the effective date of such notice? [Sec. 702(a)(1)] |  |  |  |
| 2. In the case of any foreclosure on a federally-related mortgage loan or on any dwelling or residential real property that has a bona fide tenant under a bona fide lease entered into before the notice of foreclosure, has the bank, as immediate successor in interest in such property:<br><br>a) Assumed such interest subject to the tenant's rights to occupy the premises until the end of the remaining term of the lease, unless the lease is terminable at will under state law or the property is sold to a purchaser who will occupy the unit as a primary residence? [Sec. 702(a)(2)(A)] |  |  |  |

Exh. 37

## Residential Lease Agreement

THIS LEASE AGREEMENT is made and entered into this _1st_ day of _January_, 20 _07_, by and between _Kurt Marin_ hereinafter referred to as "Landlord" and _James Beckman_, hereinafter referred to as "Tenant".

1. Landlord leases to Tenant and Tenant leases from Landlord, upon the terms and conditions contained herein, the _st_ dwelling located at _3360 NE. 165 St Miami, FA. 33160_ for the period commencing on the _1 st_ day of _JAN_, 20 _07_, and thereafter until the _31st_ day of _DEC_, 20 _16_, at which time this Lease Agreement shall automatically renew each year unless terminated in writing. *The Tenant is required to give the Landlord in writing a notice 1 month (30 days) in advance of his/her moving. Notice must be given on the first day of a month. If notice is given after the first day of the month, the 1 month (30 day) notice will not start until the following month. (The notice must be one full calendar month starting on the first day of a month.)* Rent may be increased at any time after first year and the security deposit can not be used for rent.

2. Tenant shall pay as rent the sum of $ _2500.00_ per month, due and payable monthly, in advance, no later than 5:00 p.m. by the forth day of every month. Tenant further agrees to pay a late charge of $ _10.00_ for each day rent is not received after the forth of the month to the Landlord regardless of the cause, including dishonored checks, time being of the essence. An additional Service Charge of $ _35.00_ will be paid to Landlord for all dishonored checks.

3. As an incentive to Tenant to make rent payments *before the first of the month and for being responsible for all minor maintenance of the premises*, a pre-payment discount in the amount of $ _25.00_ may be deducted from the above rental amount each month. Said discount will be forfeited if Tenant fails to perform as stated above.

4. Tenant agrees to use said dwelling as living quarters only for _2_ adults and _0_ children, namely: _____ and to pay $50.00 each month for each other person who shall occupy the premises in any capacity.

5. Tenant agrees to accept the property in its current condition and to return it in "moving-in clean" condition, or to pay a special cleaning charge of $185.00 upon vacating the premises. The carpets are to be professionally cleaned. If you prefer that we have the carpets cleaned for you the charge will be billed to you. Carpet cleaning cost are in addition to cleaning charge.

6. PETS ARE NOT ALLOWED WITHOUT WRITTEN PERMISSION FROM LANDLORD. As additional rent, Tenant agrees to pay a non-refundable pet fee of $10.00 per month for each pet. All pets on the property not registered under this Lease shall be presumed to be strays and will be disposed of by the appropriate agency as prescribed by law. A Pet Agreement, if applicable, is attached hereto as Exhibit "B", and incorporated herein by reference. PET NAMES AND DESCRIPTION: _N/A_

7. Tenant agrees not to assign this Lease, nor to sublet any portion of the property, nor to allow any other person to live therein other than as named in paragraph 4 above without first obtaining written permission from Landlord and paying the appropriate surcharge. Further, it is agreed that covenants contained in this Lease, once breached, cannot afterward be performed, and that unlawful detainer proceedings may be commenced at once, without notice to Tenant.

8. Should any provision of this Lease be found to be invalid or unenforceable, the remainder of the Lease shall not be affected thereby and each term and provision herein shall be valid and enforceable to the fullest extent permitted by law.

9. All rights given to Landlord by this Lease shall be cumulative to any other laws which might exist or come into being. Any exercise or failure to exercise by Landlord of any right shall not act as a waiver of any other rights. No statement or promise of Landlord or his agent as to tenancy, repairs, alterations, or other terms and conditions shall be binding unless reduced to writing and signed by Landlord.

10. Tenant will be responsible for payment of all utilities, garbage, water and sewer charges, telephone, gas, association fees or other bills incurred during the term of this Lease. Tenant specifically authorizes Landlord to deduct amounts of any unpaid bills from the Security deposit upon termination of this Agreement.

11. No rights of storage are given by this Agreement. Landlord shall not be liable for any loss of Tenant's property by fire, theft, breakage, burglary, or otherwise, nor for any accidental damage to persons or property in or about the leased premises resulting from electrical failure, water, rain, windstorm, etc., which may cause issue or flow into or from any part of said premises or improvements, including pipes, gas lines, sprinklers, or electrical connections, whether caused by the negligence of Landlord, Landlord's employees, contractors, agents, or by any other cause whatsoever. Tenant hereby agrees to make no claim for any such damages or loss against Landlord. *Tenant shall purchase renter's insurance.* _N/A_ is to be named as additional insured IMPROVEMENTS TO PROPERTY - Any improvements to the property made by tenant inside or outside *must not be removed without written permission from the property manger.* This includes landscaping, scrubs, flowers, walkways, out buildings such as storage sheds and play-houses, etc. Any interior improvements the tenant may have made to the property must also remain. Improvements such as but not limited to the following are installation of ceiling fans, book shelves, shelving, light fixtures, etc.

12. Any removal of Landlord's property without express written permission from the resident of this Agreement shall constitute abandonment and surrender of the premises and termination of this Agreement. Landlord may take immediate possession, exclude Tenant from property and store all Tenant's possessions at Tenant's expense pending reimbursement in full for Landlord's loss and damages.

13. Landlord has the right of emergency access to the leased premises at any time and access during reasonable hours

to inspect the property or to show property to a prospective tenant or buyer. In the event that the property is sold, the lease/rental agreement between Landlord and Tenant is canceled on the date the new owner takes possession of property. Tenant has thirty days to vacate the property or sign new lease with new owner at new owner's option.

14. Tenant agrees to pay a Security Deposit of $ _2300.00_ to bind Tenant's pledge of full compliance with the terms of this agreement. NOTE: SECURITY DEPOSIT MAY NOT BE USED TO PAY RENT! Any damages not previously reported as required in paragraph 2?, will be repaired at Tenant's expense.

15. Release of the SECURITY DEPOSIT, at the Option of the Landlord is subject to the provisions below .
    A. The full term of the Agreement has been completed.
    B. No damage to the premises, buildings, grounds is evident.
    C. The entire dwelling, appliances, closets, and cupboards are clean and free from insects, the refrigerator is defrosted and clean, The range is to be clean including the racks and broiler pan, all windows are to be clean inside and outside, all debris and rubbish have been removed from the property, carpets have been commercially cleaned and left clean and odorless.
    D. All unpaid charges have been paid including late charges, visitor charges, pet charges, delinquent rents, etc.
    WATER BILL MUST BE PAID IN FULL AND COPY OF PAID FINAL BILL SENT TO LANDLORD.
    E. All keys have been returned.
    F. A forwarding address for Tenant has been left with the Landlord. Within thirty (30) days after termination of the occupancy, the Landlord will mail the balance of the deposit to the address provided by Tenant in the names of all signatories hereto; or at the Option of the Landlord will impose a claim on the deposit and so notify the Tenant.
    G. It is the tenant's responsibility to call, make arrangements, and be at residence to let meter readers in for final reading on gas, electric, and water. If Landlord has to do this, there is a $50 charge for each utility.

16. The acceptance by Landlord of partial payments of rent due shall not, under any circumstances, constitute a waiver of Landlord, nor effect any notice or legal proceeding in unlawful detainer theretofore given or commenced under state law. Acceptance of partial rent due or late payments does not create a custom nor constitute a continuing waiver of the obligation to pay on time. No payment by the tenant or receipt by the landlord of any amount of the monthly rent herein stipulated shall be deemed to be other than _on account_ of the stipulated rent, nor shall any endorsement on any check or any letter accompanying such payment of rent be deemed an accord and satisfaction, but the landlord may accept such a partial payment without prejudice to his rights to collect the balance of such rent.

17. If Tenant leaves said premises unoccupied for 15 days while rent is due and unpaid, Landlord is granted the right hereunder to take immediate possession thereof and to exclude Tenant therefrom; removing all Tenant's property contained therein and placing it into storage at Tenant's expense.

18. Payment of rent may be made by check until the first check is returned unpaid. Regardless of cause, no additional payments may afterwards be made by check. Rent must then be made by cashier's check, money order or certified check.

19. Rent may be mailed through the United States Postal Service at Tenant's risk. Any rents lost in the mail will be treated as if unpaid until received by Landlord.

20. Tenant agrees, without protest, to reimburse Landlord for all actual and reasonable expenses incurred by way of Tenant's violation of any term or provision of this lease, including, but not limited to $10.00 for each Notice to Pay, Notice to Quit or other notice mailed or delivered by Landlord to Tenant due to Tenant's non-payment of rent, all court costs and attorney's fees and all costs of collection. Both Landlord and Tenant waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in _DADE_ County, State of _Florida_ . In such event, no action shall be entertained by said court or any court of competent jurisdiction if filed more than one year subsequent to the date the cause(s) of action accrued.

21. Tenant agrees to accept said dwelling and all of the furnishings and appliances therein as being in good and satisfactory condition unless a written statement of any objections is delivered to Landlord within three (3) days after resident takes possession. Tenant agrees that failure to file such statement shall be conclusive proof that there were no defects in the property. Tenant agrees not to permit any damage to the premises during the period of this agreement to woodwork, floors, walls, furnishings, fixtures, appliances, windows, screens, doors, lawns, landscaping, fences, plumbing, electrical, air conditioning and heating, and mechanical systems. Tenant specifically agrees that he will be responsible for, and agrees to pay for, any damage done by rain, wind, or hail caused by leaving windows open; overflow of water or stoppage of waste pipes, breakage of glass, damage to screens, deterioration of lawns and landscaping whether caused by drought, abuse or neglect. Tenant agrees not to park or store a motorhome, recreational vehicle or trailer of any type on the premises.

22. Tenant's obligations are as follows:
    A. Take affirmative action to insure that nothing is done which might place Landlord in violation of applicable building, housing, zoning, and health codes and regulations.
    B. Keep the dwelling clean and sanitary, removing garbage and trash as it accumulates, maintaining plumbing in good working order to prevent stoppages and leakage of plumbing fixtures, faucets, pipes, etc.
    C. Operate all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other appliances in a reasonable, safe manner.
    D. Assure that property belonging to Landlord is safeguarded against damage, destruction, loss, removal, or theft.
    E. Conduct himself, his family, friends, guests, visitors in a manner which will not disturb others.
    F. Allow the Landlord or his agent access to the premises for the purpose of inspection, repairs, or to show the property to someone else at reasonable hours, and to specifically authorize unannounced access anytime rent is late, or this Agreement is terminated or for pest control, maintenance estimates, serving legal notices, or emergencies.
    G. Comply with all provisions of this Agreement, particularly with respect to paying the rent on time and caring for the property. Tenant warrants that he/she will meet the above conditions in every respect, and acknowledges that failure

to perform the obligations herein stipulated will be considered grounds for termination of this Agreement and loss of all deposits.

23. No additional locks will be installed on any door without written permission from the Landlord. Landlord is to be provided duplicate keys for all locks so installed at Tenant's expense within 24 hours of installation of said locks.

24. Tenant agrees to install and maintain a telephone, and to furnish the Landlord the telephone number and/or any changes thereof within three (3) days of its installation.

25. In the event repairs are needed beyond the competence of the Tenant, Tenant is urged to contact the Landlord. Tenant is offered the discount as an incentive to make his own decisions on repairs to the property and to allow Landlord to rent the property without the need to employ professional management. Therefore, as much as possible, Tenant should refrain from contacting the Landlord or his agent except for emergencies, or for expensive repairs. Such involvement by the Landlord or his agent will result in the loss of the discount and/or deductible.

26. Tenant warrants that any work or repairs performed by him will be undertaken only if he is competent and qualified to perform it. Tenant will be totally responsible for all activities to assure that work is done in a safe manner which will meet all the applicable codes and statutes. Tenant further warrants that he will be accountable for any mishaps and/or accidents resulting from such work, and will hold the Landlord free from harm, litigation, or claims of any other person.

27. Tenant is responsible for all plumbing repairs including faucets, leaks, stopped up pipes, frozen pipes, water damage, and bathroom caulking.

28. Appliances or furniture in the unit at date of lease per the attached Exhibit "A", are loaned, not leased to Tenant. Maintenance of appliances or furniture is the responsibility of Tenant who will keep them in good repair.

29. Tenant is responsible for all glass, screen, and storm door repairs.

30. No money is to be deducted by Tenant from rent payment for any reason without express written permission of Landlord.

31. Regardless of assignment of responsibility, Tenant agrees to be responsible for the first $75.00 of any repair or maintenance required on the major systems of the property for the term of the lease. This deductible applies per occurrence.

32. Tenant accepts entirely the responsibility for recharging air conditioner compressor and the cleaning of furnace or replacement of furnace filters.

33. Smoke Detectors have been installed and are in operable condition in the following places. _Kitchen Rooms · Living Room, Den._ Tenant initials _VH_. From this time on you will be required to maintain the smoke detectors. Any new batteries are your responsibility. If you have any questions about the smoke detectors, you should call us promptly.
I/We , the undersigned, have personally checked the smoke alarms in the unit which is provided and find it/them to be in working order. I/We understand that the law requires me/us to maintain the alarm/s and keep fresh batteries in the mechanism. Tenants failure to do so absolves the Landlord, or agent from any responsibility for losses due to my/our non-compliance with the law or malfunction of the alarm.

X  Tenant signature _Van Baker H._                Date _1-1-2007_

34. NO WATER BEDS PERMITTED WITHOUT WRITTEN PERMISSION.

35. All parties agree that termination of this Agreement prior to termination date will constitute breach of the tenancy and all Security Deposits and one full month's rent shall be forfeited in favor of Landlord as liquidated damages plus you will be charged the cost of restoring the property to rental condition plus advertising and rent loss incurred until the new resident moves in. Your liability for rent loss is limited to thirty (30) days after restoration is complete.

36. Properties built before and during the late sixties and early seventies may have had lead based products and asbestos products used in them. These products were considered to be safe at the time they were used, just as the building products used today are considered safe for home construction. Only the test of time will show which products are or are not safe to use. Having read the above, the tenant signs the lease below with the full understanding that these conditions may be present in this property. The tenant and all parties associated with this property relieves the owner, property manager, and any of his agents from any responsibilities for these conditions regardless of when or how these conditions were caused.
You also acknowledge receiving the EPA Booklet "Protect Your Family From Lead In Your Home"

X _Van Baker H._            _1/1 2007_
Tenant Signature Date

X _____
Tenant Signature Date

37. From time to time, owner may be represented by an agent who will carry identification.

38. In this Agreement the singular number where used will also include the plural, the masculine gender will also include the feminine, the term Landlord will include, Owner or Lessor; and the term Tenant(s) will include Resident, Lessee or Renter.

39. Unless specifically disallowed by law, should litigation arise hereunder, service of process therefor may be obtained through certified mail, return receipt requested; the parties hereto waiving any and all rights they may have to object to the method by which service was effected.

40. TENANT agrees to send all notices to Landlord or Property Manager in writing by certified mail, return receipt requested. This is the only form of notice permitted in a court hearing as evidence of notice given.

41. The Tenant was asked if he/she could speak, read and understand English. He/she was told that signing below would indicate that they understood what they were signing and that he/she did speak and read English.

YOU SHOULD READ AND UNDERSTAND THIS LEASE, IT IS A LEGAL AND BINDING CONTRACT.

# EXHIBIT "B"

## PET AGREEMENT

### (Addendum to Lease Agreement)

Date: _____ *N/A* _____

This agreement is attached to and forms a part of the Lease Agreement dated _____ *N/A* _____ Tenant(s). between _____ *n/a* _____ Landlord, and _____

Tenants desire to keep a pet named _____ *N/A* _____ and described as _____ in the dwelling they occupy under the rental agreement or lease referred to above, and because this agreement specifically prohibits keeping pets without the Landlord's permission, Tenants agree to the following terms and conditions in exchange for this permission:

1. Tenants agree to keep their pet under control at all times.
2. Tenants agree to keep their pet restrained, but not tethered, when it is outside their dwelling.
3. Tenants agree not to leave their pet unattended for any unreasonable periods.
4. Tenants agree to dispose of their pets droppings properly and quickly.
5. Tenants agree to keep pet from causing any annoyance or discomfort to others and will remedy immediately any complaints made through the Landlord or his agent.
6. Tenants agree to get rid of their pet's offspring within eight weeks of birth.
7. Tenants agree to pay immediately for any damage, loss, or expense caused by their pet, and in addition, they will add $ _____ *n/a* _____ to their Security Deposit, any of which may be used for cleaning, repairs, or delinquent rent when Tenants vacate.
8. Tenants agree that Landlord reserves the right to revoke permission to keep the pet should Tenants break this agreement.
9. Tenant agrees to pay an additional $ _____ in rent per month per pet.

TENANT _____

LANDLORD _____

07-12402 CMM

# 37A

Exibit

Certified Mail No. _____

Re: **Qualified Written Request, Formal Protest, and Dispute of Alleged Debt
Validity of Alleged Loan**                    **and Alleged Loan**

Dear Sir / Madam

This letter shall serve as my formal Qualified Written Request to obtain all records and
documents pertaining to this loan and my Formal Protest / Dispute of alleged Debt
Validity.

Pursuant to RESPA ♣ 6(e)(1)(B) and Reg. X ♣ 3500.21 (f) 2, this letter is a "qualified
written request". I have reason to believe certain Truth in Lending disclosures may have
been withheld and loan-servicing errors may have occurred. Consequently, please send:

1.    Certified copy of my Promissory Note, including assignment Allonge.
2.    The security instrument, any modifications, endorsements, extensions,
      addenda, and all information related to items (1) and (2) above.
3.    The complete pay history from date of origination, including any portion
      of the pay history that originated with prior servicer(s).
4.    Promissory Note Deposit, and Transaction Account records.
5.    Name, address, and contact information of the Promissory Note Document
      Custodian.

Retention of payment history records are sometimes stipulated by states ranging from
seven years to complete life of the loan. If you do not have a portion of the pay history or
records requested related to a prior servicer(s). Please forward a copy of this notice to
said prior servicer(s), and provide me with the name, address, and phone number of the
prior servicer(s)

The above information may be sent by regular mail to the address provided.

Thank you for your cooperation. Please send a letter if you are unable or unwilling to
send me this information or if you cannot send it within the twenty business day response
requirements.

Very truly yours,

Kurt Marin
3320 NE 165 St
NMB FL. 33160

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL DIVISION

JP Morgan Chase Bank et, al.

Plaintiff

vs.                                                    CASE: 07-12402 CA01

Kurt Marin et, al.

Defendants.

_____/

## OPPOSITION TO PLAINTIFFS MORTGAGE FORECLOSURE COMPLAINT, AND PLEA OF NUL TIEL RECORD

Comes now,    KURT MARIN, DEFENDANT   I hereby deny the existence of Plaintiff's
ownership of the subject Promissory Note or any such record of alleged ownership by the
Plaintiff. Under Florida Unfair Trade and Deceptive Practices Act, the Florida Credit
Disclosure Act, Fraudulent Concealment, and under the common law of fraud and
negligence. My sale and credit documents, including credit applications, promissory
notes, and certificates of insurance, were altered, falsified and forged. The forgeries are
part of a scheme by the plaintiff and their attorney
          to shield the true nature of the transaction; source of funding, illegal use of the
Promissory Note and Mortgage", and the improper and misleading reporting of the
ownership status of the alleged Promissory Note and Mortgage.

The true construction of that part of the constitution and laws of the
United States will confine their operation to evidence only, and will not
justify such an alteration in the rules of pleading. The 'effect' to be given to
such copies is their 'effect' as evidence, for it [11 U.S. 481, 482]  is not
pretended that an execution could issue here upon such a record. [T]he
record as alleged in this case is not the original, it is not certified or
authenticated as a copy; and therefore it can not be offered to the Court
upon the plea of Nul Tiel Record, for under that issue this record can not
be admitted. The original must be produced and inspected. In every case

64

of debt or contract the form and effect of the plea are determined by the dignity of that debt or contract; in other words by the dignity of the evidence, whether it be of record, by specialty, or simple contract."
**MILLS v. DURYEE, 11 U.S. 481 (1813)**

"NUL TIEL RECORD, pleading. No such record- 2.When a party claims to recover on the evidence of a record, as in an action on scire facias, or when he sets up his defence on matter of record, as a former acquittal or former recovery, the opposite party may plead or, reply nul tiel record, there is no such record; in which case the issue thus raised is called an issue of nul tiel record, and it is tried by the court by the inspec- tion, of the record. Vide 1 Saund. 92, n. 3 12Vin. Ab.188; 1 Phil. Ev. 307,8; Com. Dig. Bail, R. 8 - Certiorari, A 1 Pleader, 2 W 13, 38 - Record, C; 2 McLean, 511; 7 Port. 110; 1 Spencer, 114. Bouviers Law Dictionary 1856 Edition ".

"NUL TIEL RECORD. No such record. A plea denying the existence of any such record as that alleged by the plaintiff. It is the general plea in an action of debt on a judgment, *Hoffheimer v. Stiefel*, 17 Misc. 236, 39 N.Y.S. 714; *Watters v. Freeman Bros.*, 16 Ga.App. 595, 85 S.E. 931. Judgment of nul tiel record occurs when some pleading denies the existence of a record and issue is joined thereon; the record being produced is compared by the court with the statement in the pleading which alleges it; and if they correspond, the party asserting its existence obtains judgment; if they do not correspond, the other party obtains judgment of nul tiel record (no such record)." *Black's Law Dict. 4th ed.*

## MEMORANDUMS OF LAW

## MEMORANDUM OF LAW IN SUPPORT OF THE POINT OF LAW THAT PARTY ALLEGING TO BE PLAINTIFF AND CREDITOR MUST PROVE STANDING

## PLAINTIFF BANK HAS NO STANDING TO MAINTAIN THIS ACTION

## WITHOUT APPEARING AND PRESENTING THE ORIGINAL NOTE TO

## PROVE STANDING UNDER PLEA OF NULTIEL RECORD

1.   I/we,     *The Defendant*          will observe that existing rules of court and

law in Florida  requires that the Plaintiff Bank in a collection action demonstrate

standing to collect by establishing the fact of their beneficial interest in the

Promissory Note. In example, in Kane Plaza Associates and Northwestern Mutual

Life Insurance Co. v. Chadwick, 486 S.E.2d 465, 126 N.C.App. 661 (N.C.App. 07/01/1997), (See attached "**Exhibit "A"**" a true copy of Kane Plaza, etc.) the North Carolina court of appeals held for Chadwick against collection of a note improperly asserted by the Plaintiff. In pertinent part the court held that:

> "In its first cause of action, Kane Plaza has sought payment of a promissory note. In order to recover on such an instrument, the party seeking relief must show execution, delivery, consideration, demand, and nonpayment. Sam Stockton Grading Co. v. Hall, 111 N.C. App. 630, 632, 433 S.E.2d 7, 8 (1993). **Likewise, that party** [*ie: party seeking enforcement*] **must be a real party in interest, i.e., it must assert legal rights that will be determined by the litigation.** See N.C.G.S. § 1-57 (1996); N.C.R. Civ. P. 17(a) (1990); Parnell v. Insurance Co., 263 N.C. 445, 448-49, 139 S.E.2d 723, 725 (1965)." See: Kane Plaza, supra, at paragraph 28, etc. [**boldface and underlined emphasis added to original text**]

2. As in Kane Plaza, the Plaintiff in this case seeking enforcement has utterly failed to assert its standing to collect on this alleged note by production of the said note as evidence of its *bona fide* and *standing as a real party in interest* and *holder* of a beneficial interest in the subject note.

3. As was further made explicit in Kane, supra,

> [t]he note was made payable to "J. M. Kane & Co. or order," and thus constituted an order note, N.C.G.S. § 25-3-110 (1986), which may be negotiated by delivery only upon indorsement on the instrument or a firmly attached writing, N.C.G.S. § 25-3-202 (1986). **Absent the requisite indorsement, no presumption exists that the holder, even if a transferee, qualifies as owner of the note.** G.S. § 25-3-201(3) and Official Comment 8 (1986). See: Kane Plaza, supra, at paragraph 31. [**boldface and underlined emphasis added to original text**]

4. Again, as in **Kane Plaza,** supra, the problem here is that the Plaintiff has repeatedly ignored my attempts to establish that Plaintiff Bank is the bona fide holder in due course, the real party in interest, and/or the true, correct and lawful holder of beneficial interest in the subject note sufficient to maintain an action in collection. And, as was stated above, the reason believed for Plaintiff's failure is simply because Plaintiff Bank does not possess the Note for the following simple reason that Plaintiff bank does not have an ownership or beneficial interest in the

Note.

5.   In short, the Plaintiff Bank has failed utterly to demonstrate standing in the manner required by existing Florida law.

6.   Many cases support my argument that Plaintiff Bank in this case has no standing to maintain a collection action on a Note not before the court. For example, and citing the above discussed Kane Plaza case, in <u>Walker v. Sloan</u>, 137 N.C.App. 387, 529 S.E.2d 236 (N.C.App. 04/18/2000) the North Carolina appellant court said in pertinent part...

> "[a] motion to dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted challenges the legal sufficiency of the pleading. <u>Kane Plaza Associates v. Chadwick</u>, 126 N.C. App. 661, 486 S.E.2d 465 (1997). Dismissal is warranted "(1) when the face of the complaint reveals that no law supports plaintiff[s'] claim; (2) when the face of the complaint reveals that some fact essential to plaintiff[s'] claim is missing; or (3) when some fact disclosed in the complaint defeats plaintiff[s'] claim." <u>Peterkin v. Columbus County Bd. Of Educ.</u>, 126 N.C. App. 826, 828, 486 S.E.2d 733, 735 (1997) (emphasis omitted). In ruling on a Rule 12(b)(6) motion to dismiss, the trial court regards all factual allegations of the complaint as true. <u>Kane Plaza</u>, 126 N.C. App. At 664, 486 S.E.2d at 467.

7.   Further, in <u>Barclays Bank PLC v. Johnson</u>, 499 S.E.2d 768 (N.C.App. 04/30/1998), the North Carolina court of appeals stated in pertinent part, again citing <u>Kane Plaza</u> as follows:

> "[t]o recover on a promissory note, the party seeking relief must show execution, delivery, consideration, demand, and nonpayment. Sam Stockton Grading Co. v. Hall, 111 N.C. App. 630, 632, 433 S.E.2d 7, 8 (1993). Moreover, the <u>**party seeking to enforce the promissory note "must be a real party in interest." Kane Plaza Associates v. Chadwick**</u>, 126 N.C. App. 661, 664, 486 S.E.2d 465, 467 (1997); N.C. Gen. Stat. § 1-57; N.C. R. Civ. P. 17(a)." See: <u>**Barclays Bank**</u>, supra. [**boldface and underlined emphasis added to original text**]

8.   And in, <u>Musselwhite v. McNeill</u>, 154 N.C.App. 742, 572 S.E.2d 874 (N.C.App. 12/17/2002, the North Carolina court of appeals held, uniformly with <u>Kane Plaza</u> and <u>Walker</u>, and <u>Barklays Bank</u> supra, that "...the party seeking to enforce the

66

promissory note 'must be a real party in interest'." Citing from Kane Plaza. Supra.

9.   I/we,       *THE DEFENDANT*       will further Note that like in the Florida
MERS cases, each of the above cited cases from North Carolina Courts of Appeal
have each apparently relied upon the underlying expressly stated section of the
*Uniform Commercial Code* respecting negotiable instruments as codified in North
Carolina at N.C. Gen. Stat. § 25-3-109 (1986). Since, it is the *"Uniformity"* of the
fundamental law upon which the North Carolina Appellate Court have relied, I am
comfortable in citing for its supporting and persuading rational the Pinellas County
Florida Circuit Court case of: In re MERS (ie: IN RE MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. (MERS), (See attached list of
Defendants/Case#), which was rendered out of the Circuit Court of Judge Walt
Logan on 18 August 2005. (See "**Exhibit "B"**" already filed into this case and
attached to Defendant's Motion To Dismiss, a true copy of the opinion rendered
and entered by Judge Walt Logan in the Pinellas County Florida Circuit Court case
styled In Re MERS) That consolidated case of some twenty (20) separate cases in
which MERS was the moving party in a foreclosure action, the court, on its own
motion, initiated a show cause hearing, again on its own motion, to dismiss and held
extensive hearings accordingly which in the end found disposition of all twenty (20)
cases by dismissal with prejudice for want of MERS standing to proceed in a
collection action by foreclosure. See: In Re MERS, supra. As stated in the MERS
case in the Pinellas County Florida Circuit Court of Judge Walt Logan:

> "[b]ased upon information gained at the return hearing, it appears
> that the real party in interest in many of these cases is not known at
> the time Complaint for Mortgage Foreclosure is filed. The concept
> is foreign to this court. Careful review of the argument presented
> by attorney Brochin does not convince the Court that MERS is a
> real party in interest in any sense."

10.   The court went on to conclude that

> "Based upon the above analysis, the Court finds it appropriate to
> dismiss with prejudice as to MERS the complaints as not having
> been filed by the proper party and therefore the Complaints do not
> state a cause of action and are dismissed. Morales and Dollar
> Systems, Inc. supra."

11.   I/we ·     *THE DEFENDANT*     are also comfortable in citing for its

69

b) That the court find counsel for Plaintiffs and Plaintiffs guilty of fraud upon the court and at a minimum sanction them for having filed palpably or inherently false pleas into this case they must have known to be untrue,

c) That this court grant dismissal of this case with prejudice as to the Plaintiff re-filing in this case, and

d) That this court grant to                                        any and all other relief to which is just in law and/or in equity, and

e)                                        demand Justice.

Respectfully Prepared and Submitted

by _____

Kurt Marin
3320 NE 165st
NMB. FL. 33160

By: _____


Certificate of service

I/we, _____ Kurt Marin _____, certify that on 3/07/ , 2013 I/we caused to be mailed a true and correct copy of the above and foregoing OPPOSITION TO PLAINTIFFS MORTGAGE FORECLOSURE COMPLAINT, AND PLEA OF NIL THE RECORD

by certified mail, return receipt requested to SHAPIRO Fishman + Gache LLP Attorneys his personal capacity FOR PLAINTIFF 2424 N. Federal HWY. Suite 360 PH: 561-998-6701  Fla. Bar # 70451  Boca Raton FL. 33431

_____

Kurt Marin
3320 NE 165st
Miami FL. 33160

Certified Mail No. _____

Re: Qualified Written Request, Formal Protest, and Dispute of Alleged Debt
Validity of Alleged Loan                    and Alleged Loan

Dear Sir / Madam

This letter shall serve as my formal Qualified Written Request to obtain all records and
documents pertaining to this loan and my Formal Protest / Dispute of alleged Debt
Validity.

Pursuant to RESPA # 6(e)(1)(B) and Reg. X a 3500.21 (f) 2, this letter is a "qualified
written request". I have reason to believe certain Truth in Lending disclosures may have
been withheld and loan-servicing errors may have occurred. Consequently, please send

1.    Certified copy of my Promissory Note, including assignment Allonge.
2.    The security instrument, any modifications, endorsements, extensions,
      addenda, and all information related to items (1) and (2) above.
3.    The complete pay history from date of origination, including any portion
      of the pay history that originated with prior servicer(s).
4.    Promissory Note Deposit, and Transaction Account records.
5.    Name, address, and contact information of the Promissory Note Document
      Custodian.

Retention of payment history records are sometimes stipulated by rules ranging from
seven years to complete life of the loan. If you do not have a portion of the pay history or
records requested related to a prior servicer(s). Please forward a copy of this notice to
said prior servicer(s), and provide me with the name, address, and phone number of the
prior servicer(s)

The above information may be sent by regular mail to the address provided.

Thank you for your cooperation. Please send a letter if you are unable or unwilling to
send me this information or if you cannot send it within the twenty business day response
requirements.

Very truly yours,

K t

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL DIVISION

Washington Mutual

Plaintiff

CS# 07-12402-CA01

vs.

Kurt Marin

Defendants.

OPPOSITION TO PLAINTIFFS MORTGAGE FORECLOSURE
COMPLAINT, AND PLEA OF NUL TIEL RECORD

Comes now, Kurt Marin I hereby deny the existence of Plaintiff's
ownership of the subject Promissory Note or any such record of alleged ownership by the
Plaintiff. Under Florida Unfair Trade and Deceptive Practices Act, the Florida Credit
Disclosure Act, Fraudulent Concealment, and under the common law of fraud and
negligence. My sale and credit documents, including credit applications, promissory
notes, and certificates of insurance, were altered, falsified and forged. The forgeries are
part of a scheme by the plaintiff and their attorney

to shield the true nature of the transaction, source of funding, illegal use of the
Promissory Note and Mortgage", and the improper and misleading reporting of the
ownership status of the alleged Promissory Note and Mortgage.

> The true construction of that part of the constitution and laws of the
> United States will confine their operation to evidence only, and will not
> justify such an alteration in the rules of pleading. The 'affect' to be given to
> such copies is their 'effect' as evidence, for it [11 U.S. 331, 352] is not
> pretended that an execution could issue here upon such a record. [T]he
> record as alleged in this case is not the original, it is not certified or
> authenticated as a copy; and therefore it can not be offered to the Court
> upon the plea of Nul Tiel Record, for under that issue this record can not
> be admitted. The original must be produced and inspected. In every case

it, and if the correspond, the party obtains
judgment; if they do not correspond, the other party obtains judgment of
nul tiel record (no such record)." *Black's Law Dict. 4ᵗʰ ed.*

## MEMORANDUMS OF LAW

### MEMORANDUM OF LAW IN SUPPORT OF THE POINT OF LAW THAT PARTY ALLEGING TO BE PLAINTIFF AND CREDITOR MUST PROVE STANDING

### PLAINTIFF BANK HAS NO STANDING TO MAINTAIN THIS ACTION WITHOUT APPEARING AND PRESENTING THE ORIGINAL NOTE TO PROVE STANDING UNDER PLEA OF NULTIEL RECORD

1.  I/we, *Kurt Marin* will observe that existing rules of court and law in Florida requires that the Plaintiff Bank in a collection action demonstrate standing to collect by establishing the fact of their beneficial interest in the Promissory Note. In example, in Kene Plaza Associates and Northwestern Mutual

of debt or contract the form and effect of the plea are determined by the dignity of that debt or contract; in other words by the dignity of the evidence, whether it be of record, by specialty, or simple contract."

MILLS v. DURYEE, 11 U.S. 481 (1813)

"NUL TIEL RECORD, pleading. No such record- 2. When a party claims to recover on the evidence of a record, as in an action on scire facias, or when he sets up his defence on matter of record, as a former acquittal or former recovery, the opposite party may plead or, reply nul tiel record, there is no such record; in which case the issue thus raised is called an issue of nul tiel record, and it is tried by the court by the inspec- tion, of the record. Vide 1 Saund. 92, n. 3 12Vin. Ab.188; 1 Phil. Ev. 307,8; Com. Dig. Bail, R. 8 - Certiorari, A 1 Pleader, 2 W 13, 38 - Record, C; 2 McLean, 511; 7 Port. 110; 1 Spencer, 114. Bouviers Law Dictionary 1856 Edition "

"NUL TIEL RECORD. No such record. A plea denying the existence of any such record as that alleged by the plaintiff. It is the general plea in an action of debt on a judgment, *Hoffheimer v. Stiefel*, 17 Misc. 236, 39 N.Y.S. 714; *Watters v. Freeman Bros.*, 16 Ga.App. 595, 85 S.E. 931. Judgment of nul tiel record occurs when some pleading denies the existence of a record and issue is joined thereon; the record being produced is compared by the court with the statement in the pleading which alleges it, and if they correspond, the party asserting its existence obtains

74

Life Insurance Co. v. Chadwick, 486 S.E.2d 455, 126 N.C.App. 661 (N.C.App. 07/01/1997), (See attached "Exhibit "A" a true copy of Kane Plaza, etc.) the North Carolina court of appeals held for Chadwick against collection of a note improperly asserted by the Plaintiff. In pertinent part the court held that:

> "In its first cause of action, Kane Plaza has sought payment of a promissory note. In order to recover on such an instrument, the party seeking relief must show execution, delivery, consideration, demand, and nonpayment. Sam Stockton Grading Co. v. Hall, 111 N.C. App. 630, 632, 433 S.E.2d 7, 8 (1993). Likewise, that party [ie: party seeking enforcement] must be a real party in interest, i.e., it must assert legal rights that will be determined by the litigation. See N.C.G.S. § 1-57 (1996); N.C.R. Civ. P. 17(a) (1990); Parnell v. Insurance Co., 263 N.C. 445, 448-49, 139 S.E.2d 723, 725 (1965)." See: Kane Plaza, supra, at paragraph 28, etc. [boldface and underlined emphasis added to original text]

2.   As in Kane Plaza, the Plaintiff in this case seeking enforcement has utterly failed to assert its standing to collect on this alleged note by production of the said note as evidence of its *bona fide* and *standing as a real party in interest* and *holder* of a beneficial interest in the subject note.

3.   As was further made explicit in Kane, supra,

> [t]he note was made payable to "J. M. Kane & Co. or order," and thus constituted an order note. N.C.G.S. § 25-3-110 (1986), which may be negotiated by delivery only upon indorsement on the instrument or a firmly attached writing. N.C.G.S. § 25-3-202 (1986). Absent the requisite indorsement, no presumption exists that the holder, even if a transferee, qualifies as owner of the note. G.S. § 25-3-201(3) and Official Comment 8 (1986). See: Kane Plaza, supra, at paragraph 31. [boldface and underlined emphasis added to original text]

4.   Again, as in Kane Plaza, supra, the problem here is that the Plaintiff has repeatedly ignored my attempts to establish that Plaintiff Bank is the bona fide holder in due course, the real party in interest, and/or the true, correct and lawful holder of beneficial interest in the subject note sufficient to maintain an action in collection. And, as was stated above, the reason believed for Plaintiff's failure is simply because Plaintiff Bank does not possess the Note for the following simple reason that Plaintiff bank does not have an ownership or beneficial interest in the

75

Note:

5.  In short, the Plaintiff Bank has failed utterly to demonstrate standing in the manner required by existing Florida law.

6.  Many cases support my argument that Plaintiff Bank in this case has no standing to maintain a collection action on a Note not before the court. For example, and citing the above discussed Kane Plaza case, in Walker v. Sloan, 137 N.C.App. 387, 529 S.E.2d 236 (N.C.App. 04/18/2000) the North Carolina appellant court said in pertinent part…

> "[a] motion to dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted challenges the legal sufficiency of the pleading. Kane Plaza Associates v. Chadwick, 126 N.C. App. 661, 486 S.E.2d 465 (1997). Dismissal is warranted "(1) when the face of the complaint reveals that no law supports plaintiff[s'] claim; (2) when the face of the complaint reveals that some fact essential to plaintiff[s'] claim is missing; or (3) when some fact disclosed in the complaint defeats plaintiff[s'] claim." Peterkin v. Columbus County Bd. Of Educ., 126 N.C. App. 826, 828, 486 S.E.2d 733, 735 (1997) (emphasis omitted). In ruling on a Rule 12(b)(6) motion to dismiss, the trial court regards all factual allegations of the complaint as true. Kane Plaza, 126 N.C. App. At 664, 486 S.E.2d at 467.

7.  Further, in Barclays Bank PLC v. Johnson, 499 S.E.2d 768 (N.C.App. 04/10/1998), the North Carolina court of appeals stated in pertinent part, again citing Kane Plaza as follows:

> "[t]o recover on a promissory note, the party seeking relief must show execution, delivery, consideration, demand, and nonpayment. Sam Stockton Grading Co. v. Hall, 111 N.C. App. 630, 632, 433 S.E.2d 7, 8 (1993). Moreover, the party seeking to enforce the promissory note "must be a real party in interest." Kane Plaza Associates v. Chadwick, 126 N.C. App. 661, 664, 486 S.E.2d 465, 467 (1997); N.C. Gen. Stat. § 1-57; N.C. R. Civ. P. 17(a)." See: Barclays Bank, supra. [boldface and underlined emphasis added to original text]

6 of 16

8.  And in, Musselwhite v. McNeill, 154 N.C.App. 742, 572 S.E.2d 874 (N.C.App. 12/17/2002, the North Carolina court of appeals held, uniformly with Kane Plaza and Walker, and Barclays Bank supra, that "…the party seeking to enforce the

promissory note "must be a real party in interest"." Citing from Kane Plaza, Supra.

9.   I/we, *Kurt Marin*   will further Note that like in the Florida MERS cases, each of the above cited cases from North Carolina Courts of Appeal have each apparently relied upon the underlying expressly stated section of the *Uniform Commercial Code* respecting negotiable instruments as codified in North Carolina at N.C. Gen. Stat. § 25-3-109 (1986). Since, it is the *"Uniformity"* of the fundamental law upon which the North Carolina Appellate Court have relied, I am comfortable in citing for its supporting and persuading rational the Pinellas County Florida Circuit Court case of: In re MERS (ie: IN RE MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), (See attached list of Defendants/Case#), which was rendered out of the Circuit Court of Judge Walt Logan on 18 August 2005. (See "Exhibit "B" already filed into this case and attached to Defendant's Motion To Dismiss, a time copy of the opinion rendered and entered by Judge Walt Logan in the Pinellas County Florida Circuit Court case styled In Re MERS) That consolidated case of some twenty (20) separate cases in which MERS was the moving party in a foreclosure action, the court, on its own motion, initiated a show cause hearing, again on its own motion, to dismiss and held extensive hearings accordingly which in the end found disposition of all twenty (20) cases by dismissal with prejudice for want of MERS standing to proceed in a collection action by foreclosure. See: In Re MERS, supra. As stated in the MERS case in the Pinellas County Florida Circuit Court of Judge Walt Logan:

> "[b]ased upon information gained at the return hearing, it appears that the real party in interest in many of these cases is not known at the time Complaint for Mortgage Foreclosure is filed. The concept is foreign to this court. Careful review of the argument presented by attorney Brochin does not convince the Court that MERS is a real party in interest in any sense."

10.   The court went on to conclude that

> "Based upon the above analysis, the Court finds it appropriate to dismiss with prejudice as to MERS the complaints as not having been filed by the proper party and therefore the Complaints do not state a cause of action and are dismissed. Morales and Dollar Systems, Inc. supra."

11.   I/we, *Kurt Marin*   are also comfortable in citing for its

supporting and persuading rational the Miami-Dade County, Florida Circuit Court Case of  MERS  ie. MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., vs ENZO CABRERA  ET AL.,  (see attached list of defendants case #s) also (see true and correct copy of transcript of that proceeding) which was rendered out of the Circuit Court of Miami-Dade County Florida by Judge Jon I. Gordon on the 28ᵗʰ day of September 2005 (See Exhibit "C" attached hereto and made a permanent part of the record in the present case. In these consolidated cases Judge Gordon's Order on page 9 under SHAM PLEADINGS states:

> "Now we address the more troubling question of whether MERS has committed fraud upon the Court by knowingly filing pleadings which contain allegations which are clearly false, as a mere pretense set up in bad faith and without color of fact. ' "A plea is considered 'sham' when it is palpably or inherently false, and from the plain or conceded facts in the case, must have been known to the party interposing it to be untrue.'" See Rhea v. Halkney, 157 So. 190, 193 (Fla.1934).

Further Judge Gordon went on to say in MERS vs. Cabrera Supra:

> "[T] he Court has the inherent authority to present evidence or to call witnesses in the interest of justice and in the

ransactions which does not readily integrate into existing Florida law and procedure; *it chose to fabricate the facts and to create a charade to give it appearance of proceeding lawfully*——in short, the ends justified the means." MERS v. Cabrera Supra.  Emphasis added

Further in Judge Gordon's order beginning on page page 16 and continues on page 17 in #4:

"[I]t is ORDER and ADJUDGED as follows: [T]hat the above consolidated actions are hereby dismissed *as a sham and/or a frivolous pleading* without prejudice..." MERS v. Cabrera Supra.  Emphasis added

## DECLARATION

As soon as possible an order shall be prepared and submitted to the court for ratification, unless prior to that time, *Wexford* , presents a competent fact witness to produce the Original Promissory Note to prove they are the real party in interest and rebut all other facts presented in this pleading making their statements Under penalty of perjury, supporting all the rebutted articles with evidence which would be admissible at trial and prove that their filings are not a "SHAM". Without the proper parties before the court, this honorable court lacks jurisdiction to Proceed and this case should be dismissed with prejudice if Plaintiff fails to appear and produce the Promissory Note in Question under plea of nul tiel record.

WHEREFORE PREMISES CONSIDERED, I, *Kurt Marin* requests that this court grant the following relief:

a) As soon as possible, a hearing should be ordered to examine the Promissory Note in question in this case unless prior to that time, dismiss this case with prejudice;

*Dear Perdigon one Datran Center PH1 Suite Dadeland Blvd. Miami, FL 33156*

579

b) That the court find counsel for Plaintiffs and Plaintiffs guilty of fraud upon the court, and at a minimum sanction them for having filed palpably or inherently false pleas into this case they must have known to be untrue,

c) That this court grant dismissal of this case with prejudice as to the Plaintiff re-filing in this case, and

d) That this court grant to *Kurt Marin* any and all other relief to which is just in law and/or in equity, and

e) demand Justice

Respectfully Prepared and Submitted

By: *K t~*
*Kurt Marin*
*3320 N.E., 165 St.*
*Miami, FL 33160*

By: _____

**Certificate of service**

I/we, *Kurt Marin* certify that on *July 23* 2009, I/we caused to be mailed a true and correct copy of the above and foregoing OPPOSITION TO PLAINTIFFS MORTGAGE FORECLOSURE COMPLAINT, AND PLEA OF NUL TIEL RECORD

by certified mail, return receipt requested to *Dearr Perdigon*
his personal capacity. *PH-1 Suite 1701*
*9100 S. Dade Blvd.*
*Miami, FL 33156*

*K t~*
*Kurt Marin*
*3320 N.E. 165th St.*
*Miami, FL. 33160*

*Exhibit A1*

*# pg1*

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL DIVISION

JPMorgan Chase Bank, National Association

        Plaintiff,

-vs.-

Kurt Marin; et al.

        Defendant(s).

Case #: 2007 CA 012402 02
DIVISION: 23

*2015 JUL -1 AM 10:15*

## ORDER RATIFYING CLERK'S SALE AND DIRECTING ISSUANCE OF CERTIFICATE OF TITLE AND DENYING DEFENDANT'S OBJECTION TO SALE

**THIS CAUSE** having come on to be heard upon Plaintiff's Motion to Ratify Clerk's Sale and Direct Issuance of Certificate of Title, and the Court being fully advised in the premises, it is;

**ORDERED AND ADJUDGED**:

1. Defendant's, Kurt Marin, Objection to Sale is **denied**.

2. That the foreclosure sale held February 13, 2014 is confirmed and ratified.

3. That the Clerk shall issue the Certificate of Title in JPMorgan Chase Bank, National Association forthwith.

**DONE AND ORDERED** in Open Court at MIAMI, Miami-Dade County, Florida this 1st day of _____July_____, 2015.

HONORABLE BARBARA ARECES

**Barbara Areces
Circuit Court Judge**

1

pg #2

Copies furnished to:

SHAPIRO, FISHMAN & GACHÉ, LLP, 2424 North Federal Highway, Suite 360, Boca Raton, FL 33431 Fax: (561) 998-6707

Kurt Marin, c/o Nashid Sabir, Esq, 18350 NW 2 Ave, Ste 500, Miami, FL 33169

George L. Garcia, Sr., 520 West Avenue (answer filed), Apartment #1601G, Miami Beach, FL 33139

Jeffrey Levitin, As Trustee, STANLEY DALE KLETT, JR; RUTHERFORD MULHALL, P.A., 3399 PGA BOULEVARD, SUITE 240, PALM BEACH GARDENS, FL 33410

Sima Hadad, 11900 Biscayne Blvd., Suite 809, North Miami Beach, FL 33181

Wexford High Yield Debt Fund I, LLC, 333 W Wacker Dr, Ste 1600, Chicago, IL 60606

Maurice Symonette, 3320 Northeast 165th Street, Miami, FL 33160

Carlos D. Lerman, Esquire, 2611 Hollywood Blvd., Hollywood, FL 33020

Kurt Marin, c/o Nashid Sabir, Esq. nashidlaw@bellsouth.net

Carlos D. Lerman, Esquire, carlos@lwlawfla.com

07-76750B FC01 W50

*Exhibit A*

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT OF FLORIDA

IN AND FOR DADE COUNTY

*07-12402-0401*

WASHINGTON MUTUAL BANK

      Plaintiff

Vs

Kurt Marin, Maurice Symonette

      Defendants

_____/

**OBJECTION TO SALE AND DEMAND FOR EVIDENTIARY HEARING**

**AND BY TRIAL AND INSPECTION**

Comes now Maurice Symonette and Kurt Marin by special appearance and states the following in Support of this opposition to sale and transfer of title.

1. The plaintiff is not the true holder or owner of the original blue ink promissory note or mortgage and therefore have no right to conduct the subject foreclosure.

2. The plaintiff has misrepresented the true essence and nature of this "loan transaction" the original Promissory Note is and was the only asset used to find a the alleged loan. The plaintiff failed to disclose This fact before during and after the subject "loan" closing, and continues to conseal this fact even to This day.

3. I the defendant states that the facts contained here are true, correct , complete, and not ment to Mislead, to the best of my knowledge I am settler, being also the grantor for the credit Associated with the above alleged "loan" made to the induced party.

–. On or about 07/14/2006, settler, posing as Grantor, being also in fact the first

[f]actual lender for value in the transitions to follow, was fraudulently induced

By failure or full disclosure by alleged lender to sign instruments extending a

Loan of credit.

5.  The misrepresentation involved does not mislead one as to the paper he signs

but rather misleads as to the true facts of a situation. and the false impression it

causes is a basis of a decision to sign or render a judgment. See 255N. Y.S. 2d

608,610. It renders an agreement voidable. See 174 N.E. 2d 304,308." (Barron's

legal Guides)

6.In light of these facts. I conclude that the Plaintiffs *and the defendants*

exchanged reciprocal credits involving money of account and not money of exchange: no

lawful money was or probably ever would be disbursed by either side in the covered

transactions.

7  It is a fact that undersigned knows of no promissory note signed by undersigned. and not

altered, still in the possession of the Plaintiff.

8.  it is a fact that undersigned knows of no company that was the source of the credit

Allegedly loaned to undersigned. '

9  It is a fact that undersigned knows of no way that presenter can collect from undersigned

when presenter cannot produce the aforementioned promissory Dote, source of funds

other than those of the defendant , and therefore has no authority to collect any

additional funds from undersigned.

10.One instrument of which was a promissory note/obligation promising to pay but

not to repay. the other instrument.

11. The Promissory Note and Credit Application may have named Secondary Lender therein as a beneficiary dejure, but failed to disclose and name equally of the Primary Lender (defendant name here) as a beneficiary de jure. with all relevant equal rights preserved thereby, even though Primary Lender was a beneficiary in fact, or a beneficiary ipso facto.

12. Through a course of discovery thereafter, Settlor determined that there had been a number of breaches of good faith by both Primary Borrower and Secondary Lender and a changing or reversing of the Cost and Risk of the original Promissory Note and Credit Application which required that the Promissory Note and Credit Application instruments be called forward for early settlement.

13. As a part of Settlor's discovery it was further determined that the Instruments stated that the Trustor also assigned interest to the goods, services, or funds to the original named fiduciary/trustee above, who either the same or else as a substitute fiduciary/trustee is acting as agent for the Settlor for the purpose of settling and/or discharging the loan.

14. Settlor, by its power to do so; and having authority over Fiduciary/Trustee as Primary Lender and as a co-beneficiary to the Secondary Loan, now moves to call forward to cure and to set aside such breaches, and to Set Off and to settle such obligations as remain on the part of Secondary Borrower and as Alleged Borrower for the purpose of discharging a bona fide debt, if any, and to release the further obligations of the original instruments. thereto.

15. WHEREFORE, Defendant demands a hearing to remedy said breaches caused by Primary Borrower and Secondary Lender. Settlor shall commence three days from the date this Demanded Court Hearing has been scheduled and Notice is received by Primary Borrower and Secondary Lender, proceed to file and record a new Promissory Note in accordance to the agreements, implied and in fact? contained therein and to provide such new Promissory Note to Primary Borrower and

Secondary Lender to be held and relied upon by the same to the same legal extent as the same held on to and relied upon the original Promissory Note containing

the multiple of breaches by Primary Borrower and Secondary Lender aforementioned. and to thereafter provide to Primary Borrower and Secondary Lender a satisfied Promissory Note upon which to rely in accordance to the said new Promissory Note also cured:

16. Order the Plaintiff to do or cause to be done all things necessary to cure such

breaches referred to above at which time Settlor shall have the right either.directly or by assignment of rights to seal" any dispute. offer or counter offer from any source or party that pertains to the process that Settlor has relied upon for said 'cure. by way of commercial judgment by notarial protest.

17 This is a residential foreclosure

18. Defendant Kurt Marin,was without an attorney when default was granted.

19. Defendant was not served notice and was without knowledge of that said request

and the order granting default

20. Defendant was acting temporary in pro-se on withdrawl of cousel

21. that there are issues of the law that have not been resolved.

22.That there is a bona fied cause of action ownership.

23.That the court issued a sale of the property without plaintiff's answering objections

that were presented by the Defendants and the qualified written request for disclosure

in accordance with the real estate Settlement Act.

24. under the Shid of the 14th Amendment to the states, it is well settled law that

A pro-se Defendants(s) motion should be treated liberally and not defeated buy

Captious objecionwhere issue of law may change the outcome.

25. The Plaintiffs pleads Defendant's NUL TIEL is irrelevant because a Defendant

Has failed to appear, however their plea does not reach far enough to grant default

For sale or to redquest to strike defendants demand under the law of proof of

Ownership,

26. that the granting of default enriched the plaintiff 2.5 million without a clear showing

And proof of ownership.

27. the court inadvertently gave plaintiffs the license to steal without plaintiff showing its

Hand, over the defendants objection to sell the property which motion that was never

Heard.

28. therefore, the court should stay the sale and vacate default, until such time as the facts

Can be presented, as it should be known by both plaintiff and Defendants. And for one

Of the parties t forever be silent.

wherefore , the Defendant Kurt Marin, reques this court to allow his demand upon

Plaintiff  to be heard , the court stay the sale, vacate the default and set a date to resolve

The clouded record as soon as can be heard.

For these and such other further relief as the court may deem just and fair and proper.

29. The Foregoing statements of truth are presumed to be correct, complete and not

misleading, and based on the law and my own first-hand knowledge ofthe facts in this

matter. and done under my own unlimited commercial liability. (As I  am not learned in

the law, corrections of any errors. and curative instruction is hereby requested.)

Notice to agent is notice' to principal. Notice to principal, is notice to agent.

## Certificate of service

I, Kurt Marin et al certify that on this 25th day of Feb. 2014, I caused to be mailed

A True and correct copy of the above and foregoing **objection to sale and**

**Transfer of title** by certified mail. return mail receipt requested to: WASHINGTON

MUTUAL BANK /2210 ENTERPRISE DRIVE FLORENCE. SC 29501 doc ops *MS*

FSCE 440

Kurt Marin          Maurice Symonette

3320 NE 165th st.     3320 NE 165th st

Miami Fl 33160      Miami Fl. 33160

*Exhibit "[B]"*

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT OF FLORIDA

IN AND FOR DADE COUNTY

CASE: 07-12402 CA01

**WASHINGTON MUTUAL BANK**

     **Plaintiff**

**Vs**

**Kurt Marin, Maurice Symonette**

     **Defendants**

_____/

*Emergency* OBJECTION TO SALE AND DEMAND FOR EVIDENTIARY HEARING

AND BY TRIAL AND INSPECTION

Comes now Maurice Symonette and Kurt Marin by special appearance and states the following in Support of this opposition to sale and transfer of title.

1. The plaintiff is not the true holder or owner of the original blue ink promissory note or mortgage and therefore have no right to conduct the subject foreclosure.

2. The plaintiff has misrepresented the true essence and nature of this "loan transaction" the original Promissory Note is and was the only asset used to find a the alleged loan. The plaintiff failed to disclose This fact before during and after the subject "loan" closing, and continues to conseal this fact even to This day.

3. I the defendant states that the facts contained here are true, correct, complete, and not ment to Mislead, to the best of my knowledge I am settler, being also the grantor for the credit Associated with the above alleged "loan" made to the induced party.

4. On or about 07/14/2006, settler, posing as Grantor, being also in fact the first

[f]actual lender for value in the transitions to follow, was fraudulently Induced

By failure or full disclosure by alleged lender to sign instruments extending a

Loan of credit.

5. The misrepresentation involved does not mislead one as to the paper he signs
but rather misleads as to the true facts of a situation, and the false impression it
causes is a basis of a decision to sign or render a judgment. See 255N. Y.S. 2d
608,610. It renders an agreement **voidable.** See 174 N.E. 2d 304,308." (Barron's
legal Guides)

6.In light of these facts. I conclude that the Plaintiffs *and the defendants*
exchanged reciprocal credits involving money of account and not money of exchange; no
lawful money was or probably ever would be disbursed by either side in the covered
transactions.

7  It is a fact that undersigned knows of no promissory note signed by undersigned, and not
altered, still in the possession of the Plaintiff.

8.  it is a fact that undersigned knows of no company that was the source of the credit

Allegedly loaned to undersigned.  ′

9  It is a fact that undersigned knows of no way that presenter can collect from undersigned
when presenter cannot produce the aforementioned promissory Dote, source of funds
other than those of the defendant , and therefore has no authority to collect any
additional funds from undersigned.

10.One instrument of which was a promissory note/obligation promising to pay but
not to repay, the other instrument.

11. The Promissory Note and Credit Application may have named Secondary Lender therein as a beneficiary dejure, but failed to disclose and name equally of the Primary Lender (defendant name here) as a beneficiary de jure. with all relevant equal rights preserved thereby, even though Primary Lender was a beneficiary in fact, or a beneficiary ipso facto.

12. Through a course of discovery thereafter, Settlor determined that there had been a number of breaches of good faith by both Primary Borrower and Secondary Lender and a changing or reversing of the Cost and Risk of the original Promissory Note and Credit Application which required that the Promissory Note and Credit Application instruments be called forward for early settlement.

13.As a part of Settlor's discovery it was further determined that the instruments stated that the Trustor also assigned interest to the goods, services, or funds to the original named fiduciary/trustee above, who either the same or else as a substitute fiduciary/trustee is acting as agent for the Settlor for the purpose of settling and/or discharging the loan.

14 Settlor, by its power to do so; and having authority over Fiduciary/Trustee as Primary Lender and as a co-beneficiary to the Secondary Loan, now moves to call forward to cure and to set aside such breaches, and to Set Off and to settle such obligations as remain  on the part of Secondary Borrower and as Alleged Borrower for the purpose of discharging all bona fide debt, if any, and to release the further obligations of the original instruments. thereto.

15. WHEREFORE, Defendant demands a hearing to remedy said breaches caused by Primary Borrower and Secondary Lender. Settlor shall commence three days from the date this Demanded Court Hearing has been scheduled and Notice is received by Primary Borrower and Secondary Lender, proceed to file and record a new Promissory Note in accordance to the agreements, implied and in fact? contained therein and to provide such new Promissory Note to Primary Borrower and

. Secondary Lender to be held and relied upon by the same to the same legal extent

as the same held on toand relied upon the original Promissory Note containing

the multiple of breaches by Primary Borrower and Secondary Lender

aforementioned. and to thereafter provide to Primary Borrower and Secondary

Lender a satisfied Promissory Note upon which to rely in accordance to the said

new Promissory Note also cured;

16. Order the Plaintiff to do or cause to be done all things necessary to cure such

breaches referred to above at which time Settlor shall have the right either.directly

or by assignment of rights to seal" any dispute, offer or counter offer from any

source or party that pertains ſo the process that Settlor has relied upon for said

'cure, by way of commercial judgment by notarial protest.

17. The foregoing statements of truth are presumed to be correct, complete and not

misleading, and based on the law and my own first-hand knowledge of the facts in this

matter, and done under my own unlimited commercial liability. (As I am not learned in

the law, corrections of any errors. and curative instruction is hereby requested.)

Notice to agent is notice' to principal. Notice to principal, is notice to agent.
~tl~~l~~

## Certificate of service

I, Kurt Marin et al certify that on this 18th  day of  Feb.  2014, I caused to be mailed

A True and correct copy of the above and foregoing **objection to sale and**

**Transfer of title** by certified mail, return receipt requested to; WASHINGTON

MUTUAL BANK /2210 ENTERPRISE DRIVE FLORENCE, SC 29501 doc ops M/S

FSCE 440

Kurt Marin        Maurice Symonette

3320 NE 165th st.    3320 NE 165th st

Miami Fl 33160    Miami Fl. 33160

*JPMorgan Never show up to this Hearing*  EXHIBIT 21

# IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT [21]
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA
### CIVIL DIVISION

JPMorgan Chase Bank, National Association

        Plaintiff,

-vs.-

Kurt Marin; et al.

        Defendant(s)

Case #: 2007 CA 012402 02
DIVISION: 30

## NOTICE OF HEARING

**PLEASE TAKE NOTICE THAT PLAINTIFF'S MOTION TO RESCHEDULE FORECLOSURE SALE** shall be called up for hearing before the Honorable Lester Langer, Judge of the above-styled Court in the MIAMI-DADE COUNTY COURTHOUSE, 73 WEST FLAGLER STREET, ROOM 511, MIAMI, FL 33130, at the hour of 10:30 am, on August 7, 2012 or soon thereafter as counsel may be heard.

**Florida Rules of Judicial Administration Rule 2.540 Notices to Persons With Disabilities**

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled at no cost to you, to the provision of certain assistance. Please contact Maria E. Mihalc, ADA Coordinator, Human Resource Division, Lawson E. Thomas Courthouse Center, 175 N.W. 1st Avenue, Suite 2702, Miami, FL 33128, (305) 349-7354 at least 7-days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; If you are hearing or voice impaired, call 711.

SPANISH: Si usted es una persona discapacitada que necesita alguna adaptación para poder participar de este procedimiento o evento, usted tiene derecho, sin costo alguno a que se le provea cierta ayuda. Favor de comunicarse con Maria E. Mihalc, Coordinadora de A.D.A., Human Resource Division, Lawson E. Thomas Courthouse Center, 175 N.W. 1st Avenue, Suite 2702, Miami, FL 33128, (305) 349-7354 por lo menos 7 días antes de que tenga que comparecer en corte o inmediatamente después de haber recibido esta notificación si es que falta menos de 7 días para su comparecencia. Si tiene una discapacidad auditiva ó de habla, llame al 711.

KREYOL: Si ou se yon moun ki hándikapé ki bezwen asistans ou aparèy pou ou ka patisipé nan pwosedu sa-a, ou gen dwa san ou pa bezwen péyé anyen pou ou jwen en seri de èd. Tanpri kontakté Maria E. Mihalc, Co-ordinator ADA, Human Resource Division, Lawson E. Thomas Courthouse Center, 175 N.W. 1st Avenue, Suite 2702, Miami, FL 33128, (305) 349-7354 O'mwen 7

*Exhibit 22*

## In The Circuit Court of The Eleventh Judicial Circuit in and for Miami-DadeCounty ,Florida Civil Division

### JP Morgan Chase Bank National Association  (case#2007ca01240202

Division30

Plaintiff,

VS

### Kurt Marin et al.

Defendant(s)

Motion For  Default

Now comes Kurt  Marin to file default , against  J.P.Morgan ChaseBank for failurclosee  to appear  at court heari ng  they asked for on 8/7/12.at MiamiDade county court house on 73 west flag street rm 511. See exhibit (1) and for failure to show both mortgage and promissory note to prove their ownership standing and right to foreclose. WAMU sold the note to investors a day after notes closed without my knowing which is illegal, therefore  WAMU is paid off so FDIC had no note from WAMU to give to JP Morgan therefore JP Morgan can't foreclose on notes they don't own. Your honor in US Federal District court case ELIZABETH H. COURSEN  VS  JP MORGAN ET. AL accused them of keeping her from discovering  that  she was a victim of fraud so case was not time barred. So Judge you must answer with findings and facts, make them prove they own notes, don't just be completely lawless. If your not going to default them like you would default us if we didn't show up for a hearing we called.

Certificate Of Service

I hereby certify that a true and correct copy of the foregoing has been finished by U.S.mail on this 8th day  ofAugust 2012 to address: Shapiro,Fishman & Gach'e LLP Attorneys for plaintiff 2424 N. Federa! HWY. suite 360 Boca Raton Fl.33431 Fl. Bar.# 70451 Ph: 561-9986701

KURT MARIN
3320 N.E.  165th Street

North  Miami  Beach  Fl 33160

Exhibit [25]

IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR MIAMI-DADE COUNTY

Washington Mutual Bank

        Plaintiff,

-vs-

Kurt Marin; George Garcia; Jeffrey Levitin,
As Trustee; Wexford High Yield Debt Fund I,
LLC; Sima Hadad; Unknown Parties in
Possession #1; Unknown Parties in
Possession #2; If living, and all Unknown
Parties claiming by, through, under and
against the above named Defendant(s) who
are not known to be dead or alive, whether
said Unknown Parties may claim an interest
as Spouse, Heirs, Devisees, Grantees, or
Other Claimants

        Defendant(s).

Case #:
Division #:

UNC:

## COMPLAINT

Plaintiff, Washington Mutual Bank sues Defendant(s), Kurt Marin; George Garcia;

Jeffrey Levitin, As Trustee; Wexford High Yield Debt Fund I, LLC; Sima Hadad; Unknown

Parties in Possession #1; Unknown Parties in Possession #2; If living, and all Unknown Parties

claiming by, through, under and against the above named Defendant(s) who are not known to be

dead or alive, whether said Unknown Parties may claim an interest as Spouse, Heirs, Devisees,

Grantees, or Other Claimants, and states:

### GENERAL ALLEGATIONS

1.      On July 14, 2006, there was executed and delivered a promissory note and a

mortgage securing payment of said note to the payee named thereon.  The mortgage was

recorded in Official Records Book 24735, Page 2788, of the Public Records of Miami-Dade

County, Florida, and mortgage the property described therein, then owned by and in possession of mortgagor, a copy of the mortgage is attached thereto as composite Exhibit "A".

2.      Plaintiff is the owner and holder of the subject note and mortgage.

3.      The mortgage of the Plaintiff is a purchase money mortgage being a lien superior in dignity to any prior or subsequent right, title, claim, lien or interest arising out of mortgagor or the mortgagor's predecessors in interest.

4.      There has been a default under the covenants, terms and agreements of the note and mortgage in that the payment due January 1, 2007, and all subsequent payments, have not been paid.

5.      Plaintiff declares the full amount payable under the note and mortgage to be due.

6.      A principal balance of $2,195,601.68 is due and owing to the Plaintiff, with interest from and after December 1, 2006, and title search expense for ascertaining necessary parties to this action.

7.      In order to protect its security, the Plaintiff may have advanced and paid Ad Valorem taxes, premium on insurance required by the mortgage and other necessary costs, or may be required to make such advances during the pendency of this action.  Any such sum so paid will be due and owing Plaintiff.

8.      All conditions precedent to the acceleration of this mortgage note and to foreclosure of the mortgage have been fulfilled or have occurred.

9.      The record legal title to said mortgage property is now vested in Defendant(s) Kurt Marin.

10.      For purposes of collection and foreclosure, the Plaintiff has retained the undersigned attorney and is obligated to pay said attorney a reasonable fee for services rendered.

## COUNT I

11.     This is an action to foreclose a mortgage on real property located in Miami-Dade County, Florida.

12.     Plaintiff realleges and reincorporates paragraphs 1 through 10 above as is fully set forth herein.

13.     That the Defendant, George Garcia, might have some claim or demand in the subject property by virtue of a Mortgage, in the amount of $155,000.00, dated July 14, 2006, filed in Official Records Book 24735, Page 2810, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

14.     That the Defendant, Jeffrey Levitin, As Trustee, might have some claim or demand in the subject property by virtue of a Lis Pendens, filed in Official Records Book 25143, Page 1399, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

15.     That the Defendant, Wexford High Yield Debt Fund I, LLC, might have some claim or demand in the subject property by virtue of a Lis Pendens, filed in Official Records Book 25466, Page 1800, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

16.   That the Defendant, Sima Hadad, might have some claim or demand in the subject property by virtue of a all interest, if any in the subject mortgage herein as to marital interest or homestead interest and as signatory therein, and by virtue of a Lis Pendens, filed in Official Records Book 25466, Page 1800, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

17.   That the Defendants, UNKNOWN PARTIES IN POSSESSION #1 AND UNKNOWN PARTIES IN POSSESSION #2, might have some claim or demand in the subject real property by virtue of possession, whether by tenancy from the record title holder or mere possession only.

WHEREFORE, Plaintiff respectfully request this Honorable Court enter a judgment of foreclosure, award attorney fees, costs, interests, advances and for such other and further relief that this court deems just and proper.

## COUNT II (REESTABLISHMENT OF LOST NOTE)

18.   This is an action to reestablish a Promissory Note under F.S. 673.3091.

19.   Plaintiff hereby realleges and reasserts all the allegations contained in Paragraphs 1 through 10 herein.

20.   On July 14, 2006, at Miami-Dade County, Florida, there was executed and delivered to Washington Mutual Bank, F.A. a Promissory Note and Mortgage in favor of Washington Mutual Bank, F.A., in the principal amount of $2,180,000.00.

21.   The original Note was lost, and said document is no longer within the custody or control of the Plaintiff.

22.      Plaintiff knows of no parties except the Plaintiff and Defendants who are interested in the reestablishment of said document.

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage; and demands an Order reestablishing said lost documents; and if the proceeds of the sale are insufficient to pay Plaintiff's claim, a deficiency judgment, unless any defendant personally liable shall have been discharged from liability under the subject note pursuant to the provisions of the Bankruptcy Code 11 U.S.C. Section 101, et. seq.

By: _____
COLLEEN M. COLTON
FL Bar # 0015167

SHAPIRO & FISHMAN, LLP
Attorneys for Plaintiff
2424 North Federal Highway
Suite 360
Boca Raton, Florida 33431
Telephone: (561) 998-6700
Fax: (561) 998-6707

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**
07-76750B